IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

ARMANDO LEZA,

        Petitioner,

v.

LORIE DAVIS, Director, Texas Department of Criminal Justice, Correctional Institutions Division,

        Respondent.

Case No. SA-17-CA-0101-FB

**PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254 BY A PERSON IN STATE CUSTODY**

(Death Penalty Habeas Corpus Case)

Armando Leza ("Leza"), through his attorneys, the Office of the Federal Public Defender, District of Nevada, files this Petition for Writ of Habeas Corpus on the grounds that he is unlawfully held in custody, in violation of the laws and Constitution of the United States of America, by the Texas Department of Criminal Justice, Lorie Davis, Director.

DATED this 9th day of January, 2018.

Respectfully submitted
RENE L. VALLADARES
Federal Public Defender

*/s/ Brad D. Levenson*

BRAD D. LEVENSON
Assistant Federal Public Defender
Texas Bar No. 24073411
Brad_Levenson@fd.org

*/s/ Erik Guenther*

ERIK GUENTHER
Assistant Federal Public Defender
Wisconsin Bar No. 1041774
Erik_Guenther@fd.org

411 E. Bonneville, Suite 250
Las Vegas, Nevada  89101
(702) 388-6577
(702) 388-5819 (fax)

# Table of Contents

INTRODUCTION ................................................................................................. 1

PROCEDURAL HISTORY ................................................................................... 3

    A.    Trial Court Proceedings ......................................................... 3

    B.    State Appellate Proceedings .................................................. 4

    C.    State Habeas Proceedings ...................................................... 4

    D.    Federal Court Proceedings ..................................................... 5

CLAIM ONE (LEZA IS INTELLECTUALLY DISABLED) ............................... 5

    A.    Executing The Intellectually Disabled Constitutes Cruel And Unusual Punishment ......................................................... 5

        1.    Leza suffers from significant limitations in intellectual functioning .......... 7

        2.    Leza suffers from significant limitations in adaptive functioning ........... 13

        3.    Leza's limitations began before the age of eighteen ................................ 17

        4.    Conclusion ...................................................... 18

    B.    Trial Counsel Were Ineffective For Failing To Investigate And Present Evidence At Trial Establishing Leza Is ID And Thus Constitutionally Exempt From The Death Penalty ...................... 18

    C.    Counsel Was Ineffective For Failing To Investigate Leza's Intellectual Functioning Because Evidence Of Low Intellectual Functioning—Even If Such Evidence Failed To Establish Death Ineligibiilty Under Atkins—Would Have Been Highly Relevant To The Jury's Determination Of Leza's Sentence ...................... 20

CLAIM TWO (MIRANDA WAIVER) ............................................................... 22

    A.    Relevant Facts ...................................................................... 23

    B.    Leza Did Not Validly Waive His Miranda Rights ............... 23

        1.    The Warning was invalid because it failed to advise Leza he had the right to remain silent or to request counsel ............................... 24

ii

2.      Leza did not understand the nature of his rights or the consequences of abandoning them.................................................. 25

3.      Leza's ID, FASD, heroin use, and sleep deprivation impacted his ability to waive his rights .......................................................... 27

4.      The totality of the circumstances prevented Leza from knowingly and voluntarily waiving his rights .................................................. 28

C.      Counsel Were Ineffective For Failing To Properly Address The Deficient Miranda Warning ............................................................... 30

CLAIM THREE (FALSE DNA/BLOOD EVIDENCE) ............................................. 31

A.      The State's Case Relied Heavily On Crime Scene Evidence Which, Either Did Not Exist, Or If It Did Exist, Was Never Directly Connected To Leza .............. 31

1.      The State introduced false evidence that the DNA material on Leza's left shoe was the victim's blood.............................................. 32

2.      Trial counsel were ineffective.................................................. 34

3.      While the State was aware the bottom of Leza's left shoe tested negative for the presumption of blood, it improperly inferred to the jury that bloody footprints found at the crime scene belonged to Leza.... 36

4.      Trevino's DNA profile could not be excluded on Leza's right shoe........ 37

B.      Other Errors Related To The Crime Scene Evidence Introduced At Trial .......... 38

1.      Robert Sailors testimony regarding CIL accreditation ............................ 38

2.      The State's false testimony regarding collection of the victim's DNA .... 39

C.      Trial and Post-Conviction Counsel Were Ineffective ........................................... 39

CLAIM FOUR (FAILURE TO OBJECT TO JUDGE'S COMMENT RE: DNA)..................... 41

CLAIM FIVE (IAC REGARDING TREVINO PLEA AGREEMENT) ...................................... 42

A.      Background ........................................................................................ 42

B.      Counsel Failed To Argue the Plea Was Admissible On State Law Grounds ....... 44

C.      Counsel Failed To Argue The Plea Was Admissible On Constitutional Grounds.......................................................................................... 46

D.      Leza Was Prejudiced By Trial Counsel's Deficient Performance ....................... 47

CLAIM SIX (BRADY EVIDENCE) .......................................................................... 48

CLAIM SEVEN (TREVINO'S CONFESSION TO AMANDA LEZA) .................................... 51

A.      RELEVANT FACTS .................................................................................. 52

B.      Trial Counsel Were Ineffective For Failing To Call Amanda Leza To Testify During The Guilt Phase of Leza's Trial ....................................................... 52

        1.      Amanda Leza's testimony was admissible ............................... 52

        2.      Amanda Leza's testimony would have created reasonable doubt ........... 53

C.      The Trial Court's Ruling Precluding Amanda Leza's Testimony At The Punishment Phase of Trial Was Erroneous ........................................... 54

D.      Trial Counsel Were Ineffective For Failing To Adequately Argue The Admissibility Of Amanda Leza's Testimony ....................................... 54

CLAIM EIGHT (INCONSISTENT THEORIES) ......................................................... 55

A.      Trevino Pleaded Guilty To Killing Allen By Cutting And Stabbing Her With A Knife ................................................................................... 55

B.      The State's Use Of Inconsistent Theories To Convict Leza Violated His Due Process Rights ....................................................................... 56

C.      Trial Counsel And Post-Conviction Counsel Were Ineffective ........................... 59

CLAIM NINE (CONSPIRACY THEORY) ............................................................... 59

A.      There Was Insufficient Evidence To Support A Conspiracy Charge .................. 60

B.      The Trial Court Erred By Giving A Jury Instruction That Misstated The Law ... 61

C.      The State Improperly Argued The Jury Could Convict Leza On The Basis Of A Conspiracy When There Was No Evidence To Support The Conspiracy Charge ................................................................................... 62

D.      Trial Counsel And Post-Conviction Counsel Were Ineffective ........................... 63

CLAIM TEN (MULTIPLE THEORIES/UNANIMITY INSTRUCTION) ................................. 63

A. Due Process Requires Proof Beyond A Reasonable Doubt And Unanimous Agreement of Every Element Of A Criminal Offense, And The Trial Court's Instructions Permitted The Jury To Convict Leza In The Absence of Unanimous Agreement As To His Role In The Offense ..................................... 64

    1. The trial court erred when it gave jury instructions that permitted the jury to find Leza guilty under two materially different and morally inequivalent acts.................................................................................. 65

    2. Leza was deprived of his due process right to a unanimous verdict......... 67

B. The Eighth Amendment Prohibits Capital Punishment Absent A Jury Finding The Individual Actually Killed, Attempted to Kill, Or Intended to Kill, Or Was A Major Participant In The Crime Who Displayed A Reckless Indifference To Human Life, And The Trial Court's Instructions Permitted The Jury To Convict Leza Without Making This Determination ............................................ 68

C. Trial Counsel Were Ineffective............................................................ 70

CLAIM ELEVEN (ACTUAL INNOCENCE) ............................................ 71

CLAIM TWELVE (IAC REGARDING VOIR DIRE) ................................. 73

A. The Sixth Amendment Requires An Adequate Voir Dire And An Impartial Jury......................................................................................... 74

B. Trial Counsel Failed To Question The Venire Regarding Racial Bias................ 75

C. Trial Counsel Failed To Adequately Question The Seated Jurors And Challenge Them For Cause ................................................................... 75

    1. K. Moreno – potential juror no. 7, first juror ........................................... 76

    2. J. Esparza – potential juror no. 10, second juror...................................... 77

    3. G. Estrada – potential juror no. 3, third juror.......................................... 78

    4. C. Waters – potential juror no. 16, fourth juror ....................................... 79

    5. R. Mason – potential juror no. 18, fifth juror.......................................... 80

    6. G. McAnear – potential juror no. 19, sixth juror ..................................... 80

    7. L. English – potential juror no. 30, seventh juror .................................... 81

    8. S. Lopez – potential juror no. 46, eighth juror......................................... 81

9.    F. Vargas – potential juror no. 50, ninth juror ........................................... 82

10.   S. Oakes – potential juror no. 56, tenth juror .......................................... 84

11.   S. Goodwin – potential juror no. 61, eleventh juror ................................ 84

12.   K. Harris – potential juror no. 64, twelfth juror........................................ 85

D.   Trial Counsel Were Ineffective For Failing To Adequately Challenge Biased Prospective Jurors For Cause And Instead Using Peremptory Strikes ................. 86

1.    J. Seward – potential juror no. 2 ................................................................ 86

2.    C. Moore – potential juror no. 6 ................................................................ 87

3.    C. Brackett – potential juror no. 9............................................................. 87

4.    V. Duerr – potential juror no. 14............................................................... 88

5.    P. Tate – potential juror no. 15 ................................................................. 88

6.    S. Campos – potential juror no. 20 ........................................................... 89

7.    S. Valadez – potential juror no. 27 ........................................................... 90

8.    L. Penalver – potential juror no. 33 .......................................................... 90

9.    J. Simpson – potential juror no. 23 ........................................................... 90

10.   B. McCarthy – potential juror no. 51 ........................................................ 91

11.   L. McNamee – potential juror no. 60........................................................ 91

E.   Cumulative Error ................................................................................................. 92

CLAIM THIRTEEN (IAC FASD/NEUROLOGICAL IMPAIRMENT).................................. 92

A.   Trial Counsel Were Ineffective For Failing To Investigate FASD....................... 92

1.    FASD/ARND........................................................................................... 93

2.    What trial counsel knew at the time of trial.............................................. 93

3.    IAC guilt phase ........................................................................................ 96

4.      IAC punishment phase .............................................................................. 97

CLAIM FOURTEEN (IAC SOCIAL HISTORY) ...................................................... 99

A.      What Trial Counsel Presented At The Punishment Phase ..................................... 99

B.      A Brief Summary Of What Counsel Failed To Investigate And Present ........... 100

CLAIM FIFTEEN (IAC ADDICTION) ...................................................................... 103

A.      What Trial Counsel Knew At The Time Of Trial ................................................. 104

B.      Counsel's Deficient Performance Prejudiced Leza's Punishment Case ............. 105

CLAIM SIXTEEN (IAC WITNESS PREPARATON AND PRESENTATION) ..................... 107

A.      Trial Counsel Failed To Prepare Armando Leza Sr., Juliza Leza, And Amanda
        Leza To Testify At The Punishment Phase ......................................................... 108

B.      Trial Counsel Failed To Counter the State's Evidence Regarding Leza's
        Involvement In A Prior Drive-By Shooting ........................................................ 111

C.      Trial Counsel Failed To Combat Evidence Of Leza's Attempted Escape .......... 112

CLAIM SEVENTEEN (FAILURE TO DEFINE SENTENCING TERMS) ............................ 113

A.      The Eighth Amendment Prohibits The Arbitrary And Capricious Infliction of
        The Death Penalty Arising From Vague Sentencing Scheme ............................ 114

B.      Texas's Capital Sentencing Scheme Is Unconstitutionally Vague ..................... 114

        1.      Probability ................................................................................................. 115

        2.      Criminal acts of violence .......................................................................... 117

        3.      Continuing threat to society ...................................................................... 119

        4.      Militates .................................................................................................... 120

C.      Trial Counsel's Performance Was Deficient ...................................................... 122

CLAIM EIGHTEEN (DEFICIENT GRAND JURY INDICTMENT) ....................................... 122

A.      Texas Indictments ............................................................................................... 123

B.      Analysis............................................................................................................... 124

CLAIM NINETEEN (STATUTORY 10-12 RULE) .................................................. 125

CLAIM TWENTY (OTHER IAC CLAIMS) ........................................................... 128

    A.    No Opening Statement ...................................................................... 128

    B.    Detective McCampbell's Statement About Leza's Arrest .................................. 129

    C.    Convenience Store Show-Up ............................................................ 130

    D.    Gruesome Photographs .................................................................. 131

CLAIM TWENTY-ONE (TRIAL COURT ERROR – JURY INSTRUCTIONS) .................... 132

    A.    Victim Impact Evidence ................................................................. 132

    B.    Trial Court Error Regarding Victim Impact Instructions As It Related To Future Dangerousness ................................................................... 133

    C.    Counsel's Failure To Object To Improper Victim Impact Evidence .................. 134

CLAIM TWENTY-TWO (ELECTED JUDGES) ....................................................... 135

CLAIM TWENTY-THREE (CONFLICT OF INTEREST) ........................................... 136

CLAIM TWENTY-FOUR (CUMULATIVE ERROR) ................................................ 137

PRAYER FOR RELIEF ................................................................................... 139

CERTIFICATE OF SERVICE .......................................................................... 140

# TABLE OF AUTHORITIES

## FEDERAL CASES

Alcorta v. Texas, 355 U.S. 28 (1957) ................................................. 33

Alleyne v. United States, 133 S. Ct. 2151 (2013) ................................ 124

Andres v. United States, 333 U.S. 740 (1948) ..................................... 127

Apprendi v. New Jersey, 530 U.S. 466 (2000) ............................... 68, 124

Atkins v. Virginia, 536 U.S. 304 (2002) ....................................... passim

Barclay v. Florida, 463 U.S. 939 (1983) ............................................ 121

Beets v. Scott, 65 F.3d 1258 (5th Cir. 1995) ...................................... 137

Berger v. United States, 295 U.S. 78 (1935) ................................... 34, 36

Berghuis v. Thompkins, 560 U.S. 370 (2010) ...................................... 24

Bradshaw v. Stumpf, 545 U.S. 175 (2005) ..................................... 56, 58

Brady v. Maryland, 373 U.S. 83 (1963) ............................................... 48

Brooks v. Dretke, 418 F.3d 430 (5th Cir. 2005) ................................... 75

Brumfield v. Cain, 135 S. Ct. 2269 (2015) ............................................ 6

Burley v. Cabana, 818 F.2d 414 (5th Cir. 1987) ................................. 127

California v. Brown, 479 U.S. 538 (1987) ........................................... 126

Chambers v. Mississippi, 410 U.S. 284 (1973) ............................... 47, 48

Clark v. Mitchell, 425 F.3d 270 (6th Cir. 2005) .................................. 92

Colorado v. Connelly, 479 U.S. 157 (1986) .......................................... 28

Crane v. Kentucky, 476 U.S. 683 (1986) .............................................. 30

Crist v. Bretz, 437 U.S. 28 (1978) ..................................................... 128

Daniel v. Comm, Alabama Dept. of Corrections,
    822 F.3d 1248 (11th Cir. 2016) ............................................... 20, 21

Darden v. Wainwright, 477 U.S. 168 (1986) ................................................................. 62

Davis v. Alaska, 415 U.S. 308 (1974) ......................................................................... 55

Dawson v. Delaware, 503 U.S. 159 (1992) ................................................................. 122

Derden v. McNeel, 978 F.2d 1453 (5th Cir. 1992) ..................................................... 138

Donnelly v. DeChristoforo, 416 U.S. 637 (1974) ....................................................... 62

Drake v. Kemp, 762 F.2d 1449 (11th Cir.1985) ......................................................... 57

Eddings v. Oklahoma, 455 U.S. 104 (1982) ............................................................... 47

Enmund v. Florida, 458 U.S. 782 (1982) ............................................................. 63, 68

Faulder v. Johnson, 81 F.3d 515 (5th Cir. 1996) ....................................................... 33

Florida v. Powell, 559 U.S. 50 (2010) ....................................................................... 24

Francis v. Franklin, 471 U.S. 316 (1985) ................................................................. 127

Furman v. Georgia, 408 U.S. 238 (1972) ............................................... 114, 126, 127, 134

Godfrey v. Georgia, 446 U.S. 420 (1980) ................................................................. 114

Green v. Georgia, 442 U.S. 95 (1979) .................................................................. 47, 55

Griffin v. United States, 502 U.S. 46 (1991) .............................................................. 61

Hall v. Florida, 134 S. Ct. 1986 (2014) ................................................................ passim

Harris v. United States, 536 U.S. 545 (2002) ........................................................... 124

Herrera v. Collins, 506 U.S. 390 (1993) ................................................................... 72

Hinton v. Alabama, 134 S. Ct. 1081 (2014) ......................................................... 97, 99

Holmes v. South Carolina, 547 U.S. 319 (2006) .................................................. 47, 55

Irvin v. Dowd, 366 U.S. 717 (1961) .......................................................................... 74

Johnson v. Dretke, 442 F.3d 901 (5th Cir. 2006) ................................................. 56, 57

Johnson v. United States, 135 S. Ct. 2551 (2015) ................................................... 119

Jurek v. Texas, 428 U.S. 262 (1976) ................................................................. 134

Kemp v. Kelly, 2015 WL 5842538 (E.D. Ark. 2015) ............................................ 94

Kenley v. Armontrout, 937 F.2d 1298 (8th Cir. 1991) ......................................... 93

Kimmelman v. Morrison, 477 U.S. 365 (1986) ................................................... 138

Kyles v. Whitley, 514 U.S. 419 (1995) ................................................................ 49

Lassiter v. Department of Soc. Servs., 452 U.S. 18 (1981) ................................... 56

Lawrence v. Texas, 539 U.S. 558 (2003) .......................................................... 122

Lee v. Kemna, 534 U.S. 362 (2002) .......................................................... 128, 129

Lockett v. Ohio, 438 U.S. 586 (1978) ................................................................. 47

Lowenfield v. Phelps, 484 U.S. 231 (1988) ....................................................... 119

Martinez v. Ryan, 566 U.S. 1 (2012) .............................................................. 5, 40

McCoy v. Louisiana, 138 S. Ct. 53 (2017) ......................................... 36, 37, 38, 40

Miller v. Dretke, 404 F.3d 908 (5th Cir. 2005) .................................................. 133

Miller v. Pate, 386 U.S. 1 (1967) ...................................................................... 33

Miller-El v. Dretke, 545 U.S. 231 (2005) .......................................................... 121

Mills v. Maryland, 486 U.S. 367 (1988) ........................................................... 127

Miranda v. Arizona, 384 U.S. 436 (1966) ..................................................... 23, 24

Mooney v. Holohan, 294 U.S. 103 (1935) ..................................................... 33, 34

Moore v. Quarterman, 526 F. Supp. 2d 654 (W.D. Tex. 2007) ............................ 138

Moore v. Texas, 137 S. Ct. 1039 (2017) ..................................................... passim

Moran v. Burbine, 475 U.S. 412 (1986) ........................................................ 23, 24

Morgan v. Illinois, 504 U.S. 719 (1992) ............................................................ 74

Murphy v. Florida, 421 U.S. 794 (1975) ............................................................ 75

Mu'Min v. Virginia, 500 U.S. 415 (1991) .................................................................... 74

Napue v. Illinois, 360 U.S. 264 (1959) .............................................................. 33, 34

Parker v. Dugger, 498 U.S. 308 (1991) ...................................................................... 47

Parker v. Gladden, 385 U.S. 363 (1966) .................................................................... 74

Payne v. Tennessee, 501 U.S. 808 (1991) ............................................... 132, 133, 134

Perry v. New Hampshire, 565 U.S. 228 (2012) ........................................................ 131

Ring v. Arizona, 536 U.S. 584 (2002) ................................................................ 68, 124

Rock v. Arkansas, 483 U.S. 44 (1987) ....................................................................... 55

Rompilla v. Beard, 545 U.S. 374 (2005) ............................................................ 93, 108

Rosales-Lopez v. United States, 451 U.S. 182 (1981) ............................................... 74

Sawyer v. Whitley, 505 U.S. 333 (1992) .................................................................. 119

Schad v. Arizona, 501 U.S. 624 (1991) .............................................................. passim

Schlup v. Delo, 513 U.S. 298 (1995) ......................................................................... 73

Simmons v. South Carolina, 512 U.S. 154 (1994) ................................................... 126

Simmons v. United States, 390 U.S. 377 (1968) ...................................................... 130

Smith v. Groose, 205 F.3d 1045 (8th Cir. 2000) ........................................................ 56

Smith v. Stewart, 140 F.3d 1263 (9th Cir. 1998) ................................................ passim

Smith v. Texas, 543 U.S. 37 (2004) ........................................................................... 47

Solis v. Cockrell, 342 F.3d 392 (5th Cir. 2003) ........................................................ 74

Soria v. Johnson, 207 F.3d 232 (5th Cir. 2000) ........................................................ 74

Stovall v. Denno, 388 U.S. 293 (1967) .................................................................... 130

Strickland v. Washington, 466 U.S. 668 (1984) .......................................................... 5

Strickler v. Greene, 527 U.S. 263 (1999) .................................................................. 50

Stringer v. Black, 503 U.S. 222 (1992) ............................................................... 114

Stromberg v. California, 283 U.S. 359 (1931) ........................................................ 67

Tennard v. Dretke, 542 U.S. 274 (2004) ............................................................. 108

Thompson v. Calderon, 120 F.3d 1045 (9th Cir. 1997) ....................................... 56, 58

Tison v. Arizona, 481 U.S. 137 (1987) ............................................................ passim

Trevino v. Davies, 829 F.3d 328 (5th Cir. 2016) ................................................ 93, 94

Trevino v. Thaler, 569 U.S. 413 (2013) .................................................................. 5

Tuilaepa v. California, 512 U.S. 967 (1994) ........................................................ 115

Tumey v. Ohio, 273 U.S. 510 (1927) .................................................................... 41

Turner v. Murray, 476 U.S. 28 (1986) .................................................................. 75

United States v. Bagley, 473 U.S. 667 (1985) ....................................................... 50

United States v. Cotton, 535 U.S. 625 (2002) ..................................................... 124

United States v. Dinitz, 424 U.S. 600 (1976) ..................................................... 129

United States v. Herrera, 600 F.2d 502 (5th Cir.1979) ............................................ 53

United States v. Landeros-Gonzales, 262 F.3d 424 (5th Cir. 2001) ......................... 118

United States v. Reyes-Maya, 305 F.3d 362 (5th Cir. 2002) ................................... 118

United States v. Thomas, 627 F.3d 146 (5th Cir. 2010) ........................................... 74

United States v. Wright, 783 F.2d 1091 (D.C. Cir. 1986) ........................................ 53

Virgil v. Dretke, 446 F.3d 598 (5th Cir. 2006) ...................................................... 74

Webb v. Collins, 2 F.3d 93 (5th Cir. 1993) .......................................................... 127

Wiggins v. Smith, 539 U.S. 510 (2003) ........................................................... passim

In re Winship, 397 U.S. 358 (1970) ............................................................ 61, 64, 67

# FEDERAL STATUTES

18 U.S.C. § 16 ................................................................................................ 119

28 U.S.C. § 2241 ............................................................................................... 2

# STATE CASES

Boyd v. State, 899 S.W.2d 371 (Tex. Crim. App.1995) .......................................... 118

In re Burgess, 811 So.2d 617 (Ala. 2000) ........................................................... 47

Canfield v. State, 429 S.W.3d 54 (Tex. App. Houston-1st Dist. 2014) ...................... 66

Cosio v. State, 353 S.W.3d 766 (Tex. Crim. App. 2011) ........................................ 64

Estrada v. State, 313 S.W.3d 274 (Tex. Crim. App. 2010) .................................... 119

Fritz v. State, 946 S.W.2d 844 (Tex. Crim. App. 1997) ....................................... 121

Garden v. State, 844 A.2d 311 (Del. 2004) .......................................................... 47

Gardner v. State, 699 S.W.2d 831 (Tex. Crim. App. 1985) ................................... 118

Gunville v. Gonzales, 508 S.W.3d 547 (Tex. Crim. App. 2016) ............................. 123

Hayden v. State, 155 S.W.3d 640 (Tex. App. 2005) ............................................ 129

Holmes v. State, 671 N.E.2d 841 (Ind. 1996) ...................................................... 47

Howell v. State, 860 So.2d 704 (Miss. 2003) ....................................................... 47

Hughes v. State, 878 S.W.2d 142 (Tex. Crim. App. 1992) .................................... 116

Interest of B.B. and P.B., 971 S.W.2d 160 (Tex. Ct. App. 1998) ....................... 94, 96

Johnson v. State, 495 A.2d 1 (Md. 1985) ............................................................ 47

Keen v. State, 775 So.2d 263 (Fla. 2000) ............................................................ 47

Kemp v. State, 846 S.W.2d 289 (Tex. Crim. App. 1992) ...................................... 115

Ex parte Kerr, 2009 Lexis 245 (Tex. Crim. App. 2009).......................................... 94

Leza v. State, 351 S.W.3d 344 (Tex. Crim. App. 2011) ..................................... 4, 30

Lucia v. State, No. 10-04-00229-CR,
    2005 WL 2044863 (Tex. App. Aug. 24, 2005) ........................................................ 25, 26, 27

Marx v. State, 150 S.W.2d 1014 (Tex. Crim. App. 1941) ........................................ 121

Middleton v. State, 125 S.W.3d 450 (Tex. Crim. App. 2003) ................................. 121

Proenza v. State, __ S.W.3d __, 2017 WL 5483135
    (Tex. Crim. App. Nov. 15, 2017) ........................................................................ 41

Robison v. State, 888 S.W.2d 473 (Tex. Crim. App. 1994) ............................... 115, 116

In re Sakarias, 106 P.3d 931 (Cal. 2005) ............................................................. 57

State v. Agee, 364 P.3d 971 (Ore. 2015) ................................................................ 47

State v. Getsy, 702 N.E.2d 866 (Ohio 1998) .......................................................... 47

State v. Lynch, 357 P.3d 119 (Ariz. 2015) ............................................................. 47

State v. Panetti, 891 S.W.2d 281 (Tex. App. 1994) ............................................... 25

State v. Smith, 931 P.2d 1272 (Mont. 1996) .......................................................... 47

Woldt v. People, 64 P.3d 254 (Colo. 2003) ............................................................ 47

## STATE STATUTES

N.H. Rev. Stat. § 630:5 ........................................................................................... 47

Tex. Crim. Proc. Code Ann. § 21.01 ....................................................................... 123

Tex. Crim. Proc. Code Ann. § 21.03 ................................................................... 123, 124

Tex. Crim. Proc. Code Ann. § 28.10 ....................................................................... 123

Tex. Crim. Proc. Code Ann. § 35.16 ..................................................................... passim

Tex. Crim. Proc. Code Ann. § 38.05 ....................................................................... 41

Tex. Penal Code § 7.02 ....................................................................................... 65, 66

Tex. Penal Code § 19.02 ..................................................................................... 64, 65

Tex. Penal Code § 37.07 ......................................................................................... 70

Tex. Penal Code Ann. § 15.02 ........................................................................... 61, 67

Tex. Penal Code Ann. § 28.03 ........................................................................ 117, 118

## RULES

Tex. R. Crim. Evid. 401 ........................................................................................ 45

Tex. R. Evid. 401 ............................................................................................... 130

Tex. R. Evid. 402 ............................................................................................... 130

Tex. R. Evid. 613 .................................................................................................. 46

Tex. R. Evid. 801 ............................................................................................. 46, 53

Tex. R. Evid. 803 ........................................................................................ 46, 52, 53

**INTRODUCTION**

Armando Leza is Intellectually Disabled ("ID"), a condition that he has had since birth. His mother drank while pregnant, causing Leza to suffer from neurological deficits associated with Fetal Alcohol Spectrum Disorder ("FASD"). As a result, Leza has exhibited severe language deficits, learning disabilities, and impulsivity from infancy. Growing up, Leza was not toilet trained or able to dress himself until the age of seven. By the age of sixteen, Leza was diagnosed with several mental health problems and was never able to live independently or sustain long-term employment. Trial counsel failed to investigate and develop evidence of Leza's impairments, and as a result, the jury convicted and sentenced Leza to death for the murder of Caryl Jean Allen without hearing any evidence of his neurological deficits. Because Leza is ID, his death sentence is unconstitutional under Atkins v. Virginia, 536 U.S. 304 (2002) and therefore, must be overturned.

In addition to Leza's unconstitutional death sentence, his trial was riddled with faulty evidence. To connect Leza to the crime, the State focused on two sets of bloody footprints found in the victim's apartment and presented testimony that a drop of the victim's blood was found on the top of Leza's left shoe. This testimony was blatantly misleading for two reasons. First, a test of Leza's left shoe, at most, confirmed the presence of Allen's DNA—there was never a conclusive finding the DNA was blood. As Leza had been a guest in Allen's apartment on previous occasions, the presence of her DNA, which could include skin cells and salvia, was unremarkable. And second, testing showed no evidence of blood on the bottom of Leza's shoes. Thus the bloody footprints could not be tied to Leza.

The State also focused the jury's attention on a videotaped interview Leza had with the police. While the jury watched Leza confess, the jury never heard that Leza's neurological impairments made him uniquely susceptible to the officer's pressuring questions, and further, that

1

Leza's statements were made while he was severely sleep-deprived and under the influence of drugs (heroin and possibly cocaine). More importantly, the jury should never have heard Leza's interview with the police because the statements were obtained following an unconstitutional waiver caused by a <u>Miranda</u> warning that Leza's was unable to understand due to his intellectual disabilities.

The most misleading omission, however, was the trial court's failure to admit into evidence co-defendant Delores Trevino's guilty plea admitting to "intentionally caus[ing] the death of" Allen "by cutting and stabbing" her with a knife. Further, the State failed to disclose that Trevino admitted to asking "God to forgive me" following the killing. And while the jury did not know about Trevino's admissions, the State nonetheless improperly argued to the jury there was sufficient evidence to establish Leza was the <u>sole</u> actor responsible for stabbing and killing Allen.

Finally, because of the State's omission of critical evidence and Leza's own trial counsel's ineffectiveness, the jury unfortunately did not hear a wealth of mitigation evidence including: Leza's ID and related FASD, Leza's abhorrent and transient living conditions throughout his life, his mother's physical abuse, Leza's pre-disposition to addiction, his lack of role models, and his inability to perform simple tasks and susceptibility to negative influences due to his brain impairments. As a result of these monumental errors, and others described below, Leza should be granted a new guilt trial. And because Leza is ID, the State should be constitutionally prohibited from seeking a sentence of death.

**JURISDICTION**

This Court has jurisdiction pursuant to 28 U.S.C. § 2241(d) because Leza was convicted in the 187th District Court in Bexar County, Texas. Subject matter jurisdiction is conferred by 28 U.S.C. § 2254.

## PROCEDURAL HISTORY

Armando Leza is confined under a sentence of death pursuant to the judgment of the 187th District Court, Bexar County, Texas, case number 2007-CR-4563A, which was rendered and entered on May 11, 2009. CR at 836-37.

### A.    Trial Court Proceedings

On April 11, 2007, the presiding judge of the 187th District Court, the Honorable Raymond Angelini, appointed Samuel Bayless as lead counsel to represent Leza. On the same date, the court appointed Barbara Hughes as second-chair counsel. CR 14-15.[1]  Bayless moved to withdraw from the case on October 17, 2008 for health reasons, and he was replaced by Terrance McDonald on October 22, 2008. CR 463-64, 466.[2]

On May 23, 2007, Leza was indicted for the capital murder of Caryl Jean Allen. The indictment alleged that Leza intentionally caused the death of Allen in the course of committing or attempting to commit robbery. CR 16.

Voir dire began on April 17, 2009 (2 RR) and concluded on May 6, 2009 (11 RR 10). The guilt-phase trial commenced on May 11, 2009 (12 RR 8), and concluded on May 18, 2009 (16 RR 44). The jurors returned a guilty verdict the same day. 16 RR 82-83.

The entire punishment-phase case was presented on May 18 and May 19, 2009. 17 RR; 18 RR. The jurors received instruction and argument on May 20, 2009 (19 RR 6-13) and began deliberation the same morning (19 RR 37). The jurors reached a verdict on the morning of May 21, 2009, and sentenced Leza to death. 20 RR 3-5.

On May 27, 2009, Leza filed a Motion for New Trial. The motion was denied by the court on May 29, 2009. CR 854-56.

---

[1] Barbara Hughes died unexpectedly on October 8, 2012. Ex. 120 at 1-8; Writ RR 182.
[2] Samuel Bayless died on January 11, 2010, from complications of diabetes.

## B.      State Appellate Proceedings

On May 27, 2009, Angela Moore was appointed to represent Leza in his direct appeal. CR 842. On June 16, 2010, Leza's opening brief was filed.[3] Ex. 3. The State filed its answering brief on December 17, 2010. Moore filed a reply on March 3, 2011. Ex. 6. The Court of Criminal Appeals ("CCA") affirmed Leza's judgement on October 12, 2011. Leza v. State, 351 S.W.3d 344 (Tex. Crim. App. 2011).

## C.      State Habeas Proceedings

On June 25, 2009, the district court appointed Jay Brandon to represent Leza in the initial state post-conviction habeas proceedings. Ex. 2. On January 4, 2011, Brandon filed a Motion to Appoint Co-Counsel on Leza's case as Brandon was leaving private practice to join the Bexar County District Attorney Office. Ex. 4. The state court granted Brandon's motion the same day, and appointed Michael Gross as co-counsel to represent Leza. Ex. 5. The court clarified that Gross would serve as sole counsel "[a]fter the withdrawal of Jay Brandon. . . ." Id.

On April 29, 2011, Leza filed a timely application for post-conviction writ of habeas corpus. Both Gross and Brandon signed the pleading. Ex. 8. The application raised eight grounds for relief.[4]

The State sought to recuse itself from Leza's post-conviction case due, in part, to Brandon's employment at the District Attorney's Office. Ex. 10. On March 6, 2015, the state court appointed John Economidy as Attorney Pro Tem to represent the State. Ex. 11. An evidentiary hearing was held on October 12, 2015. The district court entered Findings of Fact, Conclusions of Law ("FFCL") on March 1, 2016 recommending habeas relief be denied. Ex. 13.

---

[3] A list of the issues raised in the direct appeal can be found in the attached Appendix.

[4] A list of the issues raised in the initial state application can be found in the attached Appendix.

On January 11, 2017, the CCA entered an order adopting the district court's proposed FFCL, and denied post-conviction relief. Ex. 15.

## D.    Federal Court Proceedings

On February 16, 2017, this Court appointed the Office of the Federal Public Defender to represent Leza in his federal habeas litigation. ECF No. 2. This timely Petition follows.

## CLAIM ONE (LEZA IS INTELLECTUALLY DISABLED)

Leza's conviction and sentence of death violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because his diagnosed intellectual disability renders him functionally and developmentally below the requisite level that is subject to execution.

**Exhaustion**: This claim has not been presented to the state courts because of the ineffectiveness of trial and initial post-conviction counsel. Strickland v. Washington, 466 U.S. 668 (1984); Martinez v. Ryan, 566 U.S. 1 (2012); Trevino v. Thaler, 569 U.S. 413 (2013).

## A.    Executing The Intellectually Disabled Constitutes Cruel And Unusual Punishment

The Eighth Amendment prohibits the execution of intellectually disabled ("ID") individuals. Atkins v. Virginia, 536 U.S. 304, 318, 321 (2002).[5]   Intellectual disability is characterized by: (1) "significantly subaverage" or "significant limitations" in intellectual functioning; (2) accompanied by "significant limitations" in adaptive behavior; and (3) the onset of which occurs prior to the age of eighteen. See American Association of Intellectual and Developmental Disabilities ("AIDD")[6]; INTELLECTUAL DISABILITY: DEFINITION, CLASSIFICATION

---

[5] At the time of the Atkins decision, the term "mental retardation" was still being used, but that term has since been replaced by "intellectual disability."  Although courts still refer to intellectual disability as mental retardation, intellectual disability will be used throughout this Petition (except in the context of a direct quote). See also Ex. 16 at ¶9.

[6] Formerly the American Association on Mental Retardation ("AAMR").

AND SYSTEMS OF SUPPORTS (11th ed. 2010) (hereinafter "AAIDD Manual"); American Psychiatric Association, THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (5th ed. Revised 2013) (hereinafter "DSM-V"); Hall v. Florida, 134 S. Ct. 1986, 1993-94 (2014); accord Moore v. Texas, 137 S. Ct. 1039, 1048-49 (2017); Ex. 16 at ¶¶9-11.[7] An ID determination "must be 'informed by the medical community's diagnostic framework.'" Moore, 137 S. Ct. at 1049 (quoting Hall, 134 S. Ct. at 2000); see Brumfield, 135 S. Ct. at 2278, 2280. While "being informed by the medical community does not demand adherence to everything stated in the latest medical guide," the Court emphasized that its precedent does not "license disregard of current medical standards." Moore, 137 S. Ct. at 1049.

The Court in Atkins initially observed "an IQ between 70 and 75 or lower . . . is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." Atkins, 536 U.S. at 309 n.5; see AAIDD Manual at 36; DSM-V at 37.[8] Recently, the Supreme Court made clear that, even if a person obtains a score above that range, deficits in the individual's adaptive functioning are relevant to a determination of ID. Moore, 137 S. Ct. at 1050; see also Hall, 134 S. Ct. at 1990, 1992; DSM-V at 37; see Ex. 16 at ¶17; see also ¶16. In fact, the Supreme Court in Moore found that "[m]ild levels of intellectual disability, although they may fall outside Texas citizens' consensus, nevertheless remain intellectual disabilities . . . and States may

---

[7] The Texas Legislature has not provided a statutory definition of intellectual disability. See Moore, 137 S. Ct. at 1047 (overruling Ex parte Briseno, 135 S.W.3d 1 (Tex. Crim. App. 2004)). In the absence of a statutory definition, it is appropriate for this Court to rely on the definitions set out by the American Association on Intellectual and Developmental Disabilities ("AAIDD") and the American Psychiatric Association ("APA"). See Atkins, 536 U.S. at 308 n.3; Hall, 134 S. Ct. at 1990; Brumfield v. Cain, 135 S. Ct. 2269, 2278, 2280 (2015); Moore, 137 S. Ct. at 1039, 1044, 1048.

[8] See Brumfield, 135 S. Ct. at 2278; Hall, 134 S. Ct. at 1995.

6

not execute anyone in 'the entire category of [intellectually disabled] offenders . . . .'" Moore, 137 S. Ct. at 1051, see 1049-50 (rejecting ID assessment that terminates based solely on an IQ test).

As will be explained below, based upon the reports of experts, Dr. Kenneth Benedict and Dr. Ginger Calloway, Leza satisfies the criteria for ID, and thus is intellectually disabled. Ex. 16 at ¶62; Ex. 17 at 21-22.

**1.      Leza suffers from significant limitations in intellectual functioning**

      **a.      Intellectual functioning**

A "significant limitation in intellectual functioning" is defined as "an IQ score on a reliable and well-validated measure of general intellectual functioning of approximately two standard deviations below the population mean, considering the standard error of measurement for the specific instruments used and the instrument's strengths and limitations." AAIDD Manual.

A single IQ score may not represent an examinee's actual level of intellectual functioning. Hall, 134 S. Ct. at 2001. The term "Standard Error of Measurement" ("SEM"), is the technical term used to quantify the variability between a test taker's "true" ability and his or her obtained test score on an IQ test. The SEM is the basis for providing a statistical confidence interval within which a person's true score falls. The AAIDD Manual states that because of the SEM inherent in all IQ scores, it is incumbent on clinicians to report IQ scores within an associated range of possible scores, referred to as a confidence interval. Ex. 16 at ¶13.

Confidence intervals are typically stated at the 95% level of probability—meaning there is a 95 percent chance the "true" IQ score falls within the given range of scores. Because of the error of measurement, the AAIDD definition allows for a diagnosis of ID based on an IQ score of 75 or below (where the SEM is presumed to be plus or minus five points using the most recent and sophisticated measures of intelligence), so long as there is evidence of concurrent, related deficits

in adaptive behavior prior to the age of eighteen. The DSM-5 also recognizes the importance of the SEM in the definition of subaverage intellectual functioning. Ex. 16 at ¶14.

The AAIDD further requires the "Flynn Effect" be taken into account when assessing intellectual functioning. The "Flynn Effect" is the empirically well-established phenomenon that IQ scores of a population generally increase over time. Because of the Flynn Effect, the AAIDD recommends clinicians use the most recent version of an instrument, together with the most current normative data available for the instrument, at all times. When scores have been obtained on older or outdated tests instruments, the AAIDD Manual states that a correction based on the age of the norms is warranted. Ex. 16 at ¶15.

### b.   Evidence of significant limitations in Leza's intellectual functioning

When an individual's intelligence has been assessed on multiple occasions, it is important that scores from previous tests be carefully interpreted and explained. Ex. 16 at ¶19. In Leza's case, he has been tested three times (1993, 2009, and 2014) and all three reports lead to the conclusion Leza is ID.

### (1)   Dr. Sherman's 1993 testing

Leza's first psychometric evaluation occurred in June 1993, and was conducted by Dr. J.O. Sherman at the Bexar County Juvenile Center, as part of a Court Order in advance of a Certification and Transfer Hearing. Leza was sixteen at the time of the evaluation. This was not a full neuropsychological evaluation, and it cannot be considered a complete evaluation of ID given the absence of adaptive behavior measures or the reporting of intelligence subtest scores. Ex. 16 at ¶24.

In conducting the evaluation, Dr. Sherman relied on the Wechsler Intelligence Scale for Children–Revised (WISC-R). However, in doing so, Dr. Sherman failed to rely on the most recent

standard measure of intelligence. The WISC-III, published in 1991, was the most recent edition of the WISC and was available at the time of Leza's evaluation.

Under the outdated WISC-R, Dr. Sherman reported the following scores: Verbal IQ 69; Performance IQ 105; and Full Scale IQ 85. Because Dr. Sherman relied on an outdated intelligence scale, there is a clear need to apply the Flynn Effect and to consider SEM in analysis of Leza's scores. Ex. 16 at ¶25. When applying the Flynn Effect, the reported Full Scale IQ score of 85 converts to a score of 79, which falls in the "borderline range of intellectual functioning." Id. at ¶26. Furthermore, when considering the SEM, the applicable score range for the Full Scale IQ falls between 74 and 84. Id. Notably, studies of the WISC-R, in comparison to later editions of the WISC, have demonstrated that the WISC-R Performance IQ score tends to yield higher ability estimates than subsequent editions—thereby supporting a finding that Leza's Full Scale IQ score (of 79) was really lower than what the WISC-R presented. Id. at ¶28.

There is a more striking psychometric issue involved in the administration and interpretation of Dr. Sherman's testing—a 36-point standard score discrepancy exists between the reported Verbal IQ Score of 69 and the Performance IQ score of 105. This discrepancy is both statistically and clinically significant because it shows the Full Scale IQ does not represent a "unitary construct of intelligence." The Verbal IQ Score and the Performance IQ Score are used to calculate the Full Scale IQ Score, which can be roughly conceptualized as an "average" of the Verbal and Performance scores. In situations involving large discrepancies of this magnitude—in this case, more than two standard deviations separating the lower Verbal IQ and higher Performance IQ Scores—the construct of a "general intelligent quotient" breaks down or loses its meaning. Ultimately, what can be concluded as a certainty is that Leza was in the intellectually impaired range of functioning across the verbal/oral language aspects of the test. Ex. 16 at ¶27.

Dr. Sherman also relied on the Wide Range Achievement Test–Revised (WRAT-R) in conducting Leza's evaluation, and reported the followings scores:  Reading 58; Spelling 57; and Arithmetic 74. All of these scores fall within the range of intellectual impairment and are also essentially consistent with the Verbal IQ score of 69 reported from the same evaluation. Ex. 16 at ¶29.

Finally, it is of note that Dr. Sherman provided four developmental disorder diagnoses: Developmental Reading Disorder, Developmental Arithmetic Disorder, Developmental Expressive Language Disorder, and Specific Developmental Disorder, NOS-Spelling. In the current edition of the DSM-5, all of these diagnoses fall under the rubric of "Neurodevelopmental Disorders."  Ex. 16 at ¶31.

Given the wide-ranging nature of the noted developmental difficulties, and the notably low scores in Verbal IQ and across areas of achievement, there was sufficient reason for Dr. Sherman to raise the need for a more thorough cognitive or neuropsychological evaluation to rule out the presence of a more generalized cognitive delay (i.e., Intellectual Disability). Ex. 16 at ¶31.

### (2)      Dr. Milam's 2009 testing

Leza's second evaluation was conducted by Dr. Daneen Milam in December 2009 as part of Leza's initial state post-conviction litigation. Dr. Milam conducted ten hours of neuropsychological testing and relied upon the Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV) in conducting her evaluation. Ex. 16 at ¶32. Dr. Milam's testing was highly focused on FASD and substance abuse, not ID. Id. at ¶33. While Dr. Milam's neuropsychological evaluation provides some information that is relevant to ID, like Dr. Sherman's evaluation discussed above, it did not directly address all of the relevant factors needed to determine an ID diagnosis. Id. at ¶34.

According to Dr. Milam's report, Leza exhibited scores in the intellectually disabled range on verbal subtests, but not on visual, gross, and fine motor tasks. Ex. 16 at ¶37. Consequently, Dr. Milam concluded Leza was not ID. However, Dr. Milam's conclusion is incorrect for a number of reasons—most importantly because her conclusion is based on the erroneous belief that all test scores need to fall in the range of impaired functioning to support a diagnosis of ID. See Ex. 16 at ¶38. However, it is well-established that individuals who are diagnosed with ID display a range of strengths and weaknesses, just as non-ID individuals do. Id. In addition, while Dr. Milam provides numerous examples that demonstrate deficits in Leza's adaptive behavior, she did not make any specific or conclusive findings as to whether Leza suffered from adaptive behavior deficits. Therefore, her evaluation does not constitute a complete assessment for ID. Id.

As to the IQ scores specifically, the reported Full Scale IQ score from Dr. Milam's evaluation is a 79, which does not need to be subject to a Flynn analysis given that the test date occurred only one year after publication of the WAIS-IV. However, consideration of the SEM leads to the finding that there is a 95 percent chance that Leza's Full Scale IQ score falls between a score of 75 to 83. Ex. 16 at ¶¶39-40.

Further, the Verbal Comprehension Index (VCI) of 68 falls within the mentally impaired range of functioning. Additionally, the Perceptual Reasoning Index (PRI), which is tantamount to the Performance IQ score on older editions of the WAIS-IV, falls in the lower end of the average range (92). However, examination of the PRI subtest profile and qualitative aspects of Leza's performance is instructive in this case. There is variability among the three subtests that compose the PRI, with a pattern suggesting that Leza performs better on a more concrete task such as Block Design, where he can physically manipulate materials, than on more strictly cognitive tasks such as Matrix Reasoning and Visual Puzzles. Leza performs inconsistently on these latter two subtests,

thereby raising questions about the consistency of his higher-order reasoning skills when engaged with visual information processing. A similar degree of score variability is also seen on visual memory subtests from the Wechsler Memory Scale–Fourth Edition (WMS-IV), with percentile scores ranging from the 9th to 84th percentiles, again suggesting that relative strengths associated with visual information processing are not uniformly strong or intact. Ex. 16 at ¶41.

Lastly, in looking at Leza's WAIS-IV scores, data from the composite scales show a significant amount of variability—twenty-four standard-score points. As noted above in the analysis of Dr. Sherman's WISC-R, this amount of discrepancy presents a problem with respect to the validity of a unitary measure of ability, as represented by a Full-Scale IQ score. Ex. 16 at ¶39.

### (3)   Dr. Murphey's 2014 testing

Leza's third evaluation was conducted by Dr. Murphey in 2014, again as part of Leza's initial state post-conviction litigation. Dr. Murphey used the Stanford Binet Intelligence Scale–Fifth Edition ("SB5"), which showed Leza had a Full Scale IQ of 74. That score falls within the standard error of measurement to be considered a reflection of significant intellectual delay in the range of two standard deviations below the mean. Ex. 16 at ¶43.

The findings from the SB5 involve a significant, yet lesser degree of discrepancy between Verbal and Nonverbal IQ scores (13 standard score points). Further, this score differential is in the opposite direction than was found on the earlier WISC-R (Dr. Sherman) and WAIS-IV (Dr. Milam). On the SB5, Leza's Nonverbal IQ is a 69, a score that falls in the impaired range of intellectual functioning even without any consideration of SEM or Flynn Effect. In contrast, his Verbal IQ score is an 82. Ex. 16 at ¶44. This shows that Leza's performance on standardized intelligence tests convey substantial conceptual deficits, at different points in time, from both verbal- and visual-based tests of intelligence. Additionally, this conclusion provides support

against the interpretation provided by Dr. Milam that Leza's cognitive deficits are limited to only the verbal/linguistic domain. Id. at ¶45.

The discrepancies across different measures of intelligence (i.e., Wechsler versus Stanford Binet) are best understood to reflect Leza's sensitivity to the specific contextual factors associated with any given test. The type of discrepant test findings present in Leza's case most typically point to a generalized cognitive dysfunction associated with brain damage, as well as severe problems generalizing or applying understanding or learning from one context to another. Ex. 16 at ¶45.

### (4)  Summary of IQ

With evidence of impaired functioning—lower than two standard deviations below the mean—across measures of verbal, nonverbal, and quantitative reasoning, collected between the ages of sixteen to forty, it is clear Leza suffers from a general intellectual deficit as supported psychometrically in the form of IQ scores from four different IQ tests. Ex. 16 at ¶59(e).

### 2.  Leza suffers from significant limitations in adaptive functioning

#### a.  Adaptive functioning

In addition to significant limitations in intellectual functioning, an ID diagnosis requires "significant limitations . . . in adaptive behavior as expressed in conceptual, social, and practical adaptive skills."  AAIDD Manual at 1; accord DSM-V at 37-38. Significant limitations can be found in one of the three domains: conceptual, social, or practical. AAIDD Manual at 43, 46; DSM-V at 37; see Ex. 16 at ¶20.

The AAIDD Manual provides examples of "representative skills" in each of the three domains. Representative conceptual skills are "language; reading and writing; and money, time, and number concepts."  AAIDD Manual at 44. Representative social skills constitute "interpersonal skills, social responsibility, self-esteem, gullibility, naïveté (i.e., wariness), follows rules/obeys laws, avoids being victimized."  Id. Representative practical skills are "activities of

13

daily living (personal care), occupational skills, use of money, safety, health care, travel/transportation, schedules/routines, and use of the telephone." Id.; see Ex. 17 at 8-9; Ex. 16 at ¶21.

Similarly, the DSM-V discusses deficits in adaptive functioning as "how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background." The DSM-V also speaks in terms of assessing adaptive functioning using both clinical evaluation and individualized, culturally-appropriate, psychometrically-sound measures including interviews with parents or other family members, teachers, counselors, and care providers. DSM-V at 37-38.

Importantly, adaptive functioning is not to be assessed through examining the strengths of an individual, but through an exploration of his deficits. See AAIDD Manual at 1 ("Intellectual disability is characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills.") (emphasis added); Id. at 8 ("[P]eople with ID are complex human beings who likely have certain gifts as well as limitations. Like all people, they often do some things better than others. Individuals may have capabilities and strengths that are independent of their ID….") (emphasis added); accord Moore, 137 S. Ct. at 1051.

### b.   Evidence of Leza's adaptive deficits

Dr. Ginger Calloway, a licensed psychologist who specializes in Atkins evaluations, conducted interviews, administered testing, and reviewed social history records for Leza and concluded that Leza has significant adaptive deficits in two categories—Conceptual and Practical—and deficits likely in the Social classification. Ex. 17 at 2, 22. An individual only needs adaptive deficits in one of the three categories to be considered ID under this classification. Ex. 16 at ¶21.

### (1)    Conceptual

Leza has significant deficits in the following subsections of Conceptual behavior: functional academics; communication; and self-direction. Ex. 17 at 12-15. In functional academics, Leza has been labeled a "slow learner" at school, and testing shows Leza struggles with almost every category of learning—testing at a fourth grade level in total achievement. Id. at 10, 12. Leza has great difficulty in counting money and making change. Id. at 12-13. As to communication, Leza did not talk until the age of two and this was followed by a long history of language-related deficits involving expressive and receptive language disabilities. Id. at 13. Leza has also been diagnosed with developmental reading disorder and developmental expressive language disorder. Leza has been described by many who know him as someone who did not communicate with others, but instead would stay by himself. Id. at 14. Lastly, with regard to self-direction, there is no evidence Leza ever made a major life decision. Leza has never held a job that was not working for a family member, did not attempt to get a driver's license, has never lived independently or signed a lease, never had a checking account, and never had a plan for the future. Id.

### (2)    Practical

Leza has significant deficits in the following areas of Practical behavior:  home living, self-care, work, and community use. Ex. 17 at 15-19. With regard to home living, Leza was not able to dress himself until the third grade, was not toilet trained until the age of seven, and could not do basic chores like taking out the trash or going to the store and buying items from a shopping list. Id. at 15. Leza also could not operate a microwave oven or other small appliances, did not know how to work a washer or dryer, and could not clear a plate from the table or clean a house. Id. at 15-16. As to self-care, Leza was incapable of most tasks, including dressing himself without assistance, washing his hands with soap and water, blowing and wiping his nose with a tissue,

bathing daily, cutting meat into bite sized pieces, getting out of bed on time, obtaining a haircut, and avoiding unhealthy food and drink. Id. at 16.

Additionally, with regard to work skills, Leza could only obtain a job working for his father and even then, could not complete most of the tasks assigned. At a construction job, Leza could not use a tape measure, a drill, or a mixer, could not tear down a wall without repeated instruction, and had difficulty focusing on whatever task he was assigned. And at a restaurant job, Leza was only able to wash dishes because all the other tasks were too complicated, including serving soup, working the cash register, cleaning fish, or going to the grocery store for supplies. Ex. 17 at 16-18. Lastly, with regard to community, Leza was unable to ride a bus alone as he would get lost, could not read a bus schedule, and could not read street signs. And if he got lost while riding the bus, Leza would ride around until he recognized a familiar landmark. Leza also would get lost riding his bicycle, even though he was in an area he knew. Id. at 18-19.

### (3)     Social

Leza also has deficits in the following Social area of adaptive deficits: leisure and social skills. Ex. 17 at 19-20. Leza does not talk much, becomes easily frustrated in social settings, and does not have friends. Leza is easily led by others and is often taken advantage of. Id. at 19-20. Additionally, Leza does not understand social customs, such as how close to stand to someone, how to respond to a funny comment or joke, or how to use a knife, fork, or napkin. During his youth, Leza preferred to play with the toys of his younger brothers, even when Leza was a teenager. Leza also lacked awareness of matters like stepping out in front of traffic or when to cross the street. Id. at 20. Leza also has been described as gullible, suggestible, docile, and dependent on others. Id.

16

In sum, a portrait of Leza showed him to be hapless, quiet, highly dependent on others, highly suggestible, gullible, unable to function independently as an adult, and unable to master many tasks of daily living. Ex. 17 at 20.

### (4)      Summary of adaptive deficits

Based upon her evaluation, Dr. Calloway found that Leza suffers from significant limitations in adaptive functioning in two of the three main areas:  Conceptual and Practical. Dr. Calloway also concluded Leza has areas of deficits in the Social area. As an individual only needs deficits in one area of adaptive functioning, and here Leza has at least two, if not three, he meets the criteria of ID for adaptive deficits. Ex. 17 at 22; see Ex. 16 at ¶20.

Further, Leza's composite scoring on the Scholastic Abilities Test for Adults ("SATA")—which was administered by Dr. Calloway in her evaluation of Leza and is also used to evaluate an individual's adaptive deficits—falls at 70, two standard deviations below the mean. Further, of the nine subtests that comprise the SATA, eight fell below the 5th percentile. Ex. 16 at ¶¶48, 50; Ex. 17 at 9-10, 13

### 3.      Leza's limitations began before the age of eighteen

The final criterion for ID is onset before the age of eighteen. ID is characterized as a neurodevelopmental disorder because persons with the disability are significantly impaired in their attainment of abilities and skills during the developmental period (birth to eighteen years) in relation to those without the disability. This criteria, however, does not require the disability be formally diagnosed before the age of eighteen. Ex. 16 at ¶22.

With respect to the third diagnostic criterion, Leza's intellectual and adaptive functioning date back well before the age of eighteen, as shown above. Ex. 16 at ¶61. Indeed, there are numerous reports of delayed developmental milestones such as walking, talking, and toileting, as well as many other hallmarks of developmentally-based phenomenon such as school failures,

grade retentions, and an occupational history that started in early adolescence and did not progress to any degree of independence as he approached the age of eighteen. Id.

### 4.    Conclusion

Upon a review of the three diagnostic criterion for ID, and in light of all the information reviewed by Dr. Benedict, including the findings of Dr. Calloway regarding adaptive deficits, Leza meets the criteria for ID to a high degree of psychological certainty. Ex. 16 at ¶62. A finding of ID is prejudicial per se and bars the State from executing Leza.

### B.    Trial Counsel Were Ineffective For Failing To Investigate And Present Evidence At Trial Establishing Leza Is ID And Thus Constitutionally Exempt From The Death Penalty

Trial counsel never investigated and presented evidence that Leza was ID. If counsel had presented such evidence, Leza would have been ineligible for the death penalty as discussed fully above. See Atkins, 536 U.S. at 321; accord Moore, 137 S. Ct. at 1047. **Exhaustion**:  This claim has not been presented to the state courts because of the ineffectiveness of Leza's trial and initial post-conviction counsel.

At the time of trial, counsel had in their possession a multitude of documents and evidence which should have alerted them to the need to investigate and present evidence that Leza is ID, including that Leza had a low IQ, suffered from brain impairment, and had various adaptive deficits. Counsel's failure to present a claim that Leza was ID was deficient.

Counsel had in their possession Leza's school records. Ex. 48. A review of these records show that Leza was identified as a "slow learner" in kindergarten and that he failed multiple grades in school. The records also show that Leza was in specialized classes at certain points of his schooling and that he was passed along to higher grades even though he was functionally illiterate. Further, school testing showed that Leza had the reading skill of a third grader and the math skills of a sixth grader when he should have been at a high school level. These learning deficits were

characterized as "severe."  A deficit picture this extreme should have triggered an investigation by counsel into whether Leza was ID. Ex. 48 at 6, 17, 36-37; Ex. 67 at 7-8; Ex. 17 at 5; Ex. 66 at 2.

Counsel also had in their possession Leza's Memory and Freedom from Distractibility test results, which showed a score that fell in the ID range. Leza's scores on the WRAT-Revised also showed that he had severe deficits in Reading, Spelling, and Arithmetic. Ex. 69. Further, Dr. Sherman's report should have alerted counsel to the potential that Leza was ID based on a dramatic split in Leza's IQ scores (69 verbal/105 performance)—a split which is highly unusual, suggests brain damage, and ultimately should have been investigated by trial counsel. Ex. 67 at 8. Lastly, counsel had in their possession Leza's 1993 juvenile court psychological evaluation prepared by Dr. Sherman, which showed Leza's full-scale IQ was below average, with a verbal IQ score of 69—clearly in the ID range. The report also showed that Leza was learning-disabled and that he was placed in special resource reading classes at around age sixteen. See Initial State App., Ex. 22 (Texas Youth Commission "TYC" school records).

Further, counsel knew, but failed to appreciate, the significance of multiple developmental delays in Leza's childhood and adolescence, including his failure to walk until the age of eighteen months and his delay in talking until the age of two. Ex. 67 at 7; Ex. 66 at 2; Ex. 63 (Brown collateral interview of Celia Leza). These deficits, including language deficits, learning disabilities, attention problems, impulsivity, and faulty decision-making, should have alerted counsel to neurological impairment which would have required testing by an expert, and which in turn, would have led to an ID diagnosis. Ex. 67 at 8; Ex. 66 at 4.

A proper investigation also would have uncovered information from family members and friends that would have alerted counsel to the fact that Leza had adaptive deficits, part of a diagnosis of ID. If counsel had properly interviewed family members, they would have learned

Leza was slow to do most everyday functions, including simple tasks like getting dressed in the morning, tying his shoes, bathing, or taking out the trash. Writ RR 163-64; Ex. 63 (Brown interview of Celia Leza). Counsel additionally would have learned that Leza's inability to read and write caused him such embarrassment that he did not want to attend school. Id. When he did attend school, Leza became frustrated and acted out in order to be expelled from the classroom so that the teacher and the other children would not see how much Leza struggled with the school work. Ex. 103 at ¶9. Counsel would have additionally discovered Leza was a follower and was unable to do things that other children could do. Ex. 107 at ¶8. And Leza was different from other kids, and was even described by his older brother as "really, really slow, maybe even retarded." Ex. 103 at ¶6.

Counsel's deficient performance prejudiced Leza. Had counsel conducted the required investigation, and hired experts qualified to diagnose ID, counsel would have presented evidence to the jury that Leza suffered from "significantly subaverage" or "significant limitations" in intellectual functioning; that was accompanied by "significant limitations" in adaptive behavior; and which occurred prior to the age of eighteen. If counsel had presented such evidence, jurors would have found Leza ID, and he would not have been eligible for the death penalty. Atkins, 536 U.S. at 320-21.

**C.   Counsel Was Ineffective For Failing To Investigate Leza's Intellectual Functioning Because Evidence Of Low Intellectual Functioning—Even If Such Evidence Failed To Establish Death Ineligibiilty Under Atkins—Would Have Been Highly Relevant To The Jury's Determination Of Leza's Sentence**

Even if this Court finds Leza is not ID, Leza is still entitled to relief because counsel's performance was deficient for failing to present highly relevant evidence—including Leza's borderline intelligence, brain damage, and adaptive deficits—which would have been significant to the jury's determination of Leza's ultimate sentence. See Daniel v. Comm, Alabama Dept. of

Corrections, 822 F.3d 1248, 1278-79 n. 21 (11th Cir. 2016). **Exhaustion**:  This claim was presented to the state court as Claim V in Leza's initial state application. Ex. 8 at 77, 86-91. The state court's adjudication of the claim was contrary to, and consisted of an unreasonable application of, clearly established federal law and was based on an unreasonable determination of the facts. See Ex. 15 at 4; Ex. 13 at 155, 167-68.

As discussed above, trial counsel had in their possession sufficient evidence to alert them to the fact Leza's level of intellectual functioning was low and warranted further investigation. That investigation would have uncovered evidence of Leza's borderline intellectual functioning and brain damage (Exs. 65-67) as well as adaptive deficits (Ex. 17; Ex. 67), which would have been highly relevant to the jury's determination of Leza's sentence, in conjunction with the vast amount of other mitigating evidence that counsel failed to investigate and present. Daniel, 822 F.3d at 1278-79.

Because counsel failed to investigate ID, the jurors did not hear that Leza had slowed developmental progress as an infant, was considered slow by his mother and siblings, failed multiple grades in school, was in specialized classes because he was labeled a slow learner, and suffered from generally low overall functioning. The jurors never heard that neuropsychological testing indicated Leza had severe learning deficits in all areas, had brain impairment in five domains including executive functioning, and had IQ scores indicative of borderline intellectual functioning. The jurors never heard that Leza's reading level was around the third grade and that his writing grade level never surpassed a fourth grade level. Jurors also never heard that Leza was late to walk, late to talk, and soiled his pants up until he was seven years old. The jurors never heard that Leza could not accomplish a simple task, like clearing a plate from the table or going to the store to buy grocery items.

Because counsel failed to investigate whether Leza was ID, the jurors did not hear that Leza could not handle change or count money, never had a bank account, never signed a lease, could not live independently, and could not ride a bus alone as he would get lost. The jurors never heard that Leza could not work appliances like a microwave, a washing machine, or a dryer. The jurors never heard that Leza could not dress himself without assistance, wash his hands with soap and water, remember to bathe daily, cut meat into bite size pieces, get a haircut, or blow and wipe his nose. Leza could not even heat soup without repeated instruction.

Because counsel failed to investigate whether Leza was ID, the jurors never heard that Leza did not understand simple social customs like how close to stand to someone or how to use silverware. The jurors never heard that Leza was highly dependent on others, could not live independently, was highly suggestible and gullible, hapless, and naïve.

Had Leza's counsel investigated whether Leza was ID, that investigation would have uncovered an incredible amount of mitigating evidence, some of which is discussed above. Had counsel conducted this investigation—whether or not Leza was ultimately found to be ID—it is reasonably likely that at least one juror would have voted for a penalty other than death. Wiggins v. Smith, 539 U.S. 510, 537 (2003).

**CLAIM TWO (<u>MIRANDA</u> WAIVER)**

Leza's conviction and sentence of death violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because Leza did not knowingly and voluntarily waive his right to remain silent or his right to counsel prior to his interview with law enforcement. Further, trial and post-conviction counsel were ineffective for failing to raise these issues in state court. **<u>Exhaustion</u>**: Portions of this claim were presented to the state court as Points of Error One and Two in the direct appeal. Ex. 3 at 10-29; Ex. 6 at 2-5. Portions of this claim were also presented to the state court as Claim III in Leza's initial state application. Ex. 8 at 23-27. The state courts'

22

adjudication of the exhausted portions of the claim were contrary to, and consisted of an unreasonable application of, clearly established federal law, and were based on an unreasonable determination of the facts. See Ex. 9 at 4-9; Ex. 13 at 119-28; Ex. 15 at 3-4. Those portions of the claim not presented to the state courts was due to the ineffectiveness of trial and initial post-conviction counsel.

## A.   Relevant Facts

On April 5, 2007, late in the evening, Leza and his girlfriend (Trevino) were taken into custody. 13 RR 11, 14; 3 RR 22. Leza's police interrogation began shortly after midnight. Ex. 77 at 1. Leza was visibly sleep-deprived and video footage shows him nodding off despite being handcuffed. Ex. 75 (Leza interrogation 12:43 AM–12:53 AM). Officers were aware Leza was likely under the influence of heroin (and possibly cocaine), and Leza specifically told Detective Greiner he had "just shot up." 12 RR 138-39; Ex. 77 at 6. Nevertheless, Greiner read Leza a Miranda warning (the "Warning") and subsequently instructed Leza, "Alright just sign your name right there that you understand." Ex. 77 at 3; Ex. 73.[9]  Greiner falsely reassured Leza, "You're under arrest right now for just traffic tickets. You know it's no big deal." Ex. 77 at 4. Leza was subsequently interrogated for over two and one-half hours. Exs. 74-75. 77.

## B.   Leza Did Not Validly Waive His Miranda Rights

A waiver of Miranda rights must be made voluntarily, knowingly, and intelligently to be effective. Moran v. Burbine, 475 U.S. 412, 421 (1986). A waiver is valid when it is: (1) "the product of a free and deliberate choice rather than intimidation, coercion, or deception"; and (2) "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Id. In this case, Leza did not validly waive his Miranda rights

---

[9] Miranda v. Arizona, 384 U.S. 436 (1966).

because: (1) the Warning given to him by police failed to inform Leza he had the right to remain silent or to request counsel; (2) the Warning, as given, precluded Leza from fully understanding the nature of his rights and the consequences of abandoning them; and (3) Leza's ID, FASD, drug use, and sleep deprivation prevented him from voluntarily and knowingly waiving his rights.

### 1. The Warning was invalid because it failed to advise Leza he had the right to remain silent or to request counsel

The Warning given to Leza was critically flawed because it did not advise him that he could invoke his right to remain silent, nor did it advise him he could invoke his right to counsel. Thus, the Warning failed in its essential purpose.

The Warning stated the "above rights are continuing rights which can be <u>urged</u> by you at any stage of the proceedings." Ex. 73 (emphasis added). In bold type, the Warning stated: "Do you understand these rights?" <u>Id.</u> There was no opportunity for Leza to actually <u>invoke</u> his right to remain silent or <u>invoke</u> his right to counsel, nor was there a place where Leza could affirmatively waive those rights on the form he was given.

The distinction between the opportunity to "invoke" one's rights and the opportunity to merely "urge" one's right is significant. Definitions of the word "urge" focus "on advocacy rather than decision authority." Ex. 21 at 4-5. "Simply put, to *urge* means something entirely different than to *decide*." <u>Id.</u> at 5. While the Supreme Court has approved <u>Miranda</u> warnings that advise of the opportunity to "use" rights (<u>Florida v. Powell</u>, 559 U.S. 50 (2010)), it has never approved a warning that merely offers a suspect the opportunity to "urge" his rights. The reason for this is simple: <u>Miranda</u> requires a suspect be "assure[d] a continuous opportunity to exercise" his rights and to be told of this option. <u>Miranda</u>, 384 U.S. at 444.

Here, the Warning was deficient because it failed to offer Leza the opportunity to invoke his rights to remain silent or to have counsel. <u>Berghuis v. Thompkins</u>, 560 U.S. 370, 387 (2010).

Instead, the Warning merely instructed his rights could be "urged." The word "urge" did not communicate the choice to decide on the waiver. Thus, any waiver was ambiguous and invalid, as a consistent pattern of Texas decisions demonstrate. See, e.g., State v. Panetti, 891 S.W.2d 281, 282-84 (Tex. App. 1994); Lucia v. State, No. 10-04-00229-CR, 2005 WL 2044863, at *1 (Tex. App. Aug. 24, 2005). Because Leza was not advised of the opportunity to invoke his right to counsel or of his right to remain silent, law enforcement consciously (and systemically) withheld a significant component of the Miranda warning in violation of the federal Constitution.

### 2.    Leza did not understand the nature of his rights or the consequences of abandoning them

In addition to the substantive deficiencies, the Warning, as written and presented to Leza, substantially exceeded his ability to understand the rights he was waiving and the resulting consequences because it was: (1) unnecessarily long and orally presented; and (2) written at a reading level beyond Leza's abilities to recall and comprehend.

First, the Warning given to Leza was substantially longer than the typical warning given to an arrestee. Ex. 21 at 1-2. Specifically, the "rights portion" consisted of 139 words and outlined seven specific rights. This exceeds a typical Miranda warning by more than forty words, thereby making it 45.9% longer than the average warning. Ex. 73; Ex. 21 at 1.

In addition to the excessive length, the Warning was read aloud to Leza. Studies have shown that orally presented concepts are difficult to recall, and when applied to Miranda warnings specifically, impaired recall is very likely to occur when the orally presented material exceeds seventy-three words. Ex. 21 at 2. In fact, the average recall for passages of similar length of well-educated adults (i.e., the vast majority having a twelfth grade education or higher) is between 48% and 50%, meaning about half of the basic concepts read to them will be missed. Id. at 2. The Warning here far exceeded seventy-three words, and Leza is not a well-educated adult, having

25

dropped out of school sometime around the sixth grade. Ex. 63 at 9; Ex. 65 at 2, 5. Additionally, the Warning, unlike the studies cited above, was given in a highly stressful, inherently coercive custodial environment, which would have further affected Leza's ability to comprehend and recall the information given. Based upon these studies, if Leza had been a well-educated adult, and in a non-stressful environment, he would have understood only about <u>half</u> of the basic concepts Greiner read to him in the Warning. However, because Leza's capacity differed from the tested subjects due to his individual circumstances (he is ID) and the environment in which he received the Warning, it is likely Leza understood well less than half of the Warning as it was given.

Second, even assuming Leza had been given a full opportunity to read the Warning, rather than have it read to him,[10] the Warning is still flawed as it was written at a reading level substantially higher than required for a typical <u>Miranda</u> warning. Ex. 21 at 3. Nationally, the average reading level of a <u>Miranda</u> warning is at a seventh grade reading level. <u>Id.</u> at 3-5. The Warning used here was over a full year higher, at the 8 to 8.4 range for reading grade level. <u>Id.</u> Additionally, the right to counsel advisements were written at the 12 to 12.9 grade level (legal services to indigents) and the 13.5 to 14 grade level (the right to a lawyer). <u>Id.</u> at 3, 7. Thus, for an individual to understand the language of the right to counsel given in Leza's Warning, he/she would need at least some college education. <u>Id.</u> at 3. Furthermore, the Warning contained six important terms (charge, proceeding, right, stage, state, and waive), all of which require at least an Eighth grade education to accurately understand, with the word "waive" being understood best by those who have had at least one year of college education. <u>Id.</u> at 4, 8.

---

[10]   It is clear from the police interview however that Leza was not given a chance to read the Warning. After the Warning was read to him, Leza was told just to sign his name. <u>See</u> Ex. 77 at 3 ("Alright just sign your name right there that you understand.").

Ultimately, the reading comprehension demands for understanding concepts like the right to counsel and waiver of one's rights far exceeded Leza's level of comprehension. Leza was identified as a slow learner in kindergarten, and repeated at least three grades before being passed into seventh grade despite functional illiteracy and then ultimately dropping out. Ex. 63 at 8-9; Ex. 65 at 2, 5. Further, Leza is intellectually disabled. Exs. 16-17. At the time of the interrogation, Leza had difficulty even completing the witness information form which simply asked for personal details. Ex. 77 at 4-6. Thus, even if he had the opportunity to completely review the written warning—which he did not—Leza could not have understood half of the concepts in the document.

### 3. Leza's ID, FASD, heroin use, and sleep deprivation impacted his ability to waive his rights

The deficiencies of the Warning were made worse when considered in conjunction with Leza's ID and FASD, sleep deprivation, and the fact that he was under the influence of drugs when he was interviewed.

Due to his FASD and ID, Leza has issues with suggestibility and can be easily led. Ex. 63 at ¶17; Ex. 17 at 20; Writ RR 196-203. Leza is described as dependent on others, naïve, and gullible. Ex. 17 at 20. Because of his low IQ and gullibility, Leza could have easily been led by Greiner to waive his Miranda rights or falsely confess. Additionally, Leza's language deficits impaired his understanding of statements made by others and made him more susceptible to manipulation by those who are more cognitively sophisticated. Ex. 63 at ¶¶24-25, 29. Thus, when told he was simply "under arrest for tickets" (Ex. 77 at 3) immediately before the Warning was given, Leza likely took the statement at face value. Similarly, when Greiner instructed: "Alright just sign your name right there that you understand," Leza complied because he was a follower—not because he actually understood. Id.; Ex. 63 at ¶30. Leza's signature did not, and could not, signify he understood the content of the advisement or that he was waiving his rights.

27

Further, Leza was under the influence of drugs (heroin and possibly cocaine) during the interrogation—substances that impair mental functioning—and officers read the warning to Leza at a high rate of speed, despite knowing he was under the influence of narcotics. Numerous courts have recognized that intoxication by a defendant is relevant to determining whether a waiver of Miranda rights was voluntary where there is evidence of police coercion. See, e.g., Colorado v. Connelly, 479 U.S. 157, 164-65 (1986). Here, the impact of Leza's drug use on his ability to comprehend what was happening while in custody was substantial. Because Leza was under the influence while the Warning was read to him, by the time he offered incriminating statements he no longer would have remembered the content of the Warning. 3 RR 84-87. Heroin has a broad range of effects on the body and brain including relaxation, disinhibition, and impairment of memory and attention. Evidence also suggests Leza was on cocaine at the time of the interrogation. The effects of cocaine include confusion and talkativeness. These drugs together would have impaired Leza's ability to understand his Miranda warning and to voluntarily consent to being interrogated. Ex. 18 at 8-9.

In addition to his other deficits, Leza was significantly sleep-deprived, which would have further impacted his ability to comprehend the Warning given. Sleep-deprivation impairs cognitive skills that are crucial to resisting a coercive environment. Ex. 98 at 1. Further, the odds of offering a false confession increase significantly when one is sleep-deprived. Id. at 1, 3.

### 4. The totality of the circumstances prevented Leza from knowingly and voluntarily waiving his rights

Ultimately, Leza never explicitly waived his rights. The Warning itself was substantively deficient because it provided no opportunity for Leza to "invoke" his rights. Thus, he was never advised he had the opportunity to invoke his right to counsel or his right to remain silent.

28

Even if Leza's actions could legitimately be considered a "waiver," it was not a knowing, intelligent, or voluntary waiver because: (1) the length of the Warning read aloud to Leza posed a formidable challenge to recall information; and (2) the Warning, as written, required a reading comprehension level substantially higher than required for a typical <u>Miranda</u> warning and a vocabulary level that significantly exceeded Leza's seventh grade education. Additionally, officers read the warning to Leza at a high rate of speed, despite knowing he was under the influence of narcotics, and affirmatively deceived Leza about the reason for his arrest. Because of Leza's combined deficits, narcotic use (Ex. 18), ID (Ex. 16, Ex. 17), FASD (Ex. 63 at 8-10; Ex. 65 at 1, 6-8; Writ RR 71-72, 132), and sleep-deprivation, his ability to comprehend the Warning and the consequences of his actions was substantially impaired. Thus, Leza's <u>Miranda</u> waiver was not valid.

The admission of Leza's confession had a substantial and injurious effect on the jury's guilt and punishment verdicts. By far, the most damning evidence against Leza were his own statements, on which the State relied heavily to secure his conviction. 12 RR 17-19 (prosecution opening statement guilt); 16 RR 36, 38-41, 43 (prosecution closing argument guilt); 19 RR 32 (prosecution closing argument punishment).

Further, securing a conviction based on Leza's statements in this context raises an impermissible "possibility of false confession[]" by an intellectually disabled defendant. <u>Atkins v. Virginia</u>, 536 U.S. 304, 320 (2002). The Supreme Court has noted "in recent years a disturbing number of inmates on death row have been exonerated" including "at least one mentally retarded person who unwittingly confessed to a crime that he did not commit." <u>Id.</u> at 321 n.25. Because of Leza's low intellectual functioning, there is an unacceptable risk that Leza's conviction and sentence rest on such a false confession.

**C.  Counsel Were Ineffective For Failing To Properly Address The Deficient <u>Miranda</u> Warning**

Though trial counsel challenged the confession through a motion to suppress (CR 162; 3 RR 20–104, 4 RR 3–6), this presentation was flawed. Dr. John Roache, the expert hired to testify pre-trial that Leza's statement was involuntary due to Leza's heroin and cocaine intoxication, was not properly prepared because Dr. Roache was not given any information regarding Leza's ID and FASD, and therefore could not take into consideration the effects of Leza's pre-existing deficits in conjunction with his drug use. Ex. 20; Ex. 18 at 11-12. If he had been given such information, Dr. Roache would have testified that in addition to the harmful effects of heroin and cocaine on Leza, which would have produced a temporary drug-induced intellectual disability, Leza's own pre-existing neurological condition—including receptive language deficits, attention problems, impulsivity, and deficits in decision-making—would have compounded Leza's inability to comprehend the Warning given to him. Ex. 18 at 12. In sum, concerns about Leza's ability to comprehend and consent to speaking to the police were greater due to his ID and FASD, something Dr. Roache did not know about. <u>Id.</u>

Second, trial counsel did not raise any challenge to the confession (and did not call any expert witnesses to address the validity of Leza's purported waiver) at trial before the jury. Such a challenge should have been part of the defense's trial presentation. <u>Crane v. Kentucky</u>, 476 U.S. 683, 688 (1986).

And third, trial counsel failed to properly contest the following points:  the waiver was not voluntary, knowing, or intelligent (<u>Leza v. State</u>, 351 S.W.3d at 348); counsel failed to challenge the adequacy of the warnings; and failed to object to the argument that Leza "waived his right to silence by signing a written form to indicate that he understood his <u>Miranda</u> rights and then responding to police questioning anyway." <u>Leza</u>, 351 S.W.3d at 348.

Likewise, post-conviction counsel failed to raise significant aspects of the <u>Miranda</u> issue in Leza's initial state application, including Leza's impairments and deficits (ID, FASD, sleep-deprivation), and the flawed nature of the waiver given (limited word and reading comprehension, use of the word "urge" rather than "invoke").

For all of these reasons, Leza's statement should have been suppressed, and there is a reasonable probability that a more favorable outcome would have been obtained at the guilt and punishment phases if counsel had performed effectively.

## CLAIM THREE (FALSE DNA/BLOOD EVIDENCE)

Leza's conviction and sentence of death violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the State wrongly introduced false testimony and improper argument regarding DNA, blood, and footprint evidence. In addition, trial counsel were ineffective for failing to: (1) utilize their own forensic DNA expert to assist in defending against the State's case; (2) object to the State's false evidence and improper argument; and (3) effectively cross-examine the State's witnesses. **Exhaustion**: This claim has not been presented to the state courts because of the ineffectiveness of trial and post-conviction counsel.

## A.    The State's Case Relied Heavily On Crime Scene Evidence Which, Either Did Not Exist, Or If It Did Exist, Was Never Directly Connected To Leza

The State's case against Leza was based primarily upon two pieces of evidence: Leza's statement to the police (<u>see</u> Claim Two, above), and forensic crime scene evidence. However, as discussed below, the forensic evidence relied upon by the State was false and should never have been introduced at trial because it was not conclusively shown to exist and/or was not connected to Leza.

>    1.    **The State introduced false evidence that the DNA material on Leza's left shoe was the victim's blood**

Starting in its opening guilt-phase argument, the prosecutor informed the jurors that they would hear evidence that the victim's <u>blood</u> was found on Leza's shoe. 12 RR 20. Detective McCampbell continued this theme, testifying he instructed the Bexar County Crime Lab (CIL) to conduct "a DNA analysis of the victim's blood to compare it to the <u>blood</u> found on the Defendant's shoes." 12 RR 107 (emphasis added).

Robert Sailors, a forensic scientist at the CIL, testified Leza's left shoe "tested positive for the presence of blood during . . . testing . . . ." 13 RR 112. When asked by the State, ". . . can you say [Leza's] shoes were in contact with Caryl Jean Allen's <u>blood</u>; right," Sailors answered, "Yes, ma'am." 13 RR 119 (emphasis added).

And in closing guilt-phase argument, the State returned to the "blood" evidence arguing Leza was clearly guilty of the murder because the "victim's <u>blood</u> is on the Defendant's shoe at his arrest two days later." 16 RR 41. The State doubled down on this argument stating soon after: "It is most definitely Caryl Jean Allen's blood on the Defendant's shoe two days later." <u>Id.</u> at 42.

Although the State presented evidence and argument that the victim's "blood" was found on Leza's left shoe, in fact the CIL never tested the material on the shoe for blood, and thus any mention of the material being blood was completely false and highly prejudicial.

The CIL tested Leza's left shoe (item 3G2) with the phenolphthalein (Kastle-Meyer) test. Ex. 9 at 2; Ex. 72 at 9, 16. This is a <u>presumptive</u> test for the presence of hemoglobin-containing blood from various organisms including mammals. <u>Id.</u>; Tobe, Watson, Daeid, Evaluation of Six Presumptive Tests for Blood.[11]  The CIL, however, never conducted a <u>confirmatory</u> test for blood.

_____

[11] This presumptive test can also reveal false positive results in the presence of substances other than blood including cleaning agents, metal salts, and vegetable extracts. Ex. 19 at 2.

Ex. 19 at 2-3; see also 14 RR 13-14; Ex. 72 at 9, 16. Because a confirmatory test was not conducted, it was not possible for anyone to conclude Leza's left shoe contained the victim's blood. Ex. 19 at 2. Thus, any evidence—or argument—by the State that the material found on the shoe was conclusively blood, was false and constituted misconduct. Mooney v. Holohan, 294 U.S. 103, 112 (1935); Miller v. Pate, 386 U.S. 1, 6 (1967); see Alcorta v. Texas, 355 U.S. 28, 31 (1957); Faulder v. Johnson, 81 F.3d 515, 519 (5th Cir. 1996); Napue v. Illinois, 360 U.S. 264, 269 (1959).

At most, the State could say the material deposited on Leza's left shoe was DNA belonging to the victim. However, without the confirmatory test, the material could have been saliva, mucus, skin cells, or some other human biological matter. Ex. 19 at 3. That is a significant limitation in this case for two reasons.

First, Leza was not a stranger to the victim. Leza and Trevino lived in the same apartment complex as the victim, and had been in the victim's car and apartment before the night of the killing. See 12 RR 15, 17-18, 92,133; 13 RR 53; Ex. 75. Thus, the DNA material found on the shoe—whether it was skin cells, mucus, saliva, or some other biological matter—could have predated the killing in this case. That is to say, Leza could have come into contact with this biological material in a previous ride in the victim's car or visit to the victim's apartment. In sum, there is no way to determine when the DNA came to be deposited on Leza's shoe. Ex. 19 at 3.

And second, the CIL's own standards and acceptable lab practices recognize the limitations of serology testing and the dangers in overreaching conclusions. Ex. 19 at 3. According to the CIL Serology/DNA Operations Manual, "A positive presumptive test for blood should be interpreted only as the possible presence of blood." Ex. 70 at 35 (emphasis added). The Operations Manual also states: "Due to the nature of serological evidence, a definitive identification or interpretation

should not be made without justification documented scientific data." Id. at 36-37 (emphasis added).

The erroneous inclusion of false "blood" evidence in this case, and the State's misconduct in presenting it, had a substantial and injurious effect on the guilt and punishment verdicts. This was one of the major pieces of evidence connecting Leza to the crime scene. However, because it could not be said the material was blood, and because it could have been some other biological material deposited on Leza's shoe before the killing, the State's insistence the material was the victim's blood left a false impression on the jurors that the evidence against Leza was strong. See Mooney, 294 U.S. at 112 (the presentation of false evidence is intolerable because it perpetrates a fraud on the judge and the jury and undermines the "rudimentary demands of justice."); Berger v. United States, 295 U.S. 78, 88 (1935).[12]

### 2.      Trial counsel were ineffective

In addition to the prosecutorial misconduct discussed above, trial counsel were ineffective for failing to impeach Sailors and McCampbell as to their false testimony that the DNA material on the shoe was blood.

Soon after appointment, defense counsel sought discovery of the DNA evidence held by the CIL. 1 CR 68, 81. After the State noticed the defense it would be calling at trial experts from the CIL—Robert Sailors and Erica Graham—counsel moved for funding to hire an independent DNA expert (Dean Wideman), and to permit Wideman access to the DNA laboratory records. 2 CR 455-56, 489-90; Ex. 22 at ¶¶2-3. The court granted the defense motion and Wideman was appointed. 2 CR 492-93.

---

[12] The state district court's FFCL also misidentified the biological material as blood, a finding that was clearly unreasonable. See Ex. 13 at 27 (discussing "blood" on Leza's shoe); 28 ("blood found on [ ] Leza's shoes"); 106 ("blood" found on Leza's shoes).

Wideman received the State's DNA laboratory records from the CIL, including DNA serology testing worksheets, chain of custody records, evidence submission forms, communication logs, evidence exam notes, DNA testing worksheets, electropherograms, testing protocols, and CODIS worksheets, and conducted a case review of the materials. Ex. 22 at ¶4; Ex. 104. In addition to his review of the CIL records, Wideman requested from defense counsel information specific to Leza's case, including police reports, autopsy report, witness statements, crime scene photographs and videos, and other forensic lab reports. Ex. 22 at ¶5.

Wideman, however, never had any substantive conversations with defense counsel about the CIL materials he reviewed, and defense counsel never provided to Wideman the records he requested for his review. Wideman submitted his bill to the court without being utilized by counsel, either pre-trial or during the trial. Ex. 22 at ¶6; Ex. 104. If counsel had consulted Wideman, and if Wideman had been given the materials related to Leza's case as he requested, Wideman could have assisted counsel in preparing their cross-examination of the State's DNA experts. Ex. 22 at ¶6. For counsel to have hired an expert to review the DNA reports, and then not use that expert, amounted to gross deficient performance.

Wideman could have alerted counsel that a confirmatory test for blood was never conducted. This information would have assisted trial counsel in objecting to any mention by the State that the evidence on Leza's shoe was blood, let alone blood belonging to the victim. Further, Wideman could have assisted counsel in impeaching Sailors and McCampbell's testimony if their testimony had somehow been deemed admissible.

In addition, since counsel had the same reports that Wideman received from the CIL, there was no reason why counsel did not review the reports themselves and discover that no

confirmatory test for blood had been conducted. Counsel then could have objected to any false testimony about the victim's blood being admitted before the jury.

Moreover, and perhaps most importantly, counsel prejudiced Leza's case by unnecessarily conceding that the material found on Leza's shoe was blood. In closing guilt-phase argument, defense counsel wrongly told the jurors, "There's no doubt [Leza] was in the apartment, okay? He had a speck of blood on his left foot." 16 RR 24. Moments later counsel stated again that there was a "speck of blood on his left shoe," 16 RR 26, and followed that with, "They found blood on his left shoe," and "That's why there's one speck of blood on his left foot."  Id; see also id. at 29 ("Speck of blood on his shoe. Fact."). See McCoy v. Louisiana, 138 S. Ct. 53 (2017) (cert. granted). If counsel had utilized Wideman, or simply read the CIL reports, counsel would not have made this grave error. Simply put, if counsel had performed effectively, it is reasonably probable the jurors would not have found Leza guilty of capital murder.

### 3. While the State was aware the bottom of Leza's left shoe tested negative for the presumption of blood, it improperly inferred to the jury that bloody footprints found at the crime scene belonged to Leza

In addition to the false evidence that the victim's blood was found on Leza's shoe, the State also falsely tied Leza to "bloody" footprints found at the crime scene.

Robert Ross, a crime scene investigator for SAPD, testified that there were two sets of bloody footprints found in the victim's apartment. 12 RR 63-65, 67. Detective Greiner testified to the same, and pointed out that one set of bloody shoe prints was considerably smaller than the other, raising an inference with the jury that one set belonged to Leza and the other to Trevino. 13 RR 28-30. And in closing argument, the State again pointed out the "two sets of bloody footprints," once again connecting the footprints to Leza. See 16 RR 40.

However, the CIL tested the bottom of Leza's left shoe for the presumption of blood, and the test came back negative for the possible presence of blood. Ex. 19 at 4; Ex. 72 at 16. And the

State <u>never</u> conducted any test of the bottom of Leza's right shoe. <u>Id.</u> Thus, it was misleading for the State to introduce evidence of bloody footprints because they could not be connected to Leza.

Further, trial counsel were ineffective for failing to utilize Wideman, who could have alerted counsel to the fact that the bottom of Leza's shoe tested negative for the presence of blood. Or at the very least, counsel themselves could have read the CIL reports, discovered this information, and then effectively cross examined Ross and Greiner as to their false and irrelevant testimony attempting to link Leza to the footprints.

Counsel also should have objected to the State's prejudicial arguments made in closing argument attempting to link the bloody footprints to Leza. Effective counsel would have objected to the State's misleading argument. If counsel had performed effectively, either by properly using the expert they had, or at a minimum reading the CIL reports they had in their possession, it is reasonably probable the jurors would not have found Leza guilty of capital murder.

### 4.    Trevino's DNA profile could not be excluded on Leza's right shoe

In closing, the State argued that the only real verdict the jurors could return in this case was that Leza was guilty of murder of the victim as a principal actor. The State also argued there was no evidence that Trevino alone committed the murder. 16 RR 33-34.

However, trial counsel failed to point out that Leza's right shoe tested positive with the presumption of blood and the DNA profile on the shoe did not exclude Trevino. Ex. 19 at 4; Ex. 71 at 23. This evidence was available in the CIL report, which counsel had in their possession.

The fact that Trevino's DNA (possibly blood) was found on Leza's shoe strongly indicates Trevino was more involved in the killing than the State argued, further supporting the defense's argument that Leza's only involvement in the killing was his arrival after Trevino committed murder. <u>See</u> 16 RR 26-30.

If counsel had utilized the expert they had, Ex. 22 at ¶6, or simply read the reports in their possession, they would have been able to raise this issue with the jurors, and it is reasonably probable that the jurors would not have found Leza guilty of capital murder.

**B.    Other Errors Related To The Crime Scene Evidence Introduced At Trial**

In addition to the points argued above, there were additional errors with respect to the crime scene evidence introduced at trial.

**1.    Robert Sailors testimony regarding CIL accreditation**

Trial counsel failed to effectively cross-examine CIL analyst Sailors regarding his testimony related to CIL's lab accreditation. As it stood, Sailor's testimony over-emphasized the type of accreditation CIL undertook.

During his examination by the State, Sailors was asked about CIL's accreditation. Sailors responded the CIL had been accredited by the American Society of Crime Laboratory Directors (ASCLD) since 1998. 13 RR 102. When asked whether the ASCLD had specific standards that the CIL was to follow, Sailors responded, "Yes ma'am," and explained that the CIL was re-certified annually by the ASCLD. Id.

While it is true that an accrediting agency such as the ASCLD will audit a participating lab for, among other things, having "on file" a set of written procedures and protocols, it is not the function of ASCLD to monitor the implementation of such procedures in every case analyzed by the lab and/or every testimony given by a lab analyst. Further, the ASCLD does not engage in surprise inspections in order to maintain lab certification.[13] The ASCLD's manner of accrediting a lab is a demonstrated problem. Between 2005 and 2011, there have been multiple errors at

---

[13] In that regard, accreditation by the ASCLD is less stringent than restaurant food inspections in the City of San Antonio, where the inspections are unannounced. See Code City of San Antonio, Ch. 13, Sec. 13-4.

ASCLD certified laboratories across the nation including evidence contamination, cheating related to competency, fraud, and mistakes. See Appendix A of: https://tinyurl.com/PDSDCAmicus. See also Ex. 19 at 4. Leza's defense counsel did not cross-examine Sailors about this topic, leaving the jurors with a false impression that CIL's accreditation by the ASCLD meant more than it did.

### 2.    The State's false testimony regarding collection of the victim's DNA

The State also introduced false testimony about how DNA material was collected from the victim in this case.

In his direct testimony, Detective McCampbell stated the blood of the victim in this case was preserved for possible DNA comparison. See 12 RR 106. That testimony was inaccurate. Rather, an oral swab was taken of the victim for later DNA comparison; no blood was collected from the victim. Ex. 71 at 21, 22, 29; 13 RR 106, 111.

The prejudice from Detective McCampbell's testimony had a substantial and injurious effect on the guilt and punishment verdict. Any testimony, either direct or indirect, that the victim's blood was used for DNA comparisons, was false, and left the jurors with the false impression that the material on Leza's left shoe was the victim's blood. As discussed above, this was incorrect as no blood was taken from the victim and further, no confirmatory test for blood was ever conducted.

### C.    Trial and Post-Conviction Counsel Were Ineffective

Trial counsel were ineffective for failing to object to the introduction of false testimony that blood matching the victim's was found on Leza's left shoe, that bloody footprints found in the victim's apartment belonged to Leza, and that blood was taken from the victim for comparison purposes. Counsel were also ineffective for failing to cross examine the witnesses who testified falsely, were ineffective for failing to point out to the jurors that there was no DNA found on the bottom of Leza's shoe, and that Trevino's DNA was found on Leza's shoe, were ineffective for failing to request a mistrial when the false evidence was testified to, and were ineffective for failing

to request a curative instruction. These deficiencies were the product of counsel's failure to utilize their own DNA expert, Ex. 22 at ¶¶4-6, and failure to read or comprehend the CIL reports in their possession.

Further, trial counsel were ineffective for conceding that Leza was in the victim's apartment at the time of the crime based upon "blood" found on his shoe. In closing guilt-phase argument, trial counsel stated, "Armando Leza was in that apartment. Fact." 15 RR 23. A few sentences later, counsel again conceded Leza's presence at the murder: "There's no doubt he was in the apartment. Okay?  He had a speck of blood on his left shoe." Id. at 24; see McCoy, 138 S. Ct. 53 (2017) (cert. granted).

But, as discussed above, the State introduced false testimony that blood was on Leza's left shoe. Rather, without the confirmatory test, the material could have been saliva, mucus, skin cells, or some other human biological matter. Ex. 19 at 3. That is significant because Leza had been in the victim's car, and possibly apartment, days or even weeks before the murder. See 12 RR 15, 17-18, 92,133; 13 RR 53; Ex. 75. Thus, the biological material found on the shoe could have predated the killing in this case. That is to say, Leza could have come into contact with this biological material in a previous ride in the victim's car or visit to the victim's apartment. Ex. 19 at 3. Thus, counsel's "concession" that Leza was at the apartment the night of the killing, based upon "blood" found on his shoe, was unnecessary and overly prejudicial to Leza's guilt-phase case. In short, counsel's performance was deficient, and there is a reasonable probability of a more favorable outcome if counsel had performed effectively.

Further, post-conviction counsel was ineffective for failing to raise any of these claims during the state post-conviction proceedings below. Counsel's ineffectiveness establishes cause for Leza's failure to raise these claims below. Martinez, 566 U.S. at 8-9.

40

**CLAIM FOUR (FAILURE TO OBJECT TO JUDGE'S COMMENT RE: DNA)**

Leza's conviction and sentence of death violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because of judicial bias and ineffective assistance of trial counsel. **Exhaustion**: This claim has not been presented to the state courts because of the ineffectiveness of trial and initial post-conviction counsel.

The right to a fair trial conducted by an impartial judge is a fundamental right of a defendant. <u>Tumey v. Ohio</u>, 273 U.S. 510 (1927) (adjudication by a biased judge requires reversal without regard to prejudice). Judges are not to comment upon evidence or convey their opinion of the case to the jury. Tex. Crim. Proc. Code Ann. § 38.05.

Robert Sailors, a forensic scientist with the Bexar County Criminal Investigations Laboratory, testified as to the DNA evidence collected in Leza's case. 13 RR 97. As described in Claim Three above, Sailors offered false testimony as to the supposed "blood" evidence he stated was located on Leza's shoes. He also explained the victim was not excluded as being the donor of human DNA found from the swab on the left shoe, but she was excluded as being the donor of human DNA on the right shoe. 13 RR 113-14. Sailors then offered a description of the likelihood of a random match. 13 RR 114. He offered a mathematical calculation as the probability of random match and wrote out the number. 13 RR 115.

After writing out the number, the trial court stated, "Okay. That's a lot of zeros." 13 RR 115. Defense counsel was silent. The prosecutor then built upon the court's comment, and asked Sailors: "It's a whole lot of zeros; right?" 13 RR 115. The trial court's comment reinforced Sailors's material testimony (which separately included a material falsehood regarding the claimed presence of the victim's blood DNA) before the jury. The Court's lack of partiality prejudiced Leza and emphasized the import of the false and misleading DNA evidence against Leza. <u>See</u> <u>Proenza v. State</u>, __ S.W.3d __, 2017 WL 5483135 (Tex. Crim. App. Nov. 15, 2017) (judicial

41

comments can be fundamental error reviewable even in the absence of a contemporaneous objection).

Counsel was ineffective for failing to object to the judge's improper comment, for failing to ask the court to strike its extraneous comment, and for failing to request the court offer a curative instruction before he proceeded to cross-examine Sailors. Either individually or collectively, this error was prejudicial, and there is a reasonable probability of a more favorable result if counsel had performed effectively.

**CLAIM FIVE (IAC REGARDING TREVINO PLEA AGREEMENT)**

Leza's conviction and sentence of death violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because trial counsel were ineffective for failing to introduce and procure admission of co-defendant Dolores Trevino's November 2008 plea agreement into evidence during both the guilt and punishment phases of Leza's trial. **Exhaustion**: This claim was presented to the state courts in Leza's initial state application. See Ex. 8 at 64-69. The state courts' adjudication of the claim was contrary to, and consisted of an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts. Ex. 15 at 2; Ex. 13 at 128-32, 153-54. To the extent the Court finds aspects of this claim were not fairly presented to the state courts, Leza contends they were not presented because of the ineffectiveness of Leza's trial and initial post-conviction counsel.

**A.    Background**

A grand jury indicted Leza for capital murder arising from the killing of Allen and named Dolores Trevino as Leza's co-defendant. CR 16. The indictment alleged "Leza . . . did intentionally cause the death of an individual, namely, Caryl Jean Allen, . . . , by CUTTING AND STABBING THE COMPLAINANT WITH A DEADLY WEAPON, NAMELY A KNIFE, THAT IN THE MANNER OF ITS USE AND INTENDED USE WAS CAPABLE OF CAUSING DEATH AND

SERIOUS BODILY INJURY, and . . . was in the course of committing or attempting to commit the offense of ROBBERY of Caryl Jean Allen." Id.

About six months prior to Leza's trial, Trevino pleaded guilty to the murder of Allen—a lesser-included offense to capital murder—that was punishable by five years to life in prison. See Exs. 82-84. With the plea, Trevino admitted to virtually all of the allegations set forth in Leza's indictment. Trevino "judicially confess[ed] and admit[ted]" that she "did intentionally cause the death of an individual, namely, Caryl Jean Allen, . . . , by CUTTING AND STABBING THE COMPLAINANT WITH A DEADLY WEAPON, NAMELY A KNIFE, THAT IN THE MANNER OF ITS USE AND INTENDED USE WAS CAPABLE OF CAUSING DEATH AND SERIOUS BODILY INJURY." Ex. 85 at 2. On June 1, 2009, following Leza's trial, Trevino was sentenced to life in prison. Ex. 116.

Trial counsel failed to procure admission of Trevino's plea agreement at Leza's trial, during both the guilt and punishment phases.[14] The State filed a motion in limine and argued Trevino's plea was not relevant to Leza's guilt, but conceded it would become relevant if Trevino testified. 12 RR 4. The State sought to preclude consideration of the plea at both phases of the trial. Id. The trial court granted the motion with respect to the guilt phase, but indicated the plea could be relevant during the punishment phase. Id. Trial counsel did not oppose the motion, or argue the plea was admissible during the guilt phase.

Trial counsel attempted to introduce evidence of Trevino's plea during the punishment phase. Outside of the presence of the jury, counsel called Deputy District Clerk Lillian Cronk. 18 RR 163. Cronk testified Trevino had pleaded guilty to Allen's murder and had admitted that she

---

[14] At the state writ hearing, trial counsel admitted he had access to copies of Trevino's plea documents at the time of Leza's trial. Writ RR 193-94.

used a deadly weapon during commission of the crime. 18 RR 164. Trial counsel argued the plea is "admissible for the jury's consideration as to the full disclosure of the participants in this defense [sic]." 18 RR 165. Counsel further argued there was evidence that Trevino was the "principle and not the party, and it would be a factor to be considered for [the jury] in assessing punishment in answering the special issues." Id. The trial court acknowledged that "I think it's not fair for it not to come into evidence," but stated "I don't see any kind of vehicle that it comes in under." 18 RR 165-66. Trial counsel failed to proffer any legal authority in response by which the plea could be admitted. Consequently, the trial court ruled "[i]t is not going to be admitted," but conceded that "[i]t ought to be." 18 RR 166.

**B.     Counsel Failed To Argue the Plea Was Admissible On State Law Grounds**

Trial counsel were ineffective for failing to raise various provisions of state law supporting the admission of Trevino's plea. As an initial matter, the plea was relevant to the issues at stake in the guilt phase. At trial, the State argued Leza was guilty of capital murder because he "intentionally caused the death of . . . Allen, by cutting or stabbing her with a deadly weapon, which is a knife . . . ." 16 RR 31. The State insisted that "[i]t's cutting or stabbing" and that it "[did not] have to prove to you both." 16 RR 32. However, Trevino's plea established Leza did not cut or stab Allen with a knife as the State claimed. In her plea, Trevino confessed to killing Allen by both cutting and stabbing her with a knife.[15] Ex. 85 at 2. Moreover, Trevino's plea also undermined the State's alternative contentions that Leza was guilty of capital murder as a party or co-conspirator. See 16 RR 33-34. The State's alternative theories were based on Leza's recorded interrogation where Leza indicated he was with Trevino in Allen's apartment and helped bind Allen. See 16 RR 33-34, 38-40, 43-44. Because Trevino's plea demonstrated Leza's confession

---

[15] As a signatory to the plea, the State was bound by this admission.

during the interrogation was false, it necessarily cast the rest of Leza's statements in the interrogation into doubt. In short, at the very least, Trevino's plea made the facts at issue in the guilt phase "more or less probable." Tex. R. Crim. Evid. 401.

For similar reasons, the plea was also relevant to issues during the punishment phase. Pursuant to Code of Criminal Procedure § 37.071(2)(b)(2), the jury was required to determine whether, beyond a reasonable doubt, "the defendant, Armando Leza, actually caused the death of Caryl Jean Allen or did not actually cause the death of Caryl Jean Allen but intended to kill Caryl Jean Allen or anticipated that a human life would be taken?" 3 CR 819. As set forth above, Trevino's plea was relevant to this issue: it was probative as to whether Leza "actually caused the death of . . . Allen," and also cast into doubt Leza's claims he was with Trevino in Allen's apartment and helped bind Allen with the intent to facilitate her murder.

Additionally, the jury was instructed to determine whether Leza "would commit criminal acts of violence that would constitute a continuing threat to society," and "whether, taking into consideration all the evidence, including the circumstances of the offense, Armando Leza's character and background, and the personal moral culpability of Armando Leza, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed." 3 CR 818, 820-21. Trevino's plea was necessarily relevant to both of these questions. Because the plea established Leza did not personally murder Allen, it was probative as to both his future dangerousness to society and his personal moral culpability. Trial counsel rendered deficient performance by failing to raise these arguments. To the extent the Court finds trial counsel's arguments in support of the plea's admissibility were adequate, however, Leza contends in the alternative that the trial court erred in rejecting them and barring admission of the plea.

45

The prosecution did not raise any evidentiary objections other than relevancy when opposing introduction of Trevino's plea. However, to the extent the trial court's ruling was based on Texas's hearsay prohibition, trial counsel were ineffective for failing to cite hearsay exceptions and exclusions that would permit admission of the plea. For instance, the plea could have been admissible as a: (1) statement by an opposing party because the State—Leza's opposing party at trial—prepared, signed and adopted it. Rule 801(e)(2); (2) public record, Rule 803(8)-(9); or (3) statement against interest, Rule 803(24). Trial counsel could also have proposed the trial court simply take judicial notice of the plea as a "fact that is not subject to reasonable dispute," and inform the jury of the plea in its instructions during both the guilt and punishment phases. Rule 201(b). Trial counsel could also have called Trevino as a witness and introduced the plea as a recorded recollection, Rule 803(5). If Trevino had testified Leza was responsible for Allen's death, trial counsel could also have introduced Trevino's plea as impeachment evidence, Rule 613(a), (b). Hence, trial counsel were ineffective for failing to raise these arguments in support of the plea's admission. See also pages 54-55, below.

## C.   Counsel Failed To Argue The Plea Was Admissible On Constitutional Grounds

Trial counsel were also ineffective for failing to raise four federal constitutional grounds in support of the plea's admissibility in the punishment phase. First, trial counsel were ineffective for failing to argue the plea was admissible pursuant to the Eighth Amendment's prohibition against cruel and unusual punishment because it showed the State had already accepted the fair and proportionate sentence for Allen's death was at a maximum life imprisonment. Accordingly, a death sentence for Leza was disproportionate given that Trevino had pleaded guilty to the same crime and would only receive a prison sentence instead of the death penalty.

Second, trial counsel were ineffective for failing to argue the plea showed the State's pursuit of the death penalty for Leza violated the Equal Protection Clause. The plea showed the

State was singling out Leza for the death penalty, even as it accepted a maximum sentence of life imprisonment for Trevino for the same crime. The plea also suggested the State's attempt to procure a death sentence against Leza was discriminatory and based on his gender.

Third, trial counsel were ineffective for failing to argue the plea should have been introduced pursuant to Leza's Sixth, Eighth, and Fourteenth Amendment rights to present a defense and mitigating evidence during the punishment phase. See Holmes v. South Carolina, 547 U.S. 319, 324 (2006); Smith v. Texas, 543 U.S. 37, 44 (2004); Parker v. Dugger, 498 U.S. 308, 315 (1991); Eddings v. Oklahoma, 455 U.S. 104, 110 (1982); Green v. Georgia, 442 U.S. 95, 96-97 (1979) (per curiam); Lockett v. Ohio, 438 U.S. 586, 604-05 (1978);; Chambers v. Mississippi, 410 U.S. 284, 302 (1973).[16]

Finally, Tison v. Arizona, 481 U.S. 137 (1987), required the jury to make death-eligibility findings regarding Leza's involvement in Allen's death in addition to those set forth by state law, and trial counsel were ineffective for failing to argue Trevino's plea should have been introduced as relevant to such findings.

**D.      Leza Was Prejudiced By Trial Counsel's Deficient Performance**

As a result of trial counsel's failure to introduce evidence of Trevino's plea, the jury heard no evidence of Trevino's involvement and concession to Allen's murder. During the guilt phase of trial, it is reasonably probable the outcome would have been different if trial counsel had argued for admission of Trevino's plea because the plea would have negated the State's theory that Leza

---

[16] Many states have found that a co-defendant's life sentence is a relevant mitigating factor which should be presented to a jury. See In re Burgess, 811 So.2d 617, 628 (Ala. 2000); State v. Lynch, 357 P.3d 119, 142 (Ariz. 2015); Woldt v. People, 64 P.3d 254, 260 n.8 (Colo. 2003); Garden v. State, 844 A.2d 311, 317 (Del. 2004); Keen v. State, 775 So.2d 263, 284 (Fla. 2000); Holmes v. State, 671 N.E.2d 841, 850-51 (Ind. 1996); Johnson v. State, 495 A.2d 1, 16-17 (Md. 1985); Howell v. State, 860 So.2d 704, 762 (Miss. 2003); State v. Smith, 931 P.2d 1272, 1281 (Mont. 1996); N.H. Rev. Stat. §630:5 (5)(g); State v. Getsy, 702 N.E.2d 866, 892 (Ohio 1998); State v. Agee, 364 P.3d 971, 998-99 (Ore. 2015).

personally murdered Allen. The prosecution's remaining theories that Leza was guilty—i.e. either as a party to the murder or as a co-conspirator to robbery—did not support the verdict because these theories were based either on statements from Leza's interrogation (which were cast into doubt by Trevino's plea), or on DNA and bloody footprint evidence (which, as set forth in Claim Three, did not support Leza's guilt). 16 RR 33-34, 38-40, 41-42, 43-44.

Trial counsel's failure to procure admission of Trevino's plea also severely prejudiced Leza during the punishment phase. Chambers, 410 U.S. at 302. As a result of counsel's deficient performance, the jury assessed Leza's moral culpability without knowing it was Trevino who actually murdered Allen, or that the maximum penalty Trevino would suffer for the murder was between five years and life imprisonment. Trevino's admission would have altered Leza's moral culpability in the eyes of the jury. Individuals who were seated on Leza's jury stated during voir dire in response to questioning by trial counsel that two people who committed the same crime should receive the same punishment. 5 RR 77; 6 RR 20. Additionally, another juror disliked that a person could only be sentenced from five years to life for committing non-capital murder and could not be sentenced to death. 10 RR 126-27. It is reasonably likely these jurors would have felt the differing sentences were unfair or been unwilling to impose a death sentence on Leza if they had known Allen's actual murderer would only serve, at worst, a sentence of life imprisonment. Hence, there is a reasonable probability the outcome of Leza's punishment phase would have been different had trial counsel raised the arguments presented here in support of the plea's admission during the punishment phase.

## CLAIM SIX (**BRADY** EVIDENCE)

Leza's conviction and sentence of death violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the State withheld exculpatory evidence. Brady v. Maryland, 373 U.S. 83 (1963). **Exhaustion**: This claim has not been presented to the

48

state courts because: (1) the State failed to disclose the evidence; (2) due to the ineffectiveness of trial and initial post-conviction counsel; and/or (3) the conflict with post-conviction counsel (see Claim Twenty-Three below).

On November 19, 2008, Delores Trevino entered an open plea to the murder of Allen. See Exs. 82-84. Before entering the plea, the State met with Delores Trevino. Ex. 83 at ¶V ("I have also provided a true and correct statement of the Capital Murder of Caryl Jean Allen to members of the Bexar County District Attorney's Office, and agree to testify to those details given in my interview . . . ."). Notes of this meeting were prepared by the District Attorney's Office. Ex. 86. These notes were not disclosed to trial counsel, but were obtained by Leza's current counsel during a review of the State's file. The State's interview with Trevino contains exculpatory material that should have been provided to defense counsel.

Notes from that interview included the following exculpatory comments from Trevino: "I got the knife from the kitchen" and "I got the things to tie her up with and got the knife." Ex 86 at 3. Trevino's statements that she tied up the victim and got the knife are exculpatory as they show her direct involvement in the homicide. Additionally, and perhaps most importantly, Trevino said: "I had to kill her, but when I did, I asked God to forgive me." Id (emphasis added). Trevino's confession to the State included a statement unequivocally affirming her direct responsibility for the murder of Allen.

Trevino offered direct statements that she got the murder weapon, tied up the victim, killed the victim, and sought forgiveness. Ex 86 at 3. The State failed to disclose this evidence. Kyles v. Whitley, 514 U.S. 419, 441-44 (1995). If this evidence had been available, Leza could have attacked the integrity of the State's case—that Leza was the killer and Trevino played little to no part in the crime.

49

Armed with the admissions of guilt, Leza could have shown at trial that the prosecution elected not to call the alleged co-conspirator because her statements were consistent with Leza's position that he was not the primary actor and that Trevino was the sole killer. Trevino's undisclosed statements to the prosecution put the murder weapon in her hand. Her own statements also demonstrate that she bound the victim prior to killing her, that she killed the victim, and prayed for forgiveness. Ex 86 at 3.

The three elements of a Brady violation are clearly met here. Strickler v. Greene, 527 U.S. 263, 281-82 (1999). First, Trevino's statements were favorable to Leza as she admitted responsibility for binding the victim, obtaining the murder weapon, killing the victim, and then praying for forgiveness. Ex 86 at 3. Second, the State suppressed these statements.

And third, the suppression of Trevino's interview with the prosecution prejudiced Leza. With regard to prejudice, the State argued that Leza was the master-mind of the crime, and killed Allen. At most, the State argued, Trevino aided Leza by holding down the victim. 16 RR 33-34, 37, 40-41. However, the statements suppressed by the State show an entirely different picture. One in which Trevino tied up the victim, got the murder weapon from the kitchen, killed the victim, and then asked God for forgiveness. Ex. 86 at 3. If the jurors had heard this evidence, none of the proffered theories advanced by the State, blaming Leza for the murder, could have been found true by the jurors.

Furthermore, when the cumulative effect of these undisclosed statements is considered in conjunction with the false and misleading testimony regarding bloody footprints and blood DNA (Claim Three), there is, at a minimum, a reasonable probability of a different result. United States v. Bagley, 473 U.S. 667, 675-76 (1985).

In addition to committing a <u>Brady</u> violation, the State also committed prosecutorial misconduct by making arguments during closing that were contradicted by the suppressed Trevino statements. For example, the State said: "They tied her up and killed her" and "They tied her up." 16 RR 37, 40. However, Trevino told the prosecution that <u>she</u> got the things to tie up the victim, not that they both did. Ex 86 at 3. The prosecution was clearly aware of Trevino's statements since they were made directly by Trevino to the District Attorney's Office. <u>See also</u> Claim Twenty-Three below.

Alternatively, should the State argue that it did not suppress these statements and that they were disclosed, then prior counsel was ineffective for failing to recognize the import of Trevino's statements and utilize them to demonstrate Leza's innocence. The State's suppression of this exculpatory evidence requires that Leza's conviction must be reversed and he must be granted a new trial. Further, post-conviction counsel's conflict of interest excuses any bar to raising this claim now. <u>See</u> Claim Twenty-Three below.

**CLAIM SEVEN (TREVINO'S CONFESSION TO AMANDA LEZA)**

Leza's conviction and sentence of death violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the trial court wrongfully precluded the jury from hearing Amanda Leza testify at the punishment phase that Dolores Trevino admitted to killing the victim. In the alternative, trial counsel were ineffective for failing to properly prepare Amanda to testify at punishment. Trial counsel were also ineffective for failing to call Amanda to testify at the guilt phase. Further, trial and post-conviction counsel were ineffective for failing to raise all of these issues in state court. **Exhaustion**:  This claim was presented to the state courts in part as Point of Error Eleven in the direct appeal, and in part as Claim II in Leza's initial state application. Ex. 3 at 115-24; Ex. 6 at 8; Ex. 8 at 20-22. The state courts' adjudication of these claims was contrary to, and consisted of an unreasonable application of, clearly established federal

51

law, and was based on an unreasonable determination of the facts. See Ex. 9 at 26-28; Ex. 13 at 115–19; Ex. 15 at 2. The remaining portions of this claim were not presented to the state court because of the ineffectiveness of trial and initial post-conviction counsel.

## A.     Relevant Facts

Amanda Leza was riding in a car with Leza, Trevino, and Celia Leza when Trevino confessed to killing Allen and committing the crime alone.[17] According to Amanda, Trevino did not show any remorse and even smiled when she confessed to the killing. Trevino also told Amanda she tied up Allen and slit her throat. Ex. 106 at ¶25; 18 RR 104-05, 108, 111. Despite this admission, trial counsel did not seek to introduce Amanda's testimony at the guilt phase of trial. At punishment, counsel sought to admit Amanda's testimony, but the trial court excluded it as hearsay and because Amanda "could not follow directions" to testify to Trevino's statements verbatim. 18 RR 113-14.

## B.     Trial Counsel Were Ineffective For Failing To Call Amanda Leza To Testify During The Guilt Phase of Leza's Trial

Despite awareness of Trevino's confession to Amanda, counsel did not call Amanda to testify. Trial counsel's decision constituted deficient performance because: (1) Amanda's testimony was admissible; and (2) had trial counsel called Amanda to testify, there is a reasonable probability that, with knowledge of Trevino's confession, the jury would have acquitted Leza.

### 1.     Amanda Leza's testimony was admissible

Amanda's testimony could have been introduced by trial counsel under an exception to the hearsay rule, or alternatively, as a non-hearsay statement. Under Tex. R. Evid. 803(24), Amanda's testimony regarding Trevino's admission to killing Allen could be admitted as a statement against

---

[17] For the purposes of this Claim and to avoid confusion, Amanda Leza will be referred to as "Amanda."

interest. This statement is contrary to Trevino's interest because it would expose her to criminal liability, and therefore, would only be made if Trevino believed it to be true. Id. Additionally, Trevino's statements to Amanda were corroborated by Trevino's: (1) initial statements to law enforcement claiming she alone committed the murder (Ex. 79); (2) subsequent statements to the State before she pleaded guilty to killing Allen and asking God for forgiveness (Ex. 86 at 3); and (3) guilty plea to Allen's murder (Exs. 83, 84). All of these corroborating circumstances support the trustworthiness of Amanda's testimony.

Alternatively, Trevino's statements to Amanda could have been introduced as non-hearsay statements for their effect upon Amanda. Tex. R. Evid. 801(c); also see, e.g., United States v. Herrera, 600 F.2d 502 (5th Cir. 1979); United States v. Wright, 783 F.2d 1091, 1098 (D.C. Cir. 1986). Trial counsel could have argued that, as a result of hearing Trevino's inculpatory statements (18 RR 105, 108), Amanda called law enforcement to tell them where to find Leza and Trevino. 18 RR 106; Ex. 106 at ¶25.

### 2.    Amanda Leza's testimony would have created reasonable doubt

Trial counsel's failure to present Amanda's testimony constituted deficient performance because had trial counsel called Amanda to testify, there is a reasonable probability that, with knowledge of Trevino's confession, the jury would have acquitted Leza of capital murder or, at most, convicted him of a lesser offense. The admission of Trevino's confession would have substantially altered the story presented at trial and undermined a substantial number of the State's theories of Leza's guilt, which focused on Leza as the individual solely responsible for Allen's death. Thus, trial counsel's failure to call Amanda Leza as a witness constituted deficient performance.

**C.**     **The Trial Court's Ruling Precluding Amanda Leza's Testimony At The Punishment Phase of Trial Was Erroneous**

During the punishment phase of trial, the court precluded Amanda's testimony that Trevino confessed to killing Allen because: (1) Amanda was not testifying to Trevino's direct quotations; and (2) the testimony constituted hearsay. 18 RR 113-14. The court's ruling, however, was erroneous.

First, there is no requirement a witness testify to another person's statements verbatim. Thus, Amanda's recitation of Trevino's statement did not need to be an exact quote. Second, as to the trial court's determination that Amanda's testimony was hearsay, defense counsel properly argued the statements could be admitted as non-hearsay "statement[s] against penal interest." 18 RR 108–09. The trial court, however, prevented Amanda from testifying about Trevino's confession because Amanda "can't follow directions." 18 RR 113. As a result of its ruling, the court failed to consider the proper evidentiary grounds offered by trial counsel, and thus, its failure to admit Amanda's testimony was erroneous.[18]

**D.**     **Trial Counsel Were Ineffective For Failing To Adequately Argue The Admissibility Of Amanda Leza's Testimony**

While counsel appropriately argued Amanda's testimony was a statement against penal interest in an attempt to have her testimony admitted, counsel failed to exhaust all available arguments. For example, counsel should have additionally argued Leza had a due process right to present a complete defense and for the jury to hear Trevino's admissions. At the time of trial, there were a number of cases from the Supreme Court establishing the Sixth and Fourteenth Amendment do not permit rules that "disable a defendant from presenting her version of the events for which

---

[18] And while Leza disagrees with the court's conclusion Amanda was required to limit her testimony to direct quotations from Trevino, counsel should have prepared Amanda so she would testify Trevino said "I slit her throat and I tied her up," rather than frustrating the Court by saying: "That she slit her throat and she tied her up." 18 RR 109.

she is on trial." Rock v. Arkansas, 483 U.S. 44, 61 (1987); see also Davis v. Alaska, 415 U.S. 308, 319 (1974). Indeed, not long before trial, the Supreme Court cautioned: "[T]he Constitution … prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote."  Holmes v. South Carolina, 547 U.S. 319, 326 (2006). The Supreme Court found exclusion of hearsay testimony that a second defendant admitted to killing the victim was relevant in the punishment phase and the exclusion of this testimony violated the defendant's right to a fair trial. Green v. Georgia, 442 U.S. 95 (1979). In sum, because of the trial court's error and the deficient performance of trial counsel, the jurors did not hear at the punishment phase Trevino's confession to Amanda Leza. If they had, there is a reasonable probability that at least one juror would have voted for a sentence of less than death.

## CLAIM EIGHT (INCONSISTENT THEORIES)

Leza's conviction and sentence of death violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the State improperly relied on inconsistent theories of guilt between Leza and Trevino to convict Leza. In addition, trial counsel were ineffective for failing to object to the use of inconsistent theories. **Exhaustion**: This claim has not been presented to the state courts because of the ineffectiveness of trial and initial post-conviction counsel.

### A.    Trevino Pleaded Guilty To Killing Allen By Cutting And Stabbing Her With A Knife

As discussed in Claim Five, approximately six months prior to Leza's trial, Trevino signed a plea agreement with the Bexar County District Attorney, in which she agreed to plead guilty to the murder of Allen and additionally "judicially confess[ed] and admit[ted]" that she "did intentionally cause the death of an individual, namely, Caryl Jean Allen, . . . , by CUTTING AND STABBING THE COMPLAINANT WITH A DEADLY WEAPON, NAMELY A KNIFE, THAT

55

IN THE MANNER OF ITS USE AND INTENDED USE WAS CAPABLE OF CAUSING DEATH AND SERIOUS BODILY INJURY." Ex. 83 at 1; Ex. 85 at 2. Following Trevino's plea, the trial court entered judgement against Trevino, finding her guilty of first degree murder with a deadly weapon. Ex. 129.

Despite Trevino's admission and confession to cutting, stabbing, and ultimately causing Allen's death, the State argued Leza was responsible for killing Allen and presented this as a theory under which the jury could convict Leza of capital murder. In fact, the State specifically argued to the jury Leza was guilty of capital murder because he "intentionally caused the death of . . . Allen, by cutting or stabbing her with a deadly weapon, which is a knife . . . ." 16 RR 31. As a result of the evidence presented, the State secured both a conviction for first degree murder against Trevino and a conviction of capital murder against Leza. The jury never discovered Trevino pleaded guilty to causing Allen's death, and therefore, was unable to take this fact into consideration when weighing the evidence against Leza.

**B.    The State's Use Of Inconsistent Theories To Convict Leza Violated His Due Process Rights**

The Due Process Clause guarantees the right to a trial that comports with basic tenets of fundamental fairness. Lassiter v. Department of Soc. Servs., 452 U.S. 18, 24–25 (1981). As part of that guarantee, the law recognizes prosecutors have "the unique duty to ensure fundamentally fair trials by seeking not only to convict, but also to vindicate the truth and to administer justice." Thompson v. Calderon, 120 F.3d 1045, 1058 (9th Cir. 1997), vacated on other grounds, 523 U.S. 538 (1998). Accordingly, a state's use of factually contradictory theories that "exist at the core of the prosecutor's case against defendants for the same crime," in an effort to obtain multiple murder convictions, violates the principles of due process. Smith v. Groose, 205 F.3d 1045, 1052 (8th Cir. 2000); see also Bradshaw v. Stumpf, 545 U.S. 175, 187-88, 191-92 (2005); Johnson v. Dretke, 442

F.3d 901 (5th Cir. 2006); <u>Drake v. Kemp</u>, 762 F.2d 1449, 1479 (11th Cir. 1985) (Clark, J., specially concurring); <u>In re Sakarias</u>, 106 P.3d 931, 945 (Cal. 2005).

Here, the State violated Leza's rights when it sought to convict him of capital murder based on arguments inherently inconsistent with Trevino's admission and plea, in which Trevino conceded that she caused Allen's death by cutting and stabbing her with a knife. In an effort to secure Leza's conviction, the State offered four theories of guilt during trial: (1) Leza acted alone, (2) Leza was the main actor and Trevino assisted, (3) Trevino was the main actor and Leza assisted, and (4) Leza entered into a conspiracy with Trevino to commit the robbery and, in an attempt to carry out the conspiracy, Trevino caused Allen's death. 16 RR 9-10, 33-34.

Based on Trevino's plea agreement, it is clear the arguments and evidence presented by the State are premised on inherently inconsistent theories of guilt. Specifically, the State's first theory that Leza acted alone in causing Allen's death, is clearly inconsistent with Trevino's plea agreement, which admits that Trevino caused Allen's death by cutting and stabbing her with a knife. Additionally, the State's second theory that Leza was the main actor and Trevino helped merely by "t[ying] [Allen] up," is also inherently inconsistent with Trevino's plea, which concedes that she did more than tie Allen up, but actually stabbed and cut Allen with a knife. 16 RR 33.

The State's strategy of using legally inconsistent theories in an attempt to secure two convictions rendered Leza's trial fundamentally unfair. Because Texas's Penal Code does not require a jury to specify the theory under which it found Leza guilty, the State was able to exploit the ambiguity and lead the unknowing jury to believe there was overwhelming evidence to find Leza guilty under four different theories, when in reality, two of the theories were inconsistent with the legal findings of Trevino's plea agreement. The State's exploitation of these inconsistent theories unfairly burdened Leza and violated the State's duty to administer justice by allowing the

State to seek more serious convictions and sentences than would have likely been possible in a single trial based on a fair consideration of the evidence. See Thompson, 120 F.3d at 1058. Leza was, therefore, unfairly burdened with the responsibility of attacking all four theories—a task made even more difficult because the trial court refused to allow any evidence of Trevino's plea agreement or confession to Amanda Leza to come in at trial. See 12 RR 4. Accordingly, the State's exploitative actions deprived Leza of his due process rights to a fair trial.

The State's use of legally inconsistent theories additionally had a prejudicial effect on Leza's sentencing. During the punishment phase of trial, the jury was instructed to determine "whether, taking into consideration all the evidence, including the circumstances of the offense, Armando Leza's character and background, and the personal moral culpability of Armando Leza, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed." 3 CR 820-21. Leza's moral culpability in the commission of this crime was a factor that had a direct impact on the jury's decision between a sentence of death and a sentence of life in prison. By failing to disclose Trevino's confession that she stabbed and cut Allen, the State knowingly withheld material facts from the jury. The jury was consequently led to believe there was evidence to support a finding Leza acted alone and was, therefore, the principal actor in killing Allen, which would have undoubtedly increased his moral culpability in the eyes of the jury. Bradshaw, 545 U.S. at 187 (recognizing the prosecutor's use of inconsistent theories could have affected petitioner's sentence because it is likely the belief that petitioner played a principal role in the offense was material to the sentencing determination). Consequently, the State's knowing exploitation of inconsistent theories violated Leza's right to due process and deprived him of a fair sentencing.

**C.     Trial Counsel And Post-Conviction Counsel Were Ineffective**

Trial counsel and post-conviction counsel were ineffective for failing to object to the State's reliance on legally inconsistent theories and to raise them on post-conviction review, respectively. Although trial counsel made efforts to have Trevino's plea agreement admitted into evidence, trial counsel ultimately failed to object to the State's blatant use of legally inconsistent theories. Had trial counsel objected to the State's reliance upon legally inconsistent theories in violation of its duty to ensure a fair trial, trial counsel could have narrowed the theories under which the jury was permitted to find Leza guilty by eliminating the two theories in which Leza was the primary actor. In light of the insufficient evidence to prove the conspiracy theory, as discussed below, it is reasonably probable the jury would have then been left without sufficient evidence to convict Leza of the capital murder charge. In the alternative, there is a reasonable probability of a more favorable outcome at the punishment phase.

**CLAIM NINE (CONSPIRACY THEORY)**

Leza's conviction and sentence of death violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because: (1) there was insufficient evidence to support a conspiracy charge; (2) the trial court gave an improper jury instruction on the conspiracy charge by omitting the requirement the jury find an overt act was committed in furtherance of the conspiracy; and (3) the State committed misconduct by arguing the jury could convict Leza under a conspiracy theory despite the lack of evidence supporting the theory. In addition, trial counsel were ineffective for failing to request removal of the conspiracy charge and failing to object to the State's and trial court's misstatements of the law. **Exhaustion**:  This claim has not been presented to the state courts because of the ineffectiveness of trial and initial post-conviction counsel.

**A.     There Was Insufficient Evidence To Support A Conspiracy Charge**

The State presented four theories to find Leza guilty of capital murder:  (1) Leza acted alone; (2) Leza was the main actor and Trevino assisted; (3) Trevino was the main actor and Leza assisted; and (4) Leza entered into a conspiracy with Trevino to commit the robbery and, in an attempt to carry out the conspiracy, Trevino caused Allen's death. 16 RR 9-10, 33-34. In relying on the conspiracy theory to convict Leza of capital murder, the State's argument was premised on a finding that Leza, having allegedly entered into an agreement with Trevino to commit robbery, was guilty because Trevino caused Allen's death in furtherance of the conspiracy. Id. at 10, 33-34.

However, the State's entire case, including the evidence it presented—specifically Leza's statements about binding Allen, getting the knife, and cutting her throat—was premised on the theory that Leza was not just involved, but that he ultimately caused Allen's death. 16 RR 38. In fact, the State conceded there was no evidence to support the conspiracy charge based on Trevino causing Allen's death, when it specifically stated during closing argument that such a theory was "contrary to everything [the jury] learned in th[e] courtroom."  Id. Nevertheless, the State argued the jury could convict Leza based on this theory because of the following five statements from Leza's recorded interrogation: "We went over there together"; "We knew her"; "We knocked on the door"; "We asked her for money"; and "We went in."  Id. at 34. Presumably, the State relied on these statements in an attempt to establish the existence of an agreement to commit robbery. Yet, nothing in these five statements, nor any other evidence in the record, satisfied the State's burden to show whether Trevino took actions in furtherance of the conspiracy that ultimately caused Allen's death, or that any agreement to commit robbery existed.

Accordingly, based on the State's own concession that a conspiracy charge was contrary to everything presented at trial, and its failure to provide evidence during trial to support its argument to the jury that Trevino was responsible for Allen's death, there was insufficient evidence

to establish the conspiracy charge, and thus, the trial court should have omitted the instruction. Griffin v. United States, 502 U.S. 46, 60 (1991).

**B.      The Trial Court Erred By Giving A Jury Instruction That Misstated The Law**

The trial court read the following instruction to the jury regarding the conspiracy charge: "The term 'conspiracy,' as used in these instructions, means an agreement between two or more persons, with intent that a felony be committed that they, or one or more of them, engage in conduct that would constitute the offense."  16 RR 10; 3 CR 801. Under Section 15.02 of the Texas Penal Code, a person is guilty of criminal conspiracy if, with the intent to commit a felony, he agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense and he or one or more of them performs an overt act in pursuance of the agreement. Tex. Penal Code Ann. § 15.02. Thus, contrary to what the jury instructions provided here, criminal conspiracy under Texas law requires more than just an agreement between two or more parties to (1) commit a felony, and (2) engage in conduct that would constitute the offense—it also requires an overt act by at least one of the conspirators in pursuance of the agreement.

In this case, the trial court misstated the law when it failed to include the statutory requirement that one or more of the parties "perform[] an overt act in pursuance of the agreement." See 16 RR 10; 3 CR 801. This was particularly prejudicial because it led the jury to believe evidence of an agreement between Leza and Trevino to commit the robbery alone could be sufficient to find Leza guilty of murder. 16 RR 34. Accordingly, the trial court's erroneous jury instruction unfairly prejudiced Leza because it created a lower standard of proof under which the jury could convict Leza of murder. In re Winship, 397 U.S. 358, 364 (1970).

61

**C.    The State Improperly Argued The Jury Could Convict Leza On The Basis Of A Conspiracy When There Was No Evidence To Support The Conspiracy Charge**

In addition to the trial court's errors, the State committed misconduct when it argued the jury could convict Leza of murder on the basis of a conspiracy theory whereby Trevino caused Allen's death, despite its own concession there was no evidence to support such a theory. A prosecutor's misstatement of the law amounts to a constitutional violation if it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986).

Here, the State's misstatement of the law rendered Leza's trial fundamentally unfair because it misled the jury to believe that even if there was insufficient evidence to find Leza caused Allen's death, they could nevertheless convict Leza on the basis of a conspiracy theory. By making this argument, the State not only presented a false statement of the law, it also improperly shifted the burden of proof, forcing the defense to provide affirmative evidence a conspiracy between Leza and Trevino did not exist. The prejudicial effect of this error was further compounded by the trial court's own improper conspiracy instruction to the jury, which required the jury only find evidence of an agreement to commit a felony and engage in conduct amounting to a felony to find Leza guilty of murder. Unfortunately, the trial court never corrected this error and defense counsel did not object. Thus, the jury was left with the erroneous understanding they could find Leza guilty of murder on the basis of a conspiracy theory—absent any evidence Trevino caused Allen's death and based only on circumstantial evidence of an agreement to commit a robbery—thereby rendering Leza's trial fundamentally unfair in violation of his right to due process. Darden, 477 U.S. at 181; Donnelly v. DeChristoforo, 416 U.S. 637, 645 (1974).

**D.      Trial Counsel And Post-Conviction Counsel Were Ineffective**

Trial counsel and post-conviction counsel were ineffective for failing to object to the errors related to the conspiracy charge and to raise them on post-conviction review, respectively. As to trial counsel, while an objection was raised addressing the insufficiency of the evidence to support a conspiracy theory instruction, trial counsel never:  (1) sought removal of the conspiracy charge or objected to the State's and trial court's misstatements of the law; (2) requested a curative instruction; or (3) moved for a mistrial. Had trial counsel objected to the State's misstatement of the law or the trial court's erroneous jury instruction, it could have narrowed the theories under which the jury was permitted to find Leza guilty by eliminating the conspiracy charge from consideration. Because the jury was not required to specify which of the four theories of guilt it found the State proved beyond a reasonable doubt, the fact that trial counsel failed to object to conviction under a conspiracy theory increased the chances the jury improperly convicted Leza on a theory unsupported by sufficient evidence. Thus, had trial counsel properly objected, it is reasonably probable the jurors would not have found Leza guilty of capital murder.

**CLAIM TEN (MULTIPLE THEORIES/UNANIMITY INSTRUCTION)**

Leza's conviction and sentence of death violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the trial court permitted the State to rely upon four different theories to find Leza guilty of capital murder and refused to issue an instruction requiring the jury unanimously agree under which of the four theories Leza was guilty. The trial court's error violated:  (1) Leza's due process right to a unanimous verdict because it permitted the jurors to find Leza guilty on multiple theories that were morally and practically inequivalent; and (2) Leza's Eighth Amendment right because failing to distinguish between the four theories preluded the jury from making the necessary factual findings to sentence Leza to death under Enmund v. Florida, 458 U.S. 782, 788 (1982) and Tison v. Arizona, 481 U.S. 137, 151 (1987).

Further, trial counsel were ineffective for failing to raise these arguments at trial. **Exhaustion**: This claim was presented to the state courts as Point of Error Five in the direct appeal and Claim VI in the initial state application. Ex. 3 at 71-79; Ex. 6 at 7; Ex. 8 at 91-92. It was additionally presented to the state courts as Point of Error Four in the direct appeal. Ex. 3 at 37-71; Ex. 6 at 6-7. The state courts' adjudication of this claim was contrary to, and consisted of an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts. See Ex. 9 at 15-21; Ex. 13 at 177-78.

**A.** **Due Process Requires Proof Beyond A Reasonable Doubt And Unanimous Agreement of Every Element Of A Criminal Offense, And The Trial Court's Instructions Permitted The Jury To Convict Leza In The Absence of Unanimous Agreement As To His Role In The Offense**

Due process requires "proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the defendant] is charged." In re Winship, 397 U.S. 358, 365 (1970). Under Texas law, a jury must reach a unanimous verdict about the specific crime the defendant committed. Cosio v. State, 353 S.W.3d 766, 771 (Tex. Crim. App. 2011). Thus, conviction of a capital murder in Texas requires proof beyond a reasonable doubt and unanimous juror agreement that a person (1) intentionally or knowingly caused the death of an individual, (2) in the course of committing or attempting to commit . . . robbery. Tex. Penal Code §§ 19.02(b)(1), 19.03(a)(2).

A defendant's due process rights are violated when inherently different acts are used to define an element of the crime without a requirement the jury agree on the specific act committed. See Schad v. Arizona, 501 U.S. 624, 633 (1991). Although the Supreme Court has found states may have some flexibility in defining "different course of conduct, or states of mind, as merely alternative means of committing a single offense," this flexibility is not unlimited. Id. at 632. When the "difference between means become so important that they may not reasonably be viewed as alternatives to a common end," due process requires the "separate theories of crime [] be treated

as separate offenses subject to separate jury findings." <u>Id.</u> at 634. In an effort to make this distinction, the Supreme Court in <u>Schad</u> directed courts to consider factors like "the moral and practical equivalence of the different" acts that may satisfy the element of a single offense. <u>Id.</u> at 637.

1. **The trial court erred when it gave jury instructions that permitted the jury to find Leza guilty under two materially different and morally inequivalent acts**

In this case, Leza's right to due process was violated because the trial court allowed the jury to convict Leza of capital murder under materially different and morally inequivalent acts and mental states, without requiring a consensus as to the theory under which Leza was found guilty. The State presented four theories to find Leza guilty of capital murder: (1) Leza acted alone and caused Allen's death in the course of the robbery ("Theory One"); (2) Leza, with Trevino's assistance, caused Allen's death in the course of the robbery ("Theory Two"); (3) Leza assisted Trevino in robbing Allen and causing Allen's death ("Theory Three"); and (4) Leza entered into a conspiracy with Trevino to commit robbery, and in an attempt to carry out the agreement to commit robbery, Trevino caused Allen's death ("Theory Four"). 16 RR 11-12.

These four theories, however, fall into two distinct categories, which are both morally and practically inequivalent. Under the first category, encompassing Theories One, Two, and Three, the State was required to prove Leza had the <u>specific intent</u> (mens rea) <u>to commit capital murder</u> and committed acts that constituted <u>direct participation</u> (actus reus) <u>in the capital murder</u>. Specifically, the State needed to prove beyond a reasonable doubt: Theory One - Leza <u>intended to</u> and <u>did cause Allen's death</u> while in the course of committing robbery; Theory Two - Leza, with Trevino's assistance, <u>intended to</u> and <u>did cause Allen's death</u> while in the course of committing robbery; or Theory Three - Leza <u>intended to assist</u> and <u>did assist</u> Trevino <u>in causing Allen's death</u> while in the course of committing robbery. <u>See</u> Tex. Penal Code §§ 7.02, 19.02(b)(1), 19.03(a)(2);

16 RR 8-10. The second category, however, includes Theory Four, which was strictly based on Leza's involvement in a criminal conspiracy (see Claim Nine above).

Theory Four is morally and practically inequivalent to Theories One through Three, and, therefore, should have been treated as a distinct theory of capital murder requiring a separate and unanimous jury finding. See Schad, 501 U.S. at 634. To be guilty of capital murder based on a criminal conspiracy, the State must prove: (1) with the intent that a robbery would be committed; (2) Leza entered into an agreement with Trevino that they engage in conduct that would constitute the robbery; (3) Leza or Trevino performed an overt act in pursuance of the agreement; and (4) Leza should have anticipated a capital murder could occur as a result of carrying out the conspiracy. Tex. Penal Code §§ 7.02(b), 15.02; 16 RR 8, 10.

Unlike Theories One through Three discussed above, convicting Leza of capital murder under a conspiracy theory does not require the State prove beyond a reasonable doubt Leza actually had the specific intent to commit capital murder. See, e.g., Canfield v. State, 429 S.W.3d 54, 66 (Tex. App. Houston (1st Dist. 2014)). Rather, for mens rea purposes, the State only needed to prove (1) Leza had the specific intent to commit the non-capital offense of robbery, and (2) that he should have anticipated a death could occur as a result of the robbery. Tex. Penal Code §§ 7.02(b), 15.02; 16 RR 8, 10. These mens rea requirements are not morally equivalent to the requirements of Theories One through Three, which mandated the jury find beyond a reasonable doubt Leza had the specific intent to commit capital murder.

Additionally, under a conspiracy theory, there is no requirement Leza, himself, actually committed the murder, or even aided in the commission of the murder. Instead, the only act the jury needed to find Leza, himself, committed was the act of entering into the agreement to commit robbery. The remaining requirements—(1) that an overt act be committed in furtherance of the

agreement, and (2) that a capital murder be committed—are both actions that could have been taken by Trevino, yet ultimately used to convict Leza. See Tex. Penal Code § 15.02. The actus reus requirement of entering into an agreement to commit robbery is not morally or practically equivalent to the requirements under Theories One through Three, which demand that Leza actually commit or assist in the commission of a murder.

Accordingly, a conviction of capital murder under Theory Four based on Leza's engagement in a conspiracy, requires materially different evidence to support both the mens rea and actus reus elements of capital murder compared to those required under Theories One through Three. As the comparison between the two categories of theories are not morally or practically equivalent, they should have been treated as separate offenses subject to separate, unanimous jury findings. See Shad, 501 U.S. at 637.

### 2.      Leza was deprived of his due process right to a unanimous verdict

The trial court's failure to require separate findings had a substantial and injurious effect on the jury's verdict because it allowed the jury to convict him of capital murder without unanimously agreeing on the facts necessary to constitute the crime beyond a reasonable doubt. In re Winship, 397 U.S. at 365. Absent an instruction from the trial court requiring unanimity, there was no guarantee all twelve jurors agreed on the mens rea or actus reus elements to support a conviction. See Ex. 3 at 71-79; Ex. 8 at 91-92. In fact, in light of the general verdict form, there is a reasonable probability the jurors each disagreed on Leza's level of involvement. Stromberg v. California, 283 U.S. 359, 368 (1931).

**B.    The Eighth Amendment Prohibits Capital Punishment Absent A Jury Finding The Individual Actually Killed, Attempted to Kill, Or Intended to Kill, Or Was A Major Participant In The Crime Who Displayed A Reckless Indifference To Human Life, And The Trial Court's Instructions Permitted The Jury To Convict Leza Without Making This Determination**

The Eighth Amendment prohibits any punishment that is not proportional to the crime for which the defendant was convicted. Enmund v. Florida, 458 U.S. 782, 788 (1982). A death sentence is not proportional, and therefore may not be imposed, unless the jury finds the defendant is sufficiently culpable for the capital crime committed. See id. at 797-98; Ring v. Arizona, 536 U.S. 584, 609 (2002); Apprendi v. New Jersey, 530 U.S. 466 (2000). The death penalty may not be imposed on an individual who did not (1) actually kill, (2) attempt to kill, or (3) intend to kill the victim. Enmund, 458 U.S. at 797. The only exception to this requirement is if the jury finds the individual (1) was a major participant in the felony committed, and (2) displayed a reckless indifference to human life. Tison v. Arizona, 481 U.S. 137, 151 (1987).

Here, Leza was improperly sentenced to death because the jury imposed the capital sentence without being required to make the necessary findings under Enmund or Tison. Specifically, the jury sentenced Leza to death without determining whether Leza (1) actually killed, attempted to kill, or intended to kill Allen; or (2) was a major participant and displayed a reckless indifference to human life. See Enmund, 458 U.S. at 788; Tison, 481 U.S. at 151. As discussed above, while Theories One through Three were premised on Leza having the intent to commit capital murder, Theory Four—based on Leza's engagement in a conspiracy with Trevino—did not share a similar level of intent. Rather, under a conspiracy theory, the jury only needed to find (1) Leza entered into an agreement with the intent to commit robbery, and (2) that he should have anticipated the second felony offense of capital murder could have occurred as a result of carrying out the conspiracy. 16 RR 8. Absent a requirement the jury agree on Leza's course of conduct, there was consequently no unanimous jury determination to satisfy the Enmund

requirements—namely that Leza actually killed, attempted to kill, or had the intent to kill Allen—in light of the trial court's inclusion of the conspiracy theory, which did not require any of these findings to support a conviction.[19]

There was additionally no requirement the jury find sufficient evidence to satisfy the <u>Tison</u> requirements beyond a reasonable doubt—specifically that Leza was a major participant in the commission of the murder and that he demonstrated a reckless disregard for life. While the trial court's instructions regarding the conspiracy theory included a requirement the jury find Leza anticipate a murder could occur as a result of carrying out the conspiracy to commit robbery, anticipating a murder does not sufficiently satisfy the "reckless disregard for life" requirement to find Leza eligible for a death sentence. In fact, as the Supreme Court noted in <u>Tison</u> "participants in violent felonies like armed robberies can frequently 'anticipate that lethal force . . . might be used,'" but that does not mean they should be eligible for a death sentence. <u>Tison</u>, 481 U.S. at 150-51. Thus, absent a specific finding by the jury that Leza was a major participant and demonstrated a reckless indifference to human life, anticipation alone does not sufficiently rise to the level of culpability required by the Eighth Amendment to sentence Leza to death. Accordingly, a capital murder conviction premised on a conspiracy theory does not satisfy the requirements under <u>Enmund</u> or <u>Tison</u>.

Furthermore, the special instructions provided to the jury during the punishment phase of Leza's trial failed to remedy the issue caused by the inclusion of the conspiracy theory during the guilt phase of trial. Under Texas Code of Criminal Procedure § 37.071, the trial court instructed the jury that in order to sentence Leza to death, it must unanimously determine beyond a reasonable

---

[19] In fact, the State's conspiracy theory was premised on the argument that Leza was guilty of capital murder because Trevino, not Leza, caused Allen's death in furtherance of the conspiracy. <u>See</u> 16 RR 10, 34.

doubt Leza (1) "actually caused the death of Caryl Jean Allen" or (2) "did not actually cause the death of Caryl Jean Allen but intended to kill Caryl Jean Allen or anticipated that a human life would be taken." 19 RR 10. While the first clause of the special instruction satisfies <u>Enmund</u> by requiring the jury find Leza "actually caused the death" of Allen, the second, alternative clause of the special instruction—which accounts for the theories in which Leza did not cause Allen's death, but is, nevertheless, guilty under a law of the parties theory—allowed the jury to sentence Leza to death without meeting the requirements of either <u>Enmund</u> or <u>Tison</u>. Similar to the language used in the conspiracy instruction, the special instruction did not require the jury find Leza demonstrated "a reckless indifference to human life," but instead allowed the jury to sentence Leza to death based merely on his anticipation that a human life would be taken. <u>See</u> Tex. Penal Code § 37.07. Accordingly, absent a unanimous and specific finding by the jury that Leza's culpability was premised on one of the first three theories, and not on the conspiracy theory, the jury never found, beyond a reasonable doubt, that Leza (1) actually killed, attempted to kill, or intended to kill Allen; or (2) was a major participant and displayed a reckless indifference to human life, before sentencing him to death, as required by <u>Enmund</u> and <u>Tison</u>. Accordingly, Leza's capital murder conviction and subsequent death sentence violates the Eighth Amendment, and this error is prejudicial per se.

## C.    Trial Counsel Were Ineffective

Trial counsel were ineffective because they failed to:  (1) object to the State's reliance upon two sets of materially different and morally inequivalent theories to convict Leza of capital murder, and (2) request a unanimity instruction be given to the jury in light of the four theories relied upon to convict. As a result of trial counsel's failure, the jury was left with four different theories to convict Leza of capital murder absent any requirement they agree on the specific facts to support the mens rea or actus reus of the crime. This was particularly problematic in light of the trial court's

inclusion of the conspiracy theory. By allowing the trial court to include the conspiracy theory as a means for finding Leza guilty and then failing to require the jury unanimously specify which theory they relied upon, Leza was convicted of capital murder without satisfying the constitutional requirements as outlined under Enmund and Tison. This was additionally problematic in light of the jury's use of a general jury verdict form, which only required unanimity on whether the State successfully met its burden of proof to find Leza guilty. Had the trial court objected and requested separate jury findings–one for Theories One through Three, and one for Theory Four—the jury would have been required to unanimously agree on Leza's specific involvement in the crime. Based on the evidence presented, specifically the lack of evidence to support a conspiracy theory and the lack of clarity surrounding Leza's involvement, it is reasonably probable the jury would have been left without sufficient evidence to convict Leza of capital murder.

**CLAIM ELEVEN (ACTUAL INNOCENCE)**

Leza's conviction and sentence of death violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because Leza is innocent of the charged offense of capital murder. **Exhaustion**:  This claim was presented to the state court as Claim I of the initial state application. Ex. 8 at 11-23. The state courts' adjudication of this claim was contrary to, and consisted of an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts. See Ex. 13 at 104-14; Ex. 15 at 3.

There is an abundance of evidence demonstrating that Leza is innocent of the capital murder of Allen.

Trevino herself pled guilty to murder before the start of Leza's trial. In her guilty plea, Trevino admitted to intentionally causing the death of Allen by "cutting and stabbing" her with a knife. Ex. 82. See Claim Five, above.

Trevino also admitted to the State, before entering into her plea, that she committed the murder. Specifically, Trevino told the State she got the knife from Allen's kitchen, tied her up, and that "I had to kill her, but when I did, I asked God to forgive me."  Ex. 86; <u>see</u> Claim Five, above.

Trevino also told Amanda Leza that she tied up Allen, slit her throat, and killed her. At the time Trevino said this, she showed no remorse and actually smiled. 18 RR 105-09, 112-13.

Trevino also confessed to Leza's family. Some months after Leza was convicted, Trevino wrote Leza's family and told them that Leza was on death row for a crime that Trevino committed. Ex. 89; Ex. 90; Ex. 87.

Further, evidence shows Leza could not have committed this crime due to his brain impairments. These impairments robbed him of executive functionality leaving Leza unable to commit a crime that required planning. Ex. 65 at 8-9. In addition, Leza's dependent personality would have caused him to attach to a perceived protector—in this case, Trevino. <u>See</u> Writ RR 196-203. As a result, he would have followed Trevino to the crime, as opposed to being the organizer. In short, Leza's brain impairments show that he did not possess the capacity to commit a premeditated crime. Ex. 63 at ¶17; Ex. 17 at 20. This evidence shows that Trevino actually committed the murder in this case, and Leza was there, at most, after the fact to help remove the victim's belongings.

All of the above is compelling evidence of Leza's innocence. Thus, Leza is substantively entitled to relief because he is actually innocent of capital murder. In <u>Herrera v. Collins</u>, 506 U.S. 390 (1993), the Supreme Court assumed, without deciding that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process

such a claim." Id. at 417. Leza can make such a persuasive demonstration, thus he is entitled to habeas relief on his free standing actual innocence claim.

Second, Leza's actual innocence overcomes any procedural bars to consideration of his constitutional claims. See Schlup v. Delo, 513 U.S. 298 (1995). In Schlup, the Supreme Court recognized that actual innocence falls within the "narrows class of cases . . . implicating a fundamental miscarriage of justice," thus requiring consideration of constitutional claims even if procedural obstacles may otherwise bar consideration. Id. at 314-15. Schlup also recognizes that "newly presented evidence may indeed call into question the credibility of the witnesses presented at trial" and "[i]n such a case, the habeas court may have to make some credibility assessments." Because Leza has made a showing of actual innocence under Schlup, this Court must consider the merits of Leza's constitutional claims.

Insofar as counsel failed to present this evidence of Leza's innocence, counsel were ineffective, and there is a reasonable probability of a more favorable outcome if counsel had performed effectively. Counsel lacked any strategic reason for failing to present evidence implicating Trevino.

**CLAIM TWELVE (IAC REGARDING VOIR DIRE)**

Leza's conviction and sentence of death violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution due to the ineffective assistance of trial counsel during the voir dire proceedings. **Exhaustion**:  Section C of this claim was presented to the state courts in the initial state application. See Ex. 8 at 39-63. The state courts' adjudication of this claim was contrary to, and consisted of an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts. See Ex. 15 at 2; Ex. 13 at 139-53. The remaining sections of this claim were not presented to the state courts because of the ineffectiveness of Leza's initial post-conviction counsel.

73

A.      **The Sixth Amendment Requires An Adequate Voir Dire And An Impartial Jury**

The Sixth Amendment guarantees "a fair trial by a panel of impartial, indifferent jurors," and thus, includes "an adequate voir dire to identify unqualified jurors." Irvin v. Dowd, 366 U.S. 717, 722 (1961) (internal quotation marks omitted); Morgan v. Illinois, 504 U.S. 719, 729 (1992); see Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981). Two specific inquires during voir dire are constitutionally required: inquiries into racial prejudice when a defendant is charged with a violent crime against a person of a different race, Mu'Min v. Virginia, 500 U.S. 415, 424 (1991), and, in a capital case, inquiries into a juror's views on capital punishment. Morgan, 504 U.S. at 730-32. If voir dire reveals that a juror is biased, the trial court must excuse the juror for cause because the presence of even one biased juror violates a defendant's right to a fair and impartial jury, and constitutes structural error. Virgil v. Dretke, 446 F.3d 598, 607 (5th Cir. 2006); see Parker v. Gladden, 385 U.S. 363, 366 (1966). "'The bias of a prospective juror may be actual or implied; that is, it may be bias in fact or bias conclusively presumed as [a] matter of law.'" Solis v. Cockrell, 342 F.3d 392, 395 (5th Cir. 2003).

A juror harbors an actual bias, if his "views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Soria v. Johnson, 207 F.3d 232, 242 (5th Cir. 2000) (quoting Wainwright v. Witt, 469 U.S. 412, 424 (1985)). To demonstrate actual bias, a defendant must point to an "admission" or present "factual proof" of bias on the juror's part. United States v. Thomas, 627 F.3d 146, 161 (5th Cir. 2010). For instance, "a juror who will automatically vote for the death penalty in every case" demonstrates actual bias because the juror "has already formed an opinion on the merits," and "the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror." Morgan, 504 U.S. at 729. "If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence." Id. A "juror's assurances that he is equal to [the]

74

task [of rendering a verdict based on the evidence] cannot be dispositive of the accused's rights."

Murphy v. Florida, 421 U.S. 794, 800 (1975). "The determination of implied bias is an objective

legal judgment made as a matter of law and is not controlled by sincere and credible assurances

by the juror that he can be fair." Brooks v. Dretke, 418 F.3d 430, 434 (5th Cir. 2005).

Texas statutes set forth similar standards with respect to the dismissal of jurors for bias.

See Tex. Crim. Proc. Code Ann. § 35.16. Under Texas law, a juror may be challenged for cause if

he or she exhibits "a bias or prejudice in favor of or against the defendant," or when it "is

established in the mind of the juror such a conclusion as to the guilt or innocence of the defendant

as would influence the juror in finding a verdict." Id. §§ 35.16(a)(9), (10); see also id. § 35.16(c)(2).

**B.      Trial Counsel Failed To Question The Venire Regarding Racial Bias**

The Supreme Court requires questioning regarding racial bias in capital cases involving

interracial violence to protect against racial prejudice infecting a verdict. Turner v. Murray, 476

U.S. 28, 37 (1986). Here, Leza, a Hispanic man, was accused of a capital crime of violence against

Allen, a Caucasian female. Nonetheless, trial counsel failed to question the venire regarding racial

bias, or even mention the issue during voir dire. Counsel's failure exposed Leza to an unacceptable

risk that racial prejudice would infect his trial, and constituted ineffective assistance.

**C.      Trial Counsel Failed To Adequately Question The Seated Jurors And Challenge Them For Cause**

Trial counsel failed to adequately question or challenge for cause any of the seated jurors

during voir dire. Each of the seated jurors made written statements in their questionnaires and oral

statements during voir dire demonstrating both actual and implicit bias, often in favor of imposing

a death sentence. But trial counsel failed to adequately question the jurors regarding this bias, or

challenge them for cause. Trial counsel's performance was particularly inexplicable because first

chair counsel McDonald testified during Leza's initial post-conviction proceeding that he selected

jurors almost exclusively based on juror questionnaires and veniremembers' views on the death penalty. Writ RR 187-89. Counsel's performance was therefore unreasonable.

1.     **K. Moreno – potential juror no. 7, first juror**

Juror K. Moreno marked on his juror questionnaire that he had difficulty reading, speaking, or understanding written or spoken English, Ex. 25 (question 8), suggesting he was not qualified to serve as a juror. See Tex. Crim. Proc. Code Ann. § 35.16(a)(11). Moreno's other responses on his questionnaire corroborate his reported difficulty with the English language and indicate he did not understand what was being asked. For instance, Moreno answered many portions of the questionnaire with one-word answers, such as "Yes," "No," and "N/A," even when the questions did not solicit such answers. Id. (questions 46(i), 54-56, 71-72, 100, 106-15, 140, 152-54). Moreno repeatedly responded he was "uncertain" when asked about his views on different aspects of the criminal trial process. Id. (questions 86-99). When asked what his best arguments were for and against the death penalty and a sentence of life in prison, Moreno responded with variants of the phrase, "[i]f someone kills." Id. (questions 131-33).

Moreno's other responses on the questionnaire demonstrated both actual and implied bias in favor of the death penalty. Moreno indicated he would vote to impose a death sentence on anyone who committed murder.[20] Moreno repeatedly stated he believed the death penalty should always be imposed on a person who commits capital murder or intentionally kills, and that life imprisonment was an inappropriate sentence under such circumstances. Ex. 25 (questions 117-19, 132-33). Moreno agreed he would "probably vote for the death penalty" if he "found someone guilty of capital murder." Id. (question 125). Moreno also stated a defendant's background, criminal history, age, mental condition, and other factors should not be considered when deciding

---

[20]  Moreno also indicated he believed the Supreme Court is "too lenient with criminal defendants," suggesting a bias against criminal defendants generally. Ex. 25 (question 145).

whether to impose the death penalty, and indicated he would not need to consider these factors when sentencing Leza. Id. (questions 139-40). Finally, Moreno represented he was "unsure" whether he could apply the law to the facts of Leza's case when it "was contrary to [his] beliefs concerning the death penalty." Id. (question 142).

Moreno also demonstrated bias during voir dire. When asked whether Moreno would have "any problem deciding" Leza's future dangerousness at punishment, Moreno replied, "I think he will be dangerous in the future." 5 RR 73. When the prosecutor asked if Moreno could consider imposing a death sentence, Moreno replied, "Well, if he murdered somebody, I would think to give the death penalty." 5 RR 74. When asked whether he could determine the special issues in punishment according to the evidence, Moreno twice replied, "No."  5 RR 75. When asked if his feelings were "so pro-death penalty or against the death penalty that [they] would make it impossible for you to be a juror in this case," Moreno responded, "Yes, like the pro, it depends --." 5 RR 75. Nevertheless, trial counsel asked Moreno only one substantive question on voir dire: whether two people who committed the same crime should receive the same punishment. 5 RR 77. Trial counsel subsequently agreed to Moreno's selection as a juror. 5 RR 78.

Moreno's statements established Moreno was pre-disposed to impose the death penalty. Moreno also displayed linguistic difficulties. At the very least, Moreno's statements warranted detailed examination regarding these issues on voir dire.

## 2.      J. Esparza – potential juror no. 10, second juror

Juror J. Esparza's responses on his jury questionnaire demonstrated both actual and implied bias. Some of Esparza's answers reflect a bias against criminal defendants, and that defendants had to affirmatively introduce evidence to raise a reasonable doubt about their innocence. Esparza agreed that "[a]n accused in a criminal case should be required to present some evidence to prove his innocence," and believed the term "reasonable doubt" meant "[t]o convince [him] with

"[p]roo[f] evidence[] [sic]." Ex. 26 (questions 96, 99). Esparza also agreed with the statement that "[t]he law should concern itself more with victims of crime than those accused or convicted of crimes." Id. (question 90).

Esparza's answers to other questions reflect a bias in favor of imposing the death penalty for any intentional killing. Ex. 26 (question 105). In addition, in two separate questions, Esparza "strongly agree[d]" that a person who intentionally kills another deserves the death penalty, regardless of their background or other factors. Id. (questions 123-24). Esparza also demonstrated a pro-death-penalty bias indicating his support for the death penalty was "a Bible thing" because prohibition against murder was "one of the Ten Commandments." 6 RR 17. Esparza also stated a person who takes a life "should suffer the same." 6 RR 19. Trial counsel failed to question Esparza regarding his pro-death-penalty bias and subsequently agreed to Esparza's selection. 6 RR 28.

Esparza's statements demonstrated both actual and implicit bias against criminal defendants generally and in support of the death penalty for those who took a life. Trial counsel should have challenged Esparza for cause. At the very least, counsel should have questioned Esparza about whether he could impose a sentence other than death if Leza was found guilty of murder.

### 3.   G. Estrada – potential juror no. 3, third juror

Some of juror G. Estrada's answers reflect a bias against criminal defendants generally. Estrada claimed she was "[n]ot at peace," in response to a question about how she felt about persons accused of violent crimes. Ex. 27 (question 46(i)). Estrada also agreed with statements suggesting the criminal justice system was too lenient with defendants. Id. (questions 89, 145, 148). Estrada reported that she would tend to believe the word of a law enforcement officer over that of a civilian witness. Id. (question 93). Estrada also expressed uncertainty as to whether she

agreed that an accused in a criminal case was presumed innocent and did not have to prove anything at trial. Id. (questions 92, 96, 98).

Estrada's answers to other questions reflect a bias in favor of imposing the death penalty for any intentional killing. Ex. 27 (questions 118, 120). Estrada also agreed that a person who intentionally kills another deserves the death penalty, regardless of their background or other factors. Id. (questions 123-24). In fact, Estrada expressed uncertainty about whether those factors should even be considered at all when deciding on the death penalty. Id. (questions 127-30). Estrada stated there were no instances where life in prison was a more appropriate sentence for someone convicted of capital murder. Id. (question 137). Estrada also expressed uncertainty about whether her views would render her unable to apply the law to Leza's case. Id. (questions 141-42). Trial counsel did not question Estrada regarding her biases during voir dire, or challenge her for cause and subsequently agreed to Estrada's selection as a juror. 6 RR 72.

At the very least, trial counsel should have questioned Estrada about whether she had already decided Leza was guilty, and whether she could impose a sentence other than death.

### 4.     C. Waters – potential juror no. 16, fourth juror

Juror C. Waters's responses on her jury questionnaire demonstrated both actual and implied bias. Waters reported she once had to defend herself against physical force from her ex-boyfriend, suggesting a possible bias against individuals accused of violent crimes. Ex. 28 (question 46(b)). Waters also expressed uncertainty about whether she would be inclined to vote for the death penalty if she found someone guilty of capital murder. Id. (question 125). Trial counsel failed to question Waters about her altercation with her ex-boyfriend, or ask whether it would affect her ability to be impartial during Leza's trial. 6 RR 119-28. At the very least, trial counsel should have questioned Waters further about her prior altercation with her ex-boyfriend.

79

**5.**       **R. Mason – potential juror no. 18, fifth juror**

Juror R. Mason's responses on his jury questionnaire demonstrated both actual and implied bias, specifically based on ties to law enforcement. Mason reported that his wife was a municipal hearing officer, and that his ex-son-in-law had worked with the City Attorney's Office. Ex. 29 (questions 26(a), 27). Mason suggested he might believe the word of a law enforcement officer over a civilian witness, and agreed "[t]here are too many technicalities in the law that allow guilty people to go free." Id. (questions 89, 93). Mason also suggested he would vote for the death penalty upon finding a defendant guilty of capital murder, and ranked the defendant's childhood and background as "[n]ot at all [i]mportant" in this decision. Id. (questions 125, 135). Mason stood by this response during voir dire, agreeing that "some people tend to blame their environment on the decisions they make and . . . use that as an excuse." 6 RR 144. Despite these responses, trial counsel failed to question Mason about whether his ties to law enforcement would affect his ability to be impartial. 6 RR 142-47. At the very least, trial counsel should have questioned Mason further about his ties to law enforcement and his ability to consider Leza's background when deciding to impose the death penalty.

**6.**       **G. McAnear – potential juror no. 19, sixth juror**

Juror G. McAnear's responses demonstrated a bias against persons accused of violent crimes. McAnear reported she had been in a situation where her life was threatened and where she had to defend herself or another against physical force and that someone in her family or close to her had been sexually assaulted. Ex. 30 (questions 46(a), (b), (h)). McAnear stated she felt "[a]ngry" at persons accused of violent crimes and expressed uncertainty with respect to the proposition that an accused in a criminal case should be required to present some evidence in support of his or her innocence. Id. (questions 46(i), 96). McAnear also stated she felt the Supreme Court is "too lenient with criminal defendants." Id. (question 145). McAnear also spoke about an

incident where her ex-boyfriend once became very angry toward her and started asking for a gun. 7 RR 19. McAnear stated the incident led her to believe that some people have anger issues that motivate them to kill, and that such people may deserve the death penalty. 7 RR 19-21.

McAnear's answers to other questions also reflected a bias in favor of imposing the death penalty for any intentional killing. Ex. 30 (question 105). McAnear also agreed that she would "probably vote for the death penalty" if she found someone guilty of capital murder. Id. (question 125); see also 7 RR 23.

Counsel did not ask McAnear about any of the repeated incidents of violence, follow up on her feelings of anger at persons accused of violent crimes, or challenge McAnear for cause. 7 RR 26. At the very least, trial counsel should have questioned McAnear further about her experiences with violence and whether they would affect her ability to be impartial during Leza's trial.

### 7.    L. English – potential juror no. 30, seventh juror

Juror L. English's responses on her questionnaire, in which she repeatedly stated the Supreme Court and the criminal justice system treated defendants too leniently, demonstrated both actual and implied bias against criminal defendants. Ex. 31 (questions 145, 148, 150). Nevertheless, trial counsel did not ask English any questions during voir dire. 7 RR 195-97. At the very least, trial counsel should have questioned English further about these statements.

### 8.    S. Lopez – potential juror no. 46, eighth juror

Juror S. Lopez's responses on her jury questionnaire demonstrated both actual and implied bias. Lopez stated she believed persons accused of violent crimes "[s]hould be punished severely," and claimed repeatedly that the criminal justice system treats defendants too leniently. Ex. 32 (questions 46(i), 145, 150). Lopez also strongly agreed with the proposition that "[a]n accused in a criminal case should be required to present some evidence to prove his innocence." Id. (question

96). With respect to the death penalty, Lopez opined it should be used on "any person who intentionally kills another," and especially when the victim was elderly. Id. (questions 118, 112, 138). Lopez also indicated she believed a defendant's background should not be considered when deciding whether to impose the death penalty. Id. (question 127). Lopez's statements demonstrated both actual and implicit bias. Trial counsel should have challenged Lopez for cause in light of these statements, or at the very least questioned Lopez further about these statements.

### 9.   F. Vargas – potential juror no. 50, ninth juror

Juror F. Vargas reported suffering from a number of medical problems that rendered him unfit to serve as a juror. Vargas reported suffering from hearing loss, headaches, and double vision, and also reported hearing ringing sounds in at least one of his ears. Ex. 33 (questions 158, 160). Vargas stated he had surgery for a brain tumor, which affected the left side of his body, and caused blurry vision, double vision, and headaches. 9 RR 81-82. These medical issues rendered Vargas unqualified for jury service. See Tex. Crim. Proc. Code Ann. § 35.16(a)(5).

Vargas's answers also reflected a strong bias against criminal defendants generally and in favor of law enforcement. Vargas stated someone in his family or close to him had been murdered, and that he did "[n]ot [feel] to[o] good" about persons accused of violent crimes, Ex. 33 (questions 46 (g), (i)). Vargas repeatedly agreed with statements suggesting the criminal justice system was too lenient with defendants. Id. (questions 89, 145, 148, 150). Vargas stated "I think it['s] wrong" that "[a]n accused citizen does not have to testify on his or her own behalf." Id. (question 154). Vargas also agreed with the following statements: (1) "[t]he law should concern itself more with victims of crime than those accused or convicted of crimes"; (2) "[p]eople sentenced to prison do not serve any significant portion of their punishment"; (3) "I would tend to believe a law enforcement officer over a civilian witness"; and (4) "[i]f a defendant does not testify, it must mean that he or she has something to hide." Id. (questions 90, 91, 93, 97). In addition, Vargas

strongly agreed that: (1) "[i]f someone confesses to a crime, that must mean they did it"; and (2) "[a]n accused in a criminal case should be required to present some evidence to prove his innocence" <u>Id.</u> (questions 95-96). Vargas also believed the term "reasonable doubt" meant "[t]ell [sic] they present the[ir] case, and all the evidence." <u>Id.</u> (questions 99). Vargas's answers show he believed criminal defendants are presumptively guilty, and must affirmatively introduce evidence to raise a reasonable doubt about their innocence.

Vargas's answers to other questions repeatedly manifested a strong bias in favor of imposing the death penalty for any intentional killing. On a scale of 1 to 10, with 10 being the most like to always vote for death, Vargas ranked himself as a "10." Ex. 33 (question 105). Vargas stated he was "strongly in favor of capital punishment as an appropriate penalty in <u>every</u> homicide case." <u>Id.</u> (question 102) (emphasis added). Vargas also stated life in prison was "inappropriate for a person who has killed another" and that the death penalty is an "appropriate punishment in any murder case." <u>Id.</u> (questions 119-20). Vargas reported that he believed in the death penalty because "[w]hoever commit[s] a crime got to pay [and] be punish[ed]." <u>Id.</u> (question 112). Vargas claimed there was "too much delay between trial and the imposition of the death sentence." <u>Id.</u> (question 126). Vargas also claimed the death penalty should be carried out more often than it was in Texas because "a [l]ot [of] people getting away with murder." <u>Id.</u> (question 136).

Vargas also repeatedly indicated how he would vote during Leza's trial. In one set of responses, Vargas agreed with the statement, "I feel strongly about capital punishment, and if I convict a person of a capital murder, I will always vote for the death penalty." Ex. 33 (question 117). Vargas elsewhere stated he would "usually" or "always" vote for the death penalty when the law allowed him to. <u>Id.</u> (question 122(d), (e)). Vargas later also agreed that he would "probably vote for the death penalty" if he "found someone guilty of capital murder." <u>Id.</u> (question 125).

Vargas indicated his views about the death penalty were "so strong . . . that they would prevent [him] from performing [his] duties as a fair, objective[,] and impartial juror in a criminal case where the death penalty is a possible sentence." Id. (question 141).

Trial counsel failed to question Vargas regarding any of these responses, or challenge him for cause. See 9 RR 82-86. At the very least, trial counsel should have questioned whether Vargas had already decided on Leza's guilt and whether he could impose a sentence other than death if Leza was found guilty of capital murder.

### 10.    S. Oakes – potential juror no. 56, tenth juror

Juror S. Oakes's responses on her jury questionnaire demonstrated both actual and implied bias under both federal constitutional and Texas statutory standards. Oakes stated she "sometimes" felt that persons accused of a crime probably committed it. Ex. 34 (question 46(j)). In addition, on a scale of 1 to 10, with 10 being a person who would always vote for the death penalty, Oakes ranked herself as a "6." Id. (question 105). Nevertheless, trial counsel failed to question Oakes regarding these responses during voir dire, or challenge her for cause. 10 RR 40-43. Trial counsel should have challenged Oakes for cause in light of these statements, or at the very least questioned Oakes further about these statements.

### 11.    S. Goodwin – potential juror no. 61, eleventh juror

Juror S. Goodwin's answers reflect a bias against criminal defendants generally. For instance, Goodwin repeatedly agreed with statements suggesting the criminal justice system was too lenient with defendants. Ex. 35 (questions 89, 145, 148). Additionally, Goodwin's answers to other questions reflected a bias in favor of imposing the death penalty for any intentional killing, regardless of any other factors. For instance, when asked to rank herself on a scale of 1 to 10, with 10 being a person who would always vote for the death penalty, Goodwin ranked herself as an "8." Id. (question 105). Goodwin stated the death penalty was an "appropriate punishment in any

murder case" and should be used "on any person who intentionally kills another." Id. (questions 118, 120). Goodwin stated she believed life imprisonment was "inappropriate for a person who has killed another," and that "[t]hose who kill [with] intent, particularly against those without proper protection, should be sentenced to death." Id. (questions 119, 133). Goodwin agreed that a person who intentionally killed should be put to death, regardless of their background or other factors. Id. (question 123). In fact, Goodwin marked a defendant's childhood and background was "[n]ot at all [i]mportant" to the decision of whether to impose the death penalty. Id. (question 135). Goodwin agreed that she "would probably vote for the death penalty" if she "found someone guilty of capital murder." Id. (question 125).[21] Because Goodwin's statements demonstrated both actual and implicit bias against criminal defendants and in support of the death penalty, trial counsel, at the very least, should have questioned Goodwin further about these statements.

### 12.   K. Harris – potential juror no. 64, twelfth juror

Juror K. Harris's responses on her jury questionnaire demonstrated both actual and implied bias on a number of grounds. First, Harris noted she had personally been affected by crime: her mother was injured by a prisoner while she was working at a correctional facility. Ex. 36 (question 44). Harris elaborated further, stating her mother worked as a prison guard at a federal correctional facility and was injured when an inmate tried to snap her neck. 10 RR 127-29. Harris's mother was later diagnosed with post-traumatic stress disorder as a result of the attack. 10 RR 128. Harris herself admitted she did not know whether she was prejudiced against criminal defendants as a result of the incident. 10 RR 124. The incident and Harris's statements concerning it indicate she could not serve as an impartial juror.

---

[21] Juror Goodwin also stated she believed in the death penalty as a punishment because life imprisonment created a burden on taxpayers. Goodwin stated she believed the death penalty "should be used more often." Ex. 35 (questions 112, 114, 136).

Harris also stated during voir dire she did not want to see gruesome pictures at trial, acknowledged that she might be prejudiced by them, and stated she could not guarantee she would not give such pictures undue weight when reaching a verdict. 10 RR 125-27 (<u>see</u> Claim Twenty(D), below). Harris also voiced dissatisfaction with the sentencing range for non-capital murder, commenting she had a problem with the idea that a person could only be sentenced from five years to life in prison for committing non-capital murder and could not be sentenced to death. 10 RR 131. Finally, on a scale of 1 to 10, with 10 always voting for the death penalty, Harris ranked herself as a "6." Ex. 36 (question 105).

Harris's statements demonstrated both actual and implicit bias, in particular with respect to whether she would be prejudiced by gruesome photographs and her mother's assault. Trial counsel should have challenged Harris for cause in light of these statements, or at the very least questioned Harris further about these statements.

**D.    Trial Counsel Were Ineffective For Failing To Adequately Challenge Biased Prospective Jurors For Cause And Instead Using Peremptory Strikes**

Trial counsel failed to adequately challenge eleven biased prospective jurors for cause, and instead peremptorily struck them. As a result, Leza was prejudiced because trial counsel were left without peremptory strikes to remove the biased jurors identified in Subsection C above.[22]

**1.    J. Seward – potential juror no. 2**

Trial counsel were ineffective for failing to challenge for cause J. Seward. When asked to rank herself on a scale of 1 to 10, with 10 being a person who would always vote for death, Seward ranked herself as an "8." Ex. 37 (question 105). Seward stood by this response during voir dire, stating she would "probably" vote for the death penalty regardless of the mitigation evidence

---

[22] Both the prosecution and defense were allotted fifteen peremptory challenges. Trial counsel used all of their available peremptory challenges during voir dire. 10 RR 84 (trial counsel's final peremptory strike).

presented. 5 RR 34-35. Trial counsel challenged Seward for cause, but did not identify what statements justified the challenge. 5 RR 36. Trial counsel's challenge for cause was inadequate because they did not cite Seward's statements exhibiting bias, which ultimately resulted in the challenge being denied and trial counsel having to use a peremptory strike to excuse Seward. To the extent the Court finds trial counsel's challenge for cause was supported by adequate grounds, Leza contends in the alternative the trial court erred in denying it.

### 2.      C. Moore – potential juror no. 6

Trial counsel were ineffective for failing to challenge for cause C. Moore. When asked to rank herself on a scale of 1 to 10, with 10 being a person who would always vote for death, Moore ranked herself as a "10." Ex. 40 (question 105). In addition, Moore indicated she believed that a criminal defendant was obligated to come forward with evidence of innocence. 5 RR 93-94. Instead of challenging Moore for cause, however, trial counsel peremptorily struck her. 5 RR 105. Trial counsel's failure to challenge Moore for cause based on these statements constituted ineffective assistance of counsel.

### 3.      C. Brackett – potential juror no. 9

Trial counsel were ineffective for failing to challenge for cause C. Brackett. Brackett repeatedly endorsed the view that a criminal defendant probably committed the crime he or she was accused of. Ex. 38 (questions 46(j), 92). Brackett also agreed that if a defendant does not testify at trial, he or she likely has something to hide. Id. (question 97). In addition, Brackett marked that he was "in favor of capital punishment as an appropriate penalty in every homicide case." Id. (question 102). Brackett stood by this response during voir dire, stating he believed a person should be put to death if he or she intentionally killed. 5 RR 137. Brackett also repeatedly stated he would always consider a person who committed murder to present a future danger, and would vote accordingly during the punishment phase. 5 RR 139-40, 142. Trial counsel challenged

Brackett for cause, but did not identify what statements justified the challenge. 5 RR 144. Instead, trial counsel claimed Brackett had a "bias against the law." Id. The trial court denied trial counsel's challenge. 5 RR 145. Trial counsel then peremptorily struck Brackett. Id. 145.

Trial counsel's challenge for cause was inadequate. As a result, the challenge was denied and trial counsel were forced to use a peremptory strike to excuse Brackett. Had trial counsel properly supported the challenge with Brackett's statements, the challenge would have been granted, thereby avoiding use of a peremptory strike. To the extent the Court finds trial counsel's challenge for cause was supported by adequate grounds, the trial court erred in denying it.

### 4.    V. Duerr – potential juror no. 14

Trial counsel were ineffective for failing to challenge for cause V. Duerr. Duerr's statements evidenced bias arising out of her personal experience with homicide. During voir dire, Duerr stated her mother was a victim of homicide in 1990 and the defendant was sentenced to death. 6 RR 81. Duerr stated that the perpetrator remained on death row for sixteen years because "he kept getting appeals, appeals, appeals." Id. The perpetrator later obtained a new trial in 2007. Id. Duerr stated she thought it was unfair the death penalty was not carried out for prolonged periods of time. 6 RR 86. Duerr's statements and personal experience with homicide showed she was unable to act impartially as a juror, and would have been biased against Leza—a defendant accused of the same crime as her mother's killer. Instead of challenging Duerr for cause on this basis, trial counsel peremptorily struck her. 6 RR 87. Trial counsel's failure to challenge Duerr for cause based on her statements constituted ineffective assistance of counsel.

### 5.    P. Tate – potential juror no. 15

Trial counsel were ineffective for failing to challenge for cause P. Tate. Tate showed a bias in favor of law enforcement and against criminal defendants. Tate endorsed the view a criminal defendant probably committed the crime he or she was accused of, and that it was the defendant's

burden to present evidence showing his or her innocence. Ex. 39 (questions 92, 96). Tate also repeatedly stated he was "in favor of capital punishment as an appropriate penalty in every homicide case." Id. (questions 102, 105). In addition, Tate repeatedly stated he believed police officers were more credible as witnesses because of their status and that he would consider an illegally obtained confession, even if the trial court instructed him not to. 6 RR 102-04, 106-07. Trial counsel challenged Tate for cause, but did not cite Tate's statements in the questionnaire in support of the challenges. 6 RR 101, 103, 104, 107. As a result, the challenges were denied and trial counsel were forced to use a peremptory strike. 6 RR 101, 103, 104, 107-08. Had trial counsel properly supported the challenges with Tate's statements, the challenges would have been granted and trial counsel would not have been forced to use a peremptory strike. To the extent the Court finds trial counsel's challenges for cause were supported by adequate grounds, the trial court erred in denying them.

### 6.     S. Campos – potential juror no. 20

Trial counsel were ineffective for failing to challenge for cause S. Campos. On her juror questionnaire, Campos agreed that "[a]n accused in a criminal case should be required to present some evidence to prove his innocence." Ex. 41 (question 96). In addition, Campos stated she was raised to believe in the concept of "a life for a life," and repeatedly agreed that she believed that "if somebody takes a life, that they have forfeited their life." 7 RR 32, 44-45. Campos also agreed "the death penalty should be used if someone intentionally kills another." 7 RR 47. Instead of challenging Campos for cause, however, trial counsel peremptorily struck her. 7 RR 48. Trial counsel's failure to challenge Campos for cause based on these statements constituted ineffective assistance of counsel.

### 7.     S. Valadez – potential juror no. 27

Trial counsel were ineffective for failing to challenge for cause S. Valadez. On her questionnaire, Valadez indicated she was "in favor of capital punishment as an appropriate penalty in every homicide case." Ex. 42 (question 102). In addition, Valadez agreed she did not "think life in prison for somebody who's committed murder [was] much of a punishment at all." 7 RR 145. Valadez also stated she believed criminal defendants should be required to come forward with evidence of their innocence. 7 RR 146-48. Instead of challenging Valadez for cause, however, trial counsel peremptorily struck her. 7 RR 148. Trial counsel's failure to challenge Valadez for cause amounted to ineffective assistance of counsel.

### 8.     L. Penalver – potential juror no. 33

Trial counsel were ineffective for failing to challenge for cause L. Penalver. During voir dire, Penalver repeatedly stated she would automatically vote to impose the death penalty if the prosecution presented evidence, witnesses, and photographs showing the crime occurred. 8 RR 47-49. Trial counsel challenged Penalver for cause, but did not identify what statements justified the challenge. 8 RR 52. As a result, the trial court denied trial counsel's challenge, and trial counsel then peremptorily struck Penalver. Id. Had trial counsel properly supported the challenge with Penalver's statements, the challenge would have been granted and trial counsel would not have been forced to use a peremptory strike. To the extent the Court finds the challenge for cause was supported by adequate grounds, the trial court erred in denying it.

### 9.     J. Simpson – potential juror no. 23

Trial counsel were ineffective for failing to challenge for cause J. Simpson. When asked to rank herself on a scale of 1 to 10, with 10 being a person who would always vote for death, Simpson ranked herself as an "8." Ex. 43 (question 105). Simpson also repeatedly endorsed the view that a criminal defendant probably committed the crime he or she was accused of, and stood by this view

during voir dire. Id. (questions 46(j), 92); 9 RR 22-23. Furthermore, Simpson stated she was bothered that defendants who committed non-capital murder could not be sentenced to death, and that the cost of their imprisonment would be borne by taxpayers. 9 RR 18-19. Instead of challenging Simpson for cause, however, trial counsel peremptorily struck her. 9 RR 25. Trial counsel's failure to challenge Simpson for cause based on these statements constituted ineffective assistance of counsel.

### 10.      B. McCarthy – potential juror no. 51

Trial counsel were ineffective for failing to challenge for cause B. McCarthy. When asked to rank herself on a scale of 1 to 10, with 10 being a person who would always vote for death, McCarthy ranked herself as an "8." Ex. 44 (question 105). In addition, McCarthy stated during voir dire that she could not imagine a situation where she could find sufficient mitigation evidence to justify a life sentence. 9 RR 98-100. McCarthy also stated she was opposed to a sentence of life imprisonment because the costs of imprisonment would be borne by taxpayers. 9 RR 99. Instead of challenging McCarthy for cause, however, trial counsel peremptorily struck her. 9 RR 101. Trial counsel's failure to challenge McCarthy for cause based on these statements constituted ineffective assistance of counsel.

### 11.      L. McNamee – potential juror no. 60

Trial counsel were ineffective for failing to challenge for cause L. McNamee. During voir dire, McNamee stated that while he could consider the evidence before making a decision with respect to imposition of the death penalty, he stated his verdict would be "almost automatic" if the victims were children or very old people (such as the alleged victim here) who "aren't able to defend themselves." 10 RR 69-70. Instead of challenging McNamee for cause, however, trial counsel peremptorily struck him. 10 RR 84. Trial counsel's failure to challenge McNamee for cause based on these statements constituted ineffective assistance of counsel.

E.     **Cumulative Error**

The multiple errors of trial counsel contained herein, when their cumulative nature is considered, prejudiced and deprived Leza of his federal constitutional rights. The seating of one biased juror is prejudicial per se. Moreover, the errors and omissions of trial counsel and the trial court had a substantial and injurious effect on the verdicts, and there is a reasonable probability of a more favorable outcome if counsel had performed effectively.

**CLAIM THIRTEEN (IAC FASD/NEUROLOGICAL IMPAIRMENT)**

Leza's conviction and sentence of death violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because his trial counsel failed to investigate and present crucial evidence that Leza suffered from Fetal Alcohol Spectrum Disorder/Alcohol Related Neurodevelopmental Disorder, which could have been presented to Leza's jury in:  (1) the guilt phase as evidence of his inability to form the mental state necessary for conviction of capital murder; and (2) the punishment phase as compelling mitigation evidence that could have caused at least one juror to vote for a sentence less than death. **Exhaustion**:  This claim was presented to the state court in Claim V of the initial state application. Ex. 8 at 31-39, 75-91. The state courts' adjudication of this claim was contrary to, and consisted of an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts. See Ex. 13 at 155-64; Ex. 15 at 3-4.

A.     **Trial Counsel Were Ineffective For Failing To Investigate FASD**

Although an attorney is not required to investigate and diagnose a medical condition in the absence of any indicators, see Clark v. Mitchell, 425 F.3d 270, 286 (6th Cir. 2005), this does not excuse an attorney's deficient performance when red flags alert him/her to the possibility of such an issue. In addition, while a reasonable strategy not to investigate further when based on "sound assumptions" will not be faulted, "'[c]ounsel can hardly be said to have made a strategic choice

92

against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made.'"   Kenley v. Armontrout, 937 F.2d 1298, 1308 (8th Cir. 1991).

## 1.    FASD/ARND

Fetal Alcohol Spectrum Disorder ("FASD") is a permanent medical condition that causes significant central nervous system dysfunction that manifests in structural, foundational, and/or neurological abnormalities. Ex. 63 at ¶8. Individuals with FASD lack mental capacities essential for decision-making. Thus, persons with FASD lack the biological capacity to reflect, appreciate the wrongfulness of their actions, and control impulses. Id. at ¶16.

FASD is an umbrella term for four specific diagnostic conditions:  Fetal Alcohol Syndrome ("FAS"); Partial FAS; Alcohol Related Neurodevelopmental Disorder ("ARND")[23]; and Alcohol Related Birth Defects ("ARBD"). Ex. 63 at ¶4. A diagnosis of FASD requires two elements:  (1) a documented history of prenatal exposure to significant amounts of alcohol—more than an occasional drink; and (2) a finding of the presence of physical, intellectual, or behavioral abnormalities consistent with prenatal exposure to alcohol. Ex. 65 at 6; Writ RR 131-32.

In this case, Leza suffers from, and has been diagnosed, with FASD, specifically, ARND. Writ RR 70-72, 100-02; Ex. 65 at 1, 6.

## 2.    What trial counsel knew at the time of trial

At the time of Leza's trial in 2009, there was a great deal of information known about FASD to put counsel on notice of the need to conduct an investigation. See Rompilla v. Beard, 545 U.S. 374 (2005) (from 1988 trial, counsel were ineffective for failing to investigate and present evidence of FAS); Trevino v. Davies, 829 F.3d 328 (5th Cir. 2016) (petitioner adequately pleaded in federal petition that counsel from 1997 trial performed deficiently in failing to investigate and

---

[23] Unlike FAS and Partial FAS, ARND does not require facial abnormalities or a growth deficit. Writ RR 132-33.

present evidence of FASD); <u>Kemp v. Kelly</u>, 2015 WL 5842538, *13 (E.D. Ark. 2015) (fetal alcohol exposure was "in the air" by 1994; also referencing 1991 NAACP Legal Defense Fund Airlie Conference training on FAS); <u>Ex parte Kerr</u>, No. AP-75,500, 2009 Tex. Crim. App. Lexis 245 (Tex. Crim. App. 2009) (applicant was denied effective assistance of counsel where attorneys at 1995 Bexar County trial were unaware of mitigation evidence including "possible fetal alcohol syndrome"); <u>Interest of B.B. and P.B.</u>, 971 S.W.2d 160, 170 (Tex. Ct. App.-Beaumont 1998) (termination of parental rights because of the special care required due in part to child's FAS based upon mother's prenatal drinking); Writ RR 128-30 (testimony of Dr. Brown). Even the Texas Defender Services, a group of attorneys who assist Texas capital counsel, alerted counsel to FASD. Writ RR 185. But trial counsel did not follow-through with any investigation. Writ RR 186.

Further, at the time of the trial, there was significant evidence available to trial counsel to alert them that Leza had significant intellectual deficits and manifested indicators of FASD; yet, trial counsel failed to investigate or present this evidence. For example, counsel knew from Leza's own mother, Celia, that she drank twelve to eighteen beers a day during her pregnancy with Leza. Writ RR 18 (trial mitigation expert's conversation with Celia Leza); <u>see also</u> Writ RR 138-39 (Celia Leza interview with Dr. Brown); Writ RR 161, 171, 173, 176 (hearing testimony of Celia Leza); Ex. 64 at ¶¶20, 71, 126 (post-conviction social historian report). Trial counsel also had access to others who could have affirmed Leza's mother's prenatal alcohol consumption. <u>See</u> Writ RR 21-22 (Armando Leza, Sr.); Ex. 111 at ¶ 5; Ex. 64 at ¶126; Ex. 104 at ¶¶5-6.[24]  Even trial defense expert, Dr. John Roache, was aware of the potential for investigation into FASD. Dr. Roache informed the defense team of the possibility that Leza suffered from FASD and that he

---

[24] There is also evidence that Celia Leza took anti-depressants during her pregnancy with Leza which can also cause FASD. Ex. 63 (Brown collateral interview with Celia Leza).

would need additional information in order to confirm or rule out such a diagnosis, but he never received any further information from trial counsel. Writ RR 14-16; see also Ex. 21.

In addition, trial counsel had access to evidence documenting Leza's history of multiple developmental delays, including motor skill delays (delay in walking by six months), language delays (delay in talking by one year), and learning disabilities (being held back multiple times in elementary school and severe academic failure). These multiple neurocognitive deficits are typically caused by an underlying medical condition like FASD. Ex. 63 at ¶24; Ex. 65 at 7. Despite the presence of these well-documented learning disabilities, counsel did not explore FASD.

Trial counsel also had access to Leza's juvenile records, specifically Dr. Sherman's 1993 report, which provided evidence of Leza's significant intellectual deficits. Ex. 69. According to Dr. Sherman's 1993 report, Leza's full scale IQ was well below average—a marked deficit consistent with FASD, which is known to cause areas of severe damage alternating with areas of relatively normal functioning. Ex. 65 at 7; Ex. 69. Dr. Sherman also diagnosed Leza with Aphasia, which is a red flag for brain damage. Writ RR 135; Ex. 69 at 1, 5.

All of the above should have alerted counsel to the need to hire experts and to have Leza undergo neuropsychological testing; yet, trial counsel failed to make any requests. Had trial counsel ordered neuropsychological testing, they would have discovered Leza suffered significant deficits consistent with FASD. For example, neuropsychological testing conducted post-conviction by Dr. Murphey shows low IQ scores for Leza, and subtests which demonstrated a significant degree of "scatter"—a psychological test finding that indicates brain damage. Both of these findings are consistent with FASD. Ex. 65 at 7; Ex. 67.

Neuropsychological testing conducted post-conviction by Dr. Milam also produced results consistent with FASD in that Leza tested in the intellectually disabled range on all verbally loaded

subtests, while in other areas he was in the normal range. The test additionally showed Leza scored two or more standard deviations below the mean on "dominance," suggesting that he was very submissive and dependent on others—a factor consistent with FASD. Furthermore, Dr. Milam found ample proof that Leza suffered from poor decision making, and adaptive failures with developmental delays, which are also hallmarks of FASD. Ex. 65 at 7; Ex. 66 at ¶128; Ex. 63 at ¶24; Writ RR 140-42. In total, Dr. Milam indicated that Leza had deficits in five neurocognitive domains, including significant deficits in executive functioning. Ex. 65 at ¶4; Ex. 63 at ¶24; Writ RR 140.

All of this information would have alerted counsel to the need to investigate and present evidence of FASD as it related to Leza. In short, if counsel had hired expert(s), they would have discovered that Leza suffers from FASD. Ex. 63 at ¶33; Ex. 65 at 1, 6-10. However, trial counsel failed to investigate Leza's cognitive deficits and admitted there was no strategic decision in not investigating and presenting evidence of FASD. Writ RR 186. The omission of this evidence had a prejudicial impact on both the guilt phase and punishment phase of Leza's trial.

### 3. IAC guilt phase

FASD was directly relevant to the guilt phase of Leza's trial because it directly effects the mens rea finding as executive functioning processes channel conscious decision-making into intentions and/or actions. Specifically, Leza's FASD has robbed his brain of executive functioning and thus he is unable to plan for the future, let alone for a crime that required scheming, planning, or cunning thoughts. Ex. 65 at 8-9. Furthermore, Leza's dependent personality, which is another aspect of FASD, would have caused him to attach to a perceived protector—in this case, Trevino. Id. at 9. As a result, he would have followed Trevino to the crime, as opposed to being the organizer. This would have furthered the defense theory that Trevino committed the crime and Leza merely helped to recover the goods after the victim's death. Such information would have

been compelling evidence for the jury to find Leza did not commit the crime. At most, he was there after the fact, but was not involved as a party to the offense or as a co-conspirator.

In short, Leza's FASD would have provided evidence that he did not possess the capacity to commit a premeditated crime. Ex. 63 at ¶¶14, 16-17, 34. Had Leza's trial counsel investigated, developed, and presented this crucial information, it is reasonably probable that Leza would not have been convicted of capital murder. Counsel's failure to have experts evaluate and diagnose Leza for FASD was prejudicial to Leza's guilt phase case.

### 4.      IAC punishment phase

Further, counsel's failure to investigate and present evidence of Leza's FASD prejudiced his punishment phase case. See Ex. 64 at ¶158. In a case such as this, where "'the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence,'" failure to consult with and present the testimony of necessary experts amounts to ineffective assistance of counsel. Hinton v. Alabama, 134 S. Ct. 1081, 1088 (2014). Here, if counsel had performed effectively, the jury would have heard that, because of this medical diagnosis of FASD, Leza struggled through his day-to-day life through no fault of his own but rather, as a result of his mother's prenatal drinking.

Persons who suffer from FASD have basic neurocognitive deficits called "primary disabilities."  These include intellectual functioning (IQ); achievement or learning; memory; attention (including hyperactivity and impulsivity); motor skills; sensory processing and integration; language/communication; and executive functioning, which ultimately affects social functioning and other adaptive skills. Primary disabilities in FASD interact with adverse environmental experiences and manifest in adolescence and adult years as "secondary disabilities" which include, but are not limited to, mental health problems (94% of individuals with FASD have one or more co-morbid mental health conditions); school disruption (61%); substance abuse

(35%); trouble with the law (60%); and confinement in psychiatric hospitals, jails, prison, or residential substance abuse treatment settings (50%). Two additional secondary disabilities have been identified in adults with FASD:   dependent living (over 80%); and problems with employment (80%). Ex. 63 at ¶12.

With respect to primary disabilities, neuropsychological testing shows that Leza has severe language deficits, learning disabilities, attention problems, impulsivity, decision making problems, and adaptive deficits. These were caused by Leza's FASD. And Leza displayed functional evidence of these deficits throughout his entire life. Ex. 63 at ¶29; Ex. 66; Writ RR 73. Evidence of FASD would have uncovered reasons why Leza did not talk until the age of two, following which he still continued to struggle with expressive and receptive language disabilities. Ex. 63 at ¶23. Leza's FASD would have further answered for the jury why Leza was delayed in walking, and had such difficulties in school, ultimately dropping out in the seventh grade.

In addition to primary disabilities, there was also abundant evidence of Leza's "secondary disabilities" in adolescence that were associated with FASD. These included experimentation with drugs at age eleven, leading to serious marijuana abuse, cocaine abuse, and heroin abuse. This led to Leza's dropping out of school, and eventually committing crimes. By the age of sixteen, while in the custody of TYC, Leza was diagnosed with several mental health problems including Reading Disorder, Arithmetic Disorder, Expressive Language Disorder, and Specific Developmental Disorder NOS/Spelling. By the time he was eighteen years of age, Leza had already been incarcerated multiple times. And during his adult years, Leza was unable to live independently or sustain long-term employment. In fact, Leza's condition was so severe that he exhibited almost every secondary disability associated with FASD. Ex. 63 at ¶26. This evidence would have been crucial for jurors to understand Leza's life trajectory.

Further, the jurors should have heard that FASD is often a "hidden disability" because most affected individuals frequently go undiagnosed. Ex. 63 at ¶7. Knowing that a brain-damaged individual, like Leza, was exposed to multiple childhood adversities without receiving any intervention or assistance, would have been important information for trial counsel to present to the jury. Without such information, it is likely the jurors assumed that Leza's behavior was within his control. Id. at ¶31.

Counsel's ineffectiveness prejudiced Leza's punishment phase case. Had trial counsel investigated, developed and presented this crucial information, it is reasonably probable that the jury would have would not have chosen to impose a death sentence.

## CLAIM FOURTEEN (IAC SOCIAL HISTORY)

Leza's conviction and sentence of death violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because trial counsel failed to investigate and present evidence of Leza's psycho-social history, thereby failing to conduct an effective mitigation investigation. **Exhaustion**: This claim was presented to the state court as Claim V of the initial state application. Ex. 8 at 77-90. The state courts' adjudication of this claim was contrary to, and consisted of an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts. See Ex. 13 at 134-38, 155; Ex. 15 at 3-4.

## A.     What Trial Counsel Presented At The Punishment Phase

Trial counsel presented four witnesses during the punishment phase: Amanda Leza, Juliza Leza Sanchez, Armando Leza Sr., and Frank AuBuchon.[25] Three of these witnesses were family; the fourth (AuBuchon) was an expert witness who testified about the Texas prison system.

---

[25] For the purposes of this Claim and to avoid confusion, Leza will be referred to as "Armando," and his friends and family members will similarly be referred to by first names.

The jury first heard from Amanda, Armando's youngest sister, who asked the jurors to spare her brother's life. 18 RR 115. Defense counsel, however, did not ask Amanda anything about the childhood she shared with her brother, and there is no evidence the trial team interviewed Amanda about any aspect of Armando's life. The jury also heard from Armando's half-sister, Juliza, who described witnessing Celia's cruelty to their father, Armando Sr.—including an incident where Celia swung a chain at Armando Sr. 18 RR 118-19. The jury, however, never found out that Armando had other siblings who resided with him, much longer than the few months Juliza lived with the Leza family. The jury also heard from Armando's father who testified with the aid of an interpreter that he was afraid of Celia because she called the police on him. His testimony is only two and a half pages long and appeared to end prematurely due to the interpreter not understanding what Armando Sr. was trying to say. 18 RR 124-26.

None of these witnesses provided even a glimpse into the circumstances that affected Armando's development and behavior and which ultimately led him to be on trial for capital murder. Trial counsel's failure to present a full narrative of Armando Leza's complex and nuanced life story constitutes deficient performance, which prejudiced his punishment phase case.

**B.    A Brief Summary Of What Counsel Failed To Investigate And Present**[26]

Armando was the fourth of seven children born to Celia Sanchez Leza. While pregnant with Armando, Celia consumed alcohol and prescription drugs. During the pregnancy, Celia became involved with Armando Leza Sr. who would frequently beat her. Ex. 63 at 13-14; Writ RR 138-39, 156-61. As a baby, Armando suffered several incidents of neurological distress: seizures, high fevers, and difficulty breathing. Ex. 104 at ¶24.

---

[26] Due to the page limitation set by this Court, Leza's full social history can be found in Exhibit 124 to this Petition.

Celia and Armando Sr. were in a common law marriage for eight years, before ultimately ending their relationship. Their relationship was marred by alcoholism, serial adultery, and violence. Ex. 103 at ¶¶13-16. Neither Celia nor Armando Sr. nurtured or cared for their children. Id. The eldest of Celia's children, Ernie, who was six years older than Armando, was the closest the children had to a parent. Ernie attempted to shield his siblings from the violence between their parents, but was often unsuccessful. Ex. 101 at ¶20; Ex. 104 at ¶8. Following their eventual divorce, Armando Sr. disappeared for a period of time, and when he did re-establish contact, Celia often prevented him from seeing the children. Ex. 107 at ¶¶2-4.

Celia was a violent, unemployed alcoholic—solely responsible for her seven children. Ex. 107 at ¶¶2-4. She spent time in bars and often came home drunk accompanied by much younger men. Celia frequently used her sons to steal from empty apartments for her own financial gain. Ex. 109 at ¶19. Celia experienced outbursts of extreme anger and violently lashed out at her children. Celia sometimes raged until she wore herself out, telling her children this behavior was necessary to keep her from going insane. Ex. 103 at ¶¶28-29; Ex. 107 at ¶5.

After the divorce, the Leza family was frequently forced to move to get away from Celia's financial problems and the legal problems of her older children and therefore, occasionally ended up homeless. Ex. 104 at ¶¶14-15; Ex. 107 at ¶6. Between ages eight and sixteen, Armando lived in at least ten different places—some of which were not actual residences. Ex. 101 at ¶¶22-23, 25; Ex. 106 at ¶¶6-10. Because of their frequent relocations, Armando's education was inconsistent and disorganized. While in grades two through eight, Armando attended seven different schools, but failed multiple grades. He eventually left school during his second attempt at the sixth grade, completely skipped seventh grade, and attempted to complete eighth grade, but dropped out. Celia

placed no emphasis on school and even encouraged her children to drop out. Ex. 107 at ¶7; Ex. 103 at ¶¶26-27. Armando later enrolled in a GED program, but he was unable to finish.

School records document Armando's inability to learn and teachers' suspicions he needed special education services. Unfortunately, because the family moved so often, there was never an opportunity for an effective intervention by school officials. By the time he was a teenager, Armando's reading and writing were assessed at third and fourth grade levels. See Ex. 48 (Leza school records). Armando's intellectual limitations were also obvious outside of the school setting. Armando spent weekends working at Armando Sr.'s restaurant, but he was unable to perform the simplest tasks there. Armando's impairments also prevented him from being able to use household appliances, go shopping, ride the bus alone, or hold down a job. Ex. 105 at ¶¶17-22; see Claims One and Thirteen, above.

As a teenager, Armando had no friends of his own and is described as a loner who was uncomfortable in social settings. Ex. 105 at ¶20; Ex. 103 at ¶¶41-42. When Armando was fifteen years old, his mother allowed Liza Mendez, a twenty-two year old woman to reside with them. Armando and Lisa had a baby together when Armando was just sixteen. To make friends, Armando attempted to become a part of his older brother, William's, peer group, but he was often manipulated by these older boys into committing crimes for them. Armando's first arrest, at age fifteen, arose from crimes committed by Williams and his friends. Armando did not appear to understand the peril he placed himself in and frequently did whatever he was asked to do. Ex. 107 at ¶¶8, 17. For each of his criminal arrests, Armando was manipulated and led by an adult. As a result of the crimes he was involved in, Armando was sentenced to several months in a youth facility before eventually being released to his mother. State App., Exs. 22, 23 (Bexar County Juvenile Probation Department records and TYC records).

Following his release, Armando resided with his mother, his siblings and their significant others, his mother's boyfriend, and a large number of nieces and nephews. The family moved frequently, and some of Armando's siblings and their partners were addicted to heroin and sometimes incarcerated. Armando became addicted to heroin and had more problems with the law and was sent to prison in 1998. When Armando was released from prison in 2004, three of his siblings who were not incarcerated were addicted to heroin and his mother was selling drugs for the Mexican Mafia. Ex. 107 at ¶33; Ex. 101 at ¶29; Ex. 113 at ¶23; Ex. 103 at ¶52. Even though he made an effort to get a job and lead a clean life, Armando was soon using heroin and cocaine with his siblings and his new girlfriend, Dolores Trevino.

Without any protection from adversity, Armando's life was lost to drug addiction and criminal activity. Armando's only role models were neglectful people who abandoned their children. His family was ravaged by addiction disease and they failed to ever establish roots in a community. Because Armando changed schools so often it was impossible for him to be identified as an at-risk child. In addition to Armando's neglected upbringing, his significant limitations caused by his ID and FASD destroyed any possibility that he could have a positive future.

Trial counsel's failure to develop and present the available evidence contained herein and in Exhibit 124 was not strategic. Further, trial counsel were on notice of the need to investigate Leza's life history. Had trial counsel adequately investigated, counsel would have learned of the information provided herein, and presented that information to the jury. If the jury had heard this evidence, there is a reasonable probability at least one juror would have voted for a sentence of less than death. Wiggins, 539 U.S. at 516.

**CLAIM FIFTEEN (IAC ADDICTION)**

Leza's conviction and sentence of death violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because his trial counsel failed to investigate and

103

present crucial evidence that Leza suffered from addiction. This evidence could have been presented to Leza's jury in the punishment phase as compelling mitigation evidence, the presentation of which could have shifted the balance and caused at least one juror to vote for a sentence of less than death. Further, an expert in addiction could have assisted counsel in choosing a jury. **Exhaustion**: This claim has not been presented to the state courts because of the ineffectiveness of Leza's trial and initial post-conviction counsel.

## A.      What Trial Counsel Knew At The Time Of Trial

Trial counsel was well aware Leza was addicted to drugs as Leza himself admitted to law enforcement he had recently used heroin before his arrest. See 3 RR 82-85; 13 RR 138; Ex. 77 at 6. For example, Leza told the trial defense investigator that he (Leza) had a $300 to $400 a day cocaine and heroin habit at the time of the crime, and that he had started experimenting with marijuana at age thirteen, before ultimately turning to cocaine and heroin. Ex. 64 at ¶¶60, 80. It was further evident trial counsel knew of Leza's drug addiction as trial counsel even referred to Leza as a "junkie" in closing guilt argument. 16 RR 25.

Counsel additionally had evidence affirming Leza's addiction through the State's Fifth Notice of Intent to Introduce Rule 404(b) evidence, which showed multiple drug related arrests/offenses/bad acts for Leza including: use of drugs including heroin and cocaine between 1994 and 2007; use of marijuana from 1993 to 2007; possession of marijuana in 1996 and 1997; use of $120 worth of heroin and $100 worth of cocaine per day during 1998; use of $100 worth of heroin and $100 worth of cocaine per day during 2007; selling cocaine and heroin from 1997 to 2007; and possession of drug paraphernalia in 2005. CR at 717-26. Leza's prior prison and jail records also showed evidence of addiction. See Ex. 50 at 16, 37-38, 44, 47, 51-54, 56-60 (history of heroin and cocaine use and heroin withdrawal). Furthermore, counsel could have spoken with Leza's family members and learned similar information about Leza's addiction. See Ex. 103 at

¶53 (William Chapman); Ex. 107 at ¶¶17-18, 21, 25-26 (Fernando Leza); Ex. 106 at ¶¶17-18, 21 (Amanda Leza); Ex. 113 at ¶37 (Orlando Leza); Ex. 104 at ¶22 (Ofelia Arellano).

Counsel was clearly aware Leza's drug use could have an impact on his cognitive functions, as counsel hired Dr. John Roache to testify about the effects Leza's heroin and cocaine use had on the voluntariness of Leza's confession. 3 RR 77-101. Despite all of this information, however, some of it directly from Leza, trial counsel failed to hire an expert on addiction. Trial counsel had no strategic reason for failing to fully investigate, develop, and present evidence through an expert, that addiction informed Leza's behavior throughout his lifetime.

**B.      Counsel's Deficient Performance Prejudiced Leza's Punishment Case**

Leza's trial counsel should have hired an expert in addiction like Gantt Galloway, an expert in pharmacology who regularly assesses people who suffer from addiction. See Ex. 18. Galloway could have informed the jurors of Leza's genetic predisposition to drug addiction, how the drugs affected his brain, and how his addiction diminished his already impaired impulse control—thereby mitigating Leza's behavior both prior to and at the time of the offense.

An expert could have informed the jurors that addiction is a disease of the pleasure and reward system of the brain and that dysfunction in the brain circuits leads to biological, psychological, social, and spiritual manifestations. The jurors could have been told that the signs and symptoms of the disease include:  compulsive reward seeking behavior; craving or drug hunger; hypofrontality; and continued use of drugs despite adverse consequences. An expert could have testified that addiction can manifest itself as a chronic, progressive disease characterized by loss of control over use, so that the loss of control over behavior occurs more readily as the disease progresses. Ex. 18 at 2-3.

Additionally, evidence of Leza's drug use could have been presented to the jury to support the conclusion that his addiction was mitigating, not aggravating. For example, the jurors should

have been informed that compulsive use, the defining hallmark of addiction, directly interferes with normal controls over decision-making. Furthermore, the jurors could have been informed Leza did not understand addiction as a risk when he started using drugs before the age of eighteen. Ex. 18 at 7-8. An expert could have also educated jurors as to the medical evidence regarding how addiction arises and the effect of long-term addiction. This could have clarified for the jurors that Leza's actions were not voluntary or a matter of personal choice and willpower. Ex. 18 at 9.

The jurors should also have been informed that addiction is a disease with a known genetic predisposition. In predisposed individuals, addiction develops at a young age and progresses more rapidly. In addition to intoxication, the drugs exacerbate symptoms of genetic legacy like inattention, impulsivity, and hyperactivity. Ex. 18 at 6, 8. An expert could have testified Leza has a family history consistent with addictive disease, including alcoholism and drug addiction. Specifically, an expert could have testified about Leza's genetic risk, early onset of drug use, history of abuse, and inconsistent parental supervision—all of which combined to explain why Leza became addicted to drugs like heroin and cocaine. An expert could have informed the jury it was unsurprising Leza followed in the footsteps of his family and developed addiction. Id. at 6, 8-9.

The jurors could also have been told Leza had another risk factor for developing addiction: FASD. The impulsivity and impaired ability to weigh consequences both played key roles in the association of FASD with an initial decision to use illicit drugs and also the continued use despite the adverse consequences of addiction. Ex. 18 at 6.

Through an expert, the jurors would have known that many elements of Leza's upbringing had risk factors for addiction including the fact that Leza's mother was an inconsistent parent, sold drugs, drank heavily, and was frequently drunk herself. Ex. 18 at 6-7. Leza was also lacking in

many protective factors that could have reduced the likelihood of initial drug use and eventual addiction. For example, Leza did not have adequate language skills and had great difficulty making friends. Additionally, he was ID and could not succeed scholastically. Id. at 7.

An expert also could have helped the jurors understand how addiction, intoxication, craving, and sleep deprivation combine to influence behavior and how drug and alcohol use are not "voluntary" but rather are "compulsive" and are a part of the addiction process. Ex. 18 at 8-9.

An expert also could have assisted trial counsel in choosing jurors. An expert could have advised trial counsel to voir dire expressly about prospective jurors' opinions on addiction, and to excuse prospective jurors (1) who would not consider evidence of the scientific and medical consensus that, because of drugs, people commit acts they normally would not do, and (2) who believed that drug use and addiction was only a personal choice. Ex. 18 at 10.

Counsel's ineffectiveness prejudiced Leza's punishment phase case. Had trial counsel investigated, developed, and presented evidence of addiction, it is reasonably probable the jury would not have chosen to impose a death sentence.

## CLAIM SIXTEEN (IAC WITNESS PREPARATON AND PRESENTATION)

Leza's conviction and sentence of death violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because Leza's trial counsel failed to prepare and present witnesses to testify on his behalf at the punishment phase. **Exhaustion**: Section B of this claim has been previously presented as Claim V of the initial state application. Ex. 8 at 72-77. The state courts' adjudication of this claim was contrary to, and consisted of an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts. See Ex. 15 at 3-4. Section A and C of this claim have not been presented to the state courts because of the ineffectiveness of trial and initial post-conviction counsel.

**A.    Trial Counsel Failed To Prepare Armando Leza Sr., Juliza Leza, And Amanda Leza To Testify At The Punishment Phase**

The punishment phase of a capital trial requires both intensive pre-trial investigation, and presentation of all reasonably available evidence which might serve as the basis for a sentence less than death. See, e.g., Rompilla v. Beard, 545 U.S 374, 380-81 (2005); Tennard v. Dretke, 542 U.S. 274, 284-85 (2004); Wiggins v. Smith, 539 U.S. 510, 527 (2004). Here, trial counsel's presentation at sentencing was cursory and unpersuasive. See Claim Fourteen.

Armando Leza Sr. testified for the defense for less than four full pages of the transcript. 18 RR 124–27. He was asked only a general question about his son, and offered only a single sentence asking the jury to spare his son's life. The reason for this was that Armando Sr. was not interviewed by counsel before his testimony nor was he told what he would be testifying to. Ex. 111 at ¶20. If he had been properly interviewed and prepared, he could have testified to the following.

Armando Leza Sr. could have testified about Celia's alcohol abuse even when she was pregnant. Ex. 111 at ¶5. He also could have testified about Celia's rage and temper, including her physical abuse of himself and the children. Id. at ¶¶6-7. Armando Sr. could have testified to Celia's suicide threats which scared the children. Id. at ¶9. He was not asked but could have testified to Celia's making the children steal to make money, and how she got them involved in drugs. He also could have testified to Celia's own selling of drugs which led to one of her children being kidnapped to pay for a drug debt she owed. Id. at ¶¶14-15. Armando Sr. could have testified to Celia's leaving the children home alone while she went to bars. Id. at ¶12. He also could have testified to Celia's disinterest in education and letting the children drop out of school. Id. at ¶16. Armando Sr. could have testified about how he wanted to guide Armando "to do right in life" but that "Celia sent him in the wrong direction."  Id. at ¶17. Armando Leza Sr.'s lack of value as a witness was the result of counsel's failure to interview him and to ask relevant questions. Smith v.

Stewart, 140 F.3d 1263, 1269 (9th Cir. 1998). Had the jury heard this evidence, it is reasonably probable that at least one juror would have voted for a sentence less than death.

Trial counsel also failed to prepare Juliza Leza for her testimony. The result was a witness who was asked only cursory questions and who testified only briefly about Leza. Specifically, Juliza was only able to tell the jury she was close to Leza when they were growing up, that she was afraid of Celia Leza, and that Celia threatened her and her father, Armando Leza Sr. 18 RR 116, 118-20. Juliza had more to testify to, but did not meet with anyone from Leza's defense team prior to her testimony. Ex. 109 at ¶27. To that end, she was a witness at the request of her father, not because defense counsel contacted her. Id.

If Juliza Leza had been properly interviewed and prepared, she could have testified to the following: Leza was always very quiet and reserved, even around people he knew well, Ex. 109 at ¶17; following the divorce, Celia often refused to allow her children to leave with Armando Sr., saying that they could not go unless she was also allowed to go, id. at ¶13; Celia often climbed in the car with them, forcing her way into an outing with Armando Sr. and the boys, id.; Celia drank a lot and would routinely argue with Armando Sr., id.; and Leza and his brothers would beg to remain with their father—not wanting to go home to their mother at the end of a weekend visit. Id. at ¶15.

If properly prepared and questioned, Juliza Leza could have described how Orlando, Armando's brother, used to talk about how Celia and her lover, Robert (Pena), would sit down to a dinner they bought and not offer any to their children. Ex. 109 at ¶16. She could have also testified that Celia often berated Armando Sr. for wanting to take Leza on weekends; saying things (in front of Leza) like, "Why would you want him, he's not even your kid." Id. at ¶18. Additionally, Juliza Leza could have testified that Celia accepted and even required her children

to engage in criminal behavior. As a teenager, Leza told Juliza he did not like living with his mother because she "made" the boys steal for her. Id. at ¶19. Leza told Juliza about having to break into empty apartments where they lived, and stealing ceiling fans and hot water heaters for Celia to sell. Id. Lastly, Juliza could have added insight into Leza's upbringing. She observed that Celia and the children tore one house to pieces before they moved out, leaving holes in the walls and removing anything that could be stolen when they left the house. Id. at ¶20. After Celia and the children departed, Armando Sr. was left cleaning up the mess, as well as making the house payments. Id. Juliza was aware that Celia and children moved several more times during Leza's childhood. Id.

Trial counsel also failed to properly prepare Amanda Leza to testify. The direct examination of Amanda was only two pages. 18 RR 104–05. The jury heard Amanda was Leza's sister. 18 RR 104. Amanda offered only one statement that could be considered mitigating:  "Just please don't kill my brother."  18 RR 115.

If properly prepared and questioned, Armanda could have offered valuable mitigation evidence. Through her testimony, the jury could have learned about Leza's chaotic upbringing in a series of residences, including housing projects. Ex. 106 at ¶¶6-11. Jurors could have learned that Leza lived with an alcoholic mother who suffered from depression and allowed Leza to have an older girlfriend live with him when he was a teenager. Id. at ¶¶5, 15. The jury could have learned about Leza's broken back and use of narcotics to self-medicate. Id. at ¶¶17-18. They could have learned about Leza's long-term heroin addiction and ill-fated coupling with Trevino. Id. at ¶¶18, 20-22, 24. The jurors could have learned about Trevino bragging about stealing from people and her negative influence on Leza. Id. at ¶¶20-21.

But the jurors did not hear any of this evidence based upon counsel's ineffectiveness. Had they heard this evidence, it is reasonably probable that at least one juror would have voted for a sentence less than death.

**B.    Trial Counsel Failed To Counter the State's Evidence Regarding Leza's Involvement In A Prior Drive-By Shooting**

In the punishment phase, the prosecution argued Leza was an active participant in a prior homicide involving a drive-by shooting. 17 RR 6-7. The State called three witnesses and stipulated with the defense that the victim, Abel Carrasco, was killed due to gunshot wounds he received on September 19, 1992. 17 RR 27–18 RR 21. The State elicited testimony that during the shooting, Leza was in the back of pickup truck and he loaded a clip and handed it to the shooter, Rudy Trevino. 17 RR 38.

Defense counsel was ineffective for failing to call the shooter, Rudy Trevino, to testify. At the time of Leza's trial, Trevino was serving a state prison sentence for Carrasco's murder but had been bench-warranted back to the Bexar County to testify on Leza's behalf. However, Trevino was never called as a witness. Ex. 91. If Trevino had been called, he would have testified that Leza was not involved in the drive-by shooting. Id.

Defense counsel was also ineffective for failing to call William Chapman, Leza's brother. He too, like Rudy Trevino, was serving a state prison sentence for Carrasco's murder but had been bench warranted back to the county jail to testify at Leza's trial. Ex. 88; Ex. 103 at ¶2. If he had been called, Chapman would have testified that Leza was in the truck, but he did not in any way participate in the shooting. Id. Collectively, Chapman would have testified that Leza did not participate in the shooting, and Trevino found Leza's presence to be so negligible that he did not recall him even being in the truck. Id. at ¶103; Ex. 88.

111

Trial counsel were ineffective for failing to adequately prepare the witnesses called, and to call additional witnesses to rebut the prosecution's case in aggravation.

**C.      Trial Counsel Failed To Combat Evidence Of Leza's Attempted Escape**

At the punishment phase, the State presented evidence Leza attempted to escape from the Connally Unit in August 2001. Two correctional officers testified Leza and two other inmates were not in their cells during a night count, but were later found in the prison kitchen around 1 a.m. Also found in the kitchen was a baker's rack that officers believed was being used as a ladder to get onto a freezer which would give the inmates access to the roof of the building. The officers testified that Leza was on the baker's rack, a roof hatch was broken, and that pants, shirts, and heavy coats were found in the ceiling crawl space above the freezer. 18 RR 28-37, 40-48. The State used this evidence to argue that Leza was attempting to escape the Unit, and that he was a future danger to society, per special issue number one. 19 RR 4, 25-28, 34.

If counsel had investigated this incident, they could have presented the testimony of John Pina, who was one of the three inmates involved. Pina would have testified that the incident was far from an escape attempt.

Pina was assigned the night shift in the kitchen and was working the night of the "incident." Also there that evening was Leza, who worked in the commissary, and a third inmate named Roy Garcia. Ex. 112 at ¶¶3, 6. According to Pina, he, not Leza, was standing on a baker's rack, and rather than trying to escape, Pina was trying to repair a latch in the door to the ceiling when officers saw him. Pina also would have testified that as a result of the incident, he was written up as being "out of place" because he was in the hallway and not the kitchen, but nothing more than that because there was no evidence that anyone was attempting to escape. Pina also would have told the jurors that he was supposed to be in the kitchen that night as his shift did not end for a few

more hours. Ex. 112 at ¶7. Pina also could have told the jurors that the door latch and the bread rack were nowhere near the freezer below where the clothing was found. Id. at ¶12.

Pina also would have testified that the kitchen was in the middle of the Connally Unit (see Ex. 121) and that if someone actually did get onto the roof of the kitchen, that person would still have to find a way to get off the roof, then navigate around open areas and guard towers in order to even reach the perimeter fences a person would then have to climb over. Ex. 112 at ¶11. Pina also would have testified that he, Leza, and Garcia were in the commissary area of the kitchen directly in front of the kitchen office, which had huge windows and therefore would have been difficult to escape without being noticed. Id. at ¶10.

Pina also would have testified that he only knew Leza in passing. Pina would have testified that Leza told him he had just been granted parole, making it unlikely that Leza would attempt to escape as he was so close to being released. Ex. 112 at ¶¶13-14. Pina also would have told the jurors he would not have depended on Leza for something like an escape because Leza was not smart and did not appear to be very bright. Id. at ¶14.

At the time of Leza's trial, Pina had been released from prison and was living in San Antonio, Ex. 112 at ¶15, so trial counsel could have easily located and interviewed him. If Pina had been called as a witness (he was willing to testify), he could have convinced the jurors that the State's evidence of an attempted escape was much ado about nothing, and therefore the jurors would not have used this evidence to show that Leza was a future danger (special issue number 1). Counsel's failure prejudiced Leza's punishment case. Considered singly and cumulatively, there is a reasonable probability of a more favorable outcome if counsel had performed effectively.

**CLAIM SEVENTEEN (FAILURE TO DEFINE SENTENCING TERMS)**

Leza's conviction and sentence of death violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the aggravating factors employed in the

Texas capital sentencing scheme do not properly channel the jury's discretion. Further, trial counsel were ineffective for failing to raise this argument at trial. **Exhaustion**:  This claim was presented to the state courts in multiple parts as: (1) Claim VII in the initial state application, Ex. 8 at 93-94; (2) Point of Error Eight in the direct appeal, Ex. 3 at 102-06, Ex 6 at 7; (3) Point of Error Nine in the direct appeal, Ex. 3 at 106-08; Ex. 6 at 7; and (4) Point of Error Thirteen in the direct appeal, Ex. 8 at 129-32; Ex. 6 at 7. The state courts' adjudication of these claims was contrary to, and consisted of an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts. See Ex. 15 at 2; Ex. 13 at 179-80; Ex. 9 at 30. Further, trial counsel were ineffective for failing to raise these claims at trial.

A.    **The Eighth Amendment Prohibits The Arbitrary And Capricious Infliction of The Death Penalty Arising From Vague Sentencing Scheme**

The Eighth Amendment prohibits the arbitrary and capricious infliction of the death penalty. Furman v. Georgia, 408 U.S. 238 (1972). A capital-sentencing scheme that includes a "vague aggravating factor employed for the purpose of determining whether a defendant is eligible for the death penalty fails to channel the sentencer's discretion."  Stringer v. Black, 503 U.S. 222, 235 (1992). A constitutionally adequate sentencing scheme "must channel the sentencer's discretion by 'clear and objective standards' that provides 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.'" Godfrey v. Georgia, 446 U.S. 420, 428 (1980) (internal citation omitted). A sentencing scheme that relies on a vague sentencing factor creates an "unacceptable risk of randomness" in violation of the Eighth Amendment. Tuilaepa v. California, 512 U.S. 967, 974 (1994).

B.    **Texas's Capital Sentencing Scheme Is Unconstitutionally Vague**

In this case, Leza's Eighth Amendment right was violated because Texas's capital-sentencing scheme relies on a special instruction that is unconstitutionally vague and, therefore,

failed to give Leza's sentencers sufficient guidance. Pursuant to Texas Code of Criminal Procedure § 37.071(2)(b)(1), the court instructed the jury it must determine whether "beyond a reasonable doubt [] there is a <u>probability</u> that the defendant, Armando Leza, would commit <u>criminal acts of violence</u> that would constitute a <u>continuing threat to society</u>."  19 RR 8-9. The trial court further instructed the jury to "consider all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character or the circumstances of the offense that <u>militates</u> for or mitigates against the imposition of the death penalty."  19 RR 9 (emphasis added). The trial court, however, did not give the jury any definition of the substantive requirements of this instruction. Specifically, the trial court failed to define the terms: probability, criminal acts of violence, continuing threat to society, and militates. The jury was, therefore, left without any direction on how to apply these terms, which created an unacceptable risk of randomness in Leza's capital sentence in violation of the Eighth Amendment.

> **1.     Probability**

The trial court failed to provide the jurors with a definition of "probability."  Under Texas Code of Crim. Pro. § 3.01:  "All words, phrases and terms used in this Code are to be taken and understood in their usual acceptation in common language, except where specially defined." Section 3.01 has been held to apply to the term "probability," and thus, prior Texas court decisions have indicated the term "probability" need not be defined for the jury. <u>See, e.g., Robison v. State</u>, 888 S.W.2d 473, 481–82 (Tex. Crim. App. 1994); <u>Kemp v. State</u>, 846 S.W.2d 289, 309 (Tex. Crim. App. 1992) (internal citations omitted). However, contrary to the requirements of Section 3.01, the legal definition of probability approved by Texas courts differs from the common understanding of the term and from the actual definition of the term.

"Probability" is a statement as to the degree of confidence, expressed as a numerical measure. It is defined in various dictionaries as: "a measure or estimate of the degree of confidence

one may have in the occurrence of an event, measured on a scale from zero (impossibility) to one (certainty)," "a measure of how likely something is to happen", and "the likelihood of something occurring or the chance of something happening."   Ex. 92 at 2. In other words, a one percent estimate of confidence that Leza would be a continuing threat to society is a "probability" just as a fifty-one percent estimate of confidence that Leza would be a continuing threat to society is also a "probability."

The term "probability", however, is often misunderstood, see, e.g., Catalain Barbonianu, The Mathematics of Slots: Configurations, Combinations, Probabilities (INFAROM, 2013) at 90 ("There is a clear distinction between the mathematical notion of probability and the probability we use in the common speech, which we often confuse with possibility."), and it appears the Texas court's interpretation of "probability" is based upon this common misunderstanding. See Hughes v. State, 878 S.W.2d 142, 146–48 (Tex. Crim. App. 1992) (noting different understandings of the term "probability" and finding trial court abused its discretion in not granting motion to challenge juror for cause who applied the correct statistical definition of probability, yet still noting there was no trial court error in not defining the term for the jury).

Texas courts have defined the term "probability" as meaning "more likely than not, [defendant] represents a continuing threat to society." Robison, 888 S.W.2d. at 481. However, contrary to the understanding of Texas courts, "probability" does not contain an inherent measure of likelihood, and thus, "more likely than not" – i.e. a measure of confidence of greater than 50% - is not the correct definition of probability. By defining probability as "more likely than not" (or a measure of confidence of greater than 50%), Texas appellate courts have inserted a specific measure of probability, which differs from the common understanding of the term, and approved

116

its constitutionality, while simultaneously allowing trial courts to avoid sharing that specific definition with the jury.

If Texas courts misunderstand the term and know jurors misunderstand the term, then there is an impermissible risk the jury in Leza's case did not understand the term. This risk is guaranteed when the constitutionally approved measure of risk ("more likely than not") is not part of the common definition of "probability."  Absent a specifically defined measure of probability as greater than 50% (as approved in Robison), the jury could have found a 1% probability Leza would commit criminal acts of violence that would constitute a continuing threat to society in order to sentence Leza to death. Because the court did not advise the jury the State was required to prove a measure of probability greater than a 50% likelihood, reliance upon the undefined term "probability" unconstitutionally decreased the State's burden of proof and failed to narrow the category of defendants subject to the death penalty. The failure to define "probability" also left Special Issue Number 1 unconstitutionally vague in violation of due process.

## 2.      Criminal acts of violence

The trial court also failed to provide the jurors with a definition of "criminal acts of violence."

The problem with failing to define "criminal acts of violence" is that the statutory definition differs from a lay understanding of the phrase and does not exclude "criminal acts of violence" against property from its definition.

Absent such a limiting definition, for example, the jury could have considered the risk that Leza may commit "criminal mischief" (Tex. Penal Code Ann. § 28.03) involving the intentional or knowing damage to the property of another to be a future "criminal act of violence." Boyd v. State, 899 S.W.2d 371, 374 n.5 (Tex. Crim. App.1995) (criminal mischief is a crime of violence under Texas law); United States v. Reyes-Maya, 305 F.3d 362, 367 (5th Cir. 2002) (finding Texas

117

criminal mischief conviction should have been excluded from criminal history score in federal sentencing guidelines). Likewise, absent a limiting definition from the court, a jury could even construe the future risk of disorderly conduct (Tex. Penal Code Ann. § 28.03) to be a "criminal act of violence" since it "can include violent acts such as discharging a firearm in a public place." Reyes-Maya, 305 F.3d at 367 (noting disorderly conduct can include violent acts and should be excluded from criminal history in federal sentencing guidelines). Likewise, because "criminal acts of violence," was not defined to exclude property crimes, burglary could even be included as a potential future violent crime. Gardner v. State, 699 S.W.2d 831 (Tex. Crim. App. 1985) (looking at factual circumstances of prior burglary conviction to determine if it involved "actual violence to property"). Of course, if the jury were provided with a proper definition for "criminal acts of violence" then this risk of misapplication of the aggravator by the jury would have been reduced. See United States v. Landeros-Gonzales, 262 F.3d 424, 425–27 (5th Cir. 2001) (finding Texas "criminal mischief" conviction for graffiti to not be a prior "crime of violence" under federal law).

In this case, the State focused on Leza's past property crimes and nonviolent offenses to convince the jury to return a death penalty verdict. The State introduced Leza's prior convictions for theft of automobile, burglary of a habitation without the use of force, burglary of a building, and criminal trespass to show there was a probability Leza would commit criminal acts of violence that would constitute a continuing threat to society. 17 RR 20; 19 RR 23-25. The State also argued Leza was "disrespecting people's property" through a prior offense and by failing to identify himself to police that he was "disrespecting authorities" and "[d]isrespecting an officer." 19 RR 25. The State focused on information that did not involve any violence against persons in arguing that Leza "would commit criminal acts of violence that would constitute a continuing threat to society." If the Court had defined "criminal acts of violence" to exclude property crimes, then the

118

jury would have better understood that these prior offenses did little, if anything, to advance the State's argument that the jury should affirmatively find Special Issue Number 1 applied to Leza. Ultimately, the Court should have advised the jury that it may only consider "criminal acts of violence" that involved the use of force against another person, but not "criminal acts of violence" against another person's property. Cf. 18 U.S.C. § 16 (federal definition for "crime of violence").

Without a definition, the jurors were left without guidance as to how to apply this critical phrase and, instead, may have given weight to factors that should have been excluded from their consideration, and arbitrarily applied their own personal definitions. Accordingly, the jury instructions did not allow for the proper narrowing eligibility for the death penalty and, therefore, failed to "protect[] against arbitrary and capricious impositions of the death sentence" in violation of the Eighth Amendment. Sawyer v. Whitley, 505 U.S. 333, 341 (1992); Lowenfield v. Phelps, 484 U.S. 231, 244 (1988). Additionally, without any guiding definition, the "criminal acts of violence" phrase was unconstitutionally vague and violated Leza's right to due process. Johnson v. United States, 135 S. Ct. 2551 (2015).

### 3. Continuing threat to society

The trial court additionally failed to define the phrase "continuing threat to society" in its instruction to the jury. In determining whether a defendant will be a continuing threat to society, Texas courts have held the jury should consider whether the defendant constitutes a threat, either in or out of prison. Estrada v. State, 313 S.W.3d 274, 284 (Tex. Crim. App. 2010). However, Texas courts are under no obligation to inform the jury of this inclusion, and in this case, the trial court made no such clarification.[27]  See 19 RR 9. Leaving "society" ambiguous and undefined creates a

---

[27] While trial counsel argued to the jury society is defined as the "penal society," the trial court's instructions, which the jury is admonished to follow, does not contain a similar distinction. See 19 RR 19-21, 23.

risk the jurors will focus on the future dangerousness to the society they belong to—i.e. the general public. In fact, there is a risk that leaving "society" undefined will "exacerbate[] the jurors' concern that there is some scenario in which the defendant could be released from prison."  Ex. 92 (54 Am. Crim. L. Rev. 57, 86 (2017)). This in turn creates an unfair risk jurors will rely upon emotion and fear as opposed to fairly weighing the evidence presented to them when considering whether a defendant constitutes a continuing threat to their own community. Not only does this create unfair prejudice, but considering whether a defendant constitutes a continuing threat to society outside of the prison population, is entirely irrelevant because consideration of a capital sentence necessarily means the defendant will never be released into the general population. Accordingly, the ambiguity created in this case by the trial court's failure to define the parameters of the phrase "continuing threat to society" was unnecessarily prejudicial and violated Leza's right to be protected against the arbitrary infliction of the death penalty.

### 4.    Militates

Lastly, the trial court failed to define the term "militates" in its instruction to the jury. "Militates" is not a commonplace word and may, therefore, not be recognized by most jurors. Even when "militate" is recognized by the jury, it would not necessarily be understood by them. The dictionary definitions of "militates" vary. See, e.g., Merriam-Webster Online Dictionary: www.merriam-webster.com/dictionary/militates (last visited September 7, 2017) ("Etymology: Latin militates, . . ; to have weight or effect"); Cf. www.dictionary.com/browse/militate (last visited September 7, 2017) ("to have a substantial effect; weigh heavily"). "Militates" therefore generally means to have some weight or effect or to cause a change. But, in the context of a capital case, "militates" means, in effect, to justify or operate in favor of, the death penalty. This is different from the usual meaning that would typically be understood by the jury.

Terms with a technical legal meaning may need to be defined, particularly "when there is a risk that the jurors may arbitrarily apply their own personal definitions of the term or where a definition of the term is required to assure a fair understanding of the evidence." <u>Middleton v. State</u>, 125 S.W.3d 450, 454 (Tex. Crim. App. 2003). Given the acknowledged difficulty jurors have understanding instructions that may seem commonplace to lawyers, and that "militates" is not frequently encountered, it is unlikely the term will be readily understood by the average juror.

The jurors here were left without guidance as to how to apply this critical word and consequently may have given weight to factors which should have been excluded, or arbitrarily applied their personal definitions. For example, as a statutory matter, the State may not offer evidence of race and ethnicity to suggest that those factors make it more likely the defendant will engage in future criminal conduct. Tex, Code Crim. Proc. Art. 37.071 § 2(a)(2). An admonition to the jury to the same effect would have served to protect Leza, a Hispanic male, from a juror giving his race inappropriate weight. <u>Miller-El v. Dretke</u>, 545 U.S. 231, 234 (2005). Age, sex, national origin, religion, political views, and sexual orientation are personal characteristics which are protected by the courts, and not normally relevant to a capital sentencing absent some specific relevance. <u>See</u>, <u>e.g.</u>, <u>Barclay v. Florida</u>, 463 U.S. 939, 949 (1983). Instructions should therefore have been given to insure that the other factors to which the trial court's attention was alerted by defense counsel's objections were not improperly considered by the jury. <u>Fritz v. State</u>, 946 S.W.2d 844 (Tex. Crim. App. 1997) (gender discrimination violates Equal Protection clause); <u>Marx v. State</u>, 150 S.W.2d 1014, 1016-17 (Tex. Crim. App. 1941) (inflammatory comments concerning national origin required reversal); <u>Dawson v. Delaware</u>, 503 U.S. 159, 166-67 (1992) (mere proof of membership in the Aryan Brotherhood showed only "abstract belief," and therefore implicated defendant's First Amendment right of association); <u>Lawrence v. Texas</u>, 539 U.S. 558

121

(2003) (state cannot criminalize private homosexual activity). The instruction, as given, did not preclude the jury from consideration of Leza's constitutionally protected personal characteristics in deciding the first special issue and thus, reversal is required.

## C.     Trial Counsel's Performance Was Deficient

Despite the trial court's failure to define these key terms, trial counsel never objected or requested the trial court amend the special issue instructions to include definitions of "probability," "criminal acts of violence," "continuing threat to society," and "militates."  Had trial counsel requested the special instructions contain definitions of the terms, the jurors would have been precluded from applying their own definitions and interpretations to these legal terms. The jurors, therefore, would not have been able to consider Leza's past property crimes and non-violent offenses, they would not have been prejudiced by fears of Leza being a threat to the general population outside of prison, and there would have been no risk the jurors considered improper characteristics, like Leza's race. Absent these improper considerations, there is a reasonable probability the jurors would not have sentenced Leza to death.

## CLAIM EIGHTEEN (DEFICIENT GRAND JURY INDICTMENT)

Leza's conviction and sentence of death violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the grand jury did not consider any of the aggravating circumstances as part of the True Bill of Indictment, yet aggravating circumstances were still considered by the jury in the punishment phase. **Exhaustion**:  This claim was presented to the state court as Point of Error Three in the direct appeal. Ex. 3 at 29–37; Ex. 6 at 5-6. The state court's adjudication of the claim was contrary to, and consisted of an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts. Ex. 9 at 14-15. To the extent this claim was not raised at trial, trial counsel's performance was deficient.

Further, post-conviction counsel's failure to raise the ineffectiveness of trial counsel amounted to deficient performance.

## A.       Texas Indictments

"An 'indictment' is the written statement of a grand jury accusing a person therein named of some act or omission which, by law, is declared to be an offense."  Tex. Crim. Proc. Code Ann. § 21.01; also see Tex. Const. art. V, § 12. "Everything should be stated in an indictment which is necessary to be proved."  Tex. Crim. Proc. Code Ann. § 21.03; also see Tex. Const. art. I, § 10. Texas law prohibits amendment to the Indictment "if the amended indictment . . . charges the defendant with an additional or different offense or if the substantial rights of the defendant are prejudiced."  Tex. Crim. Proc. Code Ann. § 28.10; also see Tex. Crim. Proc. Code Ann. § 28.19. The purpose of the Texas indictment is not only to provide notice to the defendant, but also to ensure that the grand jury finds probable cause exists before the State can bring charges. Gunville v. Gonzales, 508 S.W.3d 547, 563–64 (Tex. Crim. App. 2016) ("The court has often emphasized the role of a grand jury as an independent body which acts as check on prosecutors.").

In Leza's case, the grand jury issued a True Bill of Indictment for murder in the course of a robbery with an enhancement allegation for Leza's prior conviction of burglary of a habitation. CR 16. The indictment did not contain any grand jury charge that there was a probability that Leza would commit future acts of violence that would constitute a continuing threat to society, nor did it reflect a grand jury charge that the mitigating circumstances were insufficient to warrant a sentence of life imprisonment. 19 RR 8–13. Although not listed in the indictment, trial counsel did not object to the presentation of the three aggravating factors for the jury's consideration at the punishment phase.

123

**B.    Analysis**

The Supreme Court has found the Fifth Amendment requires that "any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." Apprendi v. New Jersey, 530 U.S. 466, 470 476, 490 (2000) (emphasis added) (holding a criminal defendant is entitled to "a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt," and any fact that increases the penalty for a crime beyond the prescribed statutory maximum is subject to the same requirements); Alleyne v. United States, 133 S. Ct. 2151, 2155 (2013) ("any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury"). Subsequently, the Court held in Ring v. Arizona, 536 U.S. 584, 609 (2002) that "aggravating factors operate as 'the functional equivalent of an element of a greater offense,'" and thus, "the Sixth Amendment requires that they be found by a jury." Id.

In light of Apprendi and Ring, it is clear Texas's enumerated aggravating factors are "the functional equivalent of an element of a greater offense" because they subject a criminal defendant to capital punishment, and thus, must be specifically alleged in the grand jury indictment and supported by sufficient evidence of probable cause. See United States v. Cotton, 535 U.S. 625, 627 (2002) (holding prosecutions in federal courts require that aggravators be alleged in the indictment and supported by probable cause); Tex. Crim. Proc. Code Ann. § 21.03 ("Everything should be stated in an indictment which is necessary to be proved.")  While the Fifth Amendment applies to the guarantee of indictment by grand jury in federal court, Texas also elects to indict defendants through a grand jury procedure. In such circumstance, the notice requirement under the Sixth and Fourteenth Amendments requires defendants to be informed of the charges against them. See Harris v. United States, 536 U.S. 545 (2002).

In Leza's case, the aggravating factors were not submitted to the grand jury. All elements to a crime must be charged in an indictment before they can be considered by a jury. If Texas is allowed to proceed without a grand jury finding probable cause for each aggravating circumstance, then state prosecutors will be left with an unacceptable level of discretion. The State will continue to unilaterally add aggravating circumstances that were never contemplated by the grand jury. Absent the indictment's express presentation of every aggravator, the grand jury was never tasked to perform its protective role. The rights of a Texas state court defendant, like Leza, cannot consistently with the Equal Protection Clause, be fundamentally diminished in contrast with a defendant in federal court. Thus, Leza's conviction or, at a minimum his death sentence, must be reversed as this error had a substantial and injurious effect on the proceedings.

**CLAIM NINETEEN (STATUTORY 10-12 RULE)**

Leza's conviction and sentence of death violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because Texas's statutory "10-12 rule" is misleading and results in arbitrariness in the imposition of the death penalty. **Exhaustion**: This claim was presented to the state courts in Claim Seven of Leza's direct appeal and Claim VIII of the initial state application. Ex. 8 at 89-102; Ex. 3 at 95-120; Ex. 6 at 7. The state courts' adjudication of the claim was contrary to, and consisted of an unreasonable application of, clearly established federal law, and was based upon an unreasonable determination of the facts. Ex. 9 at 29-30; Ex. 15 at 2; Ex. 13 at 181-82.

The court's charge during the punishment phase instructed the jury it could not return an answer of "No" on the first and second special issues, or an answer of "Yes" on the third special issue, unless ten or more of the jurors agreed. 19 RR 8, 10-11. The trial court's instruction to the jury was false because, under Texas law, ten votes are not required for a capital defendant to be sentenced to life rather than death. Instead, if even a single juror had voted "No" on the first or

second special issues or "Yes" on the third special issue, Leza would have been sentenced to life in prison. Tex. Code. Crim. Proc. art. 37.071, § (2)(g). The court's "10-12" instruction, also known as the Texas "Gag Statute," was misleading.[28]  There is no doubt this false instruction by the trial court misled several jurors.[29]

The Eighth Amendment forbids misleading jurors in the manner that the jurors were here. Simmons v. South Carolina, 512 U.S. 154, 171 (1994). According to the Court in Simmons, due process demands jurors understand the true range of punishment and their actual authority and power to ensure reliability in capital sentencing. This principle is abridged when jurors are misled, particularly when that statement causes a juror who would have otherwise insisted on a life sentence to accede to a death sentence.

As in Simmons, the jurors in Leza's case were misled about the consequences of their answers to the questions they were presented. Had jurors not been misled by the court's charge, they would have answered the special issues in a manner that resulted in Leza being sentenced to life rather than death. While the constitutional sufficiency of a capital sentencing instruction is ultimately determined by what a reasonable juror could have understood the instruction to mean, see California v. Brown, 479 U.S. 538, 541 (1987), this error was not harmless.

The "10-12 rule" also creates an impermissible risk of arbitrariness in the sentencing process. Furman v. Georgia, 408 U.S. 238, 249 (1972) (Douglas, J., concurring) ("[W]henever there is a reasonable likelihood that a juror will misunderstand a sentencing term, a defendant may demand instruction on its meaning, and a death sentence following the refusal of such a request

---

[28] See Robert Clary, Texas's Capital-Sentencing Procedure Has A Simmon's Problem:  Its Gag Statute and 12-10 Rule Distort The Jury's Assessment of the Defendant's "Future Dangerousness, 54 Amer. Crim. L. Rev. (2017).
[29] Leza raised this claim in a pretrial motion, which the trial court denied. 1 CR at 195-213, 214.

should be vacated as having been 'arbitrarily or discriminatorily' imposed."). The court's instruction fostered confusion because it failed to explain what happens if the jurors could not reach the number of votes asked for by the instruction. Because the jurors are told a life sentence ensues from one set of answers and a death sentence from the other, a reasonable juror would conclude the only way to obtain either of these punishments is to answer the questions posed to the jury. See Francis v. Franklin, 471 U.S. 316 (1985). Thus, a juror can only speculate as to the result if agreement cannot be reached: a lesser sentence, an expensive retrial, or some other result.

The instruction also denied Leza the right to an individualized sentencing. Mills v. Maryland, 486 U.S. 367, 374-75 (1988). Here, a jury may decide that sufficient mitigation exists to warrant a life sentence (issue one) or that there is insufficient evidence of future dangerousness (issue three), the "10-12 rule" provides them with no clear outlet to express their individualized findings. The "10-12 rule" also deprived the jury of an effective vehicle to express their reasoned moral response to the mitigating evidence as it made it impossible for an individual juror to know the potential impact of their vote and likely resulted in a juror or jurors being compelled to vote against their conscience. See Andres v. United States, 333 U.S. 740, 752 (1948); but see Webb v. Collins, 2 F.3d 93, 95-96 (5th Cir. 1993).

And finally, the "10-12 rule" prevents the defendant from receiving effective assistance of counsel. Article 37.071(2)(a)(1) prohibits the trial court, either attorney, and the defendant from informing the jury, or prospective juror, that the failure to answer any of the issues presented will result in a mandatory life sentence. But this rule renders counsel ineffective as he or she cannot inform a sentencing jury of sentencing alternatives. See Burley v. Cabana, 818 F.2d 414, 418 (5th Cir. 1987).

In sum, the court's instructing the jury with the "10-12 rule" resulted in multiple constitutional errors. Given that at least one juror could have influenced a life sentence, and that the instructions given were calculated to confuse and coerce such a juror, the error had a substantial and injurious effect on the punishment verdict.

## CLAIM TWENTY (OTHER IAC CLAIMS)

Leza's conviction and sentence of death violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because his trial counsel failed to: (1) make an opening statement at the guilt phase; (2) object to Detective McCampbell's statement about Leza's arrest; (3) object to the improper show-up shown to Mohammad Chahrour; and (4) object to the admission of gruesome photographs. **Exhaustion**: Subpart (A) of the Claim was presented to the state courts in Claim V of the initial state application. Ex. 8 at 64-65. The state courts' adjudication of this Claim was contrary to, and consisted of an unreasonable application of, clearly established federal law, and was based on an unreasonable determination of the facts. Ex. 13 at 153; Ex. 15 at 3-4. Subparts B, C, and D of this Claim were not presented to the state courts because of the ineffectiveness of trial and initial post-conviction counsel.

## A.   No Opening Statement

Leza's defense counsel waived opening statement, claiming "We would like to reserve our right to make an opening statement until later." 12 RR 21. However, prior to the close of evidence, the trial court asked if defense counsel would like to make an opening statement, and defense counsel declined and rested. 14 RR 19. Trial counsel did not make an opening statement because he lacked a defense, evidence, and witnesses. Writ RR 193.

Opening statements may be made in both bench and jury trials. Crist v. Bretz, 437 U.S. 28, 50 (1978). The opening statement is important and often "designed to force the opposition's hand or shape the jurors' perception of events." Lee v. Kemna, 534 U.S. 362, 402 (2002) (Kennedy, J.,

dissenting).  An opening statement provides the opportunity "to state what evidence will be presented, to make it easier for the jurors to understand what is to follow, and to relate parts of the evidence and testimony to the whole[.]"  United States v. Dinitz, 424 U.S. 600, 612 (1976) (Burger, J., concurring). Leza's trial counsel waived the first opportunity to introduce and personalize Leza, to explain the defense's theme, to provide a framework for the evidence, to alert the jurors there were two sides to the case and to keep an open mind, and to build rapport with the jury.

The failure to offer an opening statement was deficient performance which prejudiced Leza and undermined confidence in the verdict. The jury did not hear any evidence as to the defense's theory of the case, if any, until closing argument. Thus, the jury had no alternate lens in which to view the evidence it received; only the lens offered by the prosecution. 12 RR 17–25.

**B.      Detective McCampbell's Statement About Leza's Arrest**

During Leza's trial, the State questioned Detective McCampbell about the arrests of Leza and Trevino. 12 RR 104–05. McCampbell described preparing arrest warrants for Trevino and Leza. 12 RR 105. McCampbell was then asked to define an arrest warrant for the jury. Id. McCampbell testified:  "Basically, I type out my probable cause, the events of the crime, to show that Armando Leza and Dolores Trevino were responsible for the death of Caryl Allen, and then I went and had the warrants signed by a Judge and they were arrested for the offense of murder." Id.

"The general rule in Texas is that the State is entitled to show circumstances surrounding an arrest. However, when such evidence is inherently prejudicial and has no relevance to any issue in the case, the general rule no longer applies, and the evidence becomes inadmissible." Hayden v. State, 155 S.W.3d 640, 646 (Tex. App. 2005).

Here, the State went beyond describing the circumstances of Leza's arrest. In addition to recounting the simple circumstances surrounding the arrest, the State solicited testimony that

indicated the detective could "show" Leza and Trevino were responsible for the victim's death and that a judge signed the arrest warrant. These statements had no tendency to make a fact of consequence more or less probable. Tex. R. Evid. 401. Irrelevant evidence is not admissible. Tex. R. Evid. 402. Admission of this evidence also served to confuse the jury by suggesting that "a judge" had already made the factual finding that the jury was to determine, i.e., that Leza was "responsible for" the victim's death. 12 RR 105.

Trial counsel did not object at any point during this exchange between the prosecutor and McCampbell. The defense did not seek a mistrial nor did the defense move to strike these statements. Finally, the defense failed to request a curative instruction. The defense failed to address the introduction of irrelevant and unduly prejudicial testimony in violation of Leza's right to due process.

**C.    Convenience Store Show-Up**

Following Trevino and Leza's arrest, Detective McCampbell received information that some of the victim's property was sold at a convenience store. 12 RR 102. Officer Tim Angell showed photographs of Trevino and Leza to the convenience store employee, Mohamad Chahrour. 13 RR 75-76. Chahrour testified he was "shown single photographs of a male and a single photograph of a female," and recognized the individuals as his customers. Id. at 63. Leza and Trevino were in custody at the time Chahrour was interviewed by Angell. Id. at 62.

Leza's photograph was identified in a one-person lineup; also known as a show up identification. As Leza was already in custody, there was no exigent circumstance that prohibited law enforcement from utilizing a six-pack photographic lineup with photographs of other individuals. Instead, the State used a "show up" identification that was highly suggestive and has been condemned for four decades because of its suggestibility. Stovall v. Denno, 388 U.S. 293, 302 (1967); see also Simmons v. United States, 390 U.S. 377, 383 (1968). Here Leza's photograph

130

was emphasized "under unnecessarily suggestive circumstance arranged by law enforcement" (Perry v. New Hampshire, 565 U.S. 228, 248 (2012)) as it was the only photograph shown to the convenience shop employee. Because of the use of a single photograph, the likelihood of misidentification violated Leza's right to due process.

Further, Leza is Hispanic and Mohamad Chahrour is not. This increases the significant risk of misidentification as people have a more difficult time identifying people from another ethnicity. In this case, the danger of a misidentification because of the show up procedure was coupled with the dangers of cross-racial misidentification. See, e.g., Ex. 93; Ex. 100.

Trial counsel were ineffective for not seeking to exclude this suggestive and unreliable out of court show up identification. Counsel was further ineffective for failing to request from the court a cautionary instruction about the show up. And state post-conviction counsel were ineffective for failing to raise the ineffectiveness of trial counsel for failing to raise this issue.

## D.    Gruesome Photographs

During the testimony of City of San Antonio Police Officer Robert Moreno (12 RR 53, 70-71) and Dr. Randall Frost, the chief medical examiner for Bexar County (12 RR 145), the State admitted into evidence four photographs showing the victim's bloody body at the crime scene or bloated face at the autopsy. See 12 RR 53, 70-71, 145; Ex. 122. Trial counsel did not object to the admission of any of the four photographs even though they were highly prejudicial and ensured that the jury would be unable to purge the memory of those horrific photographs while deliberating.

The prejudice here is clear. During voir dire, juror Harris stated that she did not want to see gruesome pictures at trial and that she might be prejudiced by them. 10 RR 125-26 (see Claim Twelve, above). Harris also stated she could not guarantee she would not give such pictures undue weight when reaching a verdict. 10 RR 126-27. The four photographs mentioned above no doubt were the type that Harris was speaking of.

131

Counsel's failure to object constituted deficient performance and there is a reasonable probability of a more favorable outcome if counsel had performed effectively.

## CLAIM TWENTY-ONE (TRIAL COURT ERROR – JURY INSTRUCTIONS)

Leza's conviction and sentence of death violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the trial court failed to instruct the jury as to various points of law concerning victim impact evidence. Specifically, the trial court failed to instruct the jurors that its consideration of victim impact evidence: (1) should not be considered in connection with the future dangerousness special issue; and (2) did not relieve the State of its burden to prove the "future dangerousness issue beyond a reasonable doubt." Moreover, trial counsel were ineffective for failing to request the court give these instructions and for failing to object to the victim impact evidence which ran afoul of controlling Supreme Court precedent.

**Exhaustion**: The portion of the claim related to the failure to give jury instructions related to victim impact evidence was presented to the state court as Point of Error Twelve in the direct appeal. Ex. 3 at 124-29; Ex. 6. The state court's adjudication of this claim was contrary to, and consisted of an unreasonable application of, clearly established federal law, and was based upon an unreasonable application of the facts. See Ex. 9 at 28-29. The portion of the claim related to the failure to object to inadmissible victim-impact evidence has not been presented to the state court due to the ineffectiveness of trial and initial post-conviction counsel.

## A.    Victim Impact Evidence

Under <u>Payne v. Tennessee</u>, 501 U.S. 808 (1991), the State's presentation of victim impact evidence is limited to a "quick glimpse" of the victim's life and "the impact of the murder on the victim's family." 501 U.S. at 822, 827. The State may not present a victim's family members' characterization or opinion about the crime, the defendant, or the appropriate sentence. <u>Payne</u>, 501 U.S. at 830 n.2 (citing <u>Booth v. Maryland</u>, 482 U.S. 496 (1987)); Erin McCampbell, <u>Tipping the</u>

132

Scales: Seeking Death Through Comparative Value Arguments, 63 Wash. & Lee Rev. 379 (2006)).

Admission of victim impact evidence is unconstitutional under the due process clause if it is so

unduly prejudicial that it renders the sentence fundamentally unfair. Payne, 501 U.S. at 825; accord

Miller v. Dretke, 404 F.3d 908, 919 (5th Cir. 2005).

The victim evidence presented at Leza's trial came from Daryl Allen, the victim's twin

brother. While the majority of Allen's testimony centered upon the impact his twin sister's death

had on his life and the other three surviving siblings, 18 RR 93-101, Allen made improper

comments directly to Leza saying: "Why did you hurt my little sister," "That was my sister, you

fool. You coward. That's what you are. You're a damn coward." 18 RR 101.

## B.    Trial Court Error Regarding Victim Impact Instructions As It Related To Future Dangerousness

The jury should have been instructed that its consideration of victim impact evidence could

not be conducted in connection with the future dangerousness special issue. The Supreme Court

in Payne held that the legitimacy of the State's decision to permit victim-impact evidence depends

on its relevance to the jury's decision. 501 U.S. at 827. Indeed, Payne specifically refers to the

legitimate role that such evidence can play when the jury is also considering the defense's

mitigation evidence. Id. at 826.

Whatever relevance Allen's testimony may have had to the uniqueness of the victim, the

impact of her death upon their families, and in rebuttal of the defense's mitigation case, it logically

bore no relationship to the issue of whether Leza would commit criminal acts of violence in the

future. The good qualities of the victim and the suffering of her loved ones did not make Leza's

propensity to commit future violent acts more or less likely.

Since this evidence had no relevance to the "future dangerousness" issue, permitting its

consideration in that context encouraged the very kind of process that is prohibited: one that allows

a decision to turn upon a factor that is entirely arbitrary and random. Furman v. Georgia, 408 U.S. 238, 255 (1972).

Further, the jury should have been instructed that its consideration of victim impact evidence did not relieve the state of its burden to prove the "future dangerousness" issue beyond a reasonable doubt. An appropriate instruction from the court would have served to focus the jury on the State's burden of proving "future dangerousness" beyond a reasonable doubt. Given the lack of a logical nexus between the inherently emotive victim-impact evidence and the probability that Leza would commit future criminal acts of violence, an instruction would have reminded the jury that what the State had to prove concerned Leza's own future conduct and not the past and continuing impact of the victim's death. Failure to so instruct the jury again raised the risk of an arbitrary rather than a channeled sentencing process, in violation of the Eight and Fourteenth Amendments. Jurek v. Texas, 428 U.S. 262, 276 (1976).

In addition to the court's error, trial counsel were also ineffective for failing to request these instructions. See Ex. 9 at 29. Counsel's ineffectiveness was prejudicial.

## C.   Counsel's Failure To Object To Improper Victim Impact Evidence

Further, trial counsel were ineffective for failing to object to victim impact evidence that was outside the permissible bounds articulated by the Supreme Court in Payne. Allen's statements at the punishment phase directed specifically to Leza—"Why did you hurt my little sister," "That was my sister, you fool. You coward. That's what you are. You're a damn coward" (18 RR 101)— was a clear violation of Payne as these remarks constituted impermissible opinion regarding Leza. Payne, 501 U.S. at 830, n.2. This victim-impact evidence was so unduly prejudicial that it rendered Leza's trial "fundamentally unfair" (id. at 825) and counsel's failure to object to it was prejudicial. Further, post-conviction counsel's failure to raise this claim in the initial post-conviction

establishes cause for Leza's failure to raise these claims below. Based upon the above, Leza is entitled to punishment phase relief.

**CLAIM TWENTY-TWO (ELECTED JUDGES)**

Leza's conviction and sentence of death violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because Leza's capital trial, sentencing, and appellate review were conducted before state judicial officers whose tenures were not dependent on good behavior, but rather dependent on popular elections. **Exhaustion**: This claim was presented to the state court as Point of Error Six in the direct appeal. Ex. 3 at 80-89; Ex. 6 at 7. The state courts' adjudication of the claim was contrary to, and consisted of an unreasonable application of, clearly established federal law. See Ex. 9 at 21-22.

The tenure of judges of the Texas state courts, including the CCA, is dependent upon popularly contested elections and retention elections. Tex. Const., Article V, § 1. The justices of the CCA perform mandatory review of capital death sentences directly without intermediary appellate review. Tex. Code Crim. Proc. Art. 37.071, §2(h). Appeal to the CCA is automatic. Id.

At the time of the adoption of the United States Constitution, the common law definition of due process of law included the requirement that judges who presided over trials in capital cases, which at that time potentially included all felony cases, have tenure during good behavior. This mechanism was intended to preserve judicial independence by insulating judicial officers from the influence of the sovereign that would otherwise have improperly affected their impartiality.

Texas law does not include any mechanism for insulating state judges and justices from majoritarian or political pressures which would affect the impartiality of an average person as a judge in a capital case. Making unpopular rulings favorable to a capital defendant or to a capitally-sentenced appellant poses the threat to a judge or justice of expending significant personal resources, of both time and money, to defend against an election challenger who can exploit

popular sentiment against the jurists' pro-capital defendant rulings, and poses the threat of ultimate removal from office. Judges and justices who are subject to popular election cannot be impartial in any capital case within due process standards because of the threat of removal as a result of unpopular decisions in favor of a capital defendant.

Because the facts of this case—the killing of a woman who was a Hurricane Katrina refugee (as repeatedly told to the jury by the State)—were particularly disturbing, the case naturally received media attention in Bexar County and its surrounding communities. A ruling favorable to Leza on any dispositive issue in his capital case, at trial or on post-conviction, would have been devastating to the chances of reelection of any judicial officer who made such a ruling, and at minimum would have required the judicial officer to expend significant resources in time and money to retain his or her office.

Conducting a capital trial or direct appeal before a tribunal that does not meet constitutional standards of impartiality and requires that Leza's conviction and sentence be vacated.

## CLAIM TWENTY-THREE (CONFLICT OF INTEREST)

Leza's conviction and sentence of death violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because Leza's post-conviction counsel was subject to a conflict of interest when he signed Leza's state post-conviction petition. **Exhaustion**:  This claim has not been presented to the state courts because of the ineffectiveness of initial post-conviction counsel.

To raise an ineffective assistance of counsel claim, Leza must show counsel's performance was deficient and that deficient performance prejudiced the defense. When the grounds for an attorney's ineffectiveness is based on a conflict of interest, prejudice will be presumed if the attorney has an actual conflict that adversely affected his or her performance. Beets v. Scott, 65 F.3d 1258 (5th Cir. 1995) (citing Cuyler v. Sullivan, 446 U.S. 335, 348 (1980)).

In this case, Leza was denied his right to assistance of non-conflicted counsel because his post-conviction attorney, Jay Brandon, was subject to a conflict of interest when he signed and filed Leza's post-conviction petition. Brandon was appointed to represent Leza in June 2009. Ex. 2. In late January to February 2011, while still representing Leza, Brandon began working as an assistant district attorney for the Bexar County District Attorney's Office—the same office opposing Leza's post-conviction petition. See Exs. 4, 7. Although Michael Gross was appointed as Brandon's co-counsel during Brandon's transition to the District Attorney's Office, Brandon failed to withdraw prior to filing Leza's petition. Ex. 5. On April 26, 2011, while working for the District Attorney's Office, Brandon signed and filed Leza's post-conviction petition. Ex. 8.

Brandon's continued representation of Leza violated Leza's Sixth Amendment right to the effective assistance of counsel because Brandon's employment with the Bexar County District Attorney's Office, the office specifically opposing Leza's petition, created an actual conflict of interest, which prevented Brandon from faithfully and adequately representing Leza's interests. Accordingly, Leza's Petition should be granted, and he should be afforded a new trial.[30]

**CLAIM TWENTY-FOUR (CUMULATIVE ERROR)**

Leza's conviction and sentence of death violate the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution due to cumulative error. **Exhaustion**:  This claim has not been presented to the state courts because of the ineffectiveness of his trial and initial post-conviction counsel.

Leza is entitled to relief based upon the cumulative errors in his trial, appeal and state post-conviction proceedings (see Claims Two through Ten, Twelve, Seventeen, Eighteen, Nineteen, Twenty-One, Twenty-Two, and Twenty-Three). See Derden v. McNeel, 978 F.2d 1453, 1454 (5th

---

[30] Further, this conflict acts as cause with respect to claims which otherwise would be subject to default.

Cir. 1992); <u>Moore v. Quarterman</u>, 526 F. Supp. 2d 654, 710-11 (W.D. Tex. 2007). Each of the claims specified in this Petition requires vacation of the conviction or death sentence including: the erroneous admission of false DNA evidence, the improper introduction of Leza's confession, the prejudicial exclusion of Trevino's guilty plea and Trevino's confession to Amanda Leza, the State's withholding of <u>Brady</u> evidence, the presentation of impermissible and inconsistent theories of guilt, and the misleading jury instructions presented at both phases of trial.

Leza is also entitled to relief upon the cumulative errors in his ineffective assistance of counsel claims (<u>see</u> Claims One through Ten, Twelve through Eighteen, Twenty, and Twenty-One). These errors included:  the failure to introduce evidence of Leza's ID, FASD, and addiction, all which showed that Leza was ineligible for the death penalty, the failure to properly voir dire prospective jurors, the failure to properly investigate Leza's life history, the failure to properly prepare witnesses, and the failure to make appropriate objections. A single, serious error by counsel may be a sufficient basis on which to grant relief on a claim of ineffective assistance of counsel. <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 384 (1986). Nonetheless, it is not necessary that any one error alone rise to the level of prejudice; multiple errors considered together may also warrant relief under <u>Strickland</u>.

/ / /

/ / /

## PRAYER FOR RELIEF

For the reasons stated above, this Court should issue a writ of habeas corpus and vacate

Leza's conviction and sentence, and grant him a new trial and sentencing hearing.[31]

Respectfully submitted this 9th day of January, 2018.

RENE VALLADARES
Federal Public Defender

*/s/ Brad D. Levenson*
BRAD D. LEVENSON
Assistant Federal Public Defender

*/s/ Erik R. Guenther*
ERIK R. GUENTHER
Assistant Federal Public Defender
Attorneys for Armando Leza

## VERIFICATION OF PETITION

I, Brad D. Levenson, declare as follows, under penalty of perjury:

1.      I am an attorney admitted to practice law in the State of Texas and am an attorney with the Office of the Federal Public Defender. I am admitted to practice in this Court.

2.      I have read the foregoing Petition for Writ of Habeas Corpus and declare that the facts alleged are true to the best of my knowledge based upon my reading of what I know to be true copies of documents in this action.

3.      I am authorized by Armando Leza to file this Petition for Writ of Habeas Corpus on his behalf. I make this verification because Mr. Leza is incarcerated in a state different than that in which my office is located, and because the truth and accuracy of the facts contained herein are more within my knowledge than that of Mr. Leza.

---

[31] The FPD wishes to acknowledge the contributions of attorneys Katherine Tanaka and Raj Shah in the drafting of this Petition.

I declare under penalty of perjury under the laws of the United States of America and the State of Texas that the foregoing is true and correct.

Executed this 9th of January, 2018, in Las Vegas, Nevada.

/s/ Brad D. Levenson
BRAD D. LEVENSON
Assistant Federal Public Defender

## CERTIFICATE OF SERVICE

In accordance with LR CV-5 of the Local Rules of Practice, the undersigned hereby certifies that on the 9th day of January, 2018, a true and correct copy of the foregoing PETITION FOR WRIT OF HABEAS CORPUS was served by the United States District Court, CM/ECF electronic filing system to:

George A. d'Hemecourt
Assistant Attorney General
Criminal Appeals Division
George.d'hemecourt@oag.texas.gov

/s/ Stephanie Young
An Employee of the
Federal Public Defender
District of Nevada

APPENDIX

## A.    Issues raised on direct appeal

Points One and Two:  The trial court erred in denying the motion to suppress Leza's videotaped statement.

Point Three:  The trial court erred when it refused to preclude the death penalty as a sentencing option or, to quash the indictment.

Point Four:  The absence of a parties special issue in the jury charge at guilt innocence violated the rule in Apprendi v. New Jersey and Tison v. Arizona.

Point Five:  Leza's right to a unanimous verdict was violated.

Point Six:  Leza's capital trial was conducted before State judicial officers dependent upon popularly-contested elections.

Point Seven:  The "10-12" Rule results in arbitrariness in the imposition of the death penalty.

Point Eight:  The trial court failed to define the word "militates."

Point Nine:  The trial court failed to define the phrase "criminal acts of violence."

Point Ten:  The trial court erred in failing to grant Leza's motion for mistrial.

Point Eleven:  The trial court erred in excluding Trevino's statement against penal interest.

Point Twelve:  The trial court erred by failing to give certain jury instructions regarding victim impact evidence.

Point Thirteen:  The trial court failed to define the word "probability."

Point Fourteen:  The State withheld Brady material.

## B.    Issues raised in the initial state application

Claim I:  Leza is innocent of the charged offense of capital murder.

Claim II:  Leza's rights were violated when the trial judge excluded evidence of Leza's innocence.

Claim III:  Leza's right to due process and a fair trial were violated because the Applicant's confession was obtained illegally.

Claim IV:  The trial court wrongly excluded evidence of Trevino's plea bargain.

Claim V:  Leza's trial counsel failed to provide effective assistance of counsel.

Claim VI:  The trial judge fundamentally erred in combining the divergent elements of separate offenses in a single submission of the jury charge.

Claim VII:  The aggravating factors employed in the Texas Capital Sentencing Scheme are vague and do not properly channel the jury's discretion.

Claim VIII:  Leza's federal constitutional rights were violated when the trial judge failed to instruct the jury that a vote by one of them would result in a life sentence.