IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ARMANDO LEZA, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | No. 5:17-CV-00101-FB |
| | § | *CAPITAL CASE* |
| LORIE DAVIS, | § | |
| Director, Texas Department | § | |
| of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

## RESPONDENT DAVIS'S ANSWER
## WITH BRIEF IN SUPPORT

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

MARK PENLEY
Deputy Attorney General
For Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

ERICH DRYDEN
Assistant Attorney General
Criminal Appeals Division
*Counsel of Record*

P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1400
*erich.dryden@oag.texas.gov*

*Attorneys for Respondent*

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES**................................................................viii

**ANSWER** .................................................................................. 1

**LEZA'S ALLEGATIONS** ............................................................ 1

**STATEMENT OF THE CASE** ...................................................... 4

**STATEMENT OF FACTS**............................................................. 5

    **I.**    **Facts Relating to Guilt-Innocence** ................................ 5

    **II.**   **Facts Relating to Punishment**...................................... 6

        **A. The State's future-dangerousness evidence** .............. 6

        **B. The defense's case in mitigation** ............................ 10

**ARGUMENT**........................................................................... 12

    **I.**    **The State Court Reasonably Rejected Leza's Claim that His Death Sentence Is Unconstitutional because He Is Intellectually Disabled (Claim 1).** ................................ 15

        **A. State court findings**............................................. 15

        **B. Applicable law** ................................................... 17

        **C. Leza's evidence fails to demonstrate that he is intellectually disabled.** ......................................... 18

            **1. IQ scores** ...................................................... 18

                **a. First score** ............................................. 18

                **b. Second score**.......................................... 20

                **c. Third score** ............................................ 22

             **2. Adaptive deficits** ........................................... 24

             **3. Onset prior to age 18**....................................... 26

II.  **Leza's Claim that His Trial Counsel Were Ineffective for Failing to Present Evidence of an Intellectual Disability Is Meritless (Claim 1, B & C).** ...................................................... 27

A.  **State court findings** ................................................................ 27

B.  **The standard** ........................................................................... 29

C.  **Trial counsel were not ineffective.** ...................................... 32

D.  **Leza's additional mitigating evidence is double-edged.** ............ 33

III.  **The State Court Reasonably Rejected Leza's Claim that the Trial Court Erred by Allowing the Admission of His Police Statement because He Did Not Validly Waive His *Miranda* Rights. Other Portions of Leza's Claim Challenging His Waiver and Confession Are Procedurally Defaulted (Claim 2).** ................................................................................ 37

A.  **Most of these claims are procedurally defaulted.** ...................... 38

B.  **Facts from the suppression hearing and state court decisions** ............................................................................. 40

1.  **Relevant facts from suppression hearing** ................................ 40

2.  **State court decision** .................................................................. 44

C.  **Leza's claims have no merit.** ................................................. 45

1.  **Applicable law** ......................................................................... 45

2.  **Leza's claim that the *Miranda* warnings were invalid because they included improper language is meritless.** ...... 47

3.  **Leza's claim that he did not understand the nature of his rights or the consequences of abandoning them is meritless.** ................................................................................ 49

4.  **Leza's claim that his alleged FASD, intellectual disability, heroin use, and sleep deprivation rendered his waiver invalid is meritless.** ................................................ 50

      **5.  The totality of circumstances does not reveal an invalid waiver.** .................................................................. 51

      **6.  Any error was harmless.** .................................................. 52

    **D. Neither trial nor habeas counsel were ineffective.** ..................... 54

**IV.  Leza's Claims Regarding False Blood Evidence Are Procedurally Barred and Meritless (Claim 4).** ................................. 56

    **A. The State did not knowingly present false testimony.** ............... 58

    **B. Other alleged errors by the State** ...................................... 61

    **C. Leza's IATC claim is meritless.** ........................................ 63

    **D. Leza's additional IATC claims lack merit.** ............................ 65

**V.  Leza's Claim that Trial Counsel Were Ineffective for Failing to Object to the Judge's Comment about the DNA Results Is Meritless (Claim 4).** ......................................................... 67

**VI.  The State Court Reasonably Rejected Leza's Claim that Trial Counsel Were Ineffective for Failing to Argue Proper Grounds for Admitting Dolores Trevino's Plea Agreement (Claim 5).** ..................................................................... 69

    **A. State court findings** .......................................................... 70

    **B. Trial counsel were not ineffective.** ...................................... 71

      **1.  Guilt-innocence** .............................................................. 71

      **2.  Punishment** .................................................................. 74

**VII.  Leza's *Brady* Claim Is Procedurally Barred and Meritless (Claim 6).** ................................................................... 77

    **A. The claim is procedurally barred.** ...................................... 77

    **B. Leza has failed to show suppression or materiality.** ................. 77

**VIII.  Leza Is Not Entitled to Relief on His Claims Related to the Exclusion of Amanda Leza's Testimony (Claim 7).** ........................ 80

A.  Background .................................................................... 80

B.  Leza's claim of trial court error at the punishment phase
    and IATC at the guilt phase are procedurally defaulted. .......... 82

C.  State court findings ....................................................... 83

D.  Leza's claims have no merit. ........................................... 84

    1.  Trial court error at punishment ................................. 84

    2.  Leza's IATC claim is meritless. ................................. 86

IX.  Leza's Claim that the State Used Factually Inconsistent
     Theories Is Defaulted and Meritless (Claim 8). .................. 88

X.   Leza's Claim that the Evidence Was Insufficient to Support
     Conspiracy Is Defaulted and Meritless (Claim 9). .............. 91

A.  There was no trial court error. ....................................... 92

B.  Leza's claim of prosecutorial misconduct is meritless. ............. 94

C.  Leza's IATC claim is meritless. ....................................... 96

XI.  Leza's Claims Pertaining to Multiple Theories and Unanimity
     Are Defaulted and Meritless (Claim 10). ......................... 96

A.  The IATC claim is defaulted. ........................................ 97

B.  State court findings ...................................................... 98

C.  Leza's claims lack merit. .............................................. 99

    1.  Leza's moral equivalency argument is meritless. ............ 99

    2.  Jury unanimity is not required. ............................... 101

    3.  Leza's *Enmund*/*Tison* claim has no merit. ............... 102

    4.  Leza's IATC claim is meritless. .............................. 105

XII.  Leza's Claim of Actual Innocence Is Not Cognizable and
      Meritless (Claim 11). ............................................... 106

**XIII. Leza's Claims Regarding IATC During Voir Dire Are Meritless (Claim 12).** ...................................................... 111

    **A. Summary of state court findings** ............................... 112

    **B. The full questionnaires are barred under *Pinholster*.** ............. 114

    **C. Regardless, Leza's claims have no merit.** ..................................... 115

        **1. The standard** ........................................................... 115

        **2. Leza's IATC claim regarding racial bias is conclusory.** ....... 116

        **3. Leza's claim that counsel failed to adequately question jurors and challenge them for cause is meritless.** .............. 116

            **a. Juror Moreno** ................................................ 117

            **b. Juror Esparza** ............................................... 119

            **c. Juror Estrada** ............................................... 121

            **d. Juror Waters** ................................................ 123

            **e. Juror Mason** ................................................. 125

            **f. Juror McAnear** .............................................. 126

            **g. Juror English** ............................................... 129

            **h. Juror Lopez** ................................................. 130

            **i. Juror Vargas** ................................................ 132

            **j. Juror Oakes** ................................................. 135

            **k. Juror Goodwin** .............................................. 138

            **l. Juror Harris** ................................................ 140

        **4. Leza's claim that counsel should have challenged other veniremembers for cause rather than using peremptory strikes on them is defaulted and not a viable claim.** ................................................... 144

     5.  Leza's claim of cumulative error is defaulted and meritless. ................................................................. 146

XIV.  Leza's IATC Claim Regarding Counsel's Failure to Investigate and Present Mitigating Evidence Lacks Merit (Claims 13, 14 & 15). ................................................. 147

    A. State court findings ................................................ 148

    B. Leza's IATC claim regarding the failure to present FASD evidence is meritless (Claim 13). ................................ 152

       1.  Guilt-innocence phase ..................................... 152

       2.  Punishment ..................................................... 152

    C. Leza's IATC claim regarding social history is meritless (Claim 14). ........................................................... 157

    D. Counsel were not ineffective for not presenting evidence of Leza's drug addiction (Claim 15). .............................. 164

XV.  Leza's Additional IATC Claims that Counsel Failed to Prepare and Present Witnesses Are Defaulted and Meritless (Claim 16). ..................................................... 167

    A. Leza has not shown that trial counsel inadequately prepared witnesses. ............................................... 167

    B. Trial Counsel were not ineffective for not presenting additional evidence about the drive-by shooting. .................. 170

    C. Trial counsel were not ineffective for not presenting additional evidence about Leza's attempted escape. ............. 172

XVI.  The Trial Court's Failure to Define Sentencing Terms Does Not Amount to a Constitutional Violation (Claim 17). .................. 176

XVII. The Grand Jury Indictment Need Not Include the Aggravating Factors in the Texas Special Issues (Claim 18). ...... 179

XVIII. Leza's Challenge to Texas's "10-12" Rule Is Meritless (Claim 19). ...................................................... 181

**XIX.  Leza's Other IATC Claims Are Defaulted and Meritless (Claim 20)** ................................................................................................ 182

  **A.  Opening statement** ............................................................ 182

  **B.  Detective McCampbell's statement** .................................. 184

  **C.  Convenience store show up** ............................................ 185

  **D.  Graphic photos** ................................................................ 186

**XX.  Leza's Claims about the Victim Impact Testimony Are Meritless (Claim 21).** ........................................................................ 187

**XXI.  Leza's Claim Regarding Elected Judges Is Meritless (Claim 22).** ........................................................................................ 190

**XXII. Leza's Conflict-of-Interest Claim Is Not Cognizable on Federal Habeas Review and Meritless (Claim 23)** ........................ 192

**XXIII. Leza's Cumulative-Error Claim Is Procedurally Defaulted and Meritless (Claim 24).** ................................................................ 193

**CONCLUSION** ................................................................................... 194

**CERTIFICATE OF SERVICE** ............................................................ 195

# TABLE OF AUTHORITIES

## Cases

*Albright v. Oliver*, 510 U.S. 266 (1994) ..................................................... 179

*Anderson v. Harless*, 459 U.S. 4 (1982) ..................................................... 97

*Anderson v. Quarterman*, 204 F. App'x. 402 (5th Cir. 2006) .................................. 180

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) ............................................. 98, 179, 180

*Atkins v. Virginia,* 536 U.S. 304 (2002) ............................................................ Passim

*Ayestas v. Davis*, 933 F.3d 384 (5th Cir. 2019),
    *cert. denied*, --- S. Ct. ---, 2020 WL 871712 (Feb. 24, 2020) ................................ 165

*Bailey v. Procunier*, 744 F.2d 1166 (5th Cir. 1984) ..................................................... 92

*Balentine v. Thaler*, 626 F.3d 842 (5th Cir. 2010) .................................................... 39

*Banks v. Dretke,* 540 U.S. 668 (2004) ........................................................................... 77

*Beatty v. Stephens*, 759 F.3d 455 (5th Cir. 2014) ..................................................... 98

*Beazley v. Johnson*, 242 F.3d 248 (5th Cir. 2001) .................................................. 192

*Berkley v. Quarterman*, 507 F.Supp.2d 692 (W.D. Tex. 2007) ................................ 118

*Bigby v. Dretke*, 402 F.3d 551 (5th Cir. 2005) ......................................................... 192

*Bigby v. Stephens*, 595 F. App'x. 350 (5th Cir. 2014) ............................................. 180

*Bingham v. State*, 987 S.W.2d 54 (Tex. Crim. App. 1999) ........................................ 85

*Blue v. Thaler*, 665 F.3d 647 (5th Cir. 2011) ..................................................... 20, 182

*Booth v. Maryland*, 482 U.S. 496 (1987) .......................................................... 188, 190

*Boyle v. Johnson*, 93 F.3d 180 (5th Cir. 1996) ........................................................ 158

*Bosse v. Oklahoma*, 137 S. Ct. 1 (2016) .................................................................. 189

*Bradshaw v. Stumpf*, 545 U.S. 175 (2005) .......................................................... 89, 90

*Brady v. Maryland*, 373 U.S. 83 (1963) ............................................................ Passim

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) ...................................................... 52, 94

*Bridge v. Lynaugh*, 838 F.2d 770 (5th Cir. 1988) ................................................ 71

*Brogdon v. Blackburn*, 790 F.2d 1164 (5th Cir. 1986) ......................................... 76

*Brown v. Thaler*, 684 F.3d 482 (5th Cir. 2012) ............................................. 155, 163

*Buckner v. Davis*, 945 F.3d 906 (5th Cir. 2019) .................................................. 115

*Buntion v. Quarterman*, 524 F.3d 664 (5th Cir. 2008) ......................................... 191

*Busby v. Davis*, 925 F.3d 699 (5th Cir. 2019) ............................................ 15, 23, 29

*Butler v. Davis*, 745 F. App'x 528 (5th Cir. 2018),
  *cert. denied*, 139 S. Ct. 1545 (2019) ................................................................. 165

*Cabana v. Bullock*, 474 U.S. 376 (1986) ..................................................... 103, 105

*California v. Prysock*, 453 U.S. 355 (1981) ........................................................ 48

*Callins v. Johnson*, 89 F.3d 210 (5th Cir. 1996) ................................................. 110

*Cannady v. Dugger*, 931 F.2d 752 (11th Cir. 1991) ............................................. 53

*Carter v. Johnson*, 131 F.3d 452 (5th Cir. 1997) ................................................. 46

*Chavez v. Cockrell*, 310 F.3d 805 (5th Cir. 2002) ............................................... 115

*Chester* v. *Thaler,* 666 F.3d 340 (5th Cir. 2011) ................................................. 16

*Clark v. Johnson*, 202 F.3d 760 (5th Cir. 2000) .................................................. 14

*Clark v. Quarterman*, 457 F.3d 441 (5th Cir. 2006) ............................................. 26

*Cole v. State*, 839 S.W.2d 798 (Tex. Crim. App. 1990) ........................................ 73

*Coleman v. Thompson*, 501 U.S. 722 (1991) ...................................................... Passim

*Colorado v. Connelly*, 479 U.S. 157 (1986) ................................................ 44, 46, 51

*Colorado v. Spring*, 479 U.S. 564 (1987) ........................................................... 44

*Cooks v. State*, 844 S.W.2d 697 (Tex. Crim. App. 1992) ............................................. 86

*Cordova v. Johnson*, 157 F.3d 380 (5th Cir. 1998) ..................................................... 76

*Cullen v. Pinholster*, 563 U.S. 170 (2011) ............................................................ Passim

*Cuyler v. Sullivan*, 446 U.S. 335 (1980) ................................................................ 192

*Cupp v. Naughten*, 414 U.S. 141 (1973) ................................................................. 52

*Davila v. Davis*, 137 S. Ct. 2058 (2017) ................................................................ 39

*Davila v. Davis*, 650 F. App'x 860 (5th Cir. 2016) ................................................ 181

*Darden v. Wainwright*, 477 U.S. 168 (1986) ............................................................ 95

*DeCastro v. Branker*, 642 F.3d 442 (4th Cir. 2011) .................................................. 89

*Dennes v. Davis*, --- F. App'x ---, 2020 WL 61593 (5th Cir. Jan 6, 2020) ................. 145

*Derden v. McNeel*, 978 F.2d 1453 (5th Cir. 1992) ...................................................... 52

*Dowthitt v. Johnson*, 230 F.3d 733 (5th Cir. 2000) ............................................ 36, 107

*Drew v. Scott*, 28 F.3d 460 (5th Cir. 1994) .............................................................. 109

*Druery v. Thaler*, 647 F.3d 535 (5th Cir. 2011) ................................................ 35, 182

*Duckworth v. Egan*, 492 U.S. 195 (1989) .................................................................. 48

*Duff-Smith v. Collins*, 973 F.2d 1175 (5th Cir. 1992) ............................................. 158

*Ex parte Blue*, 230 S.W.3d 151 (Tex. Crim. App. 2007)
   *cert. denied*, 2020 WL 129667 (Jan. 13, 2020) ..................................................... 15

*Ex parte Brown*, 205 S.W.3d 538 (Tex. Crim. App. 2006) .......................................... 82

*Ex parte Cathey*, 2008 WL 4927446 (Tex. Crim. App. Nov. 18, 2008) ...................... 32

*Ex parte Hearn*, 310 S.W.3d 424 (Tex. Crim. App. 2010) .......................................... 20

*Ex parte Johnson*, 2009 WL 1165502  (Tex. Crim. App. April 29, 2009) ................... 32

*Ex parte Moore,* 548 S.W.3d 552 (Tex. Crim. App. 2018) .......................................... 17

*Ex parte Weathers*, No. WR–64302–02, 2014 WL 1758977
(Tex. Crim. App. Apr. 30, 2014) ............................................................................ 22

*Enmund v. Florida*, 458 U.S. 782 (1982) ............................................................ Passim

*Estelle v. McGuire*, 502 U.S. 62 (1991) ..................................................................... 84

*Fearance v. Scott*, 56 F.3d 633 (5th Cir. 1995) ........................................................ 38

*Florida v. Powell*, 559 U.S. 50 (2010) ...................................................................... 48

*Gardner v. State*, 306 S.W.3d 274 (Tex. Crim. App. 2009) .................................... 178

*Garland v. Maggio*, 717 F.2d 199 (5th Cir. 1983) .................................................. 146

*Garner v. Mitchell,* 557 F.3d 257 (6th Cir. 2009) ..................................................... 51

*Garza v. Stephens*, 738 F.3d 669 (5th Cir. 2013) ...................................................... 39

*Garza v. Thaler*, 909 F.Supp.2d 578 (W.D. Tex. 2012) .......................................... 155

*Giglio v. United States,* 405 U.S. 150 (1972) ............................................................ 58

*Gillard v. Scroggy*, 847 F.2d 1141 (5th Cir. 1988) ................................................. 183

*Gilmore v. Taylor*, 508 U.S. 333 (1993) ............................................................. 92, 94

*Gonzales v. Stephens*, 2014 WL 496876 (W.D. Tex. 2014) .................................... 155

*Gonzales v. Thaler*, 643 F.3d 425 (5th Cir. 2011) ................................................... 84

*Goodwin v. Johnson*, 132 F.3d 162 (5th Cir. 1997) ............................................... 109

*Granados v. Quarterman*, 455 F.3d 529 (5th Cir. 2006) ....................................... 180

*Graves v. Cockrell*, 351 F.3d 143 (5th Cir. 2003) .................................................. 107

*Gray v. Epps*, 616 F.3d 436 (5th Cir. 2010) ............................................................. 36

*Green v. Georgia,* 442 U.S. 95 (1979) ...................................................................... 87

*Green v. Johnson*, 160 F.3d 1029 (5th Cir.1998) .................................................... 100

*Greenwald v. Wisconsin*, 390 U.S. 519 (1968) ........................................................ 46

*Greer v. Thaler,* 380 F. App'x. 373 (5th Cir. 2010) .................................................... 182

*Griffith v. Quarterman*, 196 F. App'x 237 (5th Cir. 2006) ........................................ 188

*Hall v. Florida*, 572 U.S. 701 (2014) .................................................................. 18, 19

*Hancock v. Davis*, 906 F.3d 387 (5th Cir. 2018),
  *cert. denied*, 139 S. Ct. 2714 (2019). ................................................................. 108

*Hardy v. Cross*, 565 U.S. 65 (2011) ............................................................................ 13

*Harrington v. Richter*, 562 U.S. 86 (2011) ...................................................... Passim

*Harris v. Cockrell*, 313 F.3d 238 (5th Cir. 2002) ....................................................... 95

*Harris v. Reed*, 489 U.S. 255 (1989) ........................................................................... 38

*Hatten v. Quarterman*, 570 F.3d 595 (5th Cir. 2009) ................................................. 82

*Hayden v. State*, 296 S.W.3d 549 (Tex. Crim. App. 2009) ......................................... 73

*Hearn v. Thaler*, 669 F.3d 265 (5th Cir. 2012) .......................................................... 20

*Herrera v. Collins,* 506 U.S. 390 (1993) .................................................... 107, 108, 110

*Hinkle v. Dretke*, 86 F. App'x 687 (5th Cir. 2004) ................................................... 166

*Hinton v. Alabama*, 571 U.S. 263 (2014) ................................................................... 30

*Holmes v. South Carolina,* 547 U.S. 319 (2006) .................................................. 87, 88

*Hopkins v. Cockrell*, 325 F.3d 579 (5th Cir. 2003) .................................................... 35

*Hopkins v. Reeves*, 524 U.S. 88 (1998) ..................................................................... 103

*Hogue v. Johnson*, 131 F.3d 466 (5th Cir. 1997) ...................................................... 109

*Hughes v. Quarterman*, 530 F.3d 336 (5th Cir. 2008) ............................................... 39

*In re Cathey*, 857 F.3d 221 (5th Cir. 2017) ................................................................ 19

*In re Johnson*, 935 F.3d 284 (5th Cir. 2019) .............................................................. 19

*In re Mathis*, 483 F.3d 395 (5th Cir. 2007) ................................................................ 19

*In re Swearingen*, 556 F.3d 344 (5th Cir. 2009) ....................................................... 107

*In re Taylor*, 298 F. App'x 385 (5th Cir. 2008)......................................................... 102

*Jackson v. State*, 160 S.W.3d 568 (Tex. Crim. App. 2005) ............................... 110, 152

*Jenkins v. State*, 493 S.W.3d 583 (Tex. Crim. App. 2016)........................................ 178

*Johnson v. Rodriquez*, 110 F.3d 299 (5th Cir. 1997) ................................................. 75

*Jones v. United States,* 527 U.S. 373 (1999) ............................................................. 181

*Jurek v. Texas*, 428 U.S. 262 (1976) ........................................................... 75, 86, 180

*Kernan v. Hinojosa*, 136 S. Ct. 1603 (2016) ................................................................ 13

*Kerr v. Thaler*, 384 F. App'x 400 (5th Cir. 2010) ............................................. 178, 179

*Kinsel v. Cain*, 647 F.3d 265 (5th Cir. 2011) ............................................................. 192

*Kitchens v. Johnson*, 190 F.3d 698 (5th Cir. 1999)................................................... 164

*Knowles v. Mirzayance*, 556 U.S. 111 (2009) ........................................................... 101

*Koch v. Puckett,* 907 F.2d 524 (5th Cir. 1990) ..................................................... Passim

*Komolafe v. Quarterman*, 246 Fed. App'x. 270 (5th Cir. 2007)............................... 109

*Knox v. State*, 586 S.W.2d 504 (Tex. Crim. App. 1979) ........................................... 184

*Kotteakos v. United States*, 328 U.S. 750 (1946)........................................................ 94

*Kutzner v. Johnson,* 242 F.3d 605 (5th Cir. 2001) ...................................................... 59

*Kyles v. Whitley*, 514 U.S. 419 (1995)......................................................................... 77

*Ladd v. State,* 3 S.W.3d 547 (Tex. Crim. App. 1999)....................................... 104, 105

*Lane v. Scott*, 59 F.3d 1241, 1995 WL 413097 (5th Cir. 1995).................................. 76

*Leal v. Dretke*, 428 F.3d 543 (5th Cir. 2005)............................................................ 177

*Lowenfield v. Phelps*, 484 U.S. 231 (1988) ............................................................... 180

*McCleskey v. Kemp*, 481 U.S. 279 (1987) ............................................................ 75, 76

*McKoy v. North Carolina*, 494 U.S. 433 (1990) ....................................................... 101

*McQuiggin v. Perkins*, 569 U.S. 383 (2013) .............................................................. 111

*Maldonado v. Thaler*, 625 F.3d 229 (5th Cir. 2010) ............................................ 19, 20

*Mann v. Scott*, 41 F.3d 968 (5th Cir. 1994) .............................................................. 100

*Manson v. Brathwaite*, 432 U.S. 98 (1977) .............................................................. 186

*Marin v. State,* 851 S.W.2d 275 (Tex. Crim. App. 1993) ........................................ 191

*Martinez v. Dretke*, 404 F.3d 878 (5th Cir. 2005) ...................................................... 35

*Martinez v. Dretke*, 426 F.Supp.2d 403 (W.D. Tex. 2006) ............................... 177, 183

*Martinez v. Ryan*, 566 U.S. 1 (2012) ............................................................... Passim

*Matthews v. Davis*, 665 F. App'x 315 (5th Cir. 2016) .......................................... 56, 67

*Mays v. State*, 318 S.W.3d 368 (Tex. Crim. App. 2010) ........................................... 187

*Michigan v. Tucker*, 417 U.S. 433 (1974) ................................................................... 48

*Milam v. Davis*, 733 F. App'x 781 (5th Cir.),
    *cert. denied*, 139 S. Ct. 335 (2018) ......................................................................... 91

*Miller v. Johnson*, 200 F.3d 274 (5th Cir. 2000) ................................................ 56, 116

*Miller v. State*, 741 S.W.2d 382 (Tex. Crim. App. 1987) ............................. 71, 74, 116

*Mincey v. Arizona*, 437 U.S. 385 (1978) ..................................................................... 46

*Miranda v. Arizona*, 384 U.S. 436 (1966) ......................................................... Passim

*Mitchell v. Esparza*, 540 U.S. 12 (2003) .................................................................. 190

*Montoya v. Scott*, 65 F.3d 405 (5th Cir. 1995) .................................................. 93, 100

*Moore v. Texas*, 137 S. Ct. 1039 (2017) (*Moore I*) ......................................... 18, 19, 21

*Moore v. Texas*, 139 S. Ct. 666 (2019) (*Moore II*) ..................................................... 17

*Moore v. Quarterman*, 526 F.Supp.2d 654 (W.D. Tex. 2007) .................................. 177

*Murray v. Carrier*, 477 U.S. 478 (1986) ..................................................... 39

*Murray v. Giarratano*, 492 U.S. 1 (1989) .................................................... 192

*Murray v. Maggio*, 736 F.2d 279 (5th Cir. 1984) ............................................ 183

*Napue v. Illinois,* 360 U.S. 264 (1959) ....................................................... 58

*Neal v. Puckett*, 286 F.3d 230 (5th Cir. 2002) ................................... 14, 31, 170

*Nelson v. Quarterman*, 472 F.3d 287 (5th Cir. 2006) .................................... 36

*Nobles v. Johnson*, 127 F.3d 409 (5th Cir. 1997) ................................ 97, 98, 107

*Norman v. Stephens*, 817 F.3d 226 (5th Cir. 2016) .................................... 168

*Norris v. Davis*, 826 F.3d 821 (5th Cir. 2016) .............................................. 62

*Oregon v. Elstad*, 470 U.S. 298 (1985) ............................................... 46, 49

*Pape v. Thaler*, 645 F.3d 281 (5th Cir. 2011) ............................................... 64

*Paredes v. Quarterman*, 574 F.3d 281 (5th Cir. 2009) ............................... 177

*Paredes v. Thaler*, 617 F.3d 315 (5th Cir. 2010) ........................................ 100

*Parker v. Dugger*, 498 U.S. 308 (1991) ....................................................... 76

*Parker v. State*, 206 S.W.3d 593 (Tex. Crim. App. 2006) ........................... 184

*Payne v. Tennessee,* 501 U.S. 808 (1991) .................................... 188, 189, 190

*Penry v. Johnson*, 532 U.S. 782 (2001) ....................................................... 52

*Petetan v. State*, ---S.W.3d---, 2017 WL 915530 (Tex. Crim. App. 2017) ................ 178

*Peters v. Whitley*, 942 F.2d 937 (5th Cir. 1991) ......................................... 85

*Pondexter v. Quarterman*, 537 F.3d 511 (5th Cir. 2008) ........................ 55, 89, 146

*Pope v. Illinois*, 481 U.S. 497 (1987) ....................................................... 103

*Prytash v. State*, 3 S.W.3d 522 (Tex. Crim. App. 1999) ................................................ 74

*Reed v. Vannoy*, 703 F. App'x 264 (5th Cir. 2017) ...................................................... 36

*Reed v. Stephens*, 739 F.3d 753 (5th Cir. 2014) ................................................ 107, 181

*Ring v. Arizona,* 536 U.S. 584 (2002) ....................................................... 179, 180, 181

*Ripkowski v. State*, 61 S.W.3d 378 (Tex. Crim. App. 2001) ......................... 44, 45, 186

*Robles v. Thaler*, 344 F. App'x 60 (5th Cir. 2009) ..................................................... 178

*Roberts v. Thaler*, 681 F.3d 597 (5th Cir. 2012) ...................................................... 191

*Robison v. Johnson*, 151 F.3d 256 (5th Cir. 1998) ..................................................... 86

*Rock v. Arkansas,* 483 U.S. 44 (1987) ....................................................................... 88

*Rodriguez v. Quarterman*, 204 F. App'x. 489 (5th Cir. 2006) .................................... 35

*Rogers v. Lynaugh*, 848 F.2d 606 (5th Cir. 1988) ...................................................... 92

*Romero v. Lynaugh*, 884 F.2d 871 (5th Cir. 1989) .................................................... 116

*Ross v. Estelle*, 694 F.2d 1008 (5th Cir. 1983) ..................................................... 56, 94

*Ross v. Oklahoma,* 487 U.S. 81 (1988) ..................................................................... 145

*Rowell v. Dretke*, 398 F.3d 370 (5th Cir. 2005)................................................... 82, 180

*Saldano v. State*, 232 S.W.3d 77 (Tex. Crim. App. 2007)......................................... 188

*Santellan v. Cockrell*, 271 F.3d 190 (5th Cir. 2001) ................................................... 36

*Sawyer v. Whitley*, 505 U.S. 333 (1992) ..................................................................... 38

*Schad v. Arizona*, 501 U.S. 624 (1991).................................................................... 101

*Scheanette v. Quarterman*, 482 F.3d 815 (5th Cir. 2007).......................................... 82

*Schlup v. Delo*, 513 U.S. 298 (1995) ........................................................ 107, 110, 111

*Sells v. Stephens*, 536 F. App'x 483 (5th Cir. 2013)................................................. 155

*Sells v. Thaler*, 2012 WL 2562666 (W.D. Tex. June 28, 2012)................. 149, 154, 155

*Smith v. Phillips*, 455 U.S. 209 (1982) ................................................... 115

*Spence v. Johnson*, 80 F.3d 989 (5th Cir. 1996) ................................ 60, 109

*Sprouse v. Stephens*, 748 F.3d 609 (5th Cir. 2014) ............................... 177

*Strickland v. Washington*, 466 U.S. 668 (1984) ............................... Passim

*Strickler v. Greene*, 527 U.S. 263 (1999) ................................................ 77

*Swarthout v. Cooke*, 526 U.S. 216 (2011) ............................................... 84

*Teague v. Lane*, 489 U.S. 288 (1989) ............................... 49, 178, 182, 189

*Teague v. Scott*, 60 F.3d 1167 (5th Cir. 1995) ..................................... 145

*Tison v. Arizona*, 481 U.S. 137 (1987) ............................. 97, 98, 102, 105

*Trevino v. Davis*, 861 F.3d 545 (5th Cir. 2017),
 *cert. denied*, 138 S. Ct. 1793 (2018) ...................................... 155

*Trevino v. Thaler*, 569 U.S. 413 (2013) ............................................ Passim

*Trottie v. Stephens*, 720 F.3d 231 (5th Cir. 2013) ................................ 168

*Turner v. Johnson*, 106 F.3d 1178 (5th Cir. 1997) ................................. 95

*Trevino v. Johnson*, 168 F.3d 173 (5th Cir. 1999) ................................ 192

*Turner v. Quarterman*, 481 F.3d 292 (5th Cir. 2007) ............................. 52

*United States v. Bennett*, 874 F.3d 236 (5th Cir. 2017) ..................... 62, 95

*United States v. Bourgeois*, 423 F.3d 501 (5th Cir. 2005) ................... 181

*United States v. Brown*, 650 F.3d 581 (5th Cir. 2011) ............................ 77

*United States v. Burgos*, 55 F.3d 933 (4th Cir. 1995) ....................... 185–86

*United States v. Fields*, 483 F.3d 313 (2007) ..................................... 188

*United States v. Frye*, 489 F.3d 201 (5th Cir. 2007) ............................... 89

*United States v. Hall*, 455 F.3d 508 (5th Cir. 2006) ............................ 147

*United States v. Moye*, 951 F.2d 59 (5th Cir. 1992) ................................................. 146

*United State v. Paul*, 217 F.3d 989 (8th Cir. 2000) .................................................... 90

*United States v. Robinson*, 367 F.3d 278 (5th Cir. 2004) ......................................... 179

*United States v. Runyan*, 290 F.3d 223 (5th Cir. 2002) ............................................. 77

*United States v. Schlieve*, 159 F. App'x 538 (5th Cir. 2005) ..................................... 60

*United States v. Snarr*, 704 F.3d 368 (5th Cir. 2013) .............................................. 145

*United States v. Thomas*, 627 F.3d 146 (5th Cir. 2010) ........................................... 115

*United States v. Turner,* 157 F.3d 552 (8th Cir. 1998) .............................................. 51

*Uranga v. Davis*, 893 F.3d 282 (5th Cir. 2018),
   *cert. denied*, 139. S. Ct. 1179 (2019) .................................................................. 115

*Uttecht v. Brown*, 551 U.S. 1 (2007) .......................................................................... 119

*Valdez v. Cockrell*, 274 F.3d 941 (5th Cir. 2001) ........................................................ 14

*Wainwright v. Witt*, 469 U.S. 412 (1985) ........................................................... 115, 119

*Whiteley v. Warden*, 401 U.S. 560 (1971) ................................................................. 184

*Wiggins v. Smith*, 539 U.S. 510 (2003) ................................................................. 31, 33

*Williams v. Stephens*, 575 F. App'x 380 (5th Cir. 2014) ........................................... 163

*(Terry) Williams v. Taylor*, 529 U.S. 362 (2000) ........................................................ 13

*Woodford v. Visciotti*, 537 U.S. 19 (2002) .................................................................. 14

*Woods v. Johnson*, 75 F.3d 1017 (5th Cir. 1996) ........................................................ 75

*Woods. v. Quarterman*, 503 F.3d 408 (5th Cir. 2007) ................................................ 84

*Woods v. Thaler*, 399 F. App'x 884 (5th Cir. 2010) ........................................... 165, 166

*Yohey v. Collins*, 985 F.2d 222 (1993) ....................................................................... 52

**Statutes and Rules**

28 U.S.C. § 2254 .................................................................................... Passim

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) .................... Passim

Tex. Code Crim. Proc. art. 11.071 ........................................................... 15

Tex. Code Crim. Proc. art. 35.16 ..................................................... 119, 135

Tex. Code Crim. Proc. art. 37.071 ............................................. 98, 100, 104

Tex. Penal Code § 7.01 ........................................................................ 104

Tex. Penal Code § 7.02 .................................................................... Passim

Tex. Penal Code § 19.03 ....................................................................... 180

**Constitutional Provisions**

U.S. Const. amend. V ..................................................................... Passim

U.S. Const. amend. VI ................................................................. 145, 181

U.S. Const. amend. VIII .................................................................. Passim

U.S. Const. amend. XIV ................................................................... Passim

**ANSWER**

Petitioner Armando Leza was convicted and sentenced to death for the brutal murder of Caryl Allen, a disabled woman, while in the course of committing robbery. Leza now challenges his presumptively valid capital murder conviction and death sentence by filing a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent denies all of Leza's assertions of fact except those supported by the record or admitted herein.  Further, some of Leza's claims are procedurally barred because they were not properly raised in state court, and he has failed to show that any of his claims have merit or that he is entitled to further factual development.  The Director respectfully requests that Leza's petition be denied with prejudice and that he be denied a certificate of appealability (COA).

**LEZA'S ALLEGATIONS**

The Director understands Leza to assert the following claims for relief:

1.　　His death-sentence is unconstitutional because he is intellectually disabled under *Atkins v. Virginia*.[1]

2.　　Trial counsel were ineffective for failing to present evidence related to his intellectual disability to the jury for mitigation purposes.

3.　　*Miranda*[2] waiver:
    a.　The trial court erred by admitting his police statement because his *Miranda* waiver was invalid.
    b.　Trial counsel were ineffective for failing to properly object to the police statement.

4.　　False DNA Evidence:

---

[1]　　536 U.S. 304 (2002).

[2]　　*Miranda v. Arizona*, 384 U.S. 436 (1966).

1

     a.    The State introduced false evidence that the victim's blood was found on Leza's shoe.

     b.    Trial counsel were ineffective for admitting that the victim's blood was found on Leza's shoe.

     c.    The State created a false inference that Leza's footprints were found at the scene of the crime.

     d.    Trial counsel were ineffective for failing to effectively cross-examine Robert Sailors about the Bexar County Crime Lab's accreditation.

     e.    Trial counsel were ineffective for failing to object to the State's argument about the footprints or elicit testimony that the bottom of Leza's left shoe tested negative for the presence of blood.

     f.    The State presented false testimony about the collection of DNA evidence from the victim.

5.    Trial counsel were ineffective for failing to object to an improper comment made by the trial judge about the DNA results.

6.    Trial counsel were ineffective by failing to argue proper grounds for the admission of Delores Trevino's plea agreement, which the trial court excluded.

7.    The State suppressed material, exculpatory notes taken by the prosecutor during Trevino's pre-plea confession, in violation of *Brady v. Maryland*.[3]

8.    Amanda Leza's testimony:
     a.    The trial court improperly excluded the testimony.
     b.    Trial counsel were ineffective for failing to object to the exclusion of the testimony as a due process violation.
     c.    Trial counsel were ineffective for failing to offer the testimony at the guilt/innocence portion of trial.

9.    Inconsistent theories:
     a.    The State violated Leza's right to due process by presenting a theory to the jury that he was the primary actor in the murder, which was inconsistent with Trevino's plea of guilty.
     b.    Trial counsel were ineffective for failing to object to these inconsistent theories.

10.   Conspiracy:
     a.    There was insufficient evidence of the charge of conspiracy to commit murder that was presented to the jury.

---

[3]    373 U.S. 83 (1963).

   b.   The trial court erred by misstating the law of conspiracy in the
        jury charge.
   c.   The state committed misconduct by presenting the conspiracy
        argument despite the lack of evidence supporting it.
   d.   Trial counsel were ineffective for failing to object to these errors.

11.   Multiple theories:
   a.   The trial court violated Leza's due process right to a unanimous
        verdict by presenting multiple theories to the jury.
   b.   The presentation of multiple theories precluded the jury from
        making the factual findings on Leza's individual responsibility
        necessary to sentence him to death.

12.   Leza is actually innocent of capital murder.

13.   Trial counsel were ineffective during jury selection for:
   a.   failing to question veniremembers about racial bias;
   b.   failing to challenge all seated jurors for cause or not questioning
        them adequately;
   c.   using peremptory challenges instead of challenges for cause on
        veniremembers; and
   d.   committing multiple errors resulting in cumulative error.

14.   Trial Counsel were ineffective for failing to present evidence that Leza
      suffers from Fetal Alcohol Spectrum Disorder (FASD) and/or Alcohol
      Related Neurodevelopmental Disorder:
   a.   to prove that he did not possess the requisite mental state for
        capital murder; and
   b.   as mitigation evidence at punishment.

15.   Trial counsel were ineffective for failing to investigate and present
      mitigating evidence of Leza's psycho-social history.

16.   Trial counsel were ineffective for failing to present mitigating evidence
      that Leza suffered from drug addiction.

17.   Trial counsel were ineffective at punishment for:
   a.   failing to adequately prepare witnesses to testify;
   b.   failing to counter evidence that Leza was involved in an
        extraneous offense drive-by shooting; and
   c.   failing to combat evidence of Leza's attempted escape from prison.

18.   Leza's death-sentence is unconstitutional because terms in the jury
      charge were inadequately defined.

3

19.   Leza's conviction and death-sentence are unconstitutional because the grand jury was not asked to consider the aggravating circumstances presented to the jury at punishment.

20.   Leza's death-sentence is unconstitutional because the "10-12 rule" is misleading and results in arbitrariness in imposition of the death penalty.

21.   Trial Counsel were ineffective for:
      a.   failing to deliver an opening statement;
      b.   failing to object to a statement made by a detective about Leza's arrest;
      c.   failing to object to an improper photo-identification procedure; and
      d.   failing to object to the admission of gruesome crime-scene photographs.

22.   Victim impact evidence:
      a.   The trial court erred by failing to properly instruct the jury on victim impact evidence.
      b.   Trial counsel were ineffective for failing to object to improper victim impact evidence.

23.   Leza's conviction and sentence are unconstitutional because his trial, sentencing, and appellate proceedings were conducted by elected judges.

24.   Leza's constitutional rights were violated because his state habeas counsel was subject to a conflict of interest.

25.   Leza's conviction and sentence violate the Constitution due to cumulative error.

## STATEMENT OF THE CASE

Leza was convicted and sentenced to death for capital murder in a judgment

entered on May 21, 2009.  3 CR 836–37.[4]  The Texas Court of Criminal Appeals (CCA)

---

[4]      CR" refers to the clerk's record, preceded by volume number and followed by the page number(s).  "RR" refers to the Reporter's Record of transcribed trial proceedings, preceded by volume number and followed by page number(s).  "SX" refers to the State's exhibits, followed by exhibit number and page number(s) where applicable.  "SHCR" refers to the state habeas clerk's record—the transcript of pleadings and documents filed with the court during Leza's state habeas proceeding—preceded by volume number and followed by page number(s).

affirmed Leza's conviction and sentence on direct appeal. *Leza v. State*, 351 S.W.3d 344 (Tex. Crim. App. 2011). Leza filed a state application for writ of habeas corpus. 1 SHCR 1–127. The trial court entered findings-of-fact and conclusions-of-law recommending that relief be denied. 8 SHCR 2230–413. The CCA issued an order adopting some of the trial court's findings and conclusions, providing additional reasoning related to some of his claims, and denying habeas relief based on the adopted findings and its own review. *Ex parte Leza,* WR-81,580-01, 2017 WL 117347 (Tex. Crim. App. Jan. 11, 2017). After Leza filed his initial federal habeas petition, DE 14, this Court granted his motion to stay proceedings so that he could return to state court to raise unexhausted claims. DE 34. The CCA dismissed Leza's subsequent state habeas application as an abuse of the writ. *Ex parte Leza,* WR-81,580-02 (Tex. Crim. App. Jan. 9, 2019). These proceedings follow.

## STATEMENT OF FACTS

## I.   Facts Relating to Guilt-Innocence

On direct appeal, the CCA provided the following summary of the facts of Leza's capital crime:

> The State's evidence at trial showed generally that [Leza] and his girlfriend, Dolores Trevino, were admitted to the apartment of Caryl Jean Allen, a semi-invalid, in the early morning hours of April 4, 2007. Both [Leza] and Trevino were staying with [Leza's] sister in the same apartment complex, and Allen had helped them out in the past by giving

---

"SHRR" refers to the state habeas evidentiary hearing reporter's record, preceded by volume number and followed by page number(s). "SHCR2" refers to the state habeas clerk's record for Leza's second state habeas proceeding, preceded by volume number and followed by page number(s). "DE" refers to this Court's docket entry, followed by docket number and page number(s). The Director's citations to the docket entry page numbers refers to the ECF page number at the top of each page rather than the number at the bottom of each page.

them rides.  When Allen refused on this occasion to provide them with
money with which to buy drugs, they tied her up on the floor of her
bedroom.  One or both of them then cut her throat and stabbed her in
the chest with a kitchen knife.  Each wound was fatal.  They took a
number of items from the apartment, commandeered Allen's car,
pawned the items they had stolen, and then set fire to and abandoned
Allen's car.  Both were arrested within forty-eight hours of the offense,
albeit for traffic warrants, and questioned at the homicide office of the
San Antonio Police Department.   In the video recording of his
interrogation, having been urged by the interrogating officer that it was
unmanly to allow his girlfriend to take responsibility for the murder
component of the offense, [Leza] eventually admitted that he had been
the one to cut Allen's throat.[5]  In a general verdict that did not specify
whether it believed [Leza] to be the principal actor or a party to Allen's
murder, the jury found [Leza] guilty and, upon hearing additional
evidence at the punishment phase about his prior criminal history and
behavior while previously incarcerated, answered the special issues in
such a way as to mandate the death penalty.

*Leza v. State*, 351 S.W.3d at 347–48 (footnote in original).

## II.    Facts Relating to Punishment

### A.    The State's future-dangerousness evidence

The State first showed that Leza had previously been convicted for the

following offenses: burglary of a habitation, no force, for which Leza was sentenced to

six years imprisonment, 17 RR 20, SX 88; theft, $750 to $20,000, SX 86; burglary of

a building and evading arrest, 17 RR 20; unlawful carrying of a weapon, 17 RR 21,

SX 89(a); criminal trespass, private, 17 RR 22–23, SX 90(a); and failure to show

identification to a police officer while having a Texas warrant, 17 RR 23–24, SX 91(a).

The State then attempted to show Leza was involved in a drive-by shooting

that left a man, Abel Carrasco, dead.  17 RR 34–41; 18 RR 4–11.  Rudy Trevino and

Leza's brother William Chapman were apparently convicted for the offense.  DE 11-

_____

[5]      [Leza] was not asked, and did not offer to give, a written statement.

2 & 11-5.  Before the jury, Jesse Peck testified that Leza was in the bed of a truck that included Trevino and Chapman, and he passed a loaded gun clip to Trevino that was not used.  17 RR 36–41.  The State's other witness, Albert Aguilar, testified he was in the car with Carrasco when Carrasco got shot, but he did not recognize Leza and did not see Leza shoot the gun.  18 RR 4–11.  The State then attempted to present Carrasco's mother to testify that her son was murdered.  However, the trial court excused the jury and asked the State what the purpose was of her testimony and how it pertained to the special issues.  Ultimately, the State did not convince the court that Leza had any substantial involvement in this crime, and the court did not permit Carrasco's mother to testify.  18 RR 13–21.  Via stipulation, the jury was simply informed Carrasco was killed in the shooting, but Leza's involvement was not mentioned.  18 RR 18–21.

Maria Elizabeth Rodriguez then testified that she had previously dated Leza. 18 RR 22.  She was aware Leza had been in TYC, but she never questioned him about his previous criminal activity, and Leza did not tell her about the drive-by shooting. 18 RR 22–23.  She stated that she did not want to testify but was forced to because she was subpoenaed.  She further said that Leza never abused or hit her.  18 RR 26.

Next, two TDCJ officers, Billy Carr and Rene Avila, testified about Leza's attempted escape with two other inmates during his prior incarceration on the Connelly Unit.  Billy Carr testified that on August 17, 2001, he was looking for three unaccounted for inmates, one being Leza.  18 RR 28–29.  In the kitchen area, there were three eight-foot high freezers, and above them on the ceiling was a hatch to the

7

outside of the roof.  18 RR 30–33.  When Carr arrived at about 1:00 a.m., he found

three offenders in hand restraints, including Leza.  In the crawl space between the

freezer and hatch, he and another officer found three state issued cold weather coats,

three extra state issued pants and shirts, and four pieces of strips of galvanized metal

crafted into different forms.  The metal pieces were nine inches to a foot in length and

about an inch and a half wide.  18 RR 33–34.  The roof access hatch had been slightly

damaged indicating it had been jimmied.  18 RR 35.

Prior TDCJ officer Rene Avila, who worked on the Connally Unit, testified that

in the early morning hours of August 17, 2001, he was looking for some missing

prisoners, including Leza.  18 RR 42.  He was in the back dock area looking for them,

which is outside, and then he looked through some double doors and saw three

individuals.  18 RR 45.  They did not have permission to be there at 1:00 a.m. 18 RR

45–46.  Leza was on top of a bread rack, which was leaning against the freezer, and

part of Leza's body was on the freezer.  18 RR 46–47.  Leza was probably a couple of

feet from the roof access panel.  18 RR 47.  Other officers responded and they took

custody of the inmates.  18 RR 48.  Leza received a loss of recreation and commissary

privileges for forty-five days as a result.  18 RR 50.

Joe Anthony Obregon, an officer with the San Antonio Police Department,

testified that on June 10, 1995, he stopped Leza at 7:35 pm, initially for a traffic stop.

18 RR 52.  Leza was arrested for failure to provide a driver's license and proof of

identification.  In the process, Leza said he had a gun under the seat of his car.  18

RR 53–54.  Under the seat, Officer Obregon found a .32 caliber revolver fully loaded

with six live rounds.  18 RR 54.  Near the gun was a small pouch that contained fourteen more bullets of the same caliber.  The serial number on the gun had been filed off such that it was not visible.  18 RR 55–56.  On cross-examination, Officer Obregon stated that Leza was polite and cooperative during the stop.  18 RR 57, 59.

Lisa Marie Cuello, an officer with the Bexar County Sheriff's Department, testified that in 2009, she was the floor supervisor assigned to the jail.  18 RR 60–61. She spoke to Leza about some contraband taken from him, specifically a razor blade in an envelope, and Bexar County does not issue razor blades.  Leza admitted it belonged to him.  18 RR 61–62.

Larry Beard was employed as a Sergeant with the Bexar County Jail.  18 RR 69.  On June 14, 2008, he received a disciplinary report involving Leza using profanity toward the staff.  Beard assessed whether there had been any resolution based in part on Leza's attitude.  Leza admitted to some wrong doing but was very non-caring and cold about it.  Leza stated "so what," and his attitude toward all the staff was poor.  18 RR 70–71.  Leza showed no remorse for his actions.  18 RR 77–78.[6]

Finally, Daryl Allen testified that the victim, Caryl, was his twin sister.  18 RR 90.  There are five siblings in the family.  18 RR 91–92.  Daryl spoke about his closeness with Caryl and the activities they did together.  18 RR 93.  Caryl had four children and eleven grandchildren.  She was close to her grandchildren, and helped raise some.  18 RR 95–96.  Daryl said his sister's death had the worst impact on him.

---

[6]     Another Bexar County detention officer, James Porter, testified that Leza threatened him at one point.  However, the trial judge ultimately instructed the jury to disregard all of his testimony.  18 RR 79–89.

They were raised to help people and be generous to the needy.  However, because of her murder, he stopped being that way, and a person's ethnicity has become an issue for him.  18 RR 97–98.  He explained how caring and helpful Caryl was.  18 RR 98–99.  Daryl said that their sister Gaynell, who helped Caryl for two years, felt that she lost a child and that Gaynell had to bear the brunt of Caryl's death, although her death impacted all the family.  18 RR 99–101.  At the end of his testimony, Daryl briefly lashed out at Leza and called him a "damn coward."  18 RR 102.

### B.     The defense's case in mitigation

The defense first presented Amanda Leza, Leza's sister, to testify that Trevino admitted to solely killing Allen.  But the trial court ultimately disallowed the testimony because Amanda's testimony about what Trevino said to her was inconsistent and because she could not follow the court's instructions.  18 RR 107.  Thus, before the jury, Amanda simply stated that Trevino showed no remorse and was smiling in the car after crime, while Leza showed remorse.  She then asked the jury to spare her brother's life.  18 RR 115

Julia Sanchez testified that Leza is her stepbrother.  18 RR 116.  They were close growing up, and when she moved out of her family's house, Leza would come stay with her and her boyfriend at their apartment.  Leza was thirteen or fourteen years old at the time.  18 RR 117.  Sanchez stated that Leza's mother, Celia, who is not her mother, would allow Leza to stay with her over the weekend.  However, then she would "snap" and say she wanted Leza back, and Celia would threaten her.  As a result, Sanchez was afraid of Celia.  18 RR 118.  Sanchez also saw Celia threaten

their father.   On one weekend, Leza was seeing his father, but Celia wanted Leza

back.   Celia obtained a chain, confronted their father, and started swinging the chain

around while walking toward their father.   18 RR 119.   Finally, Sanchez stated that

Leza dropped out of school at about age twelve.   18 RR 120.

Armando Leza, Sr., Leza's father, then testified through an interpreter.   He

stated that he was married to Celia for about ten years, but they divorced.   18 RR

124.   After he moved out, he tried to see Leza and his siblings.   One time, Leza called

him and told him to pick him up because Leza wanted to be with him.   He picked up

Leza at the corner and brought him to his apartment.   Essentially, he was hiding

Leza, but Celia found them and "threw the police to me."   Armando said he feared

Celia, and she would threaten him.   He thought it was a mistake on his part not to

talk to the police about the matter.   18 RR 125–26.   Armando said Leza was still small

at the time, before Leza was in the Texas Youth Commission (TYC).   Armando asked

the jury to spare Leza's life.   18 RR 126.

Frank Aubuchon testified that he worked in TDCJ, classification, for many

years.   18 RR 127–29.   He reviewed Leza's record, and, based on that and assuming

Leza received life without parole, he believed Leza would be placed in administrative

segregation or maximum custody.   He made that determination based on Leza's prior

institutional behavior, which was not good.   Leza previously served a complete six-

year sentence with no parole or mandatory supervision because he was suspected of

being involved in gang-related assaults and attempted escape from the Connally

maximum security unit.   18 RR 136.   The evidence showed Leza was directly involved

11

in a gang-related assault, not merely associated with it, while he was in general population.  Leza's records also showed some prior verbal threatening behavior. 18 RR 137.  At the time of his discharge, Leza was in administrative segregation. Thus, Aubuchon believed Leza would go right back into administrative segregation if sentenced to life without parole.  18 RR 138.  He then explained life in administrative segregation.  18 RR 138–39.  Aubuchon said there is no difference in the level of supervision of an inmate in administrative segregation versus an inmate on death row.  18 RR 146.  On cross-examination, Aubuchon stated that, at a minimum, Leza would have a G3 classification upon entering TDCJ, meaning he would be in general population, albeit with some restrictions.  18 RR 148–49.  He also stated an inmate is reviewed every ten years, and Leza could potentially go to a G2 classification where he is housed in a dormitory and could do any job in the prison.  18 RR 152–53.  But due to changes in the law, this has not yet happened with an inmate.  18 RR 153. However, for sixteen years before the policy change, capital offenders mingled with others in general population, and no one got killed.  18 RR 154–55.  Aubuchon said he could not guarantee Leza would be placed in maximum custody, but he believed it was more likely than not.  18 RR 157–58.

## ARGUMENT

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)."  *Harrington v. Richter*, 562 U.S. 86, 97 (2011).  AEDPA "requires a state prisoner seeking federal

habeas relief first to 'exhaus[t] the remedies available in the courts of the State.'"
*Kernan v. Hinojosa*, 136 S. Ct. 1603, 1604 (2016) (per curiam) (alteration in original).
State court adjudication, in turn, requires review under § 2254(d). *Richter*, 562 U.S.
at 98–99. This section "imposes a highly deferential standard of review for evaluating
state court rulings and demands that state court decisions be given the benefit of the
doubt," *Hardy v. Cross*, 565 U.S. 65, 66 (2011) (per curiam) (quotation omitted), and
"is limited to the record that was before the state court." *Cullen v. Pinholster*, 563
U.S. 170, 181 (2011).

Under § 2254(d), relief may not be granted unless the state court adjudication
(1) "'was contrary to' federal law then clearly established in the holdings of" the
Supreme Court, (2) "'involved an unreasonable application of' such law," or (3) "'was
based on an unreasonable determination of the facts' in light of the record before the
state court." *Richter*, 562 U.S. at 100 (quoting § 2254(d)(1)–(2)) (citing
*(Terry) Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

A state court decision is contrary to clearly established federal law if it "applies
a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or
confronts facts that are "materially indistinguishable" from relevant Supreme Court
precedent yet reaches an opposite result. *(Terry) Williams*, 529 U.S. at 405–06. A
state court unreasonably applies clearly established federal law if it correctly
identifies the governing Supreme Court precedent but unreasonably applies it to the
facts of a particular case. *Id.* at 407–09. To analyze unreasonable application, a
federal court "must determine what arguments or theories supported or . . . could

13

have supported[] the state court's decision[] and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Richter*, 562 U.S. at 102. Thus, "a state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree" on the correctness of the state court's decision. *Id.* at 101 (quotation omitted).

Further, it is the state court's "ultimate decision" that is to be tested for unreasonableness and not every jot of its reasoning. *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc). Indeed, state courts are presumed to "know and follow the law." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). And, even if the state court's decision lacks reasoning, § 2254(d) applies and must be overcome by the inmate. *Richter*, 562 U.S. at 98.

AEDPA also provides that state court factual findings "shall be presumed to be correct" unless an inmate carries "the burden of rebutting the presumption of correctness by clear and convincing evidence." § 2254(e)(1). This presumption is "especially strong" where, as here, the state trial judge and the state habeas judge are one and the same. *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000). "The presumption of [factual] correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001).

14

## I.   The State Court Reasonably Rejected Leza's Claim that His Death Sentence Is Unconstitutional because He Is Intellectually Disabled (Claim 1).

Leza contends that his death-sentence is unconstitutional because he is intellectually disabled.  DE 50 at 22–35.  He raised this claim in his subsequent state habeas application after this Court stayed this federal habeas proceeding.  *But see* Section I, A, *infra*.  The CCA dismissed the claim finding that Leza failed to meet the requirements for a subsequent habeas application under Texas Code of Criminal Procedure Article 11.071, Section 5.  But under Fifth Circuit precedent, the dismissal constitutes a merits adjudication of the *Atkins* claim and, consequently, is entitled to deference under AEDPA.  *See Busby v. Davis*, 925 F.3d 699, 707–10 (5th Cir. 2019) (citing *Ex parte Blue*, 230 S.W.3d 151, 162–63 (Tex. Crim. App. 2007)), *cert. denied*, 2020 WL 129667 (Jan. 13, 2020).  Leza fails to show that the rejection of his claim is objectively unreasonable.

### A.   State court findings

Although Leza did not explicitly raise a freestanding *Atkins* claim in his original state habeas application, substantively he did.  The state habeas court correctly pointed out that Leza "tap-dances all around the application without using the terminology of intellectual disability."  8 SHCR 2396.  The court then said: "Despite all the serious deficiencies in the application, it can be discerned that the real issue to be honestly addressed here is intellectual disability."  *Id.*  The reason for this is that Leza presented a number of experts at the state habeas hearing who testified and opined about his supposed intellectual disability.  1 SHRR 7–151.  Thus,

15

the state habeas court did enter findings and conclusions pertaining to this claim, which are entitled to deference under § 2254(d). At the very least, these findings are entitled to a presumption of correctness under § 2254(e).

First, the habeas court set out the legal standard for assessing intellectual disability. 8 SHCR 2396–2401. The court then assessed the trial and habeas evidence from Drs. Sherman, Brown, Milam, Murphey, DeMoor, and Roache. 8 SHCR 2401–04. The court then found and concluded as follows:

> Dr. Sherman's psychological evaluation testing showed that Mr. Leza had an IQ well above 70, even though Mr. Leza had learning deficits. His record showed that he had adaptive skills in his chosen career as a criminal. Even considering the habeas evidence, the best (or worse) that Mr. Leza can say is that he had, in the words of his best expert witness, Dr. DeMoor, "***possible mild*** intellectual disability." Dr. Murphey also testified that Mr. Leza had but a mild intellectual disability. A possibility does not create the requisite probability that was Mr. Leza's burden of proof. Additionally, considering the information from trial and the habeas proceeding and balancing all the evidence that militates for or mitigates against the imposition of the death penalty, it cannot be said that Mr. Leza was prejudiced as there was no reasonable probability that would undermine confidence in the sentence that was rendered.

> Considering the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance and [Leza's] failure to carry his burden of proof on the *Strickland* issue, defense counsel did not provide ineffective assistance of counsel in their investigation of intellectual functioning of Mr. Leza. Dr. DeMoor's view of the testing by Dr. Milam and Dr. Murphey casts a suspicion on the veracity of the testimony about the tests administered. Conflicting expert testimony invites jurors to make a credibility determination, not to tally which side produces the most experts.

8 SHCR 2404–05 (citing *Chester* v. *Thaler,* 666 F.3d 340, 349 (5th Cir. 2011)). This decision is not objectively unreasonable, and Leza has failed to rebut the presumption of correctness afforded the findings of fact with clear and convincing evidence.

### B.    Applicable Law

"[T]he Constitution places a substantive restriction on the State's power to take the life of a[n] [intellectually disabled] offender." *Atkins,* 536 U.S. at 321. Recognizing that not all offenders who claim intellectual disability "will be so impaired as to fall within the range of [intellectually disabled] offenders about whom there is a national consensus," the Supreme Court charged the states to develop "appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." *Id*. at 317. As stated in *Atkins*:

> The [AAMR] defines [intellectual disability] as follows: "[*Intellectual disability*] refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. [Intellectual disability] manifests before age 18."

*Id*. at 309 n.3 (internal citations omitted).

The CCA has likewise adopted the three-pronged criteria in the Diagnostic and Statistical Manual, 5th edition (DSM–5) for finding intellectual disability: (A) deficits in general mental abilities, (B) impairment in everyday adaptive functioning, in comparison to an individual's age-, gender-, and socioculturally-matched peers, and (C) onset during the developmental period. *Ex parte Moore,* 548 S.W.3d 552, 560 (Tex. Crim. App. 2018). The Supreme Court considers this to be the appropriate test for intellectual disability. *Moore v. Texas*, 139 S. Ct. 666, 668 (2019) (*Moore II*).

With regard to IQ scores, overall scores cannot operate as a strict cutoff. Rather, the score must be considered along with the standard error of measurement

(SEM) for the test.  *Hall v. Florida*, 572 U.S. 701, 711–12 (2014).  If the low end of the SEM is at 70 or below, then an assessment of adaptive functioning must be considered.  *Id.* at 723; *Moore v. Texas*, 137 S. Ct. 1039, 1049 (2017) (*Moore I*).  "In determining the significance of adaptive deficits, clinicians look to whether an individual's adaptive performance falls two or more standard deviations below the mean in any of the three adaptive skill sets (conceptual, social, and practical)." *Moore I*, 137 S. Ct. at 1046.

### C.   Leza's evidence fails to demonstrate that he is intellectually disabled.

#### 1.   IQ scores

Leza's IQ scores demonstrate that he is not intellectually disabled.  He presents three rounds of testing that he contends establish his subaverage intellectual functioning.  All of these evaluations were presented in state court in support of an ineffective-assistance-of-trial-counsel (IATC) claim.  1 SHCR 82–96.  On federal habeas, Leza has added the declaration of Dr. Kenneth Benedict interpreting the previously performed testing.[7]  DE 8-20 at 2–39.

##### a.   First score

The problem with Leza's claim is that the lone IQ test occurring before age eighteen was also his highest score.  In 1993, when Leza was sixteen, Dr. J. O. Sherman administered the WISC-R (Wechsler Intelligence Scale for Children—Revised).  Leza achieved a full-scale score of 85, which falls well outside the range of

---

[7]   Because this claim was adjudicated on the merits, Dr. Benedict's declaration regarding this claim is barred under *Pinholster*.  *See* footnote 11, *infra*.  Nonetheless, portions of his declaration are discussed below.

intellectual disability. DE 10-4 at 5–6. In fact, psychiatrist Dr. Thomas DeMoor, who evaluated Leza's test scores and testified on his behalf at the state writ hearing, described the 85 as "within the low range of average." 1 SHRR 96.

Nonetheless, Leza argues that this Court should account for the Flynn Effect and adjust his score down to a 79. DE 50 at 26. The Flynn Effect posits that over time, the IQ scores of a population rise without corresponding increases in intelligence and, thus, the test must be re-normalized. *In re Mathis*, 483 F.3d 395, 398 (5th Cir. 2007). It is uncertain whether the Flynn Effect applies in Texas. *See, e.g., Maldonado v. Thaler*, 625 F.3d 229, 238 (5th Cir. 2010); *see also In re Cathey*, 857 F.3d 221, 236–37 (5th Cir. 2017) (declining to resolve whether the Flynn Effect is valid); *but see In re Johnson*, 935 F.3d 284, 292 (5th Cir. 2019) (stating that "courts recognized as viable a theory called the Flynn Effect"). In any event, even accounting for the Flynn Effect *and* the SEM, Leza admits that his 1993 IQ score range would fall between 74 and 84, which still fails to demonstrate an intellectual disability. DE 50 at 26–27. The low end of the SEM does not fall within the range of intellectual disability sufficient to trigger an analysis of adaptive deficits. *See Moore I*, 137 S. Ct. at 1049 ("Because the lower end of Moore's score range falls at or below 70, the CCA had to move on to consider Moore's adaptive functioning.") (citing *Hall*).

Leza challenges Dr. Sherman's testing via the declaration from Dr. Benedict claiming that Dr. Sherman used outdated testing, the disparities between the verbal and performance scores essentially invalidate the overall score, and developmental problems reveal the need for further neuropsychological assessments. DE 50 at 27–

28.  But there is no basis for these assertions.  "[U]nder Texas law, the lack of a full-scale IQ score of 75 or lower is fatal to an *Atkins* claim."  *Blue v. Thaler*, 665 F.3d 647, 658 (5th Cir. 2011) (citing *Maldonado*, 625 F.3d at 240).  Moreover, the Fifth Circuit "has previously held that *Atkins* gives the states discretion in how they define and determine the existence of mental retardation.  The CCA's use of 75 as its upper-limit IQ-score cutoff point tracks the DSM–IV's diagnostic criteria and finds support in *Atkins* itself."  *Id.* at 658–59 (footnotes omitted).  Further, Leza's is not claiming that Dr. Sherman's testing was flawed, only that he believes the individual scores somehow undermine the true full-scale score.  He cites no precedent for that proposition.  Moreover, Dr. Sherman's finding of developmental problems has no bearing on IQ.  The CCA "has regarded non-IQ evidence as relevant to an assessment of intellectual functioning only where a full-scale IQ score was within the margin of error for standardized IQ testing. . . . [A]pplicants may not use clinical assessment as a replacement for full-scale IQ scores in measuring intellectual functioning."  *Ex parte Hearn*, 310 S.W.3d 424, 431 (Tex. Crim. App. 2010); *see also Hearn v. Thaler*, 669 F.3d 265, 272-73 (5th Cir. 2012) (holding that the CCA's determination that clinical assessment cannot replace IQ testing should not be second-guessed under AEDPA in light of *Atkins*).

### b.    Second score

In 2009, Dr. Daneen Milam administered the WAIS-IV (Wechsler Adult Intelligence Scale—Fourth Edition) IQ test on which Leza scored a 79. After an extensive ten-hour neuropsychological examination, Dr. Milam determined that

"Mr. Leza exhibited scores in the mentally retarded range on all verbally loaded subtests but scored well within the normal limits on visual, and gross and fine motor tasks." DE 10 at 7; 1 SHCR 198.  She continued, "Were his performance to have provided proof of mental retardation, his scores on all measures would have been uniformly low.  However, on some measures his performance was well within normal limits while other measures were in the mentally retarded range, indicating brain dysfunction and lifelong neurological impairment." *Id.*

Thus, Leza's own state habeas expert concluded that he was not intellectually disabled in 2009.  Leza also concedes that this full-scale score is not subject to the Flynn Effect.  DE 50 at 29.  The SEM for the score is 75 to 83, which falls far short of 70 or below necessary to consider adaptive deficits per *Moore I.*

Leza criticizes Dr. Milam's testing and analysis, even though she gave Leza the most recent version of the WAIS, claiming that she believed all scores must be in the range of impaired functioning to support an intellectual-disability diagnosis. DE 50 at 28.  But at no point in her declaration did Dr. Milam make that assertion. I SHCR 198.  Instead, she simply remarked that some of the scores, notably the verbal, were within the "mentally retarded range," whereas scores pertaining to motor skills were well within normal limits.  *Id.*  Thus, she believed this disparity represented "brain dysfunction" and "neurological impairment." *Id.*  Her testing just did not reveal intellectual disability.[8]  In short, Dr. Milam's report refutes Leza's claim as well.

_____

[8]    In his declaration, Dr. Benedict concedes he found no errors in Dr. Milam's administration of the WAIS-IV.  DE 8-20 at 15.

####     c.      **Third score**

Leza was tested in 2014 by Dr. Joann Murphey, who administered the SB5 (Stanford-Binet Intelligence Scale—Fifth Edition) IQ test on which Leza scored a 75, yielding a range of 72 to 80.[9]  DE 10-3 at 2, 1 SHRR 19, 110.   However, the reliability of this score is dubious.   Leza's federal habeas expert, Dr. Benedict, explained his inability to fully rely on Dr. Murphey's evaluation: "[T]he data are interpreted from a strictly empirical standpoint, with little to no qualitative data regarding Mr. Leza's performance, and with little to no integration of the newly collected SB5 data with previous data from assessments of Mr. Leza's intellectual functioning."   DE 8-20 at 18.   He also claims that there are multiple scoring errors in Dr. Murphey's report, opining that he believes some of the scores were too high.   *Id*.   In addition, in at least one other case, the CCA has declined to accept an IQ score from a test administered by Dr. Murphey, finding she was not credible.   *Ex parte Weathers*, No. WR-64302-02, 2014 WL 1758977, at *4–5 (Tex. Crim. App. Apr. 30, 2014) (Price, J., concurring) (detailing state habeas adverse credibility findings about Dr. Murphey).

Moreover, as Leza concedes, Dr. Murphey's test results are curious because, unlike the prior two tests, Leza scored higher on the verbal component than he did on performance.   DE 50 at 30; DE 8-20 at 18.   Dr. Benedict concluded that without further behavioral observations or interpretation of the data, the only conclusion he could reach was that Leza's performance conveyed "substantial conceptual deficits,

---

[9]      Dr. Murphey's report and testimony reflect a score of 75. DE 10-3 at 2; 1 SHRR 110. However, in his declaration, Dr. Benedict explains that Dr. Murphey made a scoring error, and that, in his view, Leza's accurate full-scale score on the SB5 was a 74. DE 8-20 at 19.

at different points in time, from both verbal- and visual-based tests of intelligence."
DE 8-20 at 18.   But because Dr. Benedict performed no additional testing on Leza
and merely opined on testing already conducted, it could also be argued that the
results indicate Dr. Murphey's testing is suspect.

In any event, even if it is accepted as valid, Leza's 2014 SB5 score within a
range of 72–80 does not show that he is intellectually disabled.   During her writ
hearing testimony, Dr. Murphey stated that she believed Leza was "mildly
intellectually disabled," but the report explicitly classified his full-scale score only as
"Borderline Delayed."   DE 10-3 at 2.[10]   Instructively, the Fifth Circuit recently held
that the CCA reasonably determined that a petitioner could not demonstrate
subaverage intellectual functioning when the lowest IQ score he provided was a 74
on the WAIS-IV (yielding a range from 70–79), which the test's administrator
described as "Borderline."   *Busby*, 892 F.3d at 751.   Moreover, Dr. Murphey
administered the Stanford-Binet IQ test to Leza.   While this test may be adequate,
the Supreme Court has recognized that the WAIS is "the standard instrument in the
United States for assessing intellectual functioning."   *Atkins*, 536 U.S. at 309 n.5.

As explained above, on federal habeas, Leza has added the declaration of
Dr. Benedict who attempts to synthesize these IQ test results in a way that supports
Leza's "new" *Atkins* claim.   However, Leza's scores simply do not show that he suffers

---

[10]      Further, after reviewing the above-described tests, Dr. DeMoor concluded that "the
testing results favored borderline intellectual functioning, which means below average
intelligence but there were some hints of intellectual disability." 1 SHRR 95.  Dr. DeMoor
also admitted that there were some hints that Leza was not intellectually disabled, including
his "nonverbal intellectual functioning within the average range."  *Id*.

from subaverage intellectual functioning, particularly given that the score that matters the most—the one obtained when he was sixteen—is not close to the range of intellectual disability.  Leza's failure to meet the first prong of Texas's test for intellectual disability is dispositive, and his *Atkins* claim is meritless.

### 2.    Adaptive deficits

Even if his IQ test scores were in the range of an intellectual disability, Leza fails to demonstrate adaptive deficits.  While Leza struggled at times in school, he also had report cards showing grades between 70 and 85.  *See* DE 9-7 at 3.  Regarding the evidence presented during Leza's initial state habeas proceedings, his experts primarily focused on behavior that could be used for mitigation purposes, often related to FASD, not deficits indicative of an intellectual disability.  Accordingly, on federal habeas, Leza has attached a report by Dr. Ginger Calloway—also barred under *Pinholster*—who opines that Leza suffers from adaptive deficits.  DE 8-21 at 2–23.  Importantly though, much of the information Calloway obtained was from Leza's family, who were described by his state habeas mitigation expert Mary Burdette as "poor historians" and from whom Dr. Murphey had difficulty obtaining information.  DE 9-24 at 21; 1 SHCR 158; 1 SHRR 121–23.  For instance, Burdette stated the following in her report:

> Mr. Leza, in particular, is a poor historian and details regarding his past are sketchy.  His family was very reluctant to assist in this social history and ignored numerous phone calls to set up meetings. . . . Finally I was able to meet with a few family members by simply showing up on their doorsteps.  At that point, they were agreeable to assist.  Although those family members interviewed spoke English, they often asked for clarification of questions.  They too, are inconsistent historians.

24

I SHCR 141.  Regarding "Underlying Environmental Factors," Burdette stated: "It is important to review [Leza's] life while taking into account many of the environmental factors that were at play.  [Leza] and his family are not good historians, so one must piece together hints here and there to try to see the whole picture."  I SHCR 156.  She further opined that Leza's relatives were poor historians "when it comes to such things as medical history."  I SHCR 158.  Celia Leza confirmed during the state habeas hearing that she had a difficult conversation when either Burdette or Dr. Murphey called her.  I SHRR 175.  But Calloway relied heavily on information obtained from Leza, his mother Celia, and his brother in reaching her conclusions.  DE 8-21 at 12 ("[H]is mother was informative regarding Conceptual, Social and Practical skills and his brother, Fernando, was informative with regard to Conceptual and Social skills.").  That Leza's family, having been approached and found unreliable by two specialists, would suddenly become trustworthy is suspect.

The disparity in scores on the Adaptive Behavioral Assessment System (ABAS), which is designed to measure adaptive deficits, is also curious.  Apparently, this measure is given to people who know the individual and report about the individual's behavior based on anecdotal information.  Calloway gave this assessment to a cousin of Leza's, Pat Castro, and reviewed prior assessments given to Armando Leza, Sr., Celia Leza, and Leza's brother Fernando.  DE 8-21 at 12–13.  Armando Leza, Sr., provided information resulting in high scores that indicate no adaptive deficits.  *Id.* at 13.  And he was one of the family members who testified at trial on behalf of Leza.  Celia and Fernando, on the other hand, gave information resulting in

low scores indicative of adaptive deficits.  *Id.*  Calloway recognizes this disparity but seems to dismiss Armando Leza, Sr., by stating that he may not have understood the questions because English is not his native language.  *Id.*  But trial counsel clearly trusted him more than Leza's other family members due to their checkered histories. And as discussed in subsequent sections of this answer, Leza's other family members, like Celia and Fernando, are *clearly* unreliable.  *See, e.g.,* Section XIV, C, *infra.*  The scoring disparity reveals a credibility and reliability problem reflective of those who gave information, not simply an issue with Armando, Sr.  Thus, even if the ABAS is reliable, those who provided information for it are not.  Given the unreliable anecdotal evidence that is contradicted in part by evidence Leza's investigator obtained before trial, *see* Section XIV, *infra*, Leza has not met his burden.

### 3.    Onset prior to age 18

Finally, Leza fails to meet the onset prong. As explained above, he scored an 85 in 1993 at the age of 16 and a 79 in 2009.  Leza's expert agreed that his 1993 score showed that his intellectual functioning was "within the low range of average." 1 SHRR 96; *see Clark v. Quarterman*, 457 F.3d 441, 447–48 (5th Cir. 2006) (relying on an IQ test taken during developmental period in finding reasonable a state-court conclusion that the petitioner failed to meet the onset prong).  Further, in 2009, after conducting an extensive battery of tests, his own expert did not find that he was intellectually disabled.  DE 10-1 at 2.  As such, the record establishes that the onset of any intellectual disability did not occur prior to the age of 18.  In sum, this record

fails to show that Leza is intellectually disabled under *Atkins*, and the state court's decision is not objectively unreasonable.

## II.   Leza's Claim that His Trial Counsel Were Ineffective for Failing to Present Evidence of an Intellectual Disability Is Meritless (Claim 1, B & C).

Leza also contends that his trial counsel were ineffective for failing to investigate and present evidence of Leza's intellectual disability as mitigation at punishment.  DE 50 at 36–40.  Leza raised this claim in his successive state habeas application, which was dismissed for abuse of the writ, but the claim was likewise raised in his initial habeas petition where he argued counsel were ineffective for failing to investigate and present mitigating evidence.  I SHCR 36–45, 82–96.  Mixed with the other allegations, Leza alleged that counsel failed to present evidence of his "low" intellectual abilities, which demonstrate scores in the "mentally retarded" range.  I SHCR 82–91.  This claim was reasonably rejected by the CCA, and his new evidence is barred from consideration under *Pinholster*.

### A.   State court findings

In its findings of fact and conclusions of law, the state court first summarized the evidence and testimony presented during the habeas evidentiary hearing. 8 SHCR 2309–33.  And some of this evidence involved several experts who offered their opinions about Leza's intellectual abilities, including Gerald Byington, Dr. DeMoor, Dr. Murphey, and Dr. Brown.  8 SHCR 2312, 2314, 2319, 2321–23, 2327. This testimony was presented in the larger context of the IATC claim that counsel failed to investigate and present mitigating evidence, particularly evidence that Leza

27

suffers from FASD.  But Leza clearly indicated that intellectual disability was also a

claim.  Nonetheless, the state court found as follows:

> Mr. Leza inaccurately suggests that his defense attorneys did nothing.
> The record shows otherwise.  A review of the motions filed by defense
> counsel in the clerk's record shows a very aggressive filing of motions as
> [d]efense counsel moved to produce any report on Mr. Leza by any
> psychiatric expert [ ].   Counsel filed a motion for exculpatory and
> mitigating evidence [ ].  Counsel obtained Mr. Leza's juvenile records [ ].
> . . . . These juvenile records include his family and social history, an
> account of his mother's failure to cooperate, his discharge from TYC, and
> most importantly **the psychological and testing evaluation of
> Mr. Leza by psychologist J. O. Sherman.**  In defending Mr. Leza,
> defense counsel employed no less than two investigators: Jack Denman
> [ ] and Ray [YBarbo] [ ]. . . . The defense got additional funds to pay for
> Mr. [YBarbo's] services [ ].  Mr. [YBarbo's] billing [ ] shows that he spent
> extensive time researching Mr. Leza and his family.  Defense counsel
> obtained the services of a mitigation specialist, Anne Matthews [ ] and
> even got additional funding for her to perform additional work [ ].  The
> defense had access to and were served with Mr. Leza's medical records
> from the jail and from prison [ ].  It is noted that in those records that
> Mr. Leza admitted a drug addiction that costs him $100/day for cocaine
> and $100/day for heroin[,] [ ], denied mental retardation, mental health
> history, suicide attempts, seizures [ ], **was attributed as having
> average intellectual functioning** on March 24, 1998 [ ], and denied
> sexual abuse [ ].  In this regard, it is noted that Mr. Leza's counsel did
> not address any of these achievements at the writ hearing.  It also is
> noted that Mr. Leza failed to call mitigation specialist Anne Matthews
> to the writ hearing and failed to introduce her notes.  Most tellingly
> perhaps is that the defense retained two experts.  First, Dr. John
> Roache, a behavioral psychologist whose specialty was clinical
> pharmacology, was retained to fight Mr. Leza's confession and he
> testified [ ].  Second, the defense got funded for and retained Frank G.
> Aubuchon as a prison classification expert [ ].   Defense attorney
> Terrence McDonald testified at the writ hearing [ ] that he had received
> a phone call from the Texas Defender Service in which fetal alcohol
> syndrome [(FAS)] was mentioned.  He passed the information to co-
> counsel Barbara Hughes, who is now deceased and cannot relate what
> she then did. McDonald praised both attorney Hughes and mitigation
> investigator Ann Matthews [ ].

8 SHCR 2363–64 (emphases in original).  The court also found that Leza's family members are poor historians and uncooperative, which does not "aid defense attorneys in preparing for the sentencing phase of a capital murder case."  8 SHCR 2363–65 (emphasis in original) (record citations omitted); *see also* 8 SHCR 2384–93 (further findings pertaining to failure to investigate and present all mitigating evidence).  Under § 2254(d), this decision is not objectively unreasonable.  And even if the claim is technically defaulted, the findings of fact are still entitled to a presumption of correctness under § 2254(e).[11]

### B.  The standard

Claims of ineffective assistance of counsel are governed under the familiar standard enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984).  A defendant's

---

[11]      As stated above, in *Busby*, the Fifth Circuit held that when the CCA dismisses an intellectual–disability claim for abuse of the writ without considering the merits, it is still an adjudication on the merits because the CCA has made clear that it considers the merits of successive *Atkins* claims.  925 F.3d at 707–10.  That same reasoning does not apply to IATC claims.  *Id.* at 707.  But because the Director considers the instant IATC claim exhausted, the additional evidence Leza presented in his subsequent application—namely the declarations from Drs. Benedict and Calloway—is barred from review under *Pinholster*, 563 U.S. at 181 (holding that "review under § 2254(d)(1) is *limited to the record that was before the state court* that adjudicated the claim on the merits") (emphasis added).  If this Court determines the instant claim is unexhausted and procedurally barred because it was raised only in Leza's abusive application, then Leza must demonstrate he can overcome the default via the equitable exception announced in *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013).  Leza has likely waived this argument because he failed to brief it.  Nevertheless, to meet the *Martinez/Trevino* exception, Leza must show that (1) his IATC claim is "substantial," meaning that he "must demonstrate that the claim has some merit," *Martinez*, 566 U.S. at 14; and (2) his initial state habeas counsel was ineffective in failing to present this claim in his first state habeas application.  *See id.*; *Trevino*, 569 U.S. at 429.  As discussed herein, Leza cannot satisfy this exception because, for the reasons addressed below, his ineffectiveness claim lacks merit, and state habeas counsel was not ineffective.

claim that he was denied constitutionally effective assistance requires him to affirmatively prove both that (1) counsel rendered deficient performance, and (2) his actions resulted in actual prejudice. *Id.* at 687–88, 690. Importantly, failure to prove either deficient performance or resultant prejudice will defeat an ineffectiveness claim, making it unnecessary to examine the other prong. *Id.* at 687.

To demonstrate deficient performance, Leza must show that in light of the circumstances as they appeared at the time of the conduct, "counsel's representation fell below an objective standard of reasonableness," i.e., "prevailing professional norms." *Id.* at 689–90; *see also Hinton v. Alabama*, 571 U.S. 263, 273 (2014) (per curiam) (emphasizing that the "performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances") (citation omitted). The Supreme Court has admonished that judicial scrutiny of counsel's performance "must be highly deferential," with every effort made to avoid "the distorting effect of hindsight." *Strickland*, 466 U.S. 689–90; *Richter*, 562 U.S. at 105 ("It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.'"). Accordingly, there is a "strong presumption" that the alleged deficiency "falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Even if deficient performance can be established, Leza must still affirmatively prove prejudice that is "so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Id.* at 687. This requires him to show a reasonable probability that but for counsel's deficiencies, "the result of the proceeding would have been

30

different." *Id.* at 694. A "reasonable probability" is one sufficient to undermine confidence in the outcome. *Id.* And as explained by the Supreme Court, the question in conducting *Strickland*'s prejudice analysis "is *not* whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel [had] acted differently." *Richter*, 562 U.S. at 111 (emphasis added and citations omitted). Rather, "[t]he likelihood of a different result must be substantial, not just conceivable." *Id.* at 112 (citation omitted).

With respect to errors at the sentencing phase of a death penalty trial, the relevant prejudice inquiry is "whether there is a reasonable probability, that absent the errors, the sentencer [] would have concluded the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695; *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) ("In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence."); *see also Neal*, 286 F.3d at 241 ("Stated to the point: Is this additional mitigating evidence so compelling that there is a reasonable probability at least one juror could reasonably have determined that, because of Neal's reduced moral culpability, death was not an appropriate sentence?") (footnote omitted).

Finally, relief is not warranted even if this Court believes Leza has satisfied *Strickland*. Instead, Leza is entitled to relief only if this Court concludes that the state court's determination that Leza did not satisfy *Strickland* is objectively unreasonable under § 2254(d). *Richter*, 562 U.S. at 101. Thus, a federal court's

31

review of a state court's resolution of an IATC claim under the AEDPA is "doubly deferential." *Pinholster*, 563 U.S. at 190.

### C.     Trial counsel were not ineffective.

Leza alleges that trial counsel had information available suggesting he is intellectually disabled, such as school and TYC records, but they failed to pursue it. DE 50 at 36–38.   Because there is no merit to Leza's *Atkins* claim, for the reasons addressed above, counsel could not have been ineffective for failing to raise it.

Moreover, counsel cannot be deemed deficient because it is clear that counsel obtained Dr. Sherman's report documenting Leza's intellectual functioning in 1993. This report is contained in the mitigation file of Ann Matthews.  7 SHCR 2060–65. As shown, Dr. Sherman found that Leza was of below average intelligence with a full-scale IQ score of 85.   Even with the Flynn Effect, the score does not meet the criteria for intellectual disability.   Further, at the time Leza was tried—May of 2009—the CCA had still not recognized the validity of the Flynn effect.  *See Ex parte Johnson*, 2009 WL 1165502, at *1 (Tex. Crim. App. April 29, 2009) (noting that five months before in a similar case the CCA had ordered the convicting court to evaluate evidence concerning the legitimacy of the Flynn Effect) (Price, J., dissenting); *see also Ex parte Cathey*, 2008 WL 4927446, at *1 (Tex. Crim. App. Nov. 18, 2008).  Thus, counsel had no reason to believe that the score was somehow inflated.  In addition, per the state court findings, other records also indicated Leza was not intellectually disabled.

In short, given that counsel had a report from a qualified psychologist of an IQ test conducted on Leza before he was 18, and given that the test showed he was not

intellectually disabled, counsel cannot be deemed ineffective for failing to pursue the matter. At the very least, the state court's adjudication of the claim is not objectively unreasonable, and Leza has not rebutted the presumption of correctness afforded the state court findings with clear and convincing evidence.

### D.    Leza's additional mitigating evidence is double-edged.

Leza claims that, even if he is not intellectually disabled, trial counsel were ineffective for failing to present evidence of his low intellectual ability "which would have been significant to the jury's determination of Leza's ultimate sentence." DE 50 at 38. Leza asserts that the failure to present evidence of intellectual disability deprived the jury from hearing about his learning disability and developmental deficits. *Id.* at 39. Leza concludes: "Had counsel conducted this investigation—whether or not Leza was ultimately found to be [intellectually disabled]—it is reasonably likely that at least one juror would have voted for a penalty other than death." *Id.* at 40.

Leza concedes that this claim is exhausted; it was raised as part of his *Wiggins* claim in his initial state habeas proceeding. 1 SHCR 77–96. The state habeas court rejected this claim, 8 SHCR 2363–68, and this decision is not objectively unreasonable. Moreover, it appears Leza relies in part on the declarations from Benedict and Calloway in support of his claim, but because their declarations were first submitted with Leza's successive application, this evidence is barred under *Pinholster*.

33

The main flaw with Leza's claim is that he views the evidence of his alleged intellectual disability as solely mitigating.  This is not so.  On state habeas review— and in the instant petition—Leza repeatedly connected his mental-health problems and intellectual disability to permanent brain impairments caused in part by FASD leading to impulsivity, poor decision-making, and even aggressiveness.  1 SHCR 14– 15, 89–90; *see also* DE 50 at 17, 37, 112, 116, 124–25.  Nearly all of the experts who submitted reports on Leza stated precisely the same.  1 SHCR 173 (Burdette declaration) (stating that people with FASD are "easily led by delinquent peers" and have "learning disabilities, impulsivity, poor judgment, limited social skills, increased susceptibility to criminal behavior and victimization"), 179 ("[Leza] is a follower, functionally illiterate and very impulsive.  Due to his mental regulation deficits, he has an impaired ability to perceive the consequences of his actions."); 198 (Milam declaration) ("[T]here is ample proof of impulsivity, poor decision making, and adaptive failures along with developmental delays, which are all hallmarks of FASD."), 199 ("For his entire life, Mr. Leza has consistently displayed difficult, distractible and impulsive behavior *often to the extent that he endangered his own or others' safety*.") (emphasis added), *id.* (Leza's impulsiveness "kept him from making classification "levels" that would allow him to be discharged."); 205–08, 212 (Brown declaration).

In a case squarely on point, the Fifth Circuit rejected a petitioner's claim that counsel was ineffective for failing to offer mitigating evidence of a brain injury:

> As the state court found, "[p]resentation of some type of brain injury could indicate that [petitioner's] violent behavior was of a

permanent nature not induced by drug use, suggesting he could be a
future threat to those in prison." *Such evidence, according to the court,
would be "double-edged mitigation evidence," since it could undermine
[defense counsel's] theory that once separated from drugs, petitioner
would no longer be a continuing threat to those in prison.* Or, as the
State argued, "expert testimony suggesting that [petitioner's] condition
was permanent would have eviscerated counsel's defensive theory."

*Druery v. Thaler*, 647 F.3d 535, 541-42 (5th Cir. 2011) (emphasis added); *see also*

*Martinez v. Dretke*, 404 F.3d 878, 890 (5th Cir. 2005) ("The introduction of evidence

that Martinez suffered from organic (i.e., permanent) brain damage, which is

associated with poor impulse control and a violent propensity, would have

substantiated the state's evidence and increased the likelihood of a future

dangerousness finding.").

Here, trial counsel Terrence McDonald testified at the state habeas hearing

that his co-counsel, Barbara Hughes, was in charge of mitigation and that he had

faith in Hughes and Matthews to make mitigation decisions. 1 SHRR 183–85, 191–

92. Hughes did not testify because she was deceased. Nonetheless, the Fifth Circuit

has held that the decision to forego presenting double-edged evidence is a reasonable

trial strategy. *See Rodriguez v. Quarterman*, 204 F. App'x. 489, 500 (5th Cir. 2006)

(finding the decision not to present double-edged evidence regarding petitioner's

permanent brain damage was reasonable since it could have bolstered the State's

case regarding future dangerousness); *Hopkins v. Cockrell*, 325 F.3d 579, 586 (5th

Cir. 2003) (holding "that a tactical decision not to pursue and present potentially

mitigating evidence on the ground that it is double-edged in nature is objectively

reasonable"). A juror could see some mental conditions only as aggravating because

they increase the likelihood that a defendant will act violently again.  *See Nelson v. Quarterman*, 472 F.3d 287, 307–08 (5th Cir. 2006).  Moreover, the Fifth Circuit has reiterated that "double-edged evidence cannot support a showing of prejudice under *Strickland*."  *Reed v. Vannoy*, 703 F. App'x 264, 270 (5th Cir. 2017) (citing *Dowthitt v. Johnson*, 230 F.3d 733,  745 (5th Cir. 2000)); *see also Gray v. Epps*, 616 F.3d 436, 449 (5th Cir. 2010).

Evidence that Leza is permanently damaged and susceptible to impulse problems that could cause violent behavior may have sealed his fate.  Equally detrimental is the notion that Leza is easily led by others due to his mental impairments.  For instance, Leza has argued, and continues to argue, that his girlfriend was the ringleader of this crime, and he murdered Allen at her direction. If he is predisposed to such action due to a permanent condition, the jury would have likely held that against him in answering the special issues.  And the defense could not have separated the alleged intellectual disability from the other evidence of mental impairments due to FASD because even Leza argues they are all linked.

Finally, given the incredibly brutal facts of the offense—slashing the throat of a disabled victim and stabbing her in the chest—combined with Leza's criminal and poor prison disciplinary histories, there is not a reasonable likelihood the jury would have answered the special issues differently had counsel presented double-edged evidence.  *See Strickland,* 466 U.S. at 698–99 (finding no prejudice due to State's overwhelming evidence on aggravating factors supporting death penalty); *Santellan v. Cockrell*, 271 F.3d 190, 198 (5th Cir. 2001) ("[c]onsidering [petitioner's] history in

light of the horrific nature of this offense, a reasonable court could conclude that there was no substantial likelihood that the outcome of the punishment phase would have been altered by evidence that he suffered organic brain damage.").

### III. The State Court Reasonably Rejected Leza's Claim that the Trial Court Erred by Allowing the Admission of His Police Statement because He Did Not Validly Waive His *Miranda* Rights.   Other Portions of Leza's Claim Challenging His Waiver and Confession Are Procedurally Defaulted (Claim 2).

Leza contends that the trial court erred by admitting his confession because his waiver of his *Miranda* rights was not knowing and voluntary.   DE 50 at 40. However, Leza's claim contains several sub-claims, some of which were rejected on direct appeal and state habeas review and others that were raised in his application dismissed for abuse of the writ.   Here, Leza claims: (1) the waiver of his *Miranda* rights was invalid because the wording in the warnings themselves was flawed; (2) the warnings "substantially exceeded his ability to understand the rights he was waiving and the resulting consequences" because they were "unnecessarily long and orally presented" and "written at a reading level beyond [his] abilities to recall and comprehend"; (3) his waiver was not knowing and voluntary because his intellectual disability, FASD, heroin use and sleep deprivation affected his ability to understand what was happening and to waive the rights; (4) the totality of the above three circumstances prevented him from knowingly and voluntarily waiving these rights; (5) the admission of the confession was not harmless; and (6) trial counsel were ineffective for failing to properly challenge the admission of the confession.   DE 50 at 42–48.   He also claims that state habeas counsel was ineffective for failing to raise

certain aspects of the *Miranda* issue. *Id.* at 49. Some of these claims are procedurally barred from federal habeas review, and regarding those adjudicated by the state court, the state court's decision is not objectively unreasonable. Moreover, all of Leza's claims lack merit.

### A.   Most of these claims are procedurally defaulted.

Federal review of a habeas claim is procedurally barred if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural bar. *Harris v. Reed*, 489 U.S. 255, 263 (1989). Where a state court has explicitly relied on a procedural bar, a state prisoner may not obtain federal habeas relief absent a showing of cause for the default and actual prejudice, or that the federal court's failure to consider the claim will result in a miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Failure to raise a claim in an initial state habeas corpus application may not be excused for cause unless the claim was not "reasonably available" at the time of the prior petition. *Fearance v. Scott*, 56 F.3d 633, 636 (5th Cir. 1995). And a miscarriage of justice in this context means that the petitioner is actually innocent of the crime of which he was convicted or of his death sentence. *Sawyer v. Whitley*, 505 U.S. 333, 339–40, 349 (1992).

Here, Leza did not raise sub-claims 1, 2, a portion of 3,[12] 4, and 6[13] on direct appeal or in his initial habeas application. *See* DE 8–3 at 10–25; 1 SHCR 28–32. He did however raise all these claims in his application dismissed for abuse of the writ. 1 SHCR2 88–97. The Fifth Circuit has repeatedly held that Texas's abuse-of-the-writ doctrine is an adequate and independent state ground barring federal habeas review of claims raised in the abusive application. *Garza v. Stephens*, 738 F.3d 669, 675 (5th Cir. 2013); *Balentine v. Thaler*, 626 F.3d 842, 857 (5th Cir. 2010); *Hughes v. Quarterman*, 530 F.3d 336, 342 (5th Cir. 2008).

Therefore, Leza must demonstrate "cause and prejudice" to overcome the bar or show a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. "Cause" requires a petitioner to show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986)*; see also Davila v. Davis*, 137 S. Ct. 2058, 2065 (2017) (a factor is only considered external "if it cannot fairly be attributed to the

---

[12]     In sub-claim 3, Leza alleges that his alleged intellectual disability, FASD, heroin use, and sleep deprivation rendered his waiver invalid. But in his initial state habeas application, Leza did not reference his alleged intellectual disability, FASD, and sleep deprivation as reasons to question his waiver. 1 SHCR 28–32. Because Leza did not explicitly make these arguments in his application, and because the state habeas court did not address them, they should be considered defaulted.

[13]     While it does not appear that Leza raised claim 6 in his original habeas application, there is one caveat to this. In the original state habeas proceeding, the state court said: "The writ application suggests that Mr. Leza had difficulty understanding his *Miranda* rights." 8 SHCR 2394. The state court then said that "[t]his was anticipated to be a significant issue at the writ hearing" but that Leza seemed to abandon it for noted reasons. *Id.* The court proceeded, perhaps for the sake of thoroughness, to enter brief findings and conclusions regarding this IATC claim. If this claim is in fact not defaulted, Leza cannot show that this decision is not objectively unreasonable. 28 U.S. C. § 2254(d).

prisoner"). Leza does not address the default in his petition. Therefore, these claims are clearly defaulted.

Regarding the ineffectiveness claim, the default is viewed through the lens of the *Martinez*/*Trevino* equitable exception. *See* footnote 11, *supra*. But Leza cannot satisfy this exception because, for the reasons addressed below, his ineffectiveness claim is not substantial, and state habeas counsel was not ineffective for failing to raise it. Therefore, this claim is also defaulted.

### B.   Facts from the suppression hearing and state court decisions

### 1.   Relevant facts from suppression hearing

At a pretrial hearing, the State called three police officers. Officer Darrell Volkman testified that he received Leza into custody at 12:15 a.m. on April 6, 2007. 3 RR 21–22. Leza appeared coherent, alert, and in control of his faculties. 3 RR 25. During a break from the interview, after Leza had been read his rights, Officer Volkman allowed Leza to smoke a cigarette behind the police station. At this time, Leza told him that he would never would have gotten caught had his sister not told on him. 3 RR 25. Officer Volkman did not ask Leza any questions to elicit this. 3 RR 26. Officer Volkman later verified that Detective Greiner had given Leza his *Miranda* warnings before the spontaneous statement. *Id.* The only other statement Leza made to him was when Officer Volkman put Leza in the interview room and Leza said: "[T]hey don't do this when you get arrested for tickets." *Id.* Officer Volkman testified: "I'd seen nothing that would make me believe that he was intoxicated at all. He was very coherent." 3 RR 32. At the time of his testimony, he had been with the San

Antonio Police Department for twenty-one years.  3 RR 33.  As a police officer, he had come into contact with people under the influence of heroin "almost on an everyday basis."  3 RR 34.

Detective Wallace McCampbell interviewed Leza during the early morning hours of April 6.  3 RR 37.  Detective Greiner, however, did the majority of interviewing of Leza.  *Id.*  The officers allowed Leza to see his mother and sisters, per his request.  Leza was also given the opportunity to talk to Trevino because they both asked to speak to each other.  3 RR 38–39.  Detective McCampbell testified that on the DVD are the *Miranda* warnings read to Leza by Detective Greiner.  Also, Leza got a copy of his rights, signed and dated the card, and put the time on the card.  3 RR 39–40.  Officer McCampbell stated that Leza was alert and conscious of what was going on and what was said and being asked.  Officer McCampbell was able to have a dialogue with Leza and ask him questions, to which he appropriately answered.  3 RR 40.  Leza's speech was not slurred and he did not appear intoxicated.  At one point they could overhear Trevino crying in the adjacent room.  Officer McCampbell left the room and went into the room with Officer Greiner and Trevino to try and quiet her down so that Leza could not hear what she was saying.  At the time, Leza was trying to listen to Trevino.  3 RR 41–42.  Officer McCampbell had no further conversations with Leza after he interviewed him.  3 RR 42.  He believed that Leza was coherent when they talked, even though he was informed Leza said he had recently injected heroin.  3 RR 44–46.

Detective Greiner testified that she interviewed Leza from about 12:45 a.m. until almost 4:00 a.m.  3 RR 49.  She first read Leza his constitutional warnings, which are shown on the DVD.  3 RR 50.  Leza acknowledged he understood.  She also handed Leza the *Miranda* warnings and asked him to sign his name and confirm that he understood.  *Id.*  Leza followed her instructions and signed his name.  *Id.*  Leza also filled out a form called a "statement information supplement" (SIS) which is filled out by the suspect and contains personal information.  3 RR 51.  She also asked Leza to sign a consent to search form to obtain a buccal swab.  Leza was able to follow those directions and sign the form.  *Id.*; SX 2–4.  Leza signed the *Miranda* warnings at 12:15 am on April 6, 2007, and he put his phone number, race, sex, age, and social security number on the SIS form.  3 RR 53–54.  Leza also correctly took a buccal swab per her instructions.  3 RR 54–56.  At one point, Detective Greiner gave Leza a coke and a bag of chips.  3 RR 56.  After some initial discussion, Leza asked to see his family members, and Officer Greiner allowed him to see his mother, sister and Trevino.  3 RR 58.  Leza spoke to Trevino for about 20 to 30 minutes.  3 RR 60.  In the initial part of the interview, Leza was not upfront about the murder.  3 RR 61–62.  At 3:08 a.m., Leza admitted he cut Allen's throat.  3 RR 62.  Leza also gave information about Allen being tied up, and Detective Greiner did not discuss that with him beforehand.  *Id.*  Thus, Leza was able to provide details about the offense she never suggested or discussed.  3 RR 62–63.  Officer Greiner testified that Leza did not appear intoxicated and was very coherent.  Over the years, she had interviewed people so intoxicated she had to stop the interview, and that was not

necessary here because Leza was awake and alert.  3 RR 63-64.  Leza also inquired whether the interview was being recorded or if the room was "bugged," to which Officer Greiner said "yes."  3 RR 64–65.  Officer Greiner said that throughout the entire interview, Leza's responses to her were appropriate.  3 RR 65.

The defense then presented Dr. John Roache, a research scientist, who testified about the effects of heroin on cognition.  3 RR 77–78.  He observed the videotape of the interrogation, and he met with Leza briefly.  He stated that it was very clear Leza was heroin intoxicated at the beginning of the tape, and then over the next few hours he showed signs of sobering up.  3 RR 82–84.  Dr. Roache said Leza admitted to injecting heroin, had droopy eyelids, relaxed facial muscles, and a decreased respiration rate.  3 RR 83.  He was "absolutely confident" that at the time the *Miranda* warnings were given, Leza was under the influence of heroin.  He stated that Leza's intoxication combined with the detectives telling him he was being questioned for traffic tickets would have reduced his capacity to pay attention to what was said earlier.  3 RR 85–86.  Thus, according to Dr. Roache, Leza was mentally impaired when given the *Miranda* warnings.  3 RR 86.  Dr. Roache conceded that at the time Leza made his most incriminating statements about murdering Allen, he would not have been intoxicated or had impaired judgment.  But Leza would not have recalled the *Miranda* warnings and would not have been thinking about those rights at the time he made the incriminating statement.  3 RR 87.  Dr. Roache also stated that Leza's signature on the warnings did not change his mind because that is a "motor event," which is different than the cognitive processing of information.  3 RR

90.  On cross-examination, Dr. Roache agreed that Leza was able to have a discourse with Detective Greiner, answer questions and talk about his tickets, and give information about his family.  3 RR 91–92.  He also conceded that much of his opinion was based on Leza's admission to injecting heroin and that he had no independent knowledge if Leza actually did as he said.  3 RR 97–100.

Following the hearing, the trial court determined that Leza was provided his *Miranda* warnings and that his statements were given voluntarily.  4 RR 6.

### 2.      State court decision

On direct appeal, the CCA addressed Leza's claim that his waiver and confession were involuntary due to being told he was arrested for traffic tickets and due to his heroin use.  The CCA held that neither circumstance was sufficient to render his waiver involuntary because (1) a suspect's awareness of all possible subjects of questioning before the interrogation is not relevant to whether a waiver is knowing and voluntary, (2) it became immediately apparent to Leza that the police were only interested in questioning him about the murder; and (3) Leza's heroin use before the interrogation does not implicate his constitutional rights because, under Supreme Court precedent, the Fifth Amendment is not concerned with moral and psychological pressures to confess stemming from sources other than official coercion. *Leza v. State*, 351 S.W.3d at 350 (citing *Colorado v. Spring*, 479 U.S. 564, 577 (1987) & quoting *Ripkowski v. State*, 61 S.W.3d 378, 384 (Tex. Crim. App. 2001) (quoting *Colorado v. Connelly*, 479 U.S. 157, 170 (1986)).  But the CCA further held:

> [Leza's] heroin use *does* have a bearing on his comprehension,
> however, and is a factor that is relevant to determining whether

this *Miranda* waiver was knowing and intelligent.  We cannot reject [Leza's] argument in this regard, then, as a matter of law.  At the pre-trial hearing on [Leza's] motion to suppress, he presented an expert in behavioral pharmacology who testified that, in his opinion, [Leza] was obviously under the influence of heroin intoxication during the interrogation.  And while that influence seemed to dissipate over the course of the three-hour interrogation, at least at the outset, when the *Miranda* warnings were administered and [Leza] signed the acknowledgment of those warnings ostensibly indicating that he understood them, [Leza's] capacity to pay attention and make informed decisions based on the information that was being imparted to him was impaired.  But the trial court was not obliged to credit this testimony over that of the detaining and interrogating officers.  They maintained at the pre-trial hearing, as had the "various" police officers who testified in *Ripkowski,* that [Leza] was awake and alert, appeared to comprehend the warnings and the questions propounded to him, and was coherent and appropriate in his responses; and that, moreover, in light of their prior experience in dealing with heroin users, [Leza] did not appear to them to be under its influence *at all,* much less to the extent that he could not comprehend the proceedings.  As in *Ripkowski v. State,* here "the trial court was entitled to believe the State's witnesses rather than [the] appellant's expert."  We cannot say that the trial court erred to conclude that the State satisfied its burden by a preponderance of the evidence to establish a valid waiver, and thus to deny [Leza's] motion to suppress to the extent it was based on federal constitutional law.

*Id.* at 351 (emphasis in original).  The state habeas court also rejected this claim on similar grounds, 8 SHCR 2355–56, but the CCA found the claim barred because it was raised and rejected on direct appeal.  *Ex parte Leza*, 2017 WL 117347, at *1.  These decisions are not objectively unreasonable.

### C.   Leza's claims have no merit.

#### 1.   Applicable law

The procedural safeguards established in *Miranda* protect an accused's Fifth Amendment privilege against self-incrimination during custodial interrogation.  384 U.S. at 478–79.  Prior to custodial interrogation, the subject is to be informed

that (1) he has the right to remain silent; (2) anything said can and will be used against him in court; (3) he has the right to consult with counsel prior to questioning; (4) he has a right to have counsel present at the interrogation; and (5) if he cannot afford an attorney, one will be appointed.  *Id.* at 468–70, 479.  Further, "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present."  *Id.* at 474.

In order for a defendant to establish that his confession was involuntary, he must demonstrate (1) that it resulted from coercive police conduct, *Connelly*, 479 U.S. at 163–64; and (2) was not "'the product of his free and rational choice.'"  *Mincey v. Arizona*, 437 U.S. 385, 401 (1978) (quoting *Greenwald v. Wisconsin*, 390 U.S. 519, 521 (1968)).  The sole concern under the Fifth Amendment is government coercion, nothing else.  *Connelly*, 479 U.S. at 170.  "Although mental condition may be a significant factor in the voluntariness calculus, 'this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'"  *Carter v. Johnson*, 131 F.3d 452, 462 (5th Cir. 1997) (quoting *Connelly*).  The voluntariness of the Fifth Amendment waiver of self-incrimination depends on the absence of police overreaching.  *Connelly*, 479 U.S. at 170.  "Indeed, the Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'"  *Id.* (quoting *Oregon v. Elstad*, 470 U.S. 298, 305 (1985)).  The requirement of official coercion applies equally in the context of a waiver of *Miranda* rights.  *Id.* at 169–70 ("There is obviously no

46

reason to require more in the way of a 'voluntariness' inquiry in the *Miranda* waiver

context than in the Fourteenth Amendment confession context.").

> **2.     Leza's claim that the *Miranda* warnings were
> invalid because they included improper language is
> meritless.**

Leza argues that the *Miranda* warnings he received did not afford him an

adequate opportunity to invoke his rights.  DE 50 at 42–43.  His complaint is that the

warnings informed him only that he could "urge" his rights, rather than invoke them

at any time.   *Id.*   As the CCA explained, Leza did not "challenge the adequacy of

the *Miranda* warnings that were administered to him before he made the statement

. . . ."  *Leza v. State*, 351 S.W.3d at 348.  Thus, the CCA did not have the opportunity

to address this new assertion.    Rather, Leza raised it in his abusive habeas

application; thus, the claim is defaulted.

In any event, the argument lacks merit.  The following *Miranda* warnings were

read to Leza:

> Before you are asked any questions, it is my duty as a police officer to
> advise you of your rights and warn you of the consequences of waiving
> these rights.
> 1.     You have the right to remain silent.
> 2.     You do not have to make any statement, oral or written, to
>        anyone.
> 3.     Any statement that you make will be used as evidence against
>        you in a court of law at your trial.
> 4.     You have a right to have a lawyer present to advise you before
>        and during any questioning by police officers or attorneys
>        representing the state.
> 5.     You may have your own lawyer present, or if you are too poor to
>        hire a lawyer, the court will appoint a lawyer for you free of
>        charge, now or at any other time.
> 6.     If you decide to talk with anyone, you can, and you can stop
>        talking to them at any time you want.

7.    The above rights are continuing rights which can be urged by you at any stage of the proceedings.

DE 48 at 1485 (State's pretrial Ex. 2). Leza now argues that these warnings improperly informed him that he had the right to "urge" his rights and were too long for him to comprehend.  But he fails to cite any law indicating that *Miranda* warnings cannot use the word "urge," that they have to be a certain length, or that the warnings given to him were otherwise inadequate.

Indeed, Leza's argument is foreclosed by Supreme Court precedent, including precedent he cites.  The Court has held:

> We have never insisted that *Miranda* warnings be given in the exact form described in that decision.  In *Miranda itself*, the Court said that "[t]he warnings required and the waiver necessary in accordance with our opinion today are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant."  384 U.S., at 476 (emphasis added).  [ ].  In *California v. Prysock*, 453 U.S. 355 [ ] (1981) (per curiam), we stated that "the 'rigidity' of *Miranda* [does not] exten[d] to the precise formulation of the warnings given a criminal defendant," and that "no talismanic incantation [is] required to satisfy its strictures."  *Id.*, at 359 [ ]. . . .
>
> The prophylactic *Miranda* warnings are "not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected." *Michigan v. Tucker*, 417 U.S. 433, 444 [ ] (1974). Reviewing courts therefore need not examine *Miranda* warnings as if construing a will or defining the terms of an easement.  The inquiry is simply whether the warnings reasonably "conve[y] to [a suspect] his rights as required by *Miranda*."  *Prysock, supra*, 453 U.S., at 361 [ ].

*Duckworth v. Egan*, 492 U.S. 195, 202–03 (1989); *see also Florida v. Powell*, 559 U.S. 50, 60–61 (2010) (reiterating above precedent).  The stated warnings here conformed to *Miranda's* requirement; verbatim language is not constitutionally required.

48

### 3. Leza's claim that he did not understand the nature of his rights or the consequences of abandoning them is meritless.

Next, Leza argues the warnings were invalid because they were "(1) unnecessarily long and orally presented; and (2) written at a reading level beyond Leza's abilities to recall and comprehend." DE 50 at 43–45. This claim is procedurally defaulted, but it is patently meritless as well because Leza does not cite any precedent supporting his claim. Instead, he refers to an attached psychological expert's report about the warnings themselves and Leza's deficiencies in being able to comprehend them. *Id.* As the precedent above clearly shows, *Miranda* warnings are proper as long as they convey the required rights to a suspect. And despite Leza's argument to the contrary, there was nothing complex about the rights given to him. There is no precedent mandating that *Miranda* warnings must be "dumbed down" to certain suspects or that officers must know the intellectual abilities of suspects before providing the rights. Indeed, this argument arguably runs afoul of the non-retroactivity doctrine of *Teague v. Lane*, 489 U.S. 288, 310 (1989) ("[N]ew constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced."). And although Leza refers to his alleged inadequate reading level, there is no question that he knows how to read, write, and understand rights of this nature. As Leza admitted to Officer Volkman: "[T]hey don't do this when you get arrested for tickets." 3 RR 26.

Regarding the warnings being provided orally, the precedent refutes Leza's claim. *See Elstad*, 470 U.S. at 314–15 (holding suspect knowingly and voluntarily

waived his rights that police officer read to him aloud and where the officer recorded the suspect's responses).  This claim must be denied.

> **4.    Leza's claim that his alleged FASD, intellectual disability, heroin use, and sleep deprivation rendered his waiver invalid is meritless.**

Leza alleges that all these deficits rendered his waiver invalid.  DE 50 at 45–46.  The only portion of this claim that is not defaulted is that pertaining to Leza's heroin use, which was addressed by the CCA, and Leza presents no argument demonstrating that the state court's rejection of this claim is objectively unreasonable.  Alternatively, any evidence of an intellectual disability, FASD, and sleep deprivation was not before the state court—including on habeas review, 1 SHCR 28–32—when it adjudicated his claim that his waiver was invalid.  Thus, as new evidence, under *Pinholster*, it cannot be considered in assessing the reasonableness of the CCA's decision.

At any rate, all of the officers who testified at the suppression hearing stated that Leza was alert, understood what was asked and stated to him, and did not appear intoxicated.  Leza presented an expert at the hearing who stated differently, but the trial court was free to believe the questioning officers over Dr. Roache.  Leza presents no evidence demonstrating that this decision and the CCA's are unreasonable.

Leza also relies heavily on evidence he purports demonstrates that he is intellectually disabled.  But Leza fails to cite any law indicating that evidence of an intellectual disability or FASD could render a suspect—who manifests an ability to

converse with officers and comprehend instructions—unable to knowingly waive his *Miranda* rights. *See e.g., Garner v. Mitchell,* 557 F.3d 257, 264 (6th Cir. 2009) (holding that "diminished mental capacity alone does not prevent a defendant from validly waiving his or her *Miranda* rights"); *United States v. Turner,* 157 F.3d 552, 555–56 (8th Cir. 1998) (holding that the defendant's *Miranda* waiver was knowing and intelligent even though the defendant's IQ was low-average to borderline, and he was possibly intoxicated by PCP at the time of interrogation). As described above, there was significant evidence establishing that Leza had the capacity to understand the *Miranda* warnings. Moreover, as explained above, Leza fails to show that he is intellectually disabled. *See* Section I, *supra.*

But under *Connelly*, "the voluntariness of a waiver of this privilege has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." 479 U.S. at 170. Thus, "*Miranda* protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that." *Id.* And fatal to Leza's claim is that he does not allege any coercive conduct by the police that undermined the validity of his waiver. Instead, he simply points to his own personal shortcomings as reason to invalidate his waiver. This is insufficient, and his claim must be denied.

### 5. The totality of circumstances does not reveal an invalid waiver.

Next, Leza argues that the totality of the above circumstances prevented him from knowingly and voluntarily waiving his rights. DE 50 at 46–47. As stated, this claim is procedurally defaulted. Moreover, this argument is essentially a variant of

a cumulative-error claim—that several alleged errors, if not enough to warrant relief alone, can be combined to result in a constitutional violation. However, "'federal habeas corpus relief may only be granted for cumulative errors in the conduct of a state trial where (1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors 'so infected the entire trial that the resulting conviction violates due process.'" *Turner v. Quarterman*, 481 F.3d 292, 301 (5th Cir. 2007) (quoting *Derden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir. 1992) (en banc) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). "[W]here individual allegations of error are not of constitutional stature or are not errors, there is 'nothing to cumulate.'" *Id.* (quoting *Yohey v. Collins*, 985 F.2d 222, 229 (1993)).

As shown, Leza has not demonstrated that any of the above claims are of constitutional dimension and warrant habeas relief. Indeed, most of the above is defaulted. As such, there is nothing to cumulate, and Leza's claim necessarily fails.

### 6.    Any error was harmless.

On federal habeas, Leza must also show that any error "'had [a] substantial and injurious effect or influence in determining the jury's verdict.'" *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Under this standard, a constitutional trial error is not so harmful as to entitle a defendant to habeas relief unless there is more than a mere reasonable possibility that it contributed to the verdict. *See e.g. Penry v. Johnson*, 532 U.S. 782, 795–96 (2001).

Leza contends that "the most damning evidence against [him] were his own statements, which the State relied heavily upon to secure his conviction." DE 50 at 47. The confession was significant, but the State also presented evidence that Leza had been staying at the victim's apartment complex, had sold the stolen items from the victim's apartment at a pawn shop and was positively identified as the seller by the shop owner, had the victim's blood on his shoe, and stole her car.

Moreover, Officer Volkman testified that Leza spontaneously made incriminating comments during a break in questioning. Specifically, Leza said:

> I can't believe that my sister told on me. It was her. I know it because she doesn't like me because of my wife. She told me – told on me because I told her what I had done. No one knew it was me that did it. I would have never gotten caught.

13 RR 22. Defense counsel tried to point out that Leza never made any reference to getting caught for capital murder. 13 RR 25. But the only reasonable inference is that he was referring to murder because the only other matter he was briefly asked about was traffic tickets. And it is illogical to assume he would have made such a statement about traffic violations. Moreover, it is settled that spontaneous comments to police not provided in response to questioning are not barred under the Fifth Amendment. *Miranda*, 384 U.S. at 478; *Cannady v. Dugger*, 931 F.2d 752, 754 (11th Cir. 1991) (spontaneous comments made by an accused even after *Miranda* rights are given are not inadmissible if not given in response to government questioning).

Accordingly, even without his confession, there was sufficient evidence supporting the guilty verdict, and Leza fails to show that the admission of his confession, even if erroneous, had a substantial or injurious effect on the verdict.

### D.     Neither trial nor habeas counsel were ineffective.

Leza alleges that trial counsel were ineffective because although trial counsel presented Dr. Roache and evidence about heroin intoxication, counsel did not give the doctor information about his alleged FASD or intellectual disability.  DE 50 at 48.  As stated above, it appears this claim is defaulted, and Leza cannot meet the equitable exception of *Martinez/Trevino* because this claim is not substantial and habeas counsel had no reason to raise it.  However, the state habeas court did enter the following findings and conclusions regarding this claim, or at least a similar one, because the court believed Leza "suggested" a claim that he had difficulty understanding his *Miranda* warnings, but then he later abandoned the allegation:

Dr. DeMoor admitted [ ] that page one of his report [ ] carried the following language:

Prior to beginning the evaluation, Armando Leza [w]as given the standard notification about the forensic evaluation process.  The forensic contract was reviewed.  It was then explained to Mr. Leza, prior to beginning the evaluation, there was no guarantee that there would be findings that would be helpful to his case.  It was also explained that, even if the findings did appear helpful to his case, there was no guarantee as to the results of the actual case in court.  The limits of confidentiality were explained, including that a report would be prepared for the court.  Finally, Armando Leza was told that he could refuse to answer any question and could take a break at any time. ***Mr. Leza understood these conditions and agreed to proceed with the interview.***

Dr. DeMoor admitted that his "options" were akin to *Miranda* rights and that Mr. Leza could understand such rights [ ].

As a finding of fact, the defense psychologist and medical expert both indicate that they gave a warning to Mr. Leza which is remarkably similar to a *Miranda* warning and that he understood and agreed to proceed with the interview.  Dr. DeMoor also testified he watched Mr.

> Leza's videotaped confession and that Mr. Leza indicated he understood
> his *Miranda* rights.  [ ].  Thus under the circumstances, Mr. Leza did
> not carry his burden of proof of [IATC] on this issue. . . .

8 SHCR 2394–95 (emphasis in original).  If this claim is not defaulted, Leza cannot

show that this decision is objectively unreasonable, nor has he rebutted the

presumption of correctness afforded this finding with clear and convincing evidence.

Here, even if counsel had given Dr. Roache the additional information, this

would not have altered the outcome of the suppression hearing because the trial court

clearly believed, and was free to believe, the three questioning officers about Leza's

mental state.  And these officers stated that Leza understood the *Miranda* warnings

and the questioning.  Additional evidence of Leza's mental abilities could not have

changed what the officers witnessed or what is shown—and what the trial court saw––

on the DVD.  Further, this is not an instance where counsel did not try to rebut the

State's arguments.  By presenting Dr. Roache, counsel made an admirable case for

suppressing the confession.  It may not have succeeded, but trial counsel's tactical

decisions do not fall below *Strickland* standards simply because they do not succeed

as planned.  *Pondexter v. Quarterman*, 537 F.3d 511, 521 (5th Cir. 2008).

Leza also complains that trial counsel failed to raise any challenge to the

confession before the jury; failed to argue that the waiver was not voluntary, knowing,

or intelligent; failed to challenge the adequacy of the warnings; and failed to object to

the argument that Leza "waived his right to silence by signing a written form to

indicate that he understood his *Miranda* rights and then responding to police

questioning anyway."  DE 50 at 48 (quoting *Leza v. State*, 351 S.W.3d at 348).  But

Leza simply asserts these claims and makes no additional argument in support. The Fifth Circuit "has made clear that conclusory allegations of ineffective assistance of counsel do not raise a constitutional issue in a federal habeas proceeding." *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) (citing *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983)).

Finally, Leza alleges that state habeas counsel was ineffective for not "including the effects [that] Leza's impairments and deficits (ID, FASD, sleep-deprivation) had on his ability to understand and knowingly waive his rights and the flawed nature of the waiver given (elevated reading and writing comprehension level, use of the word "urge" rather than "invoke")." DE 50 at 49. But given the numerous defects with the above claims, state habeas counsel did not perform in an objectively unreasonable manner by not raising them. *See Matthews v. Davis*, 665 F. App'x 315, 322 (5th Cir. 2016) ("We conclude that no reasonable jurist would debate the district court's resolution of the question of whether Matthews's state habeas counsel rendered ineffective assistance by failing to bring an insubstantial ineffective-assistance-of-trial-counsel claim").

## IV.    Leza's Claims Regarding False Blood Evidence Are Procedurally Barred and Meritless (Claim 4).

In his next set of claims, Leza argues that the State introduced false evidence that Allen's blood was found on Leza's left shoe. The evidence in support of this complaint is as follows. Robert Sailors, the forensic scientist for the Bexar County Crime Laboratory, testified that blood found on Leza's left shoe contained DNA and that Allen could not be excluded as the contributor. 13 RR 112–14. The probability

ratio excluded any other person as being a contributor.  13 RR 115.  Erica Graham, who was a DNA analyst with the serology section of the lab, testified that she examined Leza's shoes for traces of blood.  14 RR 11–13.  On the side of Leza's left shoe, she saw a reddish-brown fleck that caught her eye because "it looked very visually characteristic like a bloodstain."  14 RR 13.  She then performed a "presumptive" test for blood on the stain—a test that checks for hemoglobin—and the test came back positive.  *Id.*  If a stain is big enough, she will perform a "confirmatory" test to confirm the presence of blood, but she does not usually do that with small stains, as in this case, because the procedure is to preserve enough material to get a DNA profile.  14 RR 14.  Despite no confirmatory test, Sailors referred to the DNA as coming from blood, and both the State *and* defense referred to the speck on Leza's left shoe as blood during final argument.  16 RR 24, 26, 29, 41–42.

Leza now argues that this evidence was false because without a confirmatory test, there was no way to tell if the DNA on the shoe actually came from Allen's blood. DE 50 at 49–52.  Leza has attached to his petition a report from Maher "Max" Noureddine, PhD., a molecular geneticist with ForensiGen.  DE 8-23.  In this report, Noureddine states that because no confirmatory test was conducted, it is impossible to tell if the stain on the shoe is actually blood.  Thus, testimony that blood was on the shoe is incorrect.  *Id.* at 2-4.  He concludes: "In my opinion, the limitations of science and the susceptibility of forensic testing to various errors were not communicated in full at Mr. Leza's trial.  Consequently, the trier of fact could have

misunderstood and potentially overestimated the probative value of the biological evidence in this case." *Id.* at 5.

Leza claims because he had been around Allen on prior occasions, Allen's DNA could have been deposited on his shoe via some form other than blood, such as saliva or skin cells. Thus, "the State's insistence the material was the victim's blood left a false impression on the jurors that the evidence against Leza was strong." DE 50 at 52. Leza also claims that trial counsel were ineffective for not utilizing a serology expert to counter the above testimony. *Id.* at 52–54. He further claims that the State left the false impression that bloody shoe prints found at the crime scene belonged to Leza. *Id.* at 54–55.

Leza raised all of these claims in his successive habeas application, which the CCA dismissed for abuse of the writ. 1 SHCR2 69–83. The claims are thus procedurally defaulted. Leza does not address his default in the instant application. Therefore, regarding the due process claim, he has failed to show cause via an objective external factor that precluded him from presenting the claim in his initial application. Regarding the IATC claims, he cannot meet the *Martinez/Trevino* equitable exception.

### A.    The State did not knowingly present false testimony.

It is well settled that the State may not knowingly use perjured testimony, and the State must correct perjured testimony if known. *Giglio v. United States,* 405 U.S. 150, 154 (1972); *Napue v. Illinois,* 360 U.S. 264, 269 (1959). To prevail on such a claim, a petitioner must show the testimony was false, the testimony was material,

and the prosecutor knew the testimony was false.  *Kutzner v. Johnson,* 242 F.3d 605, 609 (5th Cir. 2001).  Contradictory testimony from witnesses, inconsistencies within a witness's testimony, and conflicts between reports, written statements and the trial testimony of prosecution witnesses do not, standing alone, establish perjury.  *Koch v. Puckett,* 907 F.2d 524, 531 (5th Cir. 1990).

Leza cannot meet this standard.  First, the testimony was not false.  Graham testified that she performed a presumptive test for hemoglobin that came back positive, which is what Dr. Noureddine states.  Thus, the "presumptive" aspect of this test was before the jury.  But she also testified that, based on her experience, the stain on the left side of the shoe had the visual characteristics of blood, which is why she tested it, and the presumptive test confirmed her suspicion.  The only reason she did not perform the confirmatory test was to preserve enough material to obtain DNA results, which is a rationale even Noureddine states was "sound."  DE 8-23 at 3. While blood may not have been 100 percent confirmed from a scientific standpoint, the assumption was reasonable based on Graham's examination and the crime scene evidence.  Essentially, Leza's argument is as follows: an expert skilled in recognizing characteristic bloodstains finds such a stain on a shoe and, when tested, the stain tests presumptively positive for blood and ultimately is found to contain DNA from a victim whose throat and chest were lethally knifed, but yet it is false to refer to it as a bloodstain.  This argument is nonsensical.

Further, a fatal flaw with Leza's claim is that he simply alleges a confirmatory test was not conducted, not that such a test would have shown the substance was not

blood.   It is Leza's burden to demonstrate the testimony was false, but absent evidence that a confirmatory test would have proven the stain was not blood, his argument is nothing but speculative.   Thus, he fails to meet the first prong.

Moreover, there is a crucial reason why the witnesses, the State, and the defense referred to the stain as blood: Leza's confession.  He admitted to participating in the crime—and to slashing Allen's throat—and the testimony about the crime scene revealed blood on the carpet, blood in the form of shoe prints, and blood all around Allen's body.   12 RR 64–65, 87; 13 RR 28–29.   The defense, which was hamstrung by Leza's confession, tried to argue that Trevino was the main culprit who actually murdered Allen, and Leza got blood on his shoe because he walked into the apartment to retrieve some of the stolen items.   16 RR 26, 29.  The defense attempted to diminish the speck of blood by saying that Leza's shoes would have been covered in blood if he had actually murdered Allen.   16 RR 26.   Nonetheless, it was a reasonable deduction from the evidence that Allen's blood was in fact on Leza's shoe. *See Spence v. Johnson*, 80 F.3d 989, 997 (5th Cir. 1996) (petitioner failed to show prosecution knowingly presented perjured testimony where witness's testimony was corroborated by other evidence).   Moreover, simply presuming the speck was blood, even if wrong, does not necessarily prove the "falsity" prong.   *See United States v. Schlieve*, 159 F. App'x 538, 546 & n.29 (5th Cir. 2005) (in prosecution for drug distribution, what a witness believed a jar contained did not prove the testimony was false given that his belief, even if incorrect, was reasonable under the circumstances).

Second, this testimony was not material to the outcome.  The fact remains that Allen's DNA was found on Leza's shoe; there is no getting around that.  Whether it was from blood, saliva, or some other form, that finding combined with the other evidence in the case—Leza's confession and spontaneous admission, that he was identified pawning some of Allen's belongings, and that he and Trevino stole Allen's car and eventually set fire to it—renders testimony about bloodstains insignificant. Moreover, the notion that Allen's DNA somehow ended up on Leza's shoe—the same shoe he was wearing at the time of the offense—through some other means simply because they may have been around each other at another point in time, DE 50 at 51, is illogical and flies in the face of the trial evidence.

Third, as Leza appears to concede, *id.*, he cannot prove the State *knowingly* presented false testimony.  Sailors testified the DNA came from bloodstains, and Graham testified the stain tested presumptively positive for blood.  As discussed above, the crime scene and trial evidence clearly support their testimony.  Thus, even if the DNA experts were incorrect, the State could not have known.  More importantly, Leza offers nothing to prove the third prong.  *See Koch*, 907 F.2d at 531 (accepting as true petitioner's claim that witness committed perjury, relief not warranted where petitioner failed to allege the prosecution knew the testimony was false).  Thus, he cannot demonstrate a due process violation.

### B.    Other alleged errors by the State

To the extent Leza is alleging prosecutorial misconduct because the State referred to the DNA as bloodstains during final argument, this claim must also fail.

It is settled that an argument premised on a reasonable deduction from the trial evidence does not violate due process. *United States v. Bennett*, 874 F.3d 236, 254 (5th Cir. 2017); *Norris v. Davis*, 826 F.3d 821, 832 (5th Cir. 2016).

Leza also claims that the State falsely tied the bloody shoeprints found at the crime scene to Leza, whereas the bottom of Leza's left shoe tested negative for blood and the bottom of the right shoe was never tested. DE 50 at 55. But there was nothing false in what the State said. Investigator Ross and Detective Greiner testified that they saw two sets of different-sized bloody shoe prints in the carpet in Allen's apartment. 12 RR 64–67; 13 RR 28. During final argument, the prosecution— referring to the trial testimony and Leza's confession—stated: "Defense counsel wants you to believe this defendant is not involved. The detective testified there were two sets of bloody footprints. 'We tied her up. We both did.'" 16 RR 40. The prosecution's statement was completely accurate; both investigators found the same bloody shoe prints at the crime scene, Leza said both he and Trevino were involved, and, thus, the statement was a reasonable deduction from the evidence. Regardless, Leza cannot demonstrate any harm or prejudice given the remainder of the evidence.

Last, Leza states that the prosecution introduced false testimony about how DNA material was collected from the victim. He asserts that Detective McCampbell inaccurately stated that the blood of the victim in this case was preserved for possible DNA comparison, when in fact a buccal swab was taken from Allen's mouth for DNA purposes. DE 50 at 56. Leza states: "Any testimony, either direct or indirect, that the victim's blood was used for DNA comparisons, was false, and left the jurors with

the false impression that the material on Leza's left shoe was the victim's blood." *Id.*

at 57. This is a meritless claim. At trial, McCampbell referred to generic evidence

collecting procedures in all homicide cases. In the process, he stated:

> And during every autopsy, the sample of the victim's blood is preserved
> for possible DNA comparison down the road. And basically what you do
> – or what I did in this case was submitted everything that we had
> looking for some type of evidence that would link them to the scene at
> the time the murder had occurred and had it compared to the victim's
> DNA to see if there was any match, either the defendants' DNA in the
> apartment or the victim's DNA on any of the defendants.

12 RR 106–07. Thus, McCampbell did not testify about how the DNA match was

made in this case. And he did not state that *he* collected blood for DNA comparison.

All he said is that blood is usually preserved *during an autopsy* "for possible DNA

comparison down the road." This statement has no relevance to blood being on Leza's

shoe, which is the gist of Leza's complaint. Leza fails to explain how such a generic

and innocuous statement had any bearing on the outcome of the trial.

### C.   Leza's IATC claim is meritless.

Leza states that trial counsel initially retained DNA expert, Dean Wideman,

to assist them in the case. DE 50 at 52–53; DE 8-26. Wideman reviewed materials

pertaining to the DNA evidence and requested from defense counsel additional

materials. But he did not have any further substantive discussions with counsel

about the matter, did not receive any additional case information, and believes he

could have assisted the defense in cross-examining the State's DNA experts. DE 8-

26. Leza claims that Wideman "could have alerted counsel that a confirmatory test

for blood was never conducted" and could have "assisted trial counsel in objecting to

any mention by the State that the evidence on Leza's shoe was blood, let alone blood belonging to the victim." DE 50 at 53.

As shown above, trial counsel's strategy was not to duck the issue of blood being on Leza's shoe. It would have made little sense to get into an unnecessary battle attempting to show the stain on the shoe was something other than blood given that their client admitted to being involved in a bloody crime. Instead, during final argument, counsel argued Trevino was the killer and Leza merely came along as part of the robbery. This is why on cross-examination of Sailors, counsel prompted Sailors to concede that the DNA results would have been the same had Leza merely walked into the apartment on the bloody carpet after Allen was murdered. 13 RR 118. Even if Widener could have assisted trial counsel in some other capacity—and, in his declaration, he does not indicate how—counsel had little reason to use Widener to challenge the State's evidence that blood was found on Leza's shoe given the other evidence in the case. In short, it would have been a futile endeavor.

Here, trial counsel made a strategic decision how to frame Leza's participation in the crime—he was an accomplice in a robbery but was not the murderer. Counsel has wide latitude in making tactical decisions, including formulating a strategy that was reasonable at the time. *Strickland*, 466 U.S. at 689; *Richter*, 562 U.S. at 107. The Fifth Circuit has explained that a conscious and informed decision on trial tactics and strategy cannot be the basis of constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness. *Pape v. Thaler*, 645 F.3d 281, 291 (5th Cir. 2011). Given the facts and circumstances

64

here, Leza cannot show counsel's decision not to utilize Widener resulted in deficient performance. Indeed, it would have been unwise for counsel to try to show that Leza was not present at all during the crime, which is the essence of Leza's argument. For instance, Leza also argues that counsel were ineffective for conceding during final argument that blood was on his shoe. DE 50 at 54. But as discussed herein, this concession was reasonable given the evidence the State presented.

Moreover, Leza cannot demonstrate prejudice. Even if trial counsel had shown a confirmatory test for blood was not conducted, by no means would this have meant the stain was something other than blood. And, as stated, this would not have changed the fact that Allen's DNA was conclusively found on Leza's shoe.[14] Moreover, Leza confessed to not only participating in the crime but slitting Allen's throat; he and Trevino pawned Allen's possessions; and they stole her car and set it on fire. The evidence of Leza's guilt was substantial, and evidence that the shoe stain may not have been blood is insignificant in context.

### D. Leza's additional IATC claims lack merit.

In addition to the above, Leza claims trial counsel were ineffective for (1) failing to present evidence or question the State's experts about blood not being found on the bottom of Leza's left shoe; (2) not objecting to the State's argument attempting to tie the bloody footprints to Leza; (3) failing to effectively cross-examine

---

[14] Throughout this portion of his petition, Leza repeatedly asserts that challenging the blood evidence removes him of all physical and forensic ties to the crime scene. DE 50 at 57–58. It does nothing of the sort given that Allen's DNA was on his shoe and that there is no other credible explanation for how it could have been transferred to his shoe. As stated herein, the lack of a confirmatory test (1) does not prove the stain was not blood and (2) in no way negates the DNA evidence.

Sailors about CIL's accreditation; and (4) failing to request a mistrial or curative instruction when the above witnesses provided the alleged false testimony about the speck of blood on Leza's shoe.  DE 50 at 55–56, 58.  These claims are all meritless.

The first claim fails because it is irrelevant that blood was not found on the bottom of Leza's shoe.  Allen's DNA was in fact found on the side of the left shoe; thus, blood not being found elsewhere does nothing to absolve Leza of any culpability. Moreover, counsel did argue before the jury that only a speck of blood was found on Leza's left shoe, that his shoes would have been covered in blood if Leza slit Allen's throat, that no blood at all was found on the right shoe, and that no blood was found on Trevino's shoes.  16 RR 24, 26.

This first claim is apparently connected to the second about counsel not objecting to the State's attempt to tie the bloody footprints to Leza.  But there was no basis for counsel to lodge an objection because, as shown above, the State's argument accurately summarized the trial evidence—that two sets of bloody footprints were found in the apartment and that Leza admitted that both he and Trevino were in the apartment and they both tied her up.  An argument based on a reasonable deduction from the evidence is proper and does not provide grounds for an objection.  *Koch*, 907 F.2d at 527 (counsel not required to make futile motions or objections).

Leza's claim that counsel failed to challenge the lab's CIL accreditation is meritless for two reasons.  First, counsel did in fact question Sailors about a previous error that had occurred in the lab where a DNA sample was contaminated by Sailors's supervisor.  13 RR 116–17.  And a prior known error in the lab that tested the DNA

evidence carries more weight than ambiguous accreditation procedures supposedly leading to errors in other labs.  *See* DE 50 at 56.  Second, Leza has failed to show any prejudice because additional questioning about accreditation would not have undermined the DNA results in this case.

As for Leza's last IATC claim, there was no false testimony presented, let alone false testimony material to the outcome.  Requesting a mistrial or curative instruction would have been a futile endeavor and would not have made any difference in the outcome.

Because Leza's IATC claims are not substantial, he cannot satisfy the *Martinez/Trevino* equitable exception.  Moreover, given the flaws with these claims viewed in light of the numerous allegations presented in the original habeas application, Leza fails to show that state habeas counsel was ineffective for not raising them.  *Matthews*, 665 F. App'x at 331–32; DE 50 at 59.

## V.   Leza's Claim that Trial Counsel Were Ineffective for Failing to Object to the Judge's Comment about the DNA Results Is Meritless (Claim 4).

In a claim related to the above, Leza contends that trial counsel were ineffective for not objecting to a comment the trial judge made when Sailors was discussing the DNA results.  Specifically, Sailors testified that the DNA profile found on Leza's shoe "occurs approximately one – every 1 and 6.54 times 10 to the 15th.  I would have to write that out to tell you what that is." 13 RR 115.  The prosecution responded: "6.54 to the 15th, could that be 1 and 6.54 quadrillion?"  Sailors said: "I would have to write that out to remember," to which the prosecution stated "Go

ahead." Leza's defense counsel then said: "I'll stipulate to that, judge." The trial judge replied: "Okay. That's a whole lot of zeros." *Id.* Sailors then confirmed that the number was 1 out of every 6.54 quadrillion individuals. 13 RR 116. Leza claims:

> The trial court's comment reinforced Sailors's material testimony [ ] before the jury. The court's lack of partiality prejudiced Leza and emphasized the import of the false and misleading DNA evidence against Leza. . . . Counsel was ineffective for failing to object to the judge's improper comment, for failing to ask the court to strike its extraneous comment, and for failing to request the court offer a curative instruction before he proceeded to cross-examine Sailors.

DE 50 at 60. Leza claims that the trial court's comment resulted in prejudice.

Leza raised this claim in his abusive habeas application. 1 SHCR2 80–81. Thus, it is defaulted, and he cannot demonstrate the claim is substantial under *Martinez/Trevino* or that state habeas counsel was ineffective for failing to raise it. There was nothing improper about the judge's comment. The judge was simply stating a fact—the probability ratio of the DNA result did include "a whole lot of zeros." Moreover, the judge was speaking solely to the DNA result obtained by Sailors, which Leza does not contest. He was not making any comment about the issue of the DNA coming from blood. And even if the comment could be construed in that manner, it still was not improper for the reasons addressed in the prior section. There was no basis for an objection, and counsel is not required to make futile objections. *Koch*, 907 F.2d at 527. Indeed, if anything, an objection to a verifiable fact would have worked to Leza's detriment by potentially annoying the judge and jury. Thus, Leza fails to overcome his default.

## VI.   The State Court Reasonably Rejected Leza's Claim that Trial Counsel Were Ineffective for Failing to Argue Proper Grounds for Admitting Dolores Trevino's Plea Agreement (Claim 5).

Leza alleges that trial counsel were ineffective for failing to introduce and admit his co-defendant Trevino's plea agreement into evidence during both guilt-innocence and punishment.  DE 50 at 60–67.  Leza claims that the language of the plea agreement established that Trevino did both the "cutting and stabbing" of Allen, which absolves Leza of injuring Allen.  In other words, because Allen's neck was cut and her chest stabbed, and because in the plea agreement Trevino admitted to both "cutting and stabbing," Leza alleges she had to be the sole perpetrator.  *Id.*  Leza claims that counsel should have sought to admit the plea agreement on both state law and constitutional grounds.  *Id.*

Regarding the punishment phase, Leza raised this claim in his initial state habeas application, alleging that the trial court erred by excluding evidence of Trevino's plea bargain at punishment and that trial counsel were ineffective for failing to admit the plea bargain.  1 SHCR 32–36, 71–75.  The state habeas court reasonably rejected these claims.  8 SHCR 2357–61.  But his IATC claim was limited to punishment and constitutional grounds; he did not assert state law grounds.

Regarding the failure of trial counsel to seek to admit the plea bargain at guilt-innocence or on state law grounds, these claims are procedurally defaulted because they were only presented in Leza's abusive application.  1 SHCR2 101–10.  And Leza cannot meet the equitable exception under *Martinez/Trevino*.  To the extent this is a

claim of trial court error, it is procedurally barred because the CCA held it should have been raised on direct appeal. *Ex Parte Leza*, 2017 WL 117347, at *1.

### A.    State court findings

On habeas review, the court addressed Leza's claim that the trial court erred in failing to admit the plea bargain. The court reviewed the colloquy between the State and trial court regarding the State's motion in limine to preclude consideration of Trevino's plea bargain. 8 SHCR 2357–58. The trial court granted the motion, but the prosecution conceded that if Trevino testified—and she did not—the plea bargain might be admissible. *Id.* The habeas court then addressed the defense's attempt to introduce the plea bargain at punishment. Outside the presence of the jury, the defense called Lillian Cronk, the deputy district clerk for Bexar County, to authenticate the plea bargain and to provide some details about it. 8 SHCR 2358; 18 RR 163–65. The trial court believed that the plea agreement should be admissible but acknowledged under the law it was not. 8 SHCR 2359; 18 RR 165–66.

The state habeas court noted that the plea bargain was included in the state habeas clerk's record. 8 SHCR 2359. The court found that (1) the trial court's ruling was correct under state law because Trevino did not testify and, thus, could not be impeached; (2) under the law, a capital defendant is not entitled to submit proof of an accomplice's prior convictions as a mitigating circumstance; and (3) Leza was not subjected to cruel and usual punishment or singled out for selective prosecution, and there is no constitutional requirement that a co-defendant and defendant receive the same punishment or that a comparative proportionality review of a defendant's death

70

sentence must be made.  8 SHCR 2360–61.  Next, the court addressed Leza's IATC claim regarding punishment and found that counsel did attempt to admit the plea bargain.   The court concluded that counsel is not ineffective when counsel is prohibited from introducing inadmissible evidence.  8 SHCR 2382–83.  This decision is not objectively unreasonable.

### B.     Trial counsel were not ineffective.

#### 1.     Guilt-innocence

Trial counsel could not have been ineffective at guilt-innocence for not introducing the plea bargain because the trial court correctly granted the State's motion in limine.  Leza's arguments to the contrary, DE 50 at 62–64, the plea bargain was not admissible.  "A co-defendant's conviction and sentence for an offense arising out of the same course of events is irrelevant to the question of the defendant's guilt and thus not admissible."  *Bridge v. Lynaugh*, 838 F.2d 770, 773 (5th Cir. 1988); *see also Miller v. State*, 741 S.W.2d 382, 389 (Tex. Crim. App. 1987) ("Generally speaking, for obvious reasons, it is not permissible to show that another non-testifying person, who has been jointly or separately indicted for the same offense as the accused, has been either convicted or acquitted.").  Because Trevino did not testify in this case, counsel had no grounds to argue the statement was admissible.

Aside from the admissibility problem, there are additional reasons why counsel could not have been ineffective.  Leza's argument is that he could not have been the primary culprit since Allen was both cut and stabbed and Trevino confessed to both per the plea agreement.  DE 50 at 62–63; DE 10-23 at 3.  What Leza fails to

71

acknowledge is that the plea agreement simply reflected parties language under

Texas state law.  The Texas Penal Code states:

> (a)      A person is criminally responsible for an offense committed by the
> conduct of another if:
>
> (1)      acting with the kind of culpability required for the offense, he
> causes or aids an innocent or nonresponsible person to engage in conduct
> prohibited by the definition of the offense;
>
> (2)      acting with intent to promote or assist the commission of the
> offense, he solicits, encourages, directs, aids, or attempts to aid the other
> person to commit the offense; or
>
> (3)      having a legal duty to prevent commission of the offense and
> acting with intent to promote or assist its commission, he fails to make
> a reasonable effort to prevent commission of the offense.
>
> (b)      If, in the attempt to carry out a conspiracy to commit one felony,
> another felony is committed by one of the conspirators, *all conspirators
> are guilty of the felony actually committed, though having no intent to
> commit it, if the offense was committed in furtherance of the unlawful
> purpose and was one that should have been anticipated as a result of the
> carrying out of the conspiracy.*

Tex. Penal Code § 7.02 (emphasis added).  As a co-conspirator in the offense, Trevino

was guilty of murdering Allen by cutting and stabbing even if Leza actually slit

Allen's throat.  Thus, the plea agreement language in no way absolves Leza of his

guilt or somehow proves Trevino was the primary culprit.

Moreover, had trial counsel attempted and succeeded in admitting the plea

agreement, counsel could have faced a bigger problem.  The plea agreement Leza has

attached to his petition also contains the police report of Trevino's statements to

Detective McCampbell.  In this report, Trevino provides conflicting information, first

taking all the blame for murdering Allen but then indicating Leza is the one who
actually murdered her.  The report states:

> I asked Dolores if it was something you planned or was it something that
> just got out of hand.  At 1:44am, Dolores replied "It was something that
> just happened", "We didn't mean to do it".  Dolores stated, "I knocked
> her down", "we were talking to her", "I don't know", "I grabbed her".
> Dolores then stated that she did everything that her husband didn't do
> anything[.]  Dolores stated, "I'm the one that killed that lady["].  I told
> Dolores that I already knew that she planned on taking all the blame.
> At 1:53am, Dolores stated, "I just wanted her down, she got up from bed
> and fell down and I'm the one that held-her down".  I asked her what
> happened then.  *Dolores stated, "I didn't see, I turned around", "I don't
> know how he did it".*  Dolores described the lady being on her back at the
> end of the bed.  I asked how she held her down.  Dolores stated she held
> her hands and that she said nothing.  Dolores stated that the lady fought
> back.  *I asked Dolores where her husband was when she was holding the
> lady down. Dolores again stated that she did not want to look.* Dolores
> stated that after that, "We just took the stuff".

DE 10-23 at 13–14 (emphasis added).   Although  police  reports  are  generally
inadmissible as hearsay under the Texas Rules of Evidence, *see Cole v. State*, 839
S.W.2d 798, 811 (Tex. Crim. App. 1990), introducing the plea would have possibly
opened the door to the report.  "Evidence that is otherwise inadmissible may become
admissible  when  a party opens the door to  such  evidence."   *Hayden  v.  State*,
296 S.W.3d 549, 554 (Tex. Crim. App. 2009).  As shown, Trevino first admitted guilt
but then stated she held Allen down and did not see "how [Leza] did it."  Although as
a party to the offense she was guilty of what she admitted in her plea agreement, her
statement ultimately points the finger at Leza.  Clearly, this would not have aided
Leza's cause, and he cannot demonstrate any prejudice.

### 2.    Punishment

The primary reason Leza's claim fails regarding punishment is that trial counsel attempted to admit the plea agreement at punishment, but the trial court refused to admit it.  As shown, the trial court did not "see any vehicle" for bringing it into evidence.  Trial counsel can hardly be deemed ineffective for trying to do what the petitioner claims did not occur.

Moreover, there is a sound reason for the trial court's decision.  The rule that plea agreements are not admissible where a co-defendant does not testify applies equally to sentencing proceedings.  *Prytash v. State*, 3 S.W.3d 522, 527–28 (Tex. Crim. App. 1999) (en banc); *Miller*, 741 S.W.2d at 389.  In *Prytash*, the CCA discussed policy reasons for the inadmissibility of plea agreements:

> If evidence of plea bargain offers were admissible, the State would be ably discouraged from making such offers in the future, and plea bargaining is essential to the administration of justice in America. Public policy favors the conclusion of litigation by compromise and settlement, both in criminal and civil cases, and allowing a criminal defendant to introduce evidence about a sentence offered by the State during plea negotiations clearly militates against this policy.

3 S.W.3d at 528 (internal quotations and citations omitted).  Because the law precluded the admission of Trevino's plea bargain, counsel could not have been ineffective for failing to admit it.

Leza claims that trial counsel should have raised several constitutional arguments for admission of the plea bargain at punishment.  First, he claims that counsel should have pressed a "proportionality" review argument because Trevino pleaded guilty to the same crime but received a life sentence.  But "where the

statutory procedures adequately channel the sentencer's discretion, such proportionality review is not constitutionally required." *McCleskey v. Kemp*, 481 U.S. 279, 306 (1987).  And the Supreme Court has long held that Texas's capital sentencing procedures satisfy this mandate.  *Jurek v. Texas*, 428 U.S. 262, 276 (1976) (concluding that Texas's capital-sentencing procedure does not violate the Eighth and Fourteenth Amendments because it narrows its definition of capital murder to include "at least one statutory aggravating circumstance . . . before a death sentence may even be considered" and authorizes the consideration of mitigating factors thereby ensuring "that the sentencing jury will have adequate guidance to enable it to perform its sentencing function"); *Woods v. Johnson*, 75 F.3d 1017, 1033–34  (5th Cir. 1996) (recognizing the Texas capital sentencing special issues do not function as aggravating circumstances but rather adequately guide and focus the jury's objective consideration of particularized circumstances of the individual offense and the individual offender).

Second, Leza argues that trial counsel should have made an equal protection argument that the State discriminated against Leza based on his gender because Trevino received a lesser sentence.  DE 50 at 65.  But "a party who wishes to make out an Equal Protection claim must prove 'the existence of purposeful discrimination' motivating the state action which caused the complained-of injury."  *Johnson v. Rodriquez*, 110 F.3d 299, 306 (5th Cir. 1997) (quoting *McCleskey*, 481 U.S. at 292–93).  Thus, "to prevail under the Equal Protection Clause, [a petitioner] must prove the decisionmakers in *his* case acted with discriminatory purpose."  *McCleskey*, 481

U.S. at 292 (emphasis in original).  Leza simply makes this allegation without providing any proof of purposeful discrimination.

Third, citing Supreme Court precedent, Leza claims that counsel should have argued that the failure to introduce the plea impeded his constitutional rights "to present a defense and mitigating evidence at punishment."  DE 50 at 65.  But the introduction of evidence irrelevant to a defendant's character, record, or circumstances of the offense is not required.  *Cordova v. Johnson*, 157 F.3d 380, 383 (5th Cir. 1998) ("This court has held that a capital defendant is not entitled to introduce evidence of a co[-]defendant's sentence."); *Brogdon v. Blackburn*, 790 F.2d 1164, 1169 (5th Cir. 1986) (the failure to introduce co-defendant's life sentence was not erroneous because it was not relevant to petitioner's character and offense); *see also Lane v. Scott*, 59 F.3d 1241, 1995 WL 413097, *2–*3 (5th Cir. 1995) (rejecting argument that Supreme Court's decision in *Parker v. Dugger*[15] suggested a co-defendant's sentence was constitutionally relevant mitigating evidence because *Parker* did not address that issue).

Finally, Leza argues that he was prejudiced by counsel's failure to procure the admission of Trevino's plea.  Because the plea was not admissible at either stage, either as a matter of state or federal constitutional law, there can be no deficiency or prejudice.  DE 50 at 66–67.  Moreover, even if the plea agreement had been introduced, it would not have altered what Leza stated on video, and, as shown, introduction of the plea agreement could have opened the door to more incriminating

---

[15]     498 U.S. 308 (1991).

evidence. Because these claims are meritless, habeas relief should be denied. Moreover, Leza has failed to show the defaulted claims are substantial or that state habeas counsel was ineffective for failing to raise them.

## VII. Leza's *Brady* Claim Is Procedurally Barred and Meritless (Claim 6).

Leza argues that the State suppressed evidence of notes taken by the Bexar County District Attorney's Office that pertained to Trevino and which Leza claims are exculpatory. DE 50 at 67–69. This claim is defaulted and meritless.

### A. The claim is procedurally barred.

Leza concedes he presented this claim in his successive habeas application dismissed for abuse of the writ. DE 50 at 67; 1 SHCR2 60–64. Thus, the claim is defaulted. Further, for the reasons addressed below, he cannot demonstrate cause and prejudice pursuant to *Banks v. Dretke*[16] to overcome the default.

### B. Leza has failed to show suppression or materiality.

"To establish a *Brady* violation, the defendant must prove that (1) the prosecution suppressed evidence, (2) it was favorable to the defendant, and (3) it was material." *United States v. Brown*, 650 F.3d 581, 587–88 (5th Cir. 2011); *see also Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). The Government's good or bad faith in withholding the evidence is irrelevant. *Brown*, 650 F.3d at 588 (citing *Kyles v. Whitley*, 514 U.S. 419, 432 (1995)). "[E]vidence is not suppressed 'if the defendant knows or should know of the essential facts that would enable him to take advantage of it.'" *Id.* (quoting *United States v. Runyan*, 290 F.3d 223, 246 (5th Cir. 2002)).

_____

[16]     540 U.S. 668, 691 (2004).

Indeed, "[t]o have been suppressed, the evidence must not have been discoverable through the defendant's due diligence." *Id.*

Leza first contends the evidence was suppressed by the State "despite an open file policy." DE 50 at 68. But he offers nothing to support this position. Indeed, trial and state habeas counsel had access to Trevino's initial police statement and plea agreement. 1 SHRR 193–94 (trial counsel recalls having access to plea agreement and transcript of DVD confession). The plea agreement explicitly stated that in exchange for Trevino's guilty plea, she would provide "full, complete and truthful evidence concerning my knowledge of the CAPITAL MURDER of Caryl Jean Allen." DE 10-21 at 2. There is no indication that counsel were not aware of the substance of Trevino's statement. Leza does not address whether the notes were reasonably available through due diligence; thus, he fails to meet the suppression prong.

More conspicuously, he entirely fails to show that this evidence was favorable or material. Instead, the notes are decidedly inculpatory and harmful. The State's theory at trial was that Leza and Trevino committed the crime together. 16 RR 38. The defense countered that Trevino had committed the crime alone, and Leza arrived at the apartment sometime after the murder had been committed. 16 RR 21–31. The relevant portion of the notes in question reads:

> This Murder[;] We both knew her[;] Both had been there before[;] She [l]et us in[;] Mando's idea[.]
> We wanted a ride, she said no b/c going to Dr. in a.m. We never asked her for car. She invited us to sit down. Mando stayed with her and I went back to our apt. to return the bike. I came back to her apt. and Mando is at the door. I see ladies feet on the floor by bed. He said he had to kill her and asked God to forgive him. We needed another fix and needed to score on the West side bc not high enough. I didn't see the way he killed

her.  I got the knife from the kitchen.  She was already dead when I got to the apartment.  I can't remember if I helped tie her up.  I don't remember how she got to the floor.  I never held her down – she wasn't in any condition to fight back – she didn't say anything when we took TV.  I got the sheet and I threw a sheet over her.  I said I tied her up, I probably did, just don't remember.  We burned her car and stole the items.  I thought she was dead, I closed her eyes.  I had to kill her, but when I did, I asked God to forgive me.  I saw him stab her in the chest – now denies it.  Husband asked me to get something to tie her up.  I did not know if she was dead or alive, but I never checked her.  I got the things to tie her up with and got the knife.  Never saw him use them.  I am unplugging comps.  And TV.  And putting them in her truck.  I looked for truck keys and found them. Took TV comp. DVD, vcrs, not sure who got the cross found in his wallet, it came from her dresser.  We got $50 for computer sold on West Side, other items went to sister Amanda's house.  Sally said truck came out in the news.  Sally gave us $ to get gas and I filled a gas can with gas – just a little.  I was dropped off at corner of Laredo and Brazos to burn the truck and then he came back to me.

DE 11 at 4.

Leza cherry-picks from this statement to claim he "was not the primary actor, and that Trevino was the sole killer."  DE 50 at 68.  Leza focuses solely on this statement in the notes: "I had to kill her, But when I did, I asked God to forgive me." *Id.* at 51.  He conveniently omits these assertions: (1) "I see ladies feet on the floor by bed.  He said he had to kill her and asked God to forgive him."; (2) "I didn't see the way he killed her.  I got the knife from the kitchen.  She was already dead when I got to the apartment."; (3) "I never held her down – she wasn't in any condition to fight back."; (4) "I saw him stab her in the chest – now denies it.  Husband asked me to get something to tie her up."; (5) "I got the things to tie her up with and got the knife.  Never saw him use them."  DE 11 at 4.  These statements not only point the finger at Leza as the sole killer, they portray him as the one entirely in charge of the crime, contrary to the defense offered at trial.  There is nothing exculpatory here; indeed,

these notes offer a wealth of damaging evidence to Leza.  Had counsel attempted to convey the information from these notes to the jury, it would have devastated their defense.  In fact, they provide a much more detailed and horrifying account of Leza's actions than was ever presented at trial.  Further, Trevino's admission that she had some role in the crime was consistent with the evidence presented at trial and the State's theory of the case.

In short, Leza fails to meet any prong of *Brady*, particularly the favorability and materiality prongs.  Thus, he cannot overcome his default.

## VIII. Leza Is Not Entitled to Relief on His Claims Related to the Exclusion of Amanda Leza's Testimony (Claim 7).

Leza claims that the trial court erred in refusing to admit Amanda Leza's testimony at the punishment phase that Trevino admitted to her in the car that she murdered Allen, acted alone, and did not show any remorse.  Leza further claims that trial counsel were ineffective for failing to seek to admit her testimony at the guilt-innocence phase.  DE 50 at 70–73.

### A.     Background

At the punishment phase, Leza sought to admit Amanda's testimony.  On voir dire examination outside the presence of the jury, Amanda stated that Trevino admitted to killing Allen, that she showed no remorse and smiled, and that Leza did show remorse.  18 RR 105.  The State then objected on hearsay grounds, and the defense replied that it was a statement against penal interest because she took full responsibility for the crime.  18 RR 107–08.  The trial court remarked that Amanda was merely paraphrasing what Trevino said rather than providing an actual

80

statement.  18 RR 108–09.  When asked what Trevino said specifically, Amanda stated: "That she slit her throat and tied her up."  18 RR 109.  When asked if Trevino said she "did it all," Amanda gave no audible response.  *Id.*  After further discussion between the court and counsel, the court asked again to hear her testimony.  18 RR 110.  Amanda replied: "She slit her throat and tied her up."  18 RR 110–11.  The court said: "I think from that statement, you can contend that they did it together.  It doesn't mean she did it alone."  *Id.*  Upon further voir dire by the State, Amanda said "I don't remember" when asked if Trevino admitted to killing Allen alone.  18 RR 111–12.  Then, when asked if Trevino ever made a statement that she acted alone, Amanda stated "she did" and that "she did it alone."  18 RR 112.  The court replied that was not what Amanda stated just a moment ago and asked her again when Trevino made that remark.  *Id.*  Amanda stated: "when we were in the vehicle."  *Id.*  The court replied: "Okay.  Once again, [the prosecutor has] asked you several times and I've asked you several times.  What exactly did she say?  Not an interpretation of anything."  *Id.*  Amanda replied: "A quote?  That she slit her throat and tied her up."  18 RR 112–13.  The court then said to defense counsel: "Why don't you talk to your witness.  I don't think your witness understands what a quote is."  18 RR 113.  Defense counsel then asked Amanda to provide all statements Trevino said while in the car or at any other time if she made more than one.  *Id.*  Amanda stated again: "That she slit her throat, tied her up, and she did it."  *Id.*  The court replied: "She's not going to testify to that.  She can't follow directions."  *Id.*  The court then refused

to allow Amanda to testify to what Trevino supposedly stated because it was an interpretation of hearsay and not merely hearsay.  18 RR 114.

### B. Leza's claim of trial court error at the punishment phase and IATC at the guilt phase are procedurally defaulted.

Leza argued on direct appeal that the trial court erred in refusing to admit Amanda's testimony at the punishment phase.  The CCA held that the claim was barred under the Texas contemporaneous objection rule because trial counsel objected on state law grounds and Leza argued only constitutional grounds.  *Leza v. State*, 351 S.W.3d at 360–61.  The Fifth Circuit has long held that the Texas contemporaneous objection rule is an adequate and independent state ground barring federal habeas relief.  *Scheanette v. Quarterman*, 482 F.3d 815, 823 (5th Cir. 2007); *Rowell v. Dretke*, 398 F.3d 370, 375 (5th Cir. 2005).  Further, although Leza raised this claim on habeas review and the state court rejected it on the merits, 8 SHCR 2344–48, the CCA stated in its order that this claim was procedurally barred because it was raised and rejected on direct appeal and, thus, was not cognizable on habeas review.  *Ex parte Leza*, 2017 WL 117347, at *1 (citing *Ex parte Brown*, 205 S.W.3d 538, 546 (Tex. Crim. App. 2006)); *see also Hatten v. Quarterman*, 570 F.3d 595, 599 n.3 (5th Cir. 2009) (noting that Texas trial courts only make recommendations to the CCA but do not rule on habeas petitions).  Thus, the CCA applied two procedural bars to the claim.  Leza, moreover, does not address his default in the instant petition.  Thus, he has failed to demonstrate cause and prejudice sufficient to overcome the default.

As for the IATC claim, Leza concedes that he raised this claim in his application dismissed for abuse of the writ. But because there is no merit to his claim, for the reasons stated below, he cannot show the claim is substantial under *Martinez/Trevino* nor can he show habeas counsel was ineffective for failing to raise it in the initial petition.

### C.    State court findings

Although the CCA found the claim of trial court error defaulted, the trial court issued findings and conclusions rejecting the claim on the merits. The trial court addressed the colloquy between Amanda, the parties, and the trial court and found:

> These instances reflect that the trial judge did not find requisite corroborating circumstances that would indicate the trustworthiness of the statement. It is noted that Amanda Leza's affidavit states that her mother was present at the car at the time of the statement, but the mother was called as neither a corroborating or independent witness on this point either at trial or the writ hearing.

8 SHCR 2345. The court also found that a declaration from Mary Burdette pertaining to this matter was inadmissible hearsay, but also that it was problematic because it described the Leza family as poor historians and documented the family's lengthy criminal history. 8 SHCR 2345–46. Consequently, had family members been called, "they would have been savagely impeached," and keeping them off the witness stand was sound trial strategy. Indeed, the court pointed out that Terrence McDonald, Leza's trial counsel, testified at the hearing that the decision was made not to call family members because their information was more harmful than beneficial. 8 SHCR 2346; *see also* 1 SHRR 192. Finally, the court found that Leza "had a

83

substantial criminal record long before he met Dolores Trevino.  Both personality types, leaders and followers are capable of committing a crime."  8 SHCR 2346.

In its conclusions of law, the state court first noted that the evidence proved beyond a reasonable doubt that Leza was guilty of capital murder.  8 SHCR 2347.  The court then concluded that the exclusion of the testimony did not result in any constitutional violation.  8 SHCR 2347–48.  To the extent the claim is not defaulted, or that the CCA alternatively rejected the claim on the merits based on the state court's findings and its own review, *Ex parte Leza*, 2017 WL 117347, at *2, Leza cannot show that the state court's findings are objectively unreasonable, nor has he rebutted the presumption of correctness afforded the findings with clear and convincing evidence, pursuant to § 2254(e).

### D.   Leza's claims have no merit.

#### 1.   Trial court error at punishment

It has long been held that challenges to the admissibility of evidence and state evidentiary errors are not cognizable on federal habeas review.  *See Swarthout v. Cooke*, 526 U.S. 216, 219 (2011) (finding federal habeas review does not lie for errors of state law).  Habeas corpus review is instead limited to questions of a constitutional dimension, and federal courts generally do not review the admissibility of evidence under state law.  *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *Gonzales v. Thaler*, 643 F.3d 425, 429 (5th Cir. 2011).  Federal courts do not sit to review the propriety of state court evidentiary rulings, unless the proceedings were so extreme that they violated a petitioner's federal constitutional rights or rendered his trial

fundamentally unfair. *Woods. v. Quarterman*, 503 F.3d 408, 414 (5th Cir. 2007); *Peters v. Whitley*, 942 F.2d 937, 940 (5th Cir. 1991).

Leza argues that his sister's testimony about what Trevino said should have been admissible as a statement against penal interest. DE 50 at 71. The admissibility of a statement against penal interest under Texas law is a two-step inquiry: (1) whether the statement tends to expose the declarant to criminal liability and (2) if there are corroborating circumstances that clearly indicate the trustworthiness of the statement. *Bingham v. State*, 987 S.W.2d 54, 57 (Tex. Crim. App. 1999). While Amanda's statement that Trevino said she slit Allen's throat and tied her up may technically satisfy the first prong, Trevino had already pled guilty to murder and received a life sentence at the time the defense offered the testimony. Clearly, Amanda's testimony would not have exposed Trevino to more liability than she had already received. Leza, moreover, surely cannot satisfy the second prong because Amanda could not follow the court's instructions. As the trial court pointed out, she was either paraphrasing Trevino or undecided as to what Trevino exactly said. And although she tried to say Trevino admitted sole culpability, she never specifically provided a statement to that effect; rather, she dodged the issue or remained silent. Moreover, Amanda was trying to help her brother by pointing the finger at a co-defendant who had already been sentenced. Under these circumstances, the testimony was not only ambiguous but also highly suspect.

At any rate, Leza cannot show that the failure to admit this testimony deprived him of a fair trial. As the trial judge noted, Amanda's testimony did not exculpate

her brother: "I think from that statement, you can contend that they did it together. It doesn't mean she did it alone." 18 RR 111. The jury was well aware that the two acted together in some capacity, and Amanda's testimony would not have reduced Leza's culpability. Indeed, the jury saw Leza admit on tape to cutting Allen's throat, which renders the testimony insignificant. Given these facts, Leza cannot show that this evidentiary ruling deprived him of a fair trial.

### 2. Leza's IATC claim is meritless.

Leza first argues that trial counsel were ineffective for failing to call Amanda to testify at the guilt-innocence phase regarding Trevino's statement because it was a statement against penal interest and would have created a reasonable doubt as to his guilt. DE 50 at 71–72. But a trial court has broad discretion in determining the admissibility of evidence at punishment. *Cooks v. State*, 844 S.W.2d 697, 735 (Tex. Crim. App. 1992). "Generally, the jury is entitled to have before it 'all possibly relevant information about the individual defender whose fate it must determine.'" *Id.* (quoting *Jurek*, 428 U.S. at 276). If the trial court did not consider Amanda's hearsay testimony sufficiently reliable to admit at punishment, it certainly would not have been admitted at guilt-innocence. Counsel cannot be deemed ineffective for failing to present evidence that was ultimately inadmissible. *Robison v. Johnson*, 151 F.3d 256, 260–61 (5th Cir. 1998).

Leza also claims that trial counsel were ineffective at punishment for not making arguments based on constitutional grounds to admit Amanda's testimony. Clearly, the trial court was not going to admit her testimony at punishment after her

confusing testimony on voir dire.  Regardless, the cases on which Leza relies are

unavailing.  For instance, Leza refers to *Green v. Georgia* in which the Supreme Court

held that the exclusion on hearsay grounds of a confession from a co-defendant to a

witness that the co-defendant was the triggerman violated due process because

> [t]he excluded testimony was highly relevant to a critical issue in the
> punishment phase of the trial . . . and substantial reasons existed to
> assume its reliability.  [Co-defendant] Moore made his statement
> spontaneously to a close friend.  The evidence corroborating the
> confession was ample, and indeed sufficient to procure a conviction of
> Moore and a capital sentence.  The statement was against interest, and
> there was no reason to believe that Moore had any ulterior motive in
> making it.  Perhaps most important, the State considered the testimony
> sufficiently reliable to use it against Moore, and to base a sentence of
> death upon it.

442 U.S. 95, 96–97 (1979); DE 50 at 73.  Those same circumstances are not present

here.  Amanda did not proffer that Trevino was solely responsible—indeed she

dodged that issue; her proffer did not exculpate Leza; it was neither corroborated nor

reliable for the reasons shown; and there is clearly reason to believe Amanda had an

ulterior motive because she did not like Trevino and was trying to save her brother.

*Green* is not on point.

Leza also cites *Holmes v. South Carolina* for the proposition that "the

Constitution [ ] prohibits the exclusion of defense evidence under rules that serve no

legitimate purpose or that are disproportionate to the ends that they are asserted to

promote."  547 U.S. 319, 326 (2006); DE 50 at 57.  But Leza omits the second part of

this sentence in *Holmes*, which states: "[W]ell-established rules of evidence permit

trial judges to exclude evidence if its probative value is outweighed by certain other

factors such as unfair prejudice, confusion of the issues, or potential to mislead the

jury." 547 U.S. at 326. Because Amanda's testimony was confusing and did not actually benefit her brother and given that she could not follow the trial court's directions, the trial judge acted properly under *Holmes*.

Finally Leza cites to *Rock v. Arkansas* for the proposition that the constitution does not permit rules that "disable a defendant from presenting her version of the events for which she is on trial." 483 U.S. 44, 61 (1987); DE 50 at 73. But *Rock* involved the admission of hypnotically enhanced testimony, which is not an issue here. 483 U.S. at 60–61. Leza's constitutional arguments are baseless and would not have altered the trial court's decision.

Finally, for the reasons stated above, Leza cannot demonstrate any prejudice. Specifically, even had Amanda been permitted to give the proposed testimony, it does not absolve Leza of any guilt nor does it lessen his culpability for the murder. Thus, the IATC claims are not substantial under *Martinez/Trevino*, and state habeas counsel was not ineffective for failing to raise the claims in the initial application.

## IX.    Leza's Claim that the State Used Factually Inconsistent Theories Is Defaulted and Meritless (Claim 8).

Leza alleges that the State's use of inconsistent theories violated his right to due process and that trial counsel were ineffective for failing to object to the State's inconsistent theories. DE 50 at 74–77. Leza's claim is premised on the claims addressed above regarding Trevino's plea bargain and the language contained in the plea bargain. He asserts:

> Despite Trevino's admission and confession to cutting, stabbing, and ultimately causing Allen's death, the State argued Leza was responsible for killing Allen and presented this as a theory under which

the jury could convict Leza of capital murder. . . . As a result of the evidence presented, the State secured both a conviction for first degree murder against Trevino and a conviction of capital murder against Leza. The jury never discovered Trevino pleaded guilty to causing Allen's death, and therefore, was unable to take this fact into consideration when weighing the evidence against Leza.

*Id.* at 74–75.

Leza concedes that he raised these claims in his application dismissed for abuse of the writ. *Id.* at 74; 1 SHCR2 118–23. Regarding the due process claim, Leza does not address his default; thus, he has failed to show some objective external factor precluded him from presenting this claim in his initial habeas application. As for the IATC claim, because there is no merit to his claim, for the reasons stated below, he cannot demonstrate the claim is substantial under *Martinez/Trevino* nor can he show habeas counsel was ineffective for failing to raise it in the initial petition.

Here, Leza's due process claim fails as a matter of law and fact. His claim seems to hinge on Eighth Circuit precedent, but the allegation is foreclosed under Fifth Circuit precedent, which states: "It is well-established that the use of inconsistent theories in the separate trials of co-defendants is not a violation of the due-process clause. *Pondexter*, 537 F.3d at 527 (citing *United States v. Frye*, 489 F.3d 201, 214 (5th Cir. 2007)). Moreover, "[b]efore *Bradshaw* [*v. Stumpf*][17], the Supreme Court had not suggested that inconsistent prosecutorial theories could constitute a due process violation." *DeCastro v. Branker*, 642 F.3d 442, 457–58 (4th Cir. 2011). Justice Thomas's remarks in his *Bradshaw* concurrence support this view: the "[Supreme] Court has never hinted, much less held, that the Due Process Clause

---

[17]    545 U.S. 175 (2005).

prevents a State from prosecuting defendants based on inconsistent theories." 545 U.S. at 190 (Thomas, J., concurring).  Because there is no legal basis for Leza's claim, it necessarily fails.

Regarding the facts, the Director addressed this matter in Section VI, *supra*. The language in the plea agreement was the result of Trevino being a party to the offense.  As a party under Texas law, she was guilty of everything Leza did even if as a factual matter she did not stab or cut Allen.  The plea in no way absolves Leza of his guilt for capital murder nor does it lessen his culpability for punishment purposes. Indeed, the accompanying police report shows that Trevino pointed the finger squarely at Leza as the primary culprit.  She did the same in the notes discussed regarding the *Brady* claim.  And what is in the plea does not alter Leza's confession to the police that he slit Allen's throat.

The plea agreement also does not mean the State improperly argued differing theories.  In fact, Eighth Circuit precedent undermines Leza's argument.  *United State v. Paul*, 217 F.3d 989, 998–99 (8th Cir. 2000) ("When it cannot be determined which of two defendants' guns caused a fatal wound and either defendant could have been convicted under either theory, the prosecution's argument at both trials that the defendant on trial pulled the trigger is not factually inconsistent.").  Further, the charge to the jury stated the jury could convict Leza of capital murder if he cut *or* stabbed Allen and was either acting alone or as a party to the offense.  16 RR 9.  And the prosecution stated during final argument: "It's cutting or stabbing.  Don't have to prove to you both."  16 RR 31–32.  In other words, this is a case where it was not

entirely clear whether Leza, Trevino, or both inflicted the wounds causing Allen's death.  Under the circumstances, referring to both as a party and being guilty of actions actually caused by the other is not the equivalent of trying the defendants under inconsistent theories.

Because neither the law nor facts support Leza's claim, trial counsel were not ineffective for failing to object to inconsistent theories, and habeas counsel was not ineffective for not raising the claim in Leza's initial petition.  Thus, Leza cannot meet his burden under *Martinez*/*Trevino*, and the IATC claim is defaulted.[18]

## X.    Leza's Claim that the Evidence Was Insufficient to Support Conspiracy Is Defaulted and Meritless (Claim 9).

Leza alleges that the trial court erred in submitting a conspiracy charge to the jury because the evidence was insufficient to support that charge.  DE 50 at 78–80.  The gist of this argument is that the State's case was "premised on the theory that Leza was not just involved, but that he ultimately caused Allen's death."  *Id.* at 78.  He then argues that there was no evidence supporting a conspiracy charge and that the State argued against it.  *Id.* at 78–79.  He further claims that the State engaged in misconduct by improperly arguing that the jury could convict on conspiracy "despite its own concession to support such a theory."  *Id.* at 80.  Finally, he alleges that trial counsel were ineffective for failing to object to the charge, request a curative

---

[18]     Leza states in his petition that trial *and* postconviction counsel were ineffective. DE 50 at 77–78.  The Director is assuming Leza is arguing ineffectiveness of postconviction counsel to meet his burden under *Martinez*/*Trevino*.  But to the extent he is raising a standalone claim that postconviction counsel was ineffective, *Martinez* does not permit such a claim.  *Milam v. Davis*, 733 F. App'x 781, 787 (5th Cir.), *cert. denied*, 139 S. Ct. 335 (2018).

instruction, or move for a mistrial.   And he argues postconviction counsel was ineffective for failing to raise this issue in his initial habeas application.   *Id.* at 81.

Leza concedes that he raised these claims in his application dismissed for abuse of the writ.   *Id.* at 78; 1 SHCR2 126–31.   Regarding the claims of trial court error and prosecutorial misconduct, Leza does not address his default; thus, he has failed to show some objective external factor precluded him from presenting this claim in his initial habeas application.   In other words, he cannot demonstrate cause.   As for the IATC claim, because this claim is not substantial, he cannot demonstrate cause and prejudice under *Martinez/Trevino* nor can he show habeas counsel was ineffective for failing to raise it in the initial application.

## A.    There was no trial court error.

To warrant relief, trial court error must do more than merely affect the verdict, it must render the trial as a whole fundamentally unfair.   *Bailey v. Procunier*, 744 F.2d 1166, 1168 (5th Cir. 1984).   A trial court error renders a trial fundamentally unfair if there was a reasonable probability that the verdict would have been different absent the alleged error.   *Rogers v. Lynaugh*, 848 F.2d 606, 609 (5th Cir. 1988). Moreover, "an instruction which creates a presumption of fact violates due process if it relieves the State of its burden of proving all of the elements of the offense charged beyond a reasonable doubt."   *Gilmore v. Taylor*, 508 U.S. 333, 343 (1993).

Leza cannot satisfy his burden.   First, the trial court's conspiracy instruction simply tracked the language of the "law of parties" under Texas Penal Code, Section 7.02(b).   16 RR 9–10.   The State argued here that Leza was the main actor based on

his own statements, which it was entitled to do.  But due to any lingering uncertainty whether Leza or Trevino acted alone or whether both lethally inflicted wounds on Allen, a parties instruction was appropriate.  And the last portion of the parties instruction, as applied to this case, was whether the two conspired to rob Allen, and in the course of committing the robbery, Trevino murdered Allen and the murder was one that Leza should have anticipated.  Tex. Penal Code § 7.02(b).  The Fifth Circuit has long held that Texas's "law of parties" "may support a conviction for capital murder."  *Montoya v. Scott*, 65 F.3d 405, 415 (5th Cir. 1995).

Further, Leza's argument is meritless because he does not actually argue the evidence itself was insufficient to support the charge.  Instead, his claim is that because the State made arguments that seem contrary to the conspiracy charge, the charge should not have been given.  He cites no precedent for the proposition that where the State emphasizes one theory for prosecution, a trial court errs by instructing on another.  Moreover, in this case, and contrary to Leza's claim, the State did argue that conspiracy was a viable option.  The State said:

> Defense says there's no evidence of conspiracy.  How about the fact that, "We went over there together.  We knew her.  We knocked on her door.  Caryl Jean Allen opened the door.  We asked her for money.  We went in."  A conspiracy based upon the evidence, a conspiracy based upon the facts introduced.  But ladies and gentlemen, the facts are clear.  The defendant is guilty of this first paragraph.

16 RR 34.  Thus, the State made a case for conspiracy but argued Leza was guilty of actually murdering Allen.  Leza, in conclusory fashion, says nothing in the record shows the State satisfied its burden "to show whether Trevino took actions in furtherance of the conspiracy that ultimately caused Allen's death, or that any

93

agreement to commit robbery existed." DE 50 at 79.  Leza then makes no attempt to address the evidence in the record supposedly refuting a conspiracy instruction.  Bald assertions do not warrant habeas relief.  *Ross*, 694 F.2d at 1012.

But Leza's claim truly falters because he does not claim the evidence was insufficient to support instructions for the *other* theories of his guilt that were given prior to the conspiracy charge.  *See* 16 RR 9–10.  And the evidence is more than sufficient to support those charges.  Thus, even if the trial court erred in submitting a conspiracy charge, Leza cannot show how he was harmed.  Habeas relief is not warranted for trial court error even of constitutional magnitude if the error did not have a "'substantial and injurious effect or influence in determining the jury's verdict.'"  *Brecht*, 507 U.S. at 623, 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  Moreover, the charge did not relieve the State of its burden of proof, and Leza has failed to demonstrate otherwise.  *Gilmore*, 508 U.S. at 343.[19]

### B.    Leza's claim of prosecutorial misconduct is meritless.

Leza claims the State committed misconduct in its final argument by misleading the jury to believe if there was insufficient evidence to find Leza caused Allen's death, the jury could convict on the basis of conspiracy.  He also claims this argument improperly shifted the burden of proof to the defense by forcing the defense to provide affirmative evidence that no conspiracy exited.  DE 50 at 80–81.

---

[19]     In his petition, Leza makes the following claim: "In this case, the trial court misstated the law when it failed to include the statutory requirement that one or more of the parties "perform[] an overt act in pursuance of the agreement." DE 50 at 80.  This argument is confusing and lacks merit because Section 7.02(b) of the Penal Code mentions nothing about an overt act.  And, as shown, the jury charge submitted here tracked verbatim the language of the penal code.  16 RR 9–10.  Nothing more was required.

Improper jury argument by the State does not present a claim of constitutional magnitude in a federal habeas action unless it is so prejudicial the state court trial was rendered fundamentally unfair within the meaning of the Due Process Clause of the Fourteenth Amendment. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Harris v. Cockrell*, 313 F.3d 238, 245 (5th Cir. 2002). To establish a prosecutor's remarks were so inflammatory, the petitioner must demonstrate the misconduct was persistent and pronounced or the evidence of guilt so insubstantial the conviction would not have occurred but for the improper remarks. *Harris*, 313 F.3d at 245; *Turner v. Johnson*, 106 F.3d 1178, 1188 (5th Cir. 1997).

Leza's argument fails for multiple reasons. First, his assertions are incorrect. The purpose of providing multiple theories to the jury is to permit prosecution if the evidence does not fit within one theory but does within another. This is not misleading, this is the intent of the law. The State's final argument simply tracked the charge as given, i.e. that the jury could convict under conspiracy if it did not believe the evidence proved the other theories. Second, as stated previously, a reasonable deduction from the evidence is always a proper argument. *Bennett*, 874 F.3d at 254. Third, Leza presents no evidence showing that the burden of proof shifted to him to disprove conspiracy. Bare allegations of prosecutorial misconduct do not state a constitutional claim. *Koch*, 907 F.2d at 531. Finally, Leza presents nothing to show that any remarks by the State rendered his trial fundamentally unfair or that, but for the remarks, he would not have been convicted.

### C.      Leza's IATC claim is meritless.

Last, Leza claims trial counsel were ineffective for failing to object to the charge and the State's argument, not requesting a curative instruction, and not requesting a mistrial.  DE 50 at 81.  Leza is incorrect on the facts because trial counsel did in fact object to the conspiracy charge on the grounds of insufficient evidence. 15 RR 6 ("We think that there is no evidence, not a modicum or a scintilla of evidence that was presented to the jury that supports conspiracy as charged.  And we feel it should be removed from the charge.").  Regardless, because both the charge and argument were proper, counsel actually had no basis on which to object and request a curative instruction or mistrial.  Further, Leza cannot demonstrate prejudice because, as stated, the evidence was abundant that he was guilty under one or more of the other theories.  Finally Leza claims that state habeas counsel was ineffective for not raising this claim in his initial petition.  But because the claim is not substantial, habeas counsel was not deficient for not raising it.  Thus, Leza has failed to meet his burden under *Martinez/Trevino*, and the IATC claim is defaulted.

## XI.    Leza's Claims Pertaining to Multiple Theories and Unanimity Are Defaulted and Meritless (Claim 10).

Next, Leza raises a set of claims that are similar to the ones addressed above. He claims that (1) the trial court erred when it gave the jury instructions that permitted the jury to find him guilty under "two materially different and morally inequivalent acts" in that the conspiracy charge allowed the jury to convict him without the State proving he had the intent to commit murder and, thus, should have been treated as a distinct theory the jury had to find unanimously; (2) he was deprived

of due process because the jury could convict him on any theory without unanimously agreeing to that theory (juror unanimity); and (3) he was improperly sentenced to death because the jury was not required to make the requisite findings required by *Enmund*[20] and *Tison*.[21]   Finally, he argues trial counsel were ineffective for failing to object to the morally inequivalent charge and for not requesting an instruction on unanimity.   DE 50 at 82–89.

### A.   The IATC claim is defaulted.

The IATC claim regarding counsel's failure to object to a morally inequivalent charge[22] is unexhausted and defaulted because Leza never raised this claim on direct appeal or habeas review, including in his abusive habeas application.[23]   In order to satisfy exhaustion, all of the grounds raised in a federal habeas application must have been "fairly presented" to the state courts prior to being presented to the federal courts.   *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997).   Moreover, "[t]he exhaustion requirement is not satisfied if the prisoner presents new legal theories or *factual claims* in his federal habeas petition."   *Nobles*, 127 F.3d at 420 (emphasis added) (citing *Anderson v. Harless*, 459 U.S. 4, 6-7 (1982)).

---

[20]   *Enmund v. Florida*, 458 U.S. 782 (1982).

[21]   *Tison v. Arizona*, 481 U.S. 137 (1987).

[22]   On direct appeal or habeas review, Leza did not technically frame the trial-court-error issue as the trial court submitting morally inequivalent theories.   But given the overall consistency of the language and arguments utilized in his Appellant's Brief and the argument presented in the instant petition, it appears the claim of trial court error is likely exhausted.

[23]   Leza did raise a claim in his initial habeas application that trial counsel were ineffective for failing to request a unanimity instruction.   1 SHCR 75–77; 8 SHCR 2383.   But that is a separate issue.

Further, unexhausted claims are procedurally defaulted for the purposes of federal habeas review because, as in this case, if Leza returned to state court in order to exhaust his claim by filing a successive state application, the application would be dismissed for abuse of the writ. *Coleman*, 501 U.S. at 735 n.1; *Beatty v. Stephens*, 759 F.3d 455, 465 (5th Cir. 2014); *Nobles*, 127 F.3d at 422.

Leza also cannot meet his burden under *Martinez/Trevino* of showing the IATC claim is substantial or that state habeas counsel was ineffective for failing to raise it because, for the reasons addressed below, his underlying due process and constitutional claims lack merit. Thus, this claim is defaulted.

## B.    State court findings

In two points of error on direct appeal, Leza raised the claims of trial court error and violation of the Eighth Amendment. The CCA first held that the *Tison* and *Apprendi*[24] requirements were satisfied by the submission of the special issue "in accordance with Article 37.071, Section 2(b)(2) of the Code of Criminal Procedure, and by its punishment verdict it found that [Leza] either 'actually caused the death of [Allen] or did not actually cause the death of [Allen] but intended to kill [Allen] or anticipated that a human life would be taken.'" *Leza v. State*, 351 S.W.3d at 354–55. The CCA then addressed Leza's claim that the trial court erred in failing to require jury unanimity at the guilt phase of trial with respect to whether he was guilty, if at all, as a principal actor or as a party to the offense. The CCA rejected Leza's argument

---

[24]    *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

that the elements of party liability under Sections 7.02(a) and 7.02(b) of the Penal

Code must be found unanimously, holding:

> [T]hese are not the penal provisions that define the offense of capital murder; they do not identify the elements or gravamen of that offense. . . . They describe alternative manners by which an accused may be held accountable for the conduct of another who has committed the constituent elements of a criminal offense, but they in no way define the offense itself.  Where, as is the case here, the evidence is compelling that an accused is guilty of every constituent element of the alleged penal offense—either as a principal actor or under some theory of party liability—but there remains evidentiary play with respect to his precise role in that offense, we think it would be plainly absurd to require the jury to acquit the accused unless it can unanimously determine his status as a principal actor or a party and, if the latter, what his exact party accountability might be.  Reasoning similarly, several courts of appeals in Texas have concluded that the Legislature did not intend that a jury should have to achieve unanimity with respect to whether an accused was guilty of capital murder as a principal actor or as a party, or with respect to any particular statutory alternative by which he might be found liable as a party.  We agree, and hold that there was no error in the jury charge.

*Id.* at 355–58 (footnotes omitted).  Leza also raised the same claim on state habeas

review, which the state court rejected on essentially the same grounds.  8 SHCR

2276–78, 2406–07.  The CCA, however, found the habeas claim defaulted because it

was previously raised and rejected on direct appeal.  *Ex Parte Leza*, 2017 WL 117347,

at *1.  Nonetheless, the state courts' adjudication of this claim is not objectively

unreasonable.

### C.    Leza's claims lack merit.

#### 1.    Leza's moral equivalency argument is meritless.

Leza's first argument is that the conspiracy instruction was erroneous because,

unlike the other instructions, it does not require intent to commit murder and, thus,

is not morally equivalent to a crime involving such intent.  Because the mens rea element is lacking, the jurors should have been charged separately on this issue and required to render a unanimous decision.  DE 50 at 83–85.

First, as stated above, it is well-settled that Texas's "law of parties" may support a conviction for capital murder.  *Green v. Johnson*, 160 F.3d 1029, 1036 & n.5 (5th Cir. 1998); *Montoya*, 65 F.3d at 415; *Mann v. Scott*, 41 F.3d 968, 977 (5th Cir. 1994); *see also Paredes v. Thaler*, 617 F.3d 315, 326 (5th Cir. 2010) (holding petitioner could not establish prejudice from the disjunctive jury charge "because the jury was also permitted to conclude that he was criminally responsible for the murders under Texas's law of parties even if he did not personally shoot any of the victims").  Under the statute, a participant in a criminal conspiracy can be held criminally responsible for capital murder committed by a co-conspirator in the furtherance of their joint conspiracy even if he lacked the specific intent to commit any offense other than the ultimate object of the criminal conspiracy.  *Montoya*, 65 F.3d at 415.

Second, as the CCA held, the jury was instructed at the punishment phase pursuant to Article 37.071, Section 2(b)(2) of the Code of Criminal Procedure, "and by its punishment verdict it found that [Leza] either 'actually caused the death of [Allen] or did not actually cause the death of [Allen] but intended to kill [Allen] or anticipated that a human life would be taken.'"  *Leza v. State*, 351 S.W.3d at 354; 3 CR 826.  The CCA determined that this special issue satisfied any constitutional concerns.

Third, Leza provides no legal argument, let alone a constitutional argument, for his proposition that the conspiracy statute is infirm because it lacks a requirement

that he intended to kill Allen.   "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by th[e] [Supreme] Court." *Knowles v. Mirzayance*, 556 U.S. 111, 112 (2009).   Accordingly, the state court's denial of this claim is not contrary to or an unreasonable application of federal law.

Finally, Leza fails to demonstrate that the charge rendered his trial fundamentally unfair given that the evidence for his guilt under the other theories was more than adequate.   For these reasons, the claim should be denied.

### 2.   Jury unanimity is not required.

Leza claims that the trial court erred by allowing the jury "to convict him of capital murder without unanimously agreeing on the facts necessary to constitute the crime beyond a reasonable doubt."  DE 50 at 85.  But the Supreme Court has rejected the argument that jurors must agree regarding how an offense was committed when the jury is given multiple theories for committing the same offense.   In *Schad v. Arizona*, a plurality of the Supreme Court held:

> We have never suggested that in returning general verdicts in such cases the jurors should be required to agree upon a single means of commission, any more than the indictments were required to specify one alone.  In these cases, as in litigation generally, "different jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line.  Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict."

501 U.S. 624, 631–32 (1991) (quoting *McKoy v. North Carolina*, 494 U.S. 433, 449 (1990) (Blackmun, J., concurring) (footnotes omitted)).  Thus, where the jury charge did not allege different offenses but different ways of committing the same offense,

"[n]either Texas nor Federal law requires a jury to agree on how an offense was committed." *In re Taylor*, 298 F. App'x 385, 387 (5th Cir. 2008).

And here, the CCA—agreeing with several Texas courts of appeals—stated that "the Legislature did not intend that a jury should have to achieve unanimity with respect to whether an accused was guilty of capital murder as a principal actor or as a party, or with respect to any particular statutory alternative by which he might be found liable as a party." *Leza v. State*, 351 S.W.3d at 358. Given the federal precedent at hand, this decision is not objectively unreasonable.

### 3.   Leza's *Enmund/Tison* claim has no merit.

Leza argues that he was improperly sentenced to death because the jury imposed a death sentence without making the necessary findings under *Enmund* or *Tison*. He states: "Specifically, the jury sentenced Leza to death without determining whether Leza (1) actually killed, attempted to kill, or intended to kill Allen; or (2) was a major participant and displayed a reckless indifference to human life." DE 50 at 86. He further argues that "[t]here was additionally no requirement the jury find sufficient evidence to satisfy the *Tison* requirements beyond a reasonable doubt—specifically that Leza was a major participant in the commission of the murder and that he demonstrated a reckless disregard for life" and that the special issues submitted to the jury at punishment "failed to remedy the issue caused by the inclusion of the conspiracy theory during the guilt phase of trial." *Id.* at 87–88.

In *Enmund* and *Tison*, the Supreme Court addressed the culpability required for assessing the death penalty in felony-murder convictions. The Court held in

*Enmund* that the death penalty may not be imposed on one who "aids and abets a felony in the course of which murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that a level of lethal force will be employed." 458 U.S. at 790–91. But the Court created an exception in *Tison* when it was faced with two brothers who assisted their father in an armed prison escape and went on to commit robberies to further that escape. It held that the concerns of *Enmund* are not implicated where an accomplice was a major participant in the felony and displayed a "reckless indifference to human life." 481 U.S. at 158. It explained that reckless disregard for human life is "implicit in knowingly engaging in criminal activities known to carry a grave risk of death" and represents a highly culpable mental state when that conduct "causes its natural, though also not inevitable, lethal result." *Id.* at 157–58.

Critically, the Court did not establish any procedural guidelines or instructions on how to implement *Enmund*. Later, the Court expressly left discretion to the states: "*Enmund* does not impose any particular form of procedure upon the States." *Cabana v. Bullock*, 474 U.S. 376, 386 (1986), *overruled on other grounds*, *Pope v. Illinois*, 481 U.S. 497 (1987). Rather, "[t]he Eighth Amendment is satisfied so long as the death penalty is not imposed upon a person ineligible under *Enmund*." *Id.* at 386. A determination of requisite culpability, then, can be made at any point in the proceedings—and it can be made by a jury, a judge, or an appellate court. *Id.* at 386–87; *see also Hopkins v. Reeves*, 524 U.S. 88, 99–100 (1998) (states can comply with *Enmund* requirement at sentencing or on appeal).

103

Leza's assertion that the jury did not make these findings is meritless.  First, the evidence clearly established that Leza was a major participant in the murder because he (1) admitted to planning the crime with Trevino; (2) conceded that he did in fact slit Allen's throat; (3) was found to have Allen's DNA on his left shoe; (4) pawned the possessions he and Trevino stole; and (5) stole and burned Allen's car.  *See* 8 SHCR 2333–35 (state habeas findings summarizing the evidence).

Second, Leza's jury was permitted to find him guilty of capital murder as a co-conspirator to the felony offense of robbery, which resulted in the death of Allen, or as a party to the capital murder of Allen in the course of committing and attempting to commit robbery.  *See* Tex. Penal Code §§ 7.01, 7.02(b).  Because the charge permitted the jury to find Leza guilty upon the belief that he should have anticipated that a life would be taken or as a party to the murder itself, the jury was given the anti-parties special issue.  The anti-parties special issue requires juries to find, at the very least, that the defendant "anticipated that a human life would be taken." Tex. Code Crim. Proc. art. 37.071 § 2(b)(2).  The CCA has found this inquiry indicative of "a highly culpable mental state, at least as culpable as the one involved in *Tison*" and held that "according to contemporary social standards, the death penalty is not disproportionate for defendants with such a mental state."  *Ladd v. State,* 3 S.W.3d 547, 573 (Tex. Crim. App. 1999).  Here, the CCA specifically recognized the jury was instructed at the punishment phase in accordance with Article 37.071, Section 2(b)(2) of the Code of Criminal Procedure, "and by its punishment verdict it found that [Leza] either 'actually caused the death of [Allen] or did not actually cause the death of

104

[Allen] but intended to kill [Allen] or anticipated that a human life would be taken.'" *Leza v. State*, 351 S.W.3d at 354–55; *see also id.* at 355 (citing *Ladd* and acknowledging that the special issue "satisfies the dictates of *Tison*"). Thus, this culpable mental state satisfies *Tison*, contrary to Leza's argument. DE 50 at 87. Moreover, regarding Leza's claim that the special issues at punishment "failed to remedy the issue caused by the inclusion of the conspiracy theory," *id.* at 88, Leza provides no precedent to support this argument, other than claiming it failed to meet the dictates of *Enmund* and *Tison*, which is not correct.

In sum, in *Cabana*, the Supreme Court gave states discretion to implement *Enmund* and has yet to provide any specific procedures or language to guide states in so doing. Accordingly, Texas must be given "leeway." *See Richter*, 562 U.S. at 101. Texas's implementation of *Enmund* and *Tison* through the jury's consideration of the anti-parties special issue is consistent with Supreme Court's precedent—or, at the very least, does not contradict it. Thus, the CCA's decision is not objectively unreasonable.

### 4. Leza's IATC claim is meritless.

Leza argues trial counsel were ineffective for failing to object to the morally inequivalent charge and for not requesting an instruction on unanimity. DE 50 at 89. First, counsel did object to the conspiracy charge and asked that it be removed. 15 RR 6. The trial court denied the request. *Id.* Second, the state habeas court found that "there is no legal basis to request a unanimity instruction when, as here, such a unanimity instruction is legally impermissible." 8 SHCR 2383. And as shown, the

CCA held on direct appeal that there was no error due to the conspiracy charge inclusion and that a unanimity instruction was not warranted under the law.  Finally, Leza cannot demonstrate any prejudice because even had counsel requested and received instructions precisely to his liking, there is not a reasonable probability the result of the proceeding would have been different given the substantial evidence of his involvement in Allen's murder.  This claim is meritless.

## XII.  Leza's Claim of Actual Innocence Is Not Cognizable and Meritless (Claim 11).

Leza alleges that he is actually innocent of Allen's murder, based on the evidence and issues addressed above.  He cites to (1) the fact Trevino pleaded guilty and in her plea stated she cut and stabbed Allen; (2) the evidence addressed in the *Brady* claim above that Trevino said "I had to kill her, but when I did I asked God to forgive me"; (3) Amanda Leza's testimony that Trevino admitted to tying up Allen and slitting her throat and did not show remorse; and (4) a letter Trevino allegedly sent to Leza's family stating that Leza was on death row for a crime she committed. DE 50 at 90.  Leza also claims he could not be guilty because his brain impairments "prevented him from possessing the capacity to commit premediated murder."  *Id.*

This claim, however, is somewhat confusing because Leza first concedes that this claim is exhausted because it was raised in his initial habeas application.  *Id.* at 89.  But his state habeas claim was actual innocence premised on Trevino's confession (not the plea agreement), Amanda's testimony about what Trevino said to her, and the supposed letter from Trevino.  1 SHCR 18–24.  The application mentioned Trevino's plea agreement but did not seem to rely on that as Leza does in the instant

petition.  Moreover, the application stated nothing about the evidence pertaining to the *Brady* claim.  To the extent these new reasons constitute new factual claims, they are unexhausted and defaulted.  *Nobles*, 127 F.3d at 420 (exhaustion not satisfied where petitioner presents new factual claims).  To the extent this is new evidence in support of the same claim, it is barred under *Pinholster*.

At any rate, the state habeas court issued findings and conclusions rejecting this claim.  8 SHCR 2333–44.  In accepting the state court's findings, the CCA stated in its order that Leza's actual-innocence claim under *Herrera v. Collins*[25] failed because "[Leza] does not provide the court with newly discovered evidence that constitutes affirmative evidence of [his] innocence nor does he meet his burden to show that no reasonable juror would have convicted him in light of this alleged evidence" and that Leza's gateway claim under *Schlup v. Delo*,[26] could not be brought in an initial habeas application because it was not yet procedurally defaulted. *Ex parte Leza*, 2017 WL 117347 at *1.  This decision is not objectively unreasonable.

It is well-settled in this Circuit that a free-standing claim of actual innocence is not cognizable on federal habeas review.  *Reed v. Stephens*, 739 F.3d 753, 766 (5th Cir. 2014); *In re Swearingen*, 556 F.3d 344, 348 (5th Cir. 2009); *Graves v. Cockrell*, 351 F.3d 143, 151 (5th Cir. 2003).  Claims of actual innocence based on newly discovered evidence do not provide a basis for federal habeas relief.  *Dowthitt*, 230 F.3d at 741 (citing *Herrera*, 506 U.S. at 400).  "This rule is grounded in the principle

---

[25]     506 U.S. 390 (1993).

[26]     513 U.S. 298 (1995).

that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact." *Herrera*, 506 U.S. at 399.

Moreover, in *Herrera*, the Supreme Court did not hold that an actual-innocence claim is viable on federal habeas review but addressed the possibility that a claim could be made based on newly discovered evidence, ultimately holding:

> [B]ecause of the very disruptive effect that entertaining claims of actual innocence would have on the need for finality in capital cases, and the enormous burden that having to retry cases based on often stale evidence would place on the States, the threshold showing for such an assumed right would necessarily be extraordinarily high.

506 U.S. at 417.  Thus, even assuming such a standard exists, Leza surely cannot meet it here.  The Director has addressed above the plea agreement, the *Brady* issue, and Amanda Leza's testimony.  To recap, the language in the plea agreement was parties language that did nothing to absolve Leza of guilt; the *Brady* evidence was inculpatory toward Leza, not exculpatory; and Amanda's proposed testimony—if believed—would have only established that Trevino acted with Leza, not that Trevino acted alone.  Regarding the plea agreement and Amanda's proposed testimony, evidence available at the time of trial or via a reasonable investigation does not meet an actual-innocence standard.  *See Hancock v. Davis*, 906 F.3d 387, 390 (5th Cir. 2018), *cert. denied*, 139 S. Ct. 2714 (2019).

As for Leza's "new" evidence of a letter Trevino allegedly sent to Leza's family members, this fails to meet Leza's high burden.  Leza does not provide the letter.  Instead, he provides "voluntary" statements from Leza's sister, Sally Chapman, his mother Celia, and his brother Orlando in which they all state Celia received a letter

108

from Trevino addressed to Sally.  According to the three, Orlando opened the letter and read it to Celia.  In the letter, Trevino supposedly said Leza got the death penalty for what she did.  Upon hearing what Orlando said, Celia got angry and tore the letter up.  DE 11-1, 11-3 & 11-4.  In other words, the letter no longer exists.

What Trevino may have told Leza's family is hardly significant evidence.  First, these witnesses are stating what someone else supposedly wrote based on evidence that does not exist.  As such, the statements are hearsay, unreliable to support a meritorious claim, and cannot be considered.  *Goodwin v. Johnson*, 132 F.3d 162, 186 (5th Cir. 1997) (hearsay evidence is incompetent to defeat motion for summary judgment); *Hogue v. Johnson*, 131 F.3d 466, 505 (5th Cir. 1997) ("[W]e note that Hackett's affidavit as to what Belew said to Hackett on the telephone approximately a year after the trial is hearsay, and is not substantive evidence of anything.").  Second, even if the letter once existed, Trevino has nothing to lose by making that statement because she is serving a life sentence for murder, and double jeopardy bars her from being resentenced for it.  Further, Leza's family members have every motive to make statements of this nature trying to cast blame on Trevino.  Although Trevino did not testify, the Fifth Circuit has long held that recanting affidavits and witnesses are viewed with extreme suspicion.  *Komolafe v. Quarterman*, 246 Fed. App'x. 270, 272 (5th Cir. 2007) (citing *Spence*, 80 F.3d at 1003).  Moreover, by supposedly providing the letter at little or no cost to herself, Trevino's assertion is of little probative value.  *See Drew v. Scott*, 28 F.3d 460, 463 (5th Cir. 1994) (rejecting actual innocence claim predicated on co-defendant's statements made after he had nothing

to lose by exculpating defendant).  The Supreme Court has likewise stated that post-trial affidavits are disfavored because the affiant's statement is obtained without the benefit of cross-examination and an opportunity to make credibility determinations. *See Herrera*, 506 U.S. at 417.

Thus, assuming an actual-innocence claim is cognizable, Leza does not come close to meeting the "extraordinarily high" *Herrera* standard.  The above evidence and issues do nothing to demonstrate his innocence, particularly given his admitted involvement in murdering Allen and the DNA evidence discussed previously.  Like the petitioner in *Herrera*, Leza "is not innocent, in any sense of the word." *Herrera*, 506 U.S. at 419 (O'Connor, J., concurring).

Regarding Leza's claim that he lacked the requisite mental capacity to commit a premeditated crime, this argument fails. Actual innocence means "factual" innocence as opposed to "legal" innocence. *Callins v. Johnson*, 89 F.3d 210, 213 (5th Cir. 1996).  Further, "[t]here is simply no defense recognized by Texas law stating that, due to the defendant's mental illness, he did not have the requisite mens rea at the time of the offense because he does not have the capacity, or is absolutely incapable of ever forming that frame of mind." *Jackson v. State*, 160 S.W.3d 568, 575 (Tex. Crim. App. 2005).  And the jury clearly found Leza possessed the requisite mental state.

Leza also argues he can demonstrate actual innocence under *Schlup* to overcome any procedural bars.  But "'tenable actual-innocence gateway pleas are rare,'" and, under *Schlup's* demanding standard, the gateway should open only when

110

a petitioner presents new "'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'" *McQuiggin v. Perkins*, 569 U.S. 383, 386, 401 (2013) (quoting *Schlup*, 513 U.S. at 316). A petitioner is required to produce "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence"—sufficient to persuade the district court that "no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 324. As shown, the evidence Leza presents of his "innocence" does not come close to meeting this standard. *Schlup*, therefore, does not provide him a gateway to review his defaulted claims.

Finally, Leza states: "Insofar as counsel failed to present this evidence of Leza's innocence, counsel were ineffective, and there is a reasonable probability of a more favorable outcome if counsel had performed effectively." DE 50 at 91. The state habeas court rejected this claim. 8 SHCR 2342–44. For the reasons stated, this decision is not objectively unreasonable.

## XIII. Leza's Claims Regarding IATC During Voir Dire Are Meritless (Claim 12).

Leza claims that trial counsel were ineffective for failing to adequately question or challenge for cause "any of the seated jurors during voir dire." DE 50 at 94. Essentially, he argues every juror exhibited bias via their voir dire and juror questionnaires, and trial counsel should have more thoroughly questioned and/or challenged them all for cause. He also claims trial counsel failed to question the venire about racial bias. *Id* at 93. Then, he claims that trial counsel wasted

peremptory challenges on numerous veniremembers who should have also been challenged for cause, and had counsel done so, counsel could have exercised peremptory challenges against the jurors who actually sat. *Id.* at 105–10. Last, he alleges that counsel's cumulative errors during voir dire deprived him of a fair trial. *Id.* at 110.

Leza concedes that he raised the allegations about racial bias and wasted peremptory strikes in his habeas application dismissed for abuse of the writ. DE 50 at 92; 1 SHCR2 170–79. Thus, they are procedurally defaulted. Likewise, Leza's cumulative error claim is defaulted. And for the reasons addressed below, Leza cannot overcome his default via the *Martinez/Trevino* exception because he cannot show that these claims are substantial or that state habeas counsel was ineffective for failing to raise them.

### A.    Summary of state court findings

On state habeas review, Leza did raise the claim that trial counsel were ineffective for failing to adequately question and/or challenge each juror who sat for cause because they exhibited bias, both actual and implied. 1 SHCR 45–69. The state habeas court entered extensive findings and conclusions recommending the denial of relief. 8 SHCR 2368–82. First, the state habeas court found that trial counsel Terrence McDonald, based on his hearing testimony, made strategic decisions about how to approach voir dire. The court found:

> [C]onsistent with his trial statement, [McDonald] said [some less than desirable] jurors were sometimes accepted [ ] in order to preserve available peremptory strikes for future jurors who appeared far worse. He indicated that his primary strategy was to find jurors who were open

to all evidence.  Such thinking evokes a strategy of juror selection that
is not ineffective assistance of counsel.

8 SHCR 2369.

Second, the court found that counsel actively used challenges for cause and
exercised peremptory strikes.  Counsel challenged seven jurors for cause and used all
fifteen strikes allotted.  *Id.*

Third, the trial court found that Leza submitted deficient juror questionnaires
because Leza included only snippets from the questionnaires and not the entire
questionnaires.  8 SHCR 2369–70.  This is correct.  2 SHCR 525–77.  The court found
that Leza was "cherry-picking" the questionnaires to support his claim.  8 SHCR
2369.  However, the court found based on the evidence presented that most of the
selected jurors rated themselves neutral on the death penalty.  8 SHCR 2370–71.
Only one juror, Juror Vargas, rated himself a "10" on that issue.  But the court also
found that Juror Vargas "declared . . . that he would always vote for life without
parole if the convicted murderer was truly locked up for life."  8 SHCR 2371.
Moreover, the court found that picking Vargas was a matter of strategy because the
defense had only two peremptory strikes left before questioning Vargas and used one
of those strikes on the very next juror.  *Id.*  The state court then reviewed the answers
on the questionnaires—those answers available from the selected pages of the
questionnaires—and found that the responses did not exhibit bias.  *See* Section XIII,
C, 3, *infra*; 8 SHCR 2371–72.  The state court also reviewed the individual voir dire
of each juror, which will be addressed in more detail below.  *See* 8 SHCR 2372–80.

113

The court concluded that Leza's failure to submit the full questionnaires made it extremely difficult to assess his claim; that there is no legal requirement that counsel ask specific questions on voir dire; and that trial counsel properly exercised challenges for cause and peremptory challenges in accordance with trial strategy. 8 SHCR 2380–81. The court concluded the acceptance of Jurors Vargas and Harris was strategic; the voir dire responses from the jurors showed they could be fair; the prosecution carefully explained the trial procedures to the jurors; defense counsel had the opportunity to observe firsthand each potential juror's demeanor and interaction with the court and counsel; there are sound reasons why defense counsel may have chosen to limit questioning, namely that several of the selected jurors commented on the repetitious nature of the questionnaire and voiced "hesitancy, even fear, over having to decide this punishment issue," "which is the type of juror that a defense counsel wants"; and Leza failed to show counsel's performance "fell below an objective level of reasonableness in not asking further specific questions." 8 SHCR 2381–82. This decision is not objectively unreasonable.

## B.  The full questionnaires are barred under *Pinholster*.

With his petition, Leza now submits the full and complete juror questionnaires in support of his claim. DE 8-29–8-40. As shown, he failed to do so on state habeas review. Thus, under *Pinholster*, this Court cannot consider the full questionnaires in assessing the reasonableness of the CCA's rejection of it. 563 U.S. at 181 (holding that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits").

### C.    Regardless, Leza's claims have no merit.

#### 1.    The standard

A juror harbors an actual bias, such that he may be excluded for cause, if his "views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985)).  To demonstrate actual bias, a defendant must point to an "admission" or present "factual proof" of bias on the juror's part.  *United States v. Thomas*, 627 F.3d 146, 161 (5th Cir. 2010).  On federal habeas corpus review, proof of actual bias requires a showing that the jurors in a given case had "such fixed opinions that they could not judge impartially the guilt of the defendant."  *Chavez v. Cockrell*, 310 F.3d 805, 811 (5th Cir. 2002).

Implied bias, on the other hand, is generally reserved only for "extreme" or "extraordinary" cases that "'might include a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction.'"  *Buckner v. Davis*, 945 F.3d 906, 913 (5th Cir. 2019) (quoting *Smith v. Phillips*, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring)).  None of these situations are relevant here.  Moreover, the Fifth Circuit has questioned whether the implied bias doctrine is even clearly established federal law.  *Id.* at 913–15 (citing *Uranga v. Davis*, 893 F.3d 282, 287–89 (5th Cir. 2018), *cert. denied*, 139 S. Ct. 1179 (2019)).

115

Further, jury selection by counsel involves trial strategy that is ill suited to judicial second-guessing. *See, e.g., Romero v. Lynaugh*, 884 F.2d 871, 878–79 (5th Cir. 1989) ("The selection of a jury is inevitably a call upon experience and intuition. The trial lawyer must draw upon his own insights and empathetic abilities.... [O]ur willingness to second guess [counsel's choices] must be informed by the reality of their task and the limits of the recording of their work before us."). Strategic decisions made by counsel during the course of trial are entitled to substantial deference. *See Strickland*, 466 U.S. at 689.

### 2. Leza's IATC claim regarding racial bias is conclusory.

Leza first alleges that trial counsel were ineffective for failing to question the venire regarding racial bias. DE 50 at 93. Leza, however, provides no argument why counsel were deficient or how he was prejudiced by failing to question the venire about this matter. He simply claims he is Hispanic while the victim was Caucasian, which is true but is evidence of nothing. *Id.* The Fifth Circuit "has made clear that conclusory allegations of ineffective assistance of counsel do not raise a constitutional issue in a federal habeas proceeding." *Miller*, 200 F.3d at 282. Moreover, it appears from their surnames that at least five of the seated jurors were themselves Hispanic. Without more, Leza is not entitled to relief.

### 3. Leza's claim that counsel failed to adequately question jurors and challenge them for cause is meritless.

As a preliminary matter, the flaw with Leza's claim is that he is arguing counsel should have challenged for cause and/or more thoroughly questioned every

single juror who sat on his jury—without exception—including jurors who were arguably favorable to him.  Rather than singling out specific jurors, he is claiming, or at least insinuating, that the entire jury was biased based on cherry-picked assertions from voir dire and their questionnaires.  His claim fails to recognize that trial counsel is often required to accept some less-than-desirable jurors to avoid worse ones.  And there is no precedent mandating that counsel is required to pick a perfect jury. Regardless, for the reasons addressed below, the record shows that none of the jurors were challengeable for cause or that they were unconstitutionally biased.

### a.      Juror Moreno

Regarding Juror Moreno, the state habeas court issued findings about his voir dire, 8 SHCR 2372, and the record supports the state court's finding.  5 RR 65–78. Moreno said he would wait to hear the evidence before deciding the future dangerousness question or deciding the nature of Leza's role in the crime.  5 RR 73–74.  Although he said if Leza murdered someone "I would think to give the death penalty," he agreed it was not automatic.  5 RR 74–75.  He said he could keep an open mind.  5 RR 75.  And although he exhibited some confusion about the process, he confirmed he could wait and make a decision on the death penalty until he heard all the evidence.  5 RR 76–77.  Further, as the state court found, Moreno agreed that two people who commit the same crime should be punished the same.  5 RR 77.

Moreno's questionnaire—although *Pinholster* precludes review of the entire questionnaire—does not reveal any bias.  On the questionnaire, he provided the following:

He checked "I am neither generally opposed to nor generally in favor of capital punishment."  DE 8-29 at 19.

He indicated life without parole was appropriate in all cases where someone has been murdered.  *Id.*

On a scale of 1 to 10 on whether he could vote for the death penalty, he rated himself a "2."  *Id.* at 20.

He did check "yes" on the question asking if he would always vote for death if he convicted a person of capital murder, but when asked about the appropriateness of the death penalty, he checked that it was appropriate in any case "in which more than one person has been killed"; he did not check that it was appropriate in any murder case.  *Id.* at 23.

He checked "agree" when asked if he would probably vote for the death penalty if he convicted someone of capital murder.  *Id.* at 24–25.

In the next section, he checked "No" when asked if he would always vote for a death sentence in any capital case regardless of the facts and circumstances.  *Id.* at 25.

He indicated that his views on the death penalty were not so strong that they would prevent him from being fair and impartial.  *Id.* at 27.

He checked "No" when asked if he would not be able to consider all aggravating and mitigating evidence in deciding whether a death sentence is justified.  But he further indicated he could abide by the court's instructions to follow the law. *Id.* at 28, 31.

Leza's argument to the contrary, these answers do not indicate bias.  At most they indicate some vacillation but nothing more.  When a trial court is faced with a "quintessential vacillating juror who appear[s] intent on conscientiously following the law, as it was explained to him by the prosecution," this Court has held that federal habeas courts should defer "to the state trial judge's determination of a potential juror's bias based on the trial court's firsthand examination of the potential juror's demeanor." *Berkley v. Quarterman*, 507 F.Supp.2d 692, 725 (W.D. Tex. 2007) (citing

*Uttecht v. Brown*, 551 U.S. 1, 18-21 (2007) & *Witt*, 469 U.S. at 430–35).  Thus, trial counsel cannot be deemed ineffective here.

Moreover, in the state habeas hearing, Terrence McDonald explained how he placed emphasis on jury questionnaires, and how he and co-counsel Barbara Hughes went over those and made initial decisions about jurors.  He stated that he prefers questionnaires because jurors provide information in them without the judge, lawyers, or others looking.  1 SHRR 187–88.  He further explained that he wanted jurors with an open mind in assessing a death sentence, and given the facts of this case, he was more concerned with punishment than guilt-innocence.  1 SHRR 188–89.  Counsel's strategic decision should not be second-guessed.

Finally, Leza's only other argument for challenging Moreno is that he states Moreno could not speak or read English that well, citing Texas Code of Criminal Procedure, Article 35.16(a)(11).  DE 50 at 94.  But this statute says a challenge for cause may be warranted if the juror cannot read or write.  The statute says nothing about not understanding English that well.  And clearly Moreno could read and write.  Thus, this claim fails.

### b.   Juror Esparza

Regarding Juror Esparza, the state habeas court issued lengthy findings based on the voir dire, 8 SHCR 2373–74, and the record supports these findings.  Despite Esparza initially telling the judge that the issues were "cut and dry," 6 RR 4, his voir dire reveals otherwise.  He stated he had made no determination as to guilt because he had not heard anything, 6 RR 6; that he would make the State prove its case, 6 RR

7; that he would be able to answer the special issues based on the evidence, 6 RR 16–17; that he believed in the death penalty but did not think about it much, 6 RR 17; that his decisions depended on the circumstances, 6 RR 19; that he would not be swayed by other jurors, 6 RR 22; that "I'm going to give [Leza] an even chance . . . I can't say yes or no right now," 6 RR 23; that he put "8" on his questionnaire regarding being for the death penalty but he should have put "5," 6 RR 27; and that some of his answers on the questionnaire were influenced by the fact that the questions were repetitive and "I was getting a little tired of it," *id.*

Esparza's questionnaire also indicated the following:

He was neutral on capital punishment.  DE 8-30 at 19.

He would consider all of the penalties provided by law and the facts and circumstances of the particular case because he can only make his decision based on the evidence.  *Id.* at 20, 24.

He would require the State to prove a defendant had been in trouble with the law before assessing a death sentence.  *Id.* at 21.

The death penalty should be used only when necessary.  *Id.* at 23.

He did not believe a person was necessarily a future danger just because the person had committed capital murder.  *Id.*

A person's personal responsibility should be considered in assessing either a life or death sentence.  *Id.* at 25.

He would not always vote for a death sentence for someone convicted of capital murder regardless of the facts or circumstances.  *Id.*

All facts, including those pertaining to a defendant's background, criminal history, age, and mental condition should be considered in assessing punishment.  *Id.* at 27.

120

His views on the death penalty would not impair his ability to be fair and impartial, and he could set aside his views and apply the law to the facts in accordance with the judge's instructions. *Id.* at 27, 31.

There was no reason he would not be able to consider all aggravating and mitigating evidence in deciding whether or not the death penalty is justified. *Id.* at 28.

Although Esparza did give some conflicting information on his questionnaire, such as that he "strongly agreed" that a person who intentionally kills another deserves the death penalty regardless of background, *id.* at 24, the fact remains that the totality of the questionnaire shows an individual who would faithfully consider the law and facts and apply those factors in reaching a decision. Indeed, Esparza repeatedly emphasized in his questionnaire that the decisions hinged on the evidence. And any concerns about Esparza's impartiality were fleshed out during voir dire. Thus, trial counsel were not ineffective.

### c.  Juror Estrada

Regarding Juror Estrada, the state habeas court issued findings about his voir dire, 8 SHCR 2374, and the record supports those findings. Estrada indicated she felt uncomfortable, that it was not her place to judge, and that it would be very difficult to do her job. 6 RR 60–61. She also exhibited ambiguous feelings about the death penalty. 6 RR 62. But she then said "it has to be used depending on what the circumstances are" and that she would wait to hear all the evidence before making a decision. 6 RR 63–64. Later on, she indicated she could not be a part of the process because, "It's just another person. A human being. I can't just sentence him or not. I mean, even with all the evidence. It's another human." 6 RR 68. When asked if

she would never consider the death penalty, she said she was not sure.  6 RR 70.  She

finally answered "okay" when the defense told her she was just expected to look into

her heart and answer the questions as best as she could.  6 RR 72.

Thus, by her voir dire, Estrada was a juror favorable to the defense.  In fact,

when she was accepted by the parties, the prosecutor said: "I'll keep her.  I'm not

going to challenge her."  6 RR 72.  Under these circumstances, it would have made

little sense for trial counsel to challenge Estrada.

Estrada's questionnaire also indicated the following:

She was generally in favor of capital punishment except in cases where it is
too harsh considering all the circumstances.  DE 8-31 at 19.

She would always vote for life in prison if she knew a capital defendant would
never be released regardless of the facts and circumstances.  *Id.* at 20.

She rated herself a "5" on strength of death-penalty conviction.  *Id.*

Her moral beliefs prevented her from sitting in judgment against another, *id.*,
and she did not believe in the death penalty.  *Id.* at 22.

She would be willing to consider the death penalty in some cases but in others
she would not.  *Id.* at 24.

All facts, including those pertaining to a defendant's background, criminal
history, age, and mental condition, should be considered in assessing
punishment.  *Id.* at 27.

Her views on the death penalty would not impair her ability to be fair and
impartial.  *Id.*

She agreed her verdict must be based solely on the law and evidence.  *Id.* at
31.

She did not believe it was her place to sit in judgment on another.  *Id.*

As with the above jurors, Estrada gave a few inconsistent responses on the lengthy and repetitive questionnaire, but again her discomfort with sitting in judgment on another should have made her a favorable defense witness. Counsel had no reason to challenge Estrada for cause, and this claim lacks merit.

### d.    Juror Waters

Regarding Juror Waters, the state habeas court issued findings supported by the record. 8 SHCR 2374–75. Waters indicated she was "okay" with the death penalty but for a very "heinous" crime and only when absolutely necessary. 6 RR 110–11. She stated that she could hear all the evidence and answer the special issues based on what she heard in the courtroom. 6 RR 119. When questioned by the defense, she indicated the death penalty was more appropriate in a "brutal" case such as if a person was stabbed "55 times." 6 RR 120–21. She then said she does not believe someone forfeits his life just because that person takes another life. 6 RR 121. She believed she had the moral character to make a decision on punishment in this case. 6 RR 122. She further said that she disagreed with the statement "that any person who kills another deserves the death penalty." 6 RR 124. She said she would not lean one way or another because "every case is different." 6 RR 125. Finally she said she had no problem with the length between conviction and imposition of death sentence because "that would take away everyone's right to appeal." 6 RR 125–26. Thus, Waters' testimony shows trial counsel had no basis for a challenge for cause.

Waters' questionnaire also supports the state court's finding. She indicated the following:

She would consider all of the penalties provided by law and the facts and circumstances of the particular case.  DE 8-32 at 20, 24.

She rated herself a "5" on strength of death-penalty conviction.  *Id.* at 20.

She would require the State to prove a defendant had been in trouble with the law before assessing a death sentence.  *Id.* at 21.

She believes in the death penalty because some crimes "are so heinous they should be punishable by death."  *Id.* at 22.

She would not always vote for the death penalty, it should be used only when necessary, life in prison may be appropriate for someone who does not have a criminal history, and a death sentence is appropriate or inappropriate depending on the defendant.  *Id.* at 22–23.

Personal culpability and criminal history should factor into considering whether to assess life or death.  *Id.* at 25.

There are some cases where life in prison is more appropriate for someone convicted of capital murder and others where a death sentence is more appropriate, such as if it was "brutal, intentional or torture."  *Id.* at 27.

She would consider remorse and potential future threat before assessing a sentence.  *Id.*

Her views on the death penalty would not impair her ability to be fair and impartial, and she could set aside her views and apply the law to the facts in accordance with the judge's instructions because "I have to follow the law [and] do what is just [and] right [and] fair."  *Id.* at 27–28; *id.* at 31.

There was no reason she would not be able to consider all aggravating and mitigating evidence in deciding whether or not the death penalty is justified.  *Id.* at 28.

The law does not do too much to protect the rights of defendant because a defendant "may be innocent."  *Id.*  at 28–29.

Thus, Waters's voir dire and questionnaire revealed a person who could be unbiased and impartial.  Based on this evidence, trial counsel had no reason to challenge her for cause.

124

### e.   Juror Mason

Regarding Juror Mason, the state habeas court issued findings supported by the voir dire record.  8 SHCR 2375.  Mason stated that he could go step by step and answer the questions based on what was presented to him.  6 RR 140.  He mainly listened to the prosecutor explain the law and procedures and at the end stated he did not have any questions.  6 RR 141-42.  When questioned by defense counsel, Mason said "I don't think so" when asked if he had concerns about sentencing Leza. 6 RR 142–43.  He further said: "I look at all the facts, see what caused it, make a determination based upon what people tell me, and then make a decision, carry it through."  6 RR 143.  He agreed that he is open to listening to other people's viewpoints.  *Id.*  When asked whether he would sentence someone to death simply because that person had intentionally killed another, he stated that he would not automatically do so and that it would depend on the facts, although he was not exactly sure how he would react.  6 RR 144.  He agreed that he would take into account Leza's background and other factors in reaching a sentencing decision.  *Id.*  He stated every person is different and must be judged on an individual basis, and that he would take everything into consideration and make a decision.  6 RR 145–46.

Mason's questionnaire also supports the state court's findings.  In it, he revealed the following:

> He listens to others but "strongly agreed" that he sticks to his opinion even if others disagree, and he would find someone not guilty if it was the right but unpopular thing to do.  DE 8-33 at 17.

He did not believe a person was a future danger just because a person had committed capital murder unless that person had committed numerous acts of violence in the past, but it would depend on the evidence. *Id.* at 18.

He rated himself a "5" on strength of death-penalty conviction. *Id.*

He would require the State to prove a defendant had been in trouble with the law before assessing a death sentence. *Id.* at 21.

He believes in the death penalty, but he considers the right punishment to be one "appropriate under the law." *Id.* at 22.

Life in prison is appropriate for someone without a criminal history and who does not pose a future danger, whereas the death penalty is appropriate in some cases but not in others depending on the person convicted. *Id.* at 23, 27.

He would consider all penalties based on the facts and circumstances— aggravating and mitigating—and he did not believe a person would be a future danger unless the person had committed other acts of violence. *Id.* at 20, 24, 28.

He strongly disagreed that any person who intentionally kills another always deserves the death penalty regardless of background or other factors, and a defendant's background, age, history, mental condition, and what led up to the crime should all factor into the appropriate penalty. *Id.* at 24, 27.

His views on the death penalty would not impair his ability to be fair and impartial, he would look at all the evidence, and he could set aside his views and apply the law to the facts in accordance with the judge's instructions because his beliefs would follow the law. *Id.* at 27–28; *id.* at 31.

Thus, Mason demonstrated that he could be unbiased and impartial. His voir dire and questionnaire do not reveal otherwise, contrary to Leza's claim.

### f.    Juror McAnear

Regarding Juror McAnear, the state habeas court issued findings supported by the voir dire record. 8 SHCR 2375–76. McAnear first agreed that she was "middle of the road" on everything, had made no prejudgments, and needed to hear the facts before making a decision. 7 RR 6. She had no confusion over the trial procedures

126

and issues and believed she could sit in judgment.  7 RR 15.  She stated that there were some crimes so violent and "unforgivable" that she believed in an "eye for an eye," but that reasoning does not apply all the time.  *Id.*  She believed all cases were different and you have to "go through the process" to make that determination.  7 RR 16.  When questioned by the defense, McAnear stated that a life sentence would be an option for her, although making that decision terrified her.  7 RR 18.  When the defense talked about people who do not have a problem taking a life, she affirmed that she did not feel that way.  7 RR 19.  She revealed that, at one point, her own life was threatened by a former boyfriend, but she could set that matter aside because it occurred a long time ago.  7 RR 19–20.  McAnear indicated she might not be comfortable on the jury but that the process and keeping an open mind would assist her.  7 RR 22–23.  She also said she is stubborn in her decisions and indicated she would not be swayed by others.  7 RR 23.  Although she said in her questionnaire that she would probably sentence a person to death who is convicted of capital murder, she affirmed she could keep an open mind and does not have a propensity for capital punishment one way or another.  7 RR 23–24.

McAnear's questionnaire also supports the state court's findings.  In it, she revealed the following:

> She listens to others but agrees that she sticks to her opinion even if others disagree, and she would find someone not guilty if it was the right but unpopular thing to do.  DE 8-34 at 17.

> She would consider all of the penalties provided by law and the facts and circumstances of the particular case—including all aggravating and mitigating evidence—and there are some cases in which she could vote for the death penalty and others where she could not.  *Id.* at 20, 24, 28.

She rated herself a "6" on strength of death-penalty conviction.  *Id.*

She would require the State to prove a defendant had been in trouble with the law before assessing a death sentence.  *Id.* at 21.

She does not believe there are some crimes so severe that they warrant a death penalty regardless of whether the defendant has been violent in the past.  *Id.*

She believes in the death penalty and that some crimes warrant it, but not for every crime.  *Id.* at 22.

If she convicted someone of capital murder, she would not always vote for the death penalty, and the death penalty should only be used when absolutely necessary.  *Id.* at 23.

She agreed that a person's background, personal culpability, criminal history, and mental condition should factor into considering whether to assess life or death, although she agreed she would probably return a death sentence if she convicted a person of capital murder.  *Id.* at 23–25, 27.

A sentence of life imprisonment is more appropriate for someone convicted of capital murder if the person shows remorse and does not have a history of criminal behavior, whereas the death penalty is more appropriate for those who have committed a violent crime and have hatred in their hearts.  *Id.* at 27.

Her views on the death penalty would not impair her ability to be fair and impartial, it is important to hear the facts before deciding, and she could set aside her views and apply the law to the facts in accordance with the judge's instructions.  *Id.* at 27, 31.

Like the above jurors, McAnear's answers during voir dire and on the questionnaire demonstrated she could be impartial and unbiased.  The main argument Leza presents regarding why counsel should have challenged her for cause has to do with the incident in her past involving an ex-boyfriend.  But she made it clear that was no longer a concern, and the totality of her answers supports that notion.  Counsel had no reason to challenge McAnear for cause.

### g.      Juror English

Regarding Juror English, the state habeas court issued findings supported by the voir dire record.  8 SHCR 2376–77.  As a preliminary matter, Leza's briefing regarding English is conclusory because he merely states she was biased, and Leza cites to a few instances on the questionnaire without explaining how she was biased.  DE 50 at 99–100.  At any rate, English first indicated that use of the death penalty should be rare, citing Ted Bundy as an example.  7 RR 182.  She agreed she could listen to all the evidence and decide one way or another.  7 RR 183.  She then cited a somewhat traumatic childhood dealing with a schizophrenic parent as a reason she tends to become emotional, but she stated she did not know how she would react to being on the jury.  7 RR 184–85.  Later she indicated a horrendous crime against a child by itself might warrant death.  7 RR 193–95.  When asked if the victim was not a child and whether she could still consider the death penalty, she stated she could depending on the brutality of the crime and whether the person is a threat to society.  7 RR 195.  The defense did not ask English any questions and noted she was very candid and had the right attitude.  7 RR 195–97.

English's questionnaire also supports the state court's findings.  *See* DE 8-35 at 17–31.  Because Leza's claim is conclusory, a full analysis of her questionnaire is not necessary.  But some of her answers are as follows:

> She is generally opposed to capital punishment except in extremely brutal or bizarre cases.  *Id.* at 19, 23.

> She would consider all of the penalties provided by law and the facts and circumstances of the particular case, and she believes each case is unique.  *Id.* at 20.

She rated herself a "3" on strength of death-penalty conviction. *Id.*

She believes there are some crimes so severe that they warrant a death penalty regardless of whether the defendant has been violent in the past, but she referred to these as "hideous violent crime," "premeditated," "methodical," and "tortuous." *Id.* at 21.

She disagreed that any person who kills another deserves the death penalty regardless of background, criminal history, age, or mental state, and she disagreed that she would probably return a death sentence if she convicted a person of capital murder. *Id.* at 24, 27.

There are some cases where life in prison is more appropriate for someone convicted of capital murder, for instance someone elderly, mentally challenged or chronically ill, whereas the death penalty is more appropriate for those who commit particularly calculated murders and are a menace to society. *Id.* at 27.

Her views on the death penalty would not impair her ability to be fair and impartial, and she could set aside her views and apply the law to the facts in accordance with the judge's instructions. *Id.* at 27, 31.

If anything, English was a favorable juror for Leza, which is likely why counsel asked her no questions. Leza's claim is meritless.

### h.    Juror Lopez

Regarding Juror Lopez, the state habeas court issued findings supported by the voir dire record. 8 SHCR 2377–78. Lopez stated she believed in the death penalty but it would be a tough decision for her; she indicated it would be needed in brutal or inhumane cases. 9 RR 41. She said she would have a hard time sentencing someone to death based on her own personality. 9 RR 42. Ultimately, she stated she was "in the middle" when it came to the death penalty. It would be hard for her due to religious reasons, but her verdict would depend on the facts. 9 RR 42–43. She indicated she could return a death sentence in extremely brutal cases such as decapitation or violence against a child. 9 RR 43. But despite her religious

convictions, she said she would wait and hear all the facts before making a decision; she would make no decisions "automatically."  9 RR 44.  When questioned by defense counsel, she agreed that the defendant's family members often suffer and become victims as well.  9 RR 46.  She believed she would be "pretty fair."  9 RR 48.

Lopez's questionnaire also supports the state court's findings.  In it, she revealed the following:

> She believed people accused of violent crimes should be punished severely, DE 8-36 at 11, but she strongly agreed that she sticks to her opinion even if others disagree and would find someone not guilty if it was the right but unpopular thing to do.  *Id.* at 17.

> Based on her religious convictions, she did not know if she could sentence someone to death, and she indicated she was generally opposed to capital punishment except in brutal or bizarre cases.  *Id.* at 19.

> She indicated that there are some cases where she could not vote for death even if the law allowed her and others where she could consider it.  *Id.* at 20, 24.

> She rated herself a "5" on strength of death-penalty conviction.  *Id.* at 20.

> She believes a person would have to have been in prior trouble with the law before she could assess a death sentence.  *Id.* at 21.

> She believes in the death penalty but considers it appropriate for inhumane acts done to a child, the elderly, or other persons.  *Id.* at 22–23.

> Life in prison is appropriate for someone who does not have a criminal history or is not a future danger.  *Id.*

> She does not believe a person who committed capital murder is likely to commit future acts of violence, unless the person had previously committed other numerous acts of violence.  *Id.* at 24.

> She strongly disagreed that any person who kills another deserves the death penalty regardless of background, criminal history, age, or mental state.  *Id.*

She stated the best argument against the death penalty is that only God could take a life, and she did not know if she could live knowing she was responsible for someone else dying. *Id.* at 25.

Life in prison is more appropriate for someone who is mentally challenged or chronically ill, whereas the death penalty is more appropriate for those who commit particularly brutal crimes or murder police officers, military members, children, or the elderly. *Id.* at 27.

A defendant's background, criminal history, age, and mental condition should all factor into the appropriate penalty. *Id.*

Her views on the death penalty would not impair her ability to be fair and impartial in a case where the death penalty is an option because she has to live with the consequences of her decision. *Id.*

There was no reason she would not be able to consider all aggravating and mitigating evidence in deciding whether or not the death penalty is justified, and she could listen to the facts and decide. *Id.* at 28.

Thus, Juror Lopez was also a juror likely favorable to the defense. At the very least, counsel had little reason to challenge her for cause. Leza's claim of bias is meritless.

### i.   Juror Vargas

Leza's petition appears to take the most exception to juror Vargas based on his supposed medical disabilities and answers Leza claims demonstrate a pattern of bias. DE 50 at 100–02. But his claim is meritless, as the state court found. 8 SHCR 2378. After the prosecution explained the law and procedure, Vargas stated that he could not judge anyone until he heard all the evidence, he would not try to fix the outcome, and he could be fair. 9 RR 76. The prosecution then informed Vargas that some of the answers on his questionnaire seemed pro death-penalty, so the prosecution asked him about his views. 9 RR 77. Vargas responded that he believed in the penalty but

would have to see the evidence first. *Id.* When asked about the special issue regarding Leza's moral responsibility, Vargas stated he could answer that question based on what he had heard, and he had not already decided that issue. 9 RR 79. When asked where he would rate himself on a scale of one to ten on his feelings about the death penalty, Vargas said he would have to hear the evidence. Thus, the prosecution asked him if he was in the middle, and he said: "Yeah. You have to hear the evidence first." 9 RR 80. Vargas then mentioned that he had hearing problems and prior brain surgery for a tumor that affected much of his body, in particular his vision. 9 RR 80-82. But he said it would not impair his ability as a juror even though he had many doctor appointments, at which point the trial judge stated: "If you're on the jury, we'll work around your appointments." 9 RR 82. When questioned by the defense, Vargas stated he agreed with the law on the special issues as stated. 9 RR 84. When asked by defense counsel McDonald if he should be worried about having Vargas on the jury, Vargas said, "I don't think so." 9 RR 86.

Vargas's questionnaire also demonstrates he could be fair and impartial. In it, he revealed the following:

He "strongly agreed" that he would find someone not guilty if it was unpopular but the right decision. DE 8-37 at 17.

He expressed sentiments that the prosecution referred to about his views on the criminal justice system, indicating there are too many legal technicalities, criminal justice should be more concerned with victims, many perpetrators do not serve significant time, a confession equates to guilt, an accused in a criminal case must present some evidence to prove his innocence, and if a defendant does not testify he may have something to hide. *Id.* at 18.

But he also disagreed that if the State brings a person to trial that the person is likely guilty, he agreed that some officers will shade the truth to make their

case better, and he strongly agreed that an accused is innocent until proven guilty beyond a reasonable doubt. *Id.*

He is strongly in favor of capital punishment in all homicide cases, and rated himself a "10" on death-penalty conviction, but he indicated if he knew a life sentence meant a defendant could never be released from prison, he would vote for a life sentence in every case regardless of the facts. *Id.* at 19–20.

He would require the State to prove a defendant had previously been in trouble with the law before assessing a death penalty. *Id.* at 21.

If he convicted a person of capital murder, he would always vote for a death sentence, but the death penalty should be used only when necessary. *Id.* at 23.

A life sentence would be appropriate for someone who has no criminal history or does not pose a future danger. *Id.*

He would consider all penalties based on the facts and circumstances, although he also indicated he would always vote for death in a case where the law allowed him to. *Id.* at 24.

He agreed that he would probably vote for the death penalty if he found someone guilty of capital murder, but he also disagreed that a person who intentionally kills another deserves the death penalty regardless of background, criminal history, age, mental state, culpability, or other factors. *Id.* at 24, 25, 27.

He believes the death penalty should be carried out more in Texas, but he believes there are some cases where a life sentence would be more appropriate depending on the murder committed. *Id.* at 26–27.

He checked "yes" when asked whether his views on the death penalty were so strong that they would impair his ability to be fair and impartial in a death penalty case, but then he wrote "it all depends on hearing [the] evidence." *Id.* at 27.

There was no reason he would not be able to consider all aggravating and mitigating evidence in deciding whether or not the death penalty is justified. *Id.* at 28.

He believes the criminal justice system is too lenient on criminals, but he agreed his verdict must be based solely on the law and evidence and per the instructions of the court, and he would reject another juror's suggestion to do otherwise. *Id.* at 27–29, 31.

134

Thus, Vargas's questionnaire was mixed; he gave answers that seemed to favor both the State and defense.  And some of his answers seemed contradictory or inconsistent.  But his views were fleshed out on voir dire, and ultimately he indicated he could follows the law.  After the voir dire, a challenge for cause likely would not have succeeded.  Moreover, the defense had to accept some jurors not exactly favorable to preclude truly unfavorable veniremembers from serving on the jury.  Thus, trial counsel had to make tactical decisions who to accept and who to challenge, and under the circumstances, not challenging Vargas was reasonable.

Finally, Leza claims Vargas should have been disqualified under Texas Code of Criminal Procedure, Article 35.16(a)(5), which states a venireman can be removed for cause if health problems render the juror unfit for service and "the court in its discretion is not satisfied that the juror is fit for jury service in that particular case." Vargas stated he has some health issues that pertain to the statute, but he did not indicate it would preclude his service on the jury, and the trial judge clearly did not seem concerned enough to excuse him.  Leza has not demonstrated otherwise.  Thus, his claim must be denied.

### j.    Juror Oakes

Regarding Juror Oakes, the state habeas court issued findings supported by the voir dire record.  8 SHCR 2377–78.  Oakes stated that she could follow the law and consider both options—life or death.  10 RR 35.  She also confirmed she was neutral on the death penalty, and she stated her feelings on the death penalty were not as strong as she originally indicated on her questionnaire.  10 RR 35–36.  She

considered some murders to be worse than others, but it depended on the facts.  10 RR

36–37.  She then stated she did not think she could serve because the trial would be

starting the same time as a planned vacation.  10 RR 39.  When questioned by the

defense, she affirmed that she stated on her questionnaire that she strongly disagreed

with the statement that if a person intentionally kills another that person deserves a

death sentence regardless of background, mental status, criminal history and other

factors.  10 RR 41.  She informed defense counsel that he could be comfortable with

her following the law, setting aside her personal beliefs, and answering the questions

based on the evidence.  10 RR 42.  At this point, the questioning ended.  Even though

Oakes had planned a vacation, the court informed her she would have to stay in town

if chosen as a juror, and then both sides accepted her as a juror.  10 RR 43–44.  The

state habeas court found:

> As shown by the strike list [ ], the defense had used peremptory strike
> #14 on Juror 51.  Juror Oakes was venire person 56.  The defense then
> struck venire person 58 for cause after interviewing Ms. Oakes.  The
> defense then used its 15th and last peremptory strike of venire person
> 60.  Venire person 61 became juror no. 11.  This was pure strategy, *not*
> ineffective assistance of counsel.

8 SHCR 2378–79 (emphasis in original).

Oakes's questionnaire also supports the state court's findings.  In it, she

revealed the following:

> She indicated she makes up her mind but will listen to others, she strongly
> agreed that she sticks to her opinion even if others disagree, and she would
> find someone not guilty if it was the right but unpopular thing to do.  DE 8-38
> at 17.

> She strongly disagreed with the following: that if the prosecution goes to the
> trouble of bringing someone to trial, that person is probably guilty; that an

accused in a criminal case should be required to present some evidence to prove his innocence; and that if a defendant does not testify it must mean he or she has something to hide.  But she did agree that a confession likely means an accused is guilty.  *Id.* at 18.

She indicated she is generally in favor of the death penalty except in cases when it is too harsh considering all the circumstances.  *Id.* at 19.

She indicated that she would consider all the penalties provided by law and the facts and circumstances of the case.  *Id.* at 20, 24.

She rated herself a "5" and "6" on strength of death-penalty conviction.  *Id.*

She believes that in some cases the facts may be so severe that she would sentence a person to death based solely on the facts without regard for whether the person has committed prior violent acts.  *Id.* at 21.

She checked "no" when asked if she convicted a person of capital murder she would always vote for the death penalty; she indicated the death penalty should be used only when necessary and that it depends on the facts.  *Id.* at 23.

She strongly disagreed that any person who kills another deserves the death penalty regardless of background, criminal history, age, or mental state, and she disagreed that if she convicted someone of capital murder she would probably vote for the death penalty.  *Id.*; *see also id.* at 27.

There are some cases where life in prison is more appropriate for someone convicted of capital murder, whereas the death penalty is more appropriate for those whose crimes are malicious or hateful.  *Id.*

Her views on the death penalty would not impair her ability to be fair and impartial in a case where the death penalty is an option, and she could set aside her views and apply the law to the facts in accordance with the judge's instructions.  *Id.* at 27, 31.

There is no reason she would not be able to consider all aggravating and mitigating evidence in deciding whether or not the death penalty is justified. *Id.* at 28.

This record shows that Oakes was not an objectionable juror for the defense; she repeatedly indicated she could be unbiased and impartial.  Trial counsel had no

reason to challenge her for cause and, according to the voir dire, appeared to want Oakes on the jury. Leza's claim regarding this juror is meritless.

### k. Juror Goodwin

Regarding Juror Goodwin, the state habeas court issued findings supported by the voir dire record that she was unbiased. 8 SHCR 2378. She agreed that she would consider all penalties provided by the law and facts of the case. 10 RR 87–88. She said she believes in the death penalty and that it is necessary in some cases but that she would want to know all the facts and circumstances before making that decision. 10 RR 88. She stated that she could be fair to Leza and answer the special issues after hearing all the evidence. 10 RR 91–92. When questioned by the defense, she said she understood that one person murdering another does not necessarily mean the death penalty will be imposed. 10 RR 93. She indicated she was "good" with the special issues. 10 RR 93–95. She acknowledged that on her questionnaire she indicated if a person intentionally kills another that person deserves a death sentence regardless of background. 10 RR 95–96. But she advised defense counsel that she was answering the same question many different ways and that she could have an open mind, listen to the evidence, and possibly decide that a death sentence is not warranted. 10 RR 97. She then indicated she would take Leza's background into consideration—both the good and bad—in assessing the penalty. 10 RR 99. She agreed life imprisonment could be a proper sentence after going through all the steps. 10 RR 99–100. She also said she could set aside her beliefs when evaluating the mitigation special issue. 10 RR 101.

Goodwin's questionnaire also showed she could be unbiased and impartial.  In

it, she revealed the following:

> She indicated she is generally in favor of the death penalty except in cases
> when it is too harsh considering all the circumstances.  She wrote: "I'm in favor
> of [the] death penalty.  However, I would want to know all the facts/evidence
> before final decision."  DE 8-39 at 19.

> She rated herself an "8" on strength of death-penalty conviction.  *Id.*

> She would not require the State to prove a person had been in prior trouble
> with the law before she could assess a death sentence, and she agreed that a
> life sentence would be appropriate under the proper circumstances.  *Id.* at 21.

> She believes that in some cases the facts may be so severe that she would
> sentence a person to death based solely on the facts without regard for whether
> the person has committed prior violent acts.  *Id.* at 21.

> She checked "no" when asked if she would always vote for the death penalty if
> she convicted a person of capital murder.  *Id.* at 22–23.

> She indicated the death penalty should be used on any person who
> intentionally kills another or on any person who kills a police officer, and
> although she indicated that life in prison was inappropriate for someone who
> kills another, she then checked two boxes: that the death penalty is
> appropriate in any murder case *and* inappropriate in some cases but
> appropriate in others depending on the convicted person.  *Id.* at 23.

> She would consider all penalties provided by the law and facts and
> circumstances of the case, but she would usually vote for the death penalty.
> *Id.* at 20, 24.

> She agreed that any person who kills another deserves the death penalty
> regardless of background, criminal history, age, or mental state, and she
> agreed that she would probably vote for the death penalty if she found someone
> guilty of capital murder, but she also checked "uncertain" and "disagree" by
> the statement "[a]ny person that kills another deserves the death penalty,
> regardless of their background."  *Id.* at 24.

> She agreed that a person's background, personal culpability, age, and criminal
> history should be considered in determining whether to assess life or death as
> punishment.  *Id.* at 24–25, 27.[27]

---

[27]     A portion of page 27 of DE 8-39 is obstructed.

She checked "no" when asked: "Are your feelings about the death penalty such that you would always vote for a sentence of death as a punishment for someone convicted of a capital murder offense, regardless of the facts or circumstances?" *Id.* at 25.

Her views on the death penalty would not impair her ability to be fair and impartial in a case where the death penalty is an option, and she could set aside her views and apply the law to the facts in accordance with the judge's instructions. She stated: "I believe I am a fair person." *Id.* at 27, 31.

There was no reason she would not be able to consider all aggravating and mitigating evidence in deciding whether or not the death penalty is justified. *Id.* at 28.

Thus, Goodwin's questionnaire was mixed—she gave some answers that favored the State and others favoring the defense. That is why defense counsel questioned her rather hard during voir dire, contrary to Leza's claim that counsel was deficient in this area. DE 50 at 103. But trial counsel ultimately elicited answers that satisfied him about Goodwin's ability to keep an open mind and be impartial. This record does not demonstrate Goodwin was challengeable for cause.

### l.   **Juror Harris**

Regarding Juror Harris, the state habeas court issued findings supported by the voir dire record that she was unbiased. 8 SHCR 2379–80. She stated the death penalty is a proper punishment "if necessary," "if it was a brutal or heinous crime," and if one has no remorse. 10 RR 117. She stated she was neither generally opposed nor in favor of capital punishment. *Id.* Regarding the proper penalty, she would consider all the penalties provided by law and the facts and circumstances of the case. 10 RR 118. She also agreed the death penalty is appropriate in some cases but not others depending on the convicted person. 10 RR 122. She then spontaneously said

that "I'm trying to be as open minded as possible" and subsequently explained why she thought she could be "fairly objective." 10 RR 123–24. Harris then indicated that graphic pictures could "change her spirit." 10 RR 124–25.

When questioned by defense counsel, counsel pointed out that all murder cases are going to have gruesome pictures, and he asked Harris if she would reach a certain verdict because of what she saw in a picture. 10 RR 126. She stated: "I would hope that [I] wouldn't, but I can't promise that [I] would or that [I] would not." *Id.* When trial counsel attempted to pin Harris down on the matter, she said she should not be that swayed by what she saw in a photo, but she could not make any promises. 10 RR 127. Defense counsel asked her if he could get a definitive answer, and Harris said: "That's the best I can give you." *Id.* Harris then stated that her mother was a guard in a maximum security federal prison, and her mother had a pending lawsuit against the prison system because she was attacked by an inmate who should have been in segregation. 10 RR 127–29. She stated again that she was neither for nor against the death penalty and that she would hope to judge each case on an individual basis. 10 RR 130. Defense counsel then gave Harris an example of an intentional killing that was not capital murder—shooting someone at point blank range six times—and Harris stated: "I do have a problem with that" and that she believed the death penalty should apply in that instance. 10 RR 131. Defense counsel explained that there have to be aggravating circumstances. *Id.* When defense counsel asked Harris if she agreed with the distinction under Texas law, she stated "I haven't really put much thought in that." 10 RR 132. She then stated that she came from Virginia to Texas

and that "in Texas, it seems like you guys just kind of, you know, take them out." *Id.*
When defense counsel asked if that was "a good thing or a bad thing," Harris
expressed misgivings about an innocent person being sentenced to death. *Id.* Defense
counsel then said: "How about this?  How about if they are guilty, but because of the
background of the individual or other certain factors that maybe the jury didn't
properly consider, they shouldn't have got the death penalty.  They should have got
life in prison." *Id.* Harris replied that she agreed with that. *Id.* Defense counsel
then explained the three special issues in detail. 10 RR 132–34.  Counsel asked
Harris if in considering the special issues she heard evidence that might be
mitigating, whether she could weigh that evidence in making a decision.  Harris
replied "yes." 10 RR 135.   Finally, defense counsel asked Harris if he could be
comfortable with her on the jury.  She replied: "I really can't tell you how I'm going
to answer any of these, you know, how I'm going to feel about - - so I can't tell you yes
or no.  It's just got to - - I have to see it, or hopefully not be here." 10 RR 137–38.  She
said she would not try to hold anything defense counsel did against Leza. 10 RR 138.

The following day, both sides accepted Harris. 11 RR 10.  Defense counsel then
stated that he wanted to put something on the record:

> During the course of jury selection, we had taken the position that the
> court improperly denied a challenge for cause on juror number 15 and
> we did not ask for an additional challenge based on the fact that the next
> juror, if we were granted a challenge and used it on Kendall Harris, will
> be a much worse juror for the defense in this case; so, therefore, we have
> decided to forego and request an additional challenge in order to avoid
> moving to juror number 66.

11 RR 11.  Thus, counsel's decision to accept Harris was strategic, and this Court must defer to counsel's decision under the circumstances.  Although Harris may not have been an ideal juror for the defense, her equivocal and somewhat ambiguous statements do not reveal that a challenge for cause would have been granted.

For his part, Leza simply points to a few facts in the record—here, the incident involving Harris's mother, Harris's statement about seeing gruesome pictures, and Harris expressing dissatisfaction about the range of punishment for a non-capital murder—claims her bias is both actual and implied, and that counsel should have challenged Harris for cause or questioned her further about these statements.  DE 50 at 104.  But counsel explained why he did not challenge Harris for cause, and counsel's questioning of Harris consists of nearly fifteen pages in the record.  As shown, defense counsel did in fact try to pin Harris down on many of these issues.  Counsel cannot be deemed ineffective in these circumstances.

Finally, Harris's questionnaire did not reveal anything alarming because she provided answers indicating she was neutral, impartial, and objective.  For instance:

She indicated she is neither generally opposed to nor in favor of capital punishment.  DE 8-40 at 19.

She indicated that she would consider all the penalties provided by law and the facts and circumstances of the case.  *Id.* at 20, 24.

She rated herself an "6" on strength of death-penalty conviction.  *Id.*

She would require the State to prove a person has been in prior trouble with the law before she could assess a death sentence.  *Id.* at 21.

She believes that in some cases the facts may be so severe that she would sentence a person to death based solely on the facts without regard for whether the person has committed prior violent acts.  *Id.*

She indicated the death penalty should be used only when absolutely necessary and that life in prison is appropriate for someone who does not pose a future danger. *Id.* at 23.

She agreed that a person's background, personal culpability, and age should be considered in determining whether to assess life or death as punishment. *Id.* at 24–25.

She stated the best argument against the death penalty is that sometimes innocent people are convicted. *Id.* at 25.

She checked "no" when asked: "Are your feelings about the death penalty such that you would always vote for a sentence of death as a punishment for someone convicted of a capital murder offense, regardless of the facts or circumstances?" *Id.*

Her views on the death penalty would not impair her ability to be fair and impartial in a case where the death penalty is an option, and she could set aside her views and apply the law to the facts in accordance with the judge's instructions. She stated: "The death penalty should be considered on a case by case basis." She also explained: "I'm a rule follower, if the law is the rule then I'd follow it." *Id.* at 27–28.

She would reject another juror's suggestion to not follow the law. She stated: I rarely let others make me break the rules." *Id.* at 31.

In short, other than what was addressed during voir dire, there was nothing about Harris's questionnaire that indicated bias. At the very least, the state court's rejection of this claim is not objectively unreasonable.

>    **4.    Leza's claim that counsel should have challenged other veniremembers for cause rather than using peremptory strikes on them is defaulted and not a viable claim.**

In his next claim, Leza alleges that trial counsel were ineffective for wasting peremptory strikes on eleven other jurors when counsel could have challenged them for cause and used peremptory strikes against those who sat on the jury. DE 50 at 105–10. Leza concedes that trial counsel did in fact challenge four of these jurors for

cause, but he claims counsel did so inadequately and were forced to use peremptory strikes against them.  *Id.*

As stated above, Leza raised this claim in his abusive habeas application.  Thus it is defaulted, and Leza cannot meet the *Martinez*/*Trevino* exception.  Although Leza addresses the voir dire of these eleven jurors, an additional analysis of these jurors is not necessary.  In *Ross v. Oklahoma*, the Supreme Court held:

> We have long recognized that peremptory challenges are not of constitutional dimension.  They are a means to achieve the end of an impartial jury.  So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated.

487 U.S. 81, 88 (1988) (citations omitted).  Thus, "[a] district court's erroneous refusal to grant a defendant's challenge for cause is only grounds for reversal if the defendant establishes that the jury which actually sat to decide his guilt or innocence was not impartial."  *United States v. Snarr*, 704 F.3d 368, 386 (5th Cir. 2013) (internal quotations and citation omitted); *see also Dennes v. Davis*, --- F. App'x ---, 2020 WL 61593, at *10 (5th Cir. Jan 6, 2020).  Therefore, whether trial counsel erroneously used peremptory strikes against these veniremembers is irrelevant as long as the seated jury was impartial.  And as shown in detail above, the jury was.  Leza, therefore, cannot make out a claim for relief.

Moreover, an "attorney's actions during voir dire are considered to be a matter of trial strategy."  *Teague v. Scott*, 60 F.3d 1167, 1172 (5th Cir. 1995).  Decisions made during jury selection are not an actionable ground for relief unless the underlying strategy is "so ill chosen that it permeates the entire trial with obvious unfairness."

*Garland v. Maggio*, 717 F.2d 199, 206 (5th Cir. 1983).  Here, trial counsel used all available peremptory strikes at their disposal.  8 SHCR 2378–79.  And trial counsel still had one left after picking Oakes, who was the tenth juror.  Thus, trial counsel could have used peremptory strikes against the majority of other seated jurors had they so chosen.  But clearly counsel believed other potential jurors were more objectionable.  Leza has not shown that trial counsel's decision to use strikes on these eleven veniremembers permeated the trial with unfairness.  At any rate, because the question is whether the seated jury was impartial, and given that Leza has failed to demonstrate the jurors were biased, the instant claim fails.

### 5.    Leza's claim of cumulative error is defaulted and meritless.

Leza alleges that the cumulative effect of trial counsel's alleged errors during voir dire deprived him of a fair trial.  DE 50 at 110.  Leza raised this allegation in his application dismissed for abuse; thus, it is procedurally defaulted, and Leza cannot meet the *Martinez/Trevino* exception because this claim is not substantial and state habeas counsel was not ineffective for failing to raise it.  As set forth above, Leza fails to establish any constitutional error concerning trial counsel's performance during voir dire.  Because he does not show any errors, his claim of cumulative error necessarily fails.  *See United States v. Moye*, 951 F.2d 59, 63 n.7 (5th Cir. 1992) ("Because we find no merit to any of [petitioner's] arguments of error, his claim of cumulative error must also fail").  Moreover, the Fifth Circuit has repeatedly rejected allegations of cumulative error that are unaccompanied by a valid ineffective-assistance claim.  *See Pondexter*, 537 F.3d at 525 (acknowledging that "[m]eritless

claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised"); *United States v. Hall*, 455 F.3d 508, 520 (5th Cir. 2006) ("Our clear precedent indicates that ineffective assistance of counsel cannot be created from the accumulation of acceptable decisions and actions.").

## XIV. Leza's IATC Claim Regarding Counsel's Failure to Investigate and Present Mitigating Evidence Lacks Merit (Claims 13, 14 & 15).

Leza contends that trial counsel were ineffective primarily at the punishment phase, but also the guilt phase, for failing to investigate and present evidence of his alleged FASD, social history, and drug abuse. DE 50 at 110–26. Leza claims this evidence was mitigating in nature and available to counsel, yet counsel failed to follow up on leads to develop this information and present a more complete picture of Leza's life. He also claims the evidence would have been relevant to his state of mind at the time of the offense and, thus, to the guilt phase. *Id.*

As a preliminary matter, Leza did claim in his original habeas application that trial counsel were ineffective for failing to present all available mitigating evidence, including FASD, his drug abuse, and the social environment in which he lived. 1 SHCR 82–96. However, in the instant petition, Leza repeatedly mixes claims raised in his initial habeas application and those he raised in his abusive application, which creates confusion regarding what is and is not defaulted. For instance, the instant claims mirror those presented in his abusive application. 1 SHCR2 133–57. But Leza argues his claims regarding FASD and social history were raised in his initial application, DE 50 at 111–12, 118, whereas his claim of drug addiction was raised in the abusive application. *Id.* at 122. Because the IATC claim Leza raised in his

147

original application clearly addressed FASD, drug abuse, and social environment, the Director considers these claims exhausted. However, Leza never argued in his original application that his supposed mental impairments were relevant to guilt-innocence; thus, that claim is defaulted, and Leza cannot show under *Martinez*/*Trevino* that the claim is substantial or that state habeas counsel was ineffective for failing to raise it.

## A.    State court findings

The Director previously addressed some of the state court findings relevant to these claims in Section II, A, *supra*, namely those regarding counsel's investigation and the fact that Leza's family were poor historians. *See also* 8 SHCR 2363–65. But the state court entered additional and substantial findings regarding these matters, particularly FASD.[28] First, the state court found that Dr. John DeMoor, who testified at the state habeas hearing, was asked to point to the portion of the DSM-IV—available to a practicing attorney in 2009—that addressed FASD. The court found that the part of the DSM-IV Dr. DeMoor cited did not mention either "'alcohol' or 'fetal alcohol syndrome' so as to put an attorney on notice of a potential problem." 8 SHCR 2366–67. The court then found Drs. Brown, DeMoor and Murphey all provided testimony indicating that the medical and psychological communities had

---

[28]    The state habeas court appeared to use "FAS" and "FASD" somewhat interchangeably in the findings discussed herein. Drs. DeMoor and Brown testified that there is a difference. FAS is accompanied by neurological problems *and* classic physical deformities, particularly abnormal facial features, and is rare. On the other hand, a person with FASD, such as Leza, lacks those features and suffers mainly from a neurodevelopmental disorder or cognitive impairment. Further, FASD is an "umbrella" term that encompasses several disorders due to prenatal alcohol exposure, including FAS. *See* 1 SHRR 71–72, 100–01, 131–33, 137. But whether the correct term applied is "FAS" or "FASD" does not alter the analysis of this claim.

limited knowledge of FASD.  8 SHCR 2367; *see also* 1 SHRR 79–83.  The court concluded that Leza had not shown that his trial attorneys should have recognized this disorder as a mitigating factor.  8 SHCR 2367–68.

Subsequently, in additional findings regarding this issue, the state court found again that "Fetal alcohol syndrome was not mentioned in [the] DSM-IV TR (text revision) when published in 2000.  The terms were not introduced into the DSM until its fifth revision on May 18, 2013, four years after Mr. Leza's trial of May 11–29, 2009." 8 SHCR 2385 (citing *Sells v. Thaler*, 2012 WL 2562666, at *59 (W.D. Tex. June 28, 2012)).  The court found that, per several of the experts who testified at the hearing, training on FAS/FASD in graduate and medical schools was limited; the diagnosis was still straining to gain acceptance in the medical/psychological community; Dr. DeMoor admitted he had limited training in this field; Dr. Brown said none of her associates had testified about this issue at the time Leza was tried, and she made allegations about Leza's counsel being ineffective that were demonstrably false, thereby undermining her credibility; "Burdette used the 1994 DSM as one of her four medical references on page 52 of her declaration, but the 1994 edition of [the] DSM did not use the terms fetal alcohol syndrome," which undermined her credibility; and trial counsel cannot be faulted for failing to utilize a diagnosis on which there was little information at the time Leza was tried.  8 SHCR 2385–87.

The state court explained that, according to Drs. DeMoor and Brown, the elements relevant to FAS are (1) the mother's alcohol use in pregnancy, (2) abnormal facial features, (3) growth problems, and (4) central nervous system problems.

8 SHCR 2387.  However, Leza failed to carry his burden for the following reasons: Leza's family was portrayed as poor historians and uncooperative; Leza's siblings were unable to state that their mother drank while she was pregnant with Leza; Leza was unable to say the extent to which, if at all, his mother drank alcohol at any time; Leza's mother Celia gave inconsistent information about her drinking stating that she did not drink regularly but quite a bit at parties; according to Burdette, "It is difficult to ascertain . . . the full extent of (Mr. Leza's) mother's alcohol consumption during pregnancy"; Celia said she drank only the first two months of her pregnancy and, even then, only on the weekends; Celia's credibility was in doubt given her illiteracy, lack of education, the time span from Leza's birth to time of trial, and her tendency to exaggerate about Leza; Dr. DeMoor placed significant credence on the statement by Robert Pena—Celia's boyfriend—that she was a heavy drinker when she was pregnant with Leza, but Celia did not know Pena until Leza was eight years old; and Dr. DeMoor said that his diagnosis would require prenatal exposure "to *significant* amounts of alcohol.  There is not a specified dose of alcohol exposure required."  8 SHCR 2387–90 (emphasis in original).

The state habeas court then found that Leza lacked the characteristics of FAS, such as classic facial features and growth abnormalities.  1 SHCR 2390–91.  The court also indicated that evidence of central nervous system problems, which occur with this syndrome, is lacking.  8 SHCR 2391–92.

The court then addressed the diagnoses provided by the experts.  According to Burdette, Leza described himself as a drug dealer and hustler, and she said that

substance abuse can further compromise the judgment of a person with FASD.  Per

Dr. Murphey, Burdette labeled Leza's lifestyle of criminal activity to be "maladaptive

functioning," but he knew how to formulate a plan to a least get drugs.   Dr. DeMoor

diagnosed Leza with "neurodevelopmental disorder associated with prenatal alcohol

exposure, borderline intellectual function (according to psychological testing),

expressive and receptive language disorder, reading disability, mathematics

disability, expressive writing disability, heroin use disorder (severe), cocaine use

disorder (moderate), and marijuana use disorder (moderate)."   And Dr. Sherman

diagnosed Leza with a conduct disorder and several developmental disorders, but

nothing along the lines of FAS/FASD.  8 SHCR 2392–93.

The state court then entered the following factual and legal conclusions:

> Mr. Leza did not prove all of the required diagnostic criteria of Fetal
> Alcohol Syndrome or its spectrum.  Mr. Leza also failed to prove that
> during the time of his case, 2007–2009, that the defense should have
> realized the medical criteria and investigated.  Mr. Leza has failed to
> carry his burden of proof that there was ineffective assistance of counsel
> in failing to produce mitigating evidence on FAS.  Even if it is assumed
> that Mr. Leza met the criteria, [Leza] did not show that FAS's reported
> effects—language delays, educational delays, learning disabilities, and
> executive dysfunctions—would have resulted in a different sentence.
> This is particularly true when one considers the adverse conditioning
> produced by his drug problems and his family's dysfunctional and
> amoral lifestyles.

> Mr. Leza failed to carry his burden of proof that his attorneys were
> ineffective in failing to raise the issue of fetal alcohol syndrome or
> complex at his trial and he failed to show any probability of a different
> result. Counsel are not required to pursue fruitless leads.

8 SHCR 2393.  This decision is not objectively unreasonable.

### B.    Leza's IATC claim regarding the failure to present FASD evidence is meritless (Claim 13).

#### 1.    Guilt-innocence phase

Leza first argues that "FASD was directly relevant to the guilt phase of [his] trial because executive functioning processes channel conscious decision-making into intentions and/or actions, and thus a diagnosis of FASD would affect the mens rea finding." DE 50 at 115–16.  As explained in Section XII, *supra*, this claim lacks merit because Texas law does not recognize a defense that "due to the defendant's mental illness, he did not have the requisite mens rea at the time of the offense because he does not have the capacity, or is absolutely incapable of ever forming that frame of mind." *Jackson*, 160 S.W.3d at 575.  Moreover, the jury clearly found Leza possessed the requisite mental state, and, as discussed at length above, the trial evidence showed the same.  Counsel is not required to engage in a futile endeavor.  *Koch*, 907 F.2d at 527.

#### 2.    Punishment

Leza claims that "if counsel had performed effectively, the jury would have heard that, because of FASD, Leza struggled through no fault of his own but rather as a result of his mother's prenatal drinking." DE 50 at 116.  He then discusses all the symptoms and behaviors stemming from this disorder.  *Id.* at 116–17.

Regarding deficiency, lead counsel Terrence McDonald testified that co-counsel Barbara Hughes was in charge of mitigation.  1 SHRR 183–84.  He mentioned to Hughes to look into FAS or FASD as a possibility, but he did not know whether she had a discussion with Dr. Roache about the matter.  1 SHRR 185–86.  Gerald

Byington testified at the evidentiary hearing that Dr. Roache and the defense did discuss the matter.   According to Byington, Dr. Roache informed the defense he would need more information and testing to confirm or rule out FASD, but he did not receive any additional information from the defense.  1 SHCR 13–16.  Nonetheless, given that the matter was discussed, the logical conclusion is that Hughes rejected it for strategic reasons.

Further, although Hughes handled the mitigation, she informed McDonald that Leza's family would not make good witnesses because what they had to say was more harmful than beneficial based on aspects of their relationship with Leza. 1 SHRR 191–92.  McDonald stated that he had faith in Hughes and believed she did a good job.  *Id.*  It follows that counsel is not deficient for refusing to place detrimental witnesses on the stand who are poor historians to gain some insight into FASD.

Moreover, based on the state habeas record, the evidence that Leza has FASD is mixed.  Drs. DeMoor and Brown opined that Leza has it.  But their opinions were based in part on information obtained from Leza's family and Burdette's declaration. And Dr. DeMoor conceded that, per Burdette's declaration, Leza's siblings said they did not recall their mother drinking. Moreover, both Burdette and Dr. DeMoor interviewed Leza himself, and he did not remember his mother ever drinking. 1 SHRR 92; *see also* 1 SHRR 58–59 (Gerald Byington acknowledging Burdette's report that none of the children remember Celia drinking and Celia providing contradictory information about her drinking).  When Celia testified at the habeas hearing, she stated she drank the first few months she was pregnant with Leza but

then only on the weekend.  And when she found out she was pregnant, she stopped altogether.  1 SHRR 160–61, 173, 176, 178.  Thus, had counsel chosen to present evidence of FASD, that would have potentially opened the door to witnesses who would have provided contradictory evidence and whom McDonald did not want to call anyway.  And McDonald had a good reason for not doing so: all of Leza's siblings, except one, have had problems with crime and drugs.  One sister had seven children, and all were taken away by Child Protective Services (CPS).  Byington agreed that jurors could say "enough is enough from this family and this gentleman."  1 SHRR 55; *see Sells*, 2012 WL 2562666, at *59 (finding reasonable counsel's decision not to present evidence of FAS or "fetal alcohol effects" in mitigation "which would likely have required presenting witnesses (particularly petitioner's own family members) potentially subject to devastating cross-examination.").

Additionally, counsel cannot be faulted for not presenting evidence of an ambiguous diagnosis like FASD.  Dr. DeMoor stated that he had very basic, limited training on FASD when he was in school.  1 SHRR 79–81.  He testified that he did not know of any professionals who could have testified about the issue at the time of trial.  1 SHRR 81.  Dr. DeMoor further said that FASD was classified in the DSM-IV TR under the category "cognitive disorder not otherwise specified."  1 SHRR 82.  But he conceded that, in this particular section of the DSM-IV TR, FASD and FAS are not mentioned.  1 SHRR 83.  Moreover, Dr. Brown stated that she was available to testify about FASD.  1 SHRR 128.  But even she acknowledged that, per a statement on her web page, there are few specialists in the U.S. trained to diagnose and treat FASD

because education of FASD is not part of a standard curriculum in medical or graduate schools. As a result, most doctors and psychologists enter the workforce with limited knowledge about it. 1 SHRR 146–47. She conceded that this was true at the time Leza was tried; that although neuropsychologists have information on it, she had to specialize in the field to receive the information; and that the DSM does not mention it as a general diagnosis. 1 SHRR 148, 150. In several similar cases, this Court has held that trial counsel cannot be faulted for not presenting evidence of FASD when the mental-health community itself has not truly accepted it. *Gonzales v. Stephens*, 2014 WL 496876, at *35 (W.D. Tex. 2014); *Garza v. Thaler*, 909 F.Supp.2d 578, 647 (W.D. Tex. 2012); *Sells*, 2012 WL 2562666, at *35.

Leza also cannot demonstrate prejudice. First, the Director addressed in Section II, D, *supra*, why evidence of FASD is double-edged and could potentially do more harm than good. But the Director notes that the Fifth Circuit has specifically found evidence of FASD to be double-edged. *Trevino v. Davis*, 861 F.3d 545, 551 (5th Cir. 2017), *cert. denied*, 138 S. Ct. 1793 (2018); *Sells v. Stephens*, 536 F. App'x 483, 495 (5th Cir. 2013) ("[W]e have previously found that evidence of fetal alcohol syndrome-related deficiencies is not necessarily beneficial to a criminal defendant.") (citing *Brown v. Thaler*, 684 F.3d 482, 499 (5th Cir. 2012) ("The [fetal alcohol disability] evidence that [petitioner] claims his counsel should have presented is 'double-edged' because, although it might permit an inference that he is not as morally culpable for his behavior, it also might suggest that he, as a product of his environment, is likely to continue to be dangerous in the future.")).

Second, also relevant to FASD, Dr. DeMoor testified at the hearing that if Leza was out on the street, he would pose a high risk for committing violent crime.  1 SHRR 100-01.  Dr. DeMoor opined that Leza would be dangerous based on the entire picture, namely his "poor judgment, his addictive potential, his tendency that he's shown to have violent behavior."  1 SHRR 103.  And as stated in Section II, D, all of the experts who opined about FASD said that it carries a risk of poor impulse control and decision making, which Leza has demonstrated.

Third, evidence of FASD would not have swayed the jury in this case.  As shown in the Statement of Facts, *supra*, Leza has an escalating history of criminal behavior, including burglary of a habitation, theft, burglary of a building and evading arrest, unlawful carrying of a weapon, criminal trespass, and failure to show proof of identity to a police officer when he had a warrant out for his arrest.  His prison and jail disciplinary history is littered with incidents where he was profane and remorseless toward staff.  The record also showed he likely attempted to escape from prison. Leza's own expert, Frank Aubuchon, testified that Leza previously served a complete six-year sentence with no parole or mandatory supervision because he was suspected of being involved in gang-related assaults and due to the charge of attempted escape. Indeed, at the time of his prior discharge, Leza was in administrative segregation. And, most of all, his prior incarceration did nothing to change his behavior because, once out of prison, he committed the brutal murder of Allen.   Under these circumstances, there is not a reasonable probability that double-edged and

156

ambiguous evidence of FASD would have swayed the jury at punishment. At the very least, the state court's rejection of this claim is not objectively unreasonable.

### C. Leza's IATC claim regarding social history is meritless (Claim 14).

Leza claims that trial counsel were ineffective for failing to present a more thorough social history, such as physical ailments Leza had as a child; the dysfunctional and abusive relationship between Celia and Leza's father; Celia's outbursts, alcoholism and poor parenting; the family frequently moving; Leza's school problems; that Leza was easily led by his peers and often committed crime as a result; the criminal histories and drug abuse of his family members; and Leza's subsequent drug addiction. DE 50 at 119–22.

The first problem with this claim is that it relies on declarations from Leza's family members, specifically Leza's brothers Fernando and William, his sister Sally, his cousin Patricia Castro, and his aunt Ofelia Arellano. DE 11-15, 11-17, 11-18, 11-19, 12-1. In his initial state habeas application, Leza presented declarations from Sally, Celia, Orlando, and William, but none of these declarations pertained to Leza or his family's background and history; they pertained to an alleged statement Trevino made after she was incarcerated and Leza's involvement, or lack thereof, in the drive-by shooting. 1 SHCR 268–72; 2 SHCR 583. Because Leza concedes the instant claim was presented in his initial habeas application and adjudicated on the merits, DE 50 at 118, these new declarations are barred under *Pinholster*.

Second, as shown above, trial counsel had no intention of calling Leza's family because counsel learned what they had to say was more harmful than helpful. Trial

counsel did present testimony from Leza's father and stepsister, but this was mainly to highlight Celia's threatening behavior.   18 RR 116-26.   Investigator Ybarbo interviewed Leza, his sisters Amanda and Sally, his brother Orlando, and his mother Celia.  6 SHCR 1833-39; 7 SHCR 1840-41.  Ybarbo noted that Amanda was the only one in the family with no criminal record and did not use drugs.  6 SHCR 1837. Counsel is not ineffective for choosing not to present witnesses who could do more harm than good. *Duff-Smith v. Collins*, 973 F.2d 1175, 1183 (5th Cir. 1992).  Calling a host of family members who are or were incarcerated and who abuse drugs would have created credibility issues and likely convinced the jury that Leza's propensity for violence was a foregone conclusion given his family history.  *Boyle v. Johnson*, 93 F.3d 180, 187–88 (5th Cir. 1996) (trial counsel not ineffective for refusing to put defendant's father on the stand who was a "pill-popping" truck driver because the jury might think "like father like son").

Third, this is not a case where the defense was unaware of these issues due to a lack of investigation.   Matthews's records show that she interviewed family members for several hours.  6 SHCR 1587–88.   Investigator Ybarbo stated that he interviewed William in the Bexar County Jail and received some background information on Leza.  William told Ybarbo that the divorce of their parents affected all the sons and, after the divorce, Leza looked up to their brother Ernesto as the father figure.  But then Ernesto died, and Leza turned to William as the role model. Once William started getting involved in crime, so did Leza, which culminated in the instant murder.  2 SHCR 580.  Ybarbo also interviewed Leza, his mother, sister, and

158

brother.  6 SHCR 1833–39; 7 SHCR 1840-41.  And during final argument at the punishment phase, co-counsel Hughes argued the following based on the evidence presented: Leza has a drug problem and is a severe addict; he had poor parenting and wanted to remove himself from the situation with his mother; he dropped out of school at 12 years of age, had no support, and was left to his own devices; he chose to spend time with his cousin Julia to get away from his mother; his mother even frightened his father, which indicates how frightening she must have been to Leza; Leza was not nurtured; Leza showed remorse for his actions; and at least one of Leza's siblings is in jail, and no family members came to court to support Leza.  19 RR 14–17.

Fourth, and related to the above, the picture Leza now paints of his family is quite different than much of what Ann Matthews learned.  Some of it is consistent, some of it not, but most is not helpful.  Leza told Matthews that in school he did not want to do the work and he was suspended for fighting; he saw his father whenever he wanted; his behavior got worse, and he did what he wanted; his life at home was not good, but his mother did not drink or do drugs, she was there for the children, and she would help in any way; he discussed his troubled criminal history and said "the way he is brings him back"; his older brother William had similar problems, but Leza wanted to be like him; he was friends with members of the Latin Kings gang, which has "[l]ots of shootouts"; Celia "tried to correct him"; and Trevino's family "were Latin Kings."  6 SHCR 1625–28.

During the family interview, Matthews learned the following: when Celia was pregnant with Leza, Leza's father beat her and forced her to go to a shelter; Leza

followed his brother William; Leza never did drugs in front of his mother; Leza was always in trouble in school and was picked on by other students; at one point Leza got mad at his mother based on an argument involving Trevino, but "a [f]ew hours later, he was happily kissing mom"; Leza had illnesses as a child including pneumonia, fevers, and seizures; he *started* doing drugs when he met Trevino and started getting "locked up" when he spent time with Trevino's family; at age seventeen he stopped following his mother's rules; and CPS has custody of Leza's child.  6 SHCR 1629–30.

Upon interviewing Celia, Matthews learned: she experienced no complications when Leza was born; Leza's father once kidnapped him and took him to Mexico; as a child Leza developed sores on the top of his head that would start to bleed; Leza was slow, it was "[h]ard for him to learn," and he was in special education; and she moved a lot as a single mom.  6 SHCR 1631.

Matthews also interviewed Robert Pena, Celia's boyfriend after she divorced Leza's father.  Matthews learned: Pena and Celia have been together since Leza was eight years old; Leza's father was abusive and beat Celia, and William would try to stop the beating; Leza's father "is worthless," did not care about his kids, never had money for the kids, and deducted money for Leza's clothes from Leza's paycheck when Leza worked at his restaurant; Leza was slow in school, in special education, a follower, and did what he was told; Celia gave the kids what they needed, and Pena helped her provide for the kids; Leza would do whatever Trevino told him to do; Leza's brother Ernest died of a heart attack due to drug use; Celia defended her children

and got mad if asked about them; Leza started getting into trouble when he began spending time with the Trevinos; he believed both the children and Celia are bi-polar; Celia drinks about a six-pack of beer a day; Celia has very high blood sugar and drinks a lot of Dr. Pepper; Leza never had a father figure to teach him right from wrong; and Celia "would do anything for [her] kids." 6 SHCR 1632–33.

Finally, Matthews interviewed Larry Ramirez, who was a friend of Leza's family. Ramirez stated Leza did well when Trevino was locked up and not around— "he was trying to get his act together, wanted to do better, and get a job, etc."; as a manager for construction jobs, Ramirez wanted to hire Leza because he saw Leza "had potential to make a good employee"; Leza "went down hill" once Trevino came back into the picture, he would "bow his head around" her, and she told him what to do; Ramirez knew Leza and Trevino were involved with drugs, but he never saw them using; and Leza got along great with his mother, who "did what was best for him." 6 SHCR 1634.

Thus, the defense had much of the information Leza now argues should have been presented. That counsel chose not to present many witnesses about Leza's life and social history indicates counsel did not believe these persons would make good witnesses. Moreover, the defense was presented with many inconsistencies. Matthews's information paints Leza's father and Trevino as the primary negative influences on Leza's life. Celia, on the other hand—and contrary to the instant claim—is described in mainly positive terms as a person who cared for Leza and tried to do her best for him. Ultimately, counsel chose to present Leza's father's side of the

161

story but in limited fashion.  Given the credibility issues of Leza's family and these many inconsistencies, counsel did not have much to work with.  Under the circumstances, counsel cannot be deemed deficient.

Fifth, an additional problem with Leza's claim is that, as shown, Burdette stated in her declaration on state habeas review that the family consists of "inconsistent" and "poor" historians. 1 SHCR 141, 156, 158. Thus, obtaining accurate information from them has been difficult even long after Leza's conviction.  For Leza to claim that his new information somehow demonstrates counsel's ineffectiveness—that the information was readily available had counsel simply asked—is the epitome of hindsight and is not supported by the postconviction record.

Sixth, even if this Court could consider the new declarations from Leza's family, much of the information in them is detrimental, aside from being inconsistent with what Matthews learned.  These declarations reveal a family dominated by chaos, dysfunction, crime, alcoholism, prison time, and drug addiction.  For instance, William states the following in his declaration:

> Mom was an alcoholic from as far back as I can remember. Many members of her family were alcoholics.  Both of Mom's parents, Sotero and Felis Sanchez, were alcoholics.  My grandmother died from alcoholism.  Mom had three brothers.  At least two of them were alcoholics.  Uncle Sotero Sanchez had several arrests for driving while intoxicated.  Uncle Gilbert was arrested so many times for drunk driving, he went to jail and prison a bunch of times.

DE 11-17 at 4.  Fernando states the following in his declaration:

> Because they lived with us for more than two years, I was able to see how bad Armando's and DeeDee's addictions were.  In the beginning, they tried to hide their use of heroin and cocaine, but it reached a point that they were so strung out they didn't care who saw them using. I

remember watching them inject drugs while riding in my car as I drove
down the road.

DE 12-1 at 5.  Fernando also admits to being a heroin addict.  *Id.* at 6.  Patricia Castro
states: "I suspect that Armando and his siblings were introduced to drugs by their
mother.  A lot of us knew that Celia sold cocaine for many years.  Her sons sold it for
her.  All three of the Leza boys became heroin addicts.  Armando's sister, Sally, is still
addicted to heroin."  DE 11-19 at 3.  Ofelia Arellano states in her declaration:

> I came to know first-hand the sorts of problems Celia's children got into.
> For a while when he was a teenager, William stayed with my family.  I
> caught him stealing from my purse on more than one occasion.  After my
> home was burglarized, I suspected William was responsible.  The
> burglars, who were friends of William, broke into my home and stole a
> television and other items.

DE 11-18 at 4.

In sum, these declarations paint a picture of Celia as a neglectful, abusive
parent and Leza as a dim-witted, slow person who had trouble with basic tasks and
jobs involving manual labor.  As shown, the information Matthews received was quite
different.  At any rate, even if there is some mitigating value to the information in
these declarations, it is overcome by characterizations of the family's pervasive
criminality and drug abuse.  *See Williams v. Stephens*, 575 F. App'x 380, 387–88 (5th
Cir. 2014) (counsel not ineffective for not offering evidence of drug abuse "because it
was 'double edged' evidence that was just as likely to suggest to the jury that Williams
would be a future danger"); *Brown*, 684 F.3d at 499 (finding reasonable counsel's
decision to not offer evidence of a defendant's troubled, impoverished, and
disadvantaged background because the evidence was "double-edged" in that it "might

suggest [that he], as a product of his environment, is likely to continue to be dangerous in the future") (citation and internal quotation marks omitted); *Kitchens v. Johnson*, 190 F.3d 698, 703 (5th Cir. 1999) ("[I]f counsel had introduced the hospital records, the jury may have better understood his mental state, but would have seen a long history of drug and alcohol abuse.  Thus, given the double-edged nature of this evidence, it is hard to conclude that it would have aided Kitchens' cause.").

Finally, for the reasons stated in the prior section, Leza cannot demonstrate prejudice.  The mitigating value of this new evidence, if any, does not outweigh Leza's criminal history, his poor prison behavior, and the brutal facts of the crime.  At the very least, the state court's decision is not unreasonable.

### D.   Counsel were not ineffective for not presenting evidence of Leza's drug addiction (Claim 15).

Leza argues that trial counsel were ineffective for failing to present evidence of his drug addiction and for not hiring a drug-addiction expert.  DE 50 at 122–26.  Leza claims such an expert "could have informed the jurors of Leza's genetic predisposition to drug addiction, how the drugs affected his brain, and how his addiction diminished his already impaired impulse control—thereby mitigating Leza's behavior both prior to and at the time of the offense."  *Id.* at 124.

Leza states that he presented this claim in his abusive habeas application, which he did.  1 SHCR2 152–57.  But Leza also addressed his drug abuse in his initial habeas application, particularly in the section pertaining to mitigating evidence.  1 SHCR 10, 13–15, 86, 88–91.  Leza's drug usage is a persistent theme in Burdette's declaration, 1 SHCR 155, 157, 159–62, 165, 168, 174–77, 179, 181–83, as well as the

hearing testimony from Byington, Dr. DeMoor, and Dr. Brown, 1 SHRR 39–41, 53–55, 97–98, 102–03, 134–36.  The state court findings also reference Leza's drug usage.  8 SHCR 2283–85, 2287, 2319, 232, 2364, 2392–93, 2396, 2404.  Thus, the Director believes this claim was adjudicated on the merits by the state court.  Leza's new evidence from a drug addiction expert, DE 8-22, is thus barred under *Pinholster*.  To the extent this claim was only raised in Leza's abusive application, it is defaulted, and he cannot meet the *Martinez/Trevino* exception given that the claim is not substantial and that state habeas counsel was not ineffective for failing to raise it.

As shown in the section above, the Fifth Circuit has routinely held that counsel is not ineffective for failing to present evidence of drug abuse and addiction due to its double-edged nature.  *See also Ayestas v. Davis*, 933 F.3d 384, 392 (5th Cir. 2019), *cert. denied*, --- S. Ct. ---, 2020 WL 871712 (Feb. 24, 2020); *Butler v. Davis*, 745 F. App'x 528, 533–34 (5th Cir. 2018), *cert. denied*, 139 S. Ct. 1545 (2019).  In *Woods v. Thaler*, the Fifth Circuit rejected a claim similar to Leza's, holding:

> [T]he problem with this type of evidence is that it can also be used as evidence of a probability of future dangerousness.  One whose brain chemistry has been altered by prolonged substance abuse or who suffers from a mental disease because of a genetic predisposition would likely continue to pose a probability of future dangerousness.  This would have undermined trial counsel's strategy to present Woods as someone who would not be a future danger once he did not have access to drugs and was shown for the first time that actions have consequences, unlike when he had nearly unrestricted access to drugs and did not experience any discipline growing up with his mother.

399 F. App'x 884, 897 (5th Cir. 2010).  And Leza cites no cases that state the opposite, i.e., that presentation of drug use and addiction is beneficial.

The other flaw with this claim is that this was apparently not an issue counsel wanted to significantly delve into, per their mitigation case and McDonald's testimony. The defense had to acknowledge Leza's drug habit because he told the police he "shot up" with heroin before his arrest. The defense then brought in an expert, Dr. Roache, to challenge his confession on that basis. But presenting evidence of his drug addiction at punishment would have likely displayed his character in a negative light. And as the Fifth Circuit pointed out in *Woods*, presenting evidence that Leza's addiction was due to a genetic predisposition might have only convinced the jury that he would continue to be dangerous.

Moreover, a significant flaw with Leza's claim is that counsel did consult an expert, Dr. Roache, about the effects of drugs on cognition. Dr. Roache testified at the pre-trial suppression hearing and likely could have offered testimony about the matter during punishment. That counsel chose not to call Dr. Roache at punishment leads to only one logical conclusion: for strategic reasons, this was not a topic counsel wanted to highlight. Complaints of uncalled witnesses are not favored in federal habeas review, and a petitioner must overcome the strong presumption that his counsel's decision in not calling a witness was strategic. *Hinkle v. Dretke*, 86 F. App'x 687, 688 (5th Cir. 2004).

Finally, for the reasons addressed previously, Leza cannot demonstrate prejudice. Because the state court's rejection of this claim is not unreasonable, the claim must be denied.

**XV.  Leza's Additional IATC Claims that Counsel Failed to Prepare and Present Witnesses Are Defaulted and Meritless (Claim 16).**

In his next set of claims, Leza alleges that (1) trial counsel failed to adequately prepare and present the witnesses who did testify at the punishment phase of trial; (2) trial counsel failed to counter the State's evidence regarding Leza's involvement in a drive-by shooting; and (3) trial counsel failed to counter evidence of Leza's attempted escape from prison.  DE 50 at 126–32.  Claim 2 was presented in Leza's initial state habeas application, which was adjudicated and denied on the merits. 1 SHCR 77–82.  This decision is not objectively unreasonable.  Leza presented claims 1 and 3 in his application dismissed for abuse of the writ.  1 SHCR2 159–66.  Leza cannot overcome his default via *Martinez/Trevino* given that the claims are not substantial and that state habeas counsel was not ineffective for failing to raise them.

**A.  Leza has not shown that trial counsel inadequately prepared witnesses.**

Leza claims that trial counsel were ineffective for failing to adequately prepare and question those witnesses who testified for him: his father Armando Leza Sr., Julia Sanchez, and his sister Amanda.  The Director addressed this issue in the section above because Leza primarily complains that counsel failed to elicit from these witnesses the same evidence about Leza's dysfunctional family, Celia's poor parenting, Leza's personal characteristics, drug abuse, and the environment in which Leza lived.  As shown, much of this evidence is laced with damaging information that counsel likely wanted to keep to a minimum.

At any rate, regarding Leza's father, Leza contends that, if properly interviewed and prepared, Armando Leza, Sr., could have testified that Celia abused alcohol while pregnant; Celia went into rages and abused Armando and the children; Celia made suicide threats; Celia got the children involved in drugs, and she sold drugs herself; Celia left the children at home while she went to bars; Celia did not care about Leza dropping out of school; and he, Armando Sr., wanted to guide Leza in the right direction but Celia "sent him in the wrong direction." DE 50 at 127. The problem with this claim is that some of this evidence, although brief, was presented. *See* Statement of Facts, *supra*. Armando described Celia's controlling and threatening behavior when it came to Leza. He stated: "I [tried] for the young boy to be with me, but in reality, the fear that I had for her was really big, and I think it was a mistake on my behalf not to talk to the police." 18 RR 125–26. Julia Sanchez confirmed much of the same about Celia. Julia described the occasions when Celia told Julia that Leza could stay with her over a weekend, and then Celia "snapped" and said she wanted Leza back. Celia was threatening toward Julia, and Julia was afraid of her. 18 RR 118. Julia also described another event where Celia threatened Armando by walking toward him while swinging a chain. 18 RR 119.

Thus, the jury was told that Celia was a poor parent whom both Armando and Julia feared. Therefore, in part, Leza is complaining about counsel's failure to present cumulative evidence, which is inadequate to demonstrate ineffective assistance. *Norman v. Stephens*, 817 F.3d 226, 233 (5th Cir. 2016); *Trottie v. Stephens*, 720 F.3d 231, 244–47 (5th Cir. 2013).

As for the remainder of this evidence, the record reveals additional problems. As discussed in the prior section, Matthews interviewed the family and received a much different picture of Celia and Armando Leza, Sr.  In short, her information painted Armando as the culprit who cheated his kids, did not care for them, and beat his wife; Celia was portrayed as the caretaker who did all she could for her kids; and other than Pena's statement that Celia drank heavily, Leza denied this, and no one mentioned Celia doing drugs.  Faced with all these inconsistencies—as well as Armando's trouble testifying via an interpreter, 18 RR 125—counsel were not deficient for limiting his testimony.

Leza also claims that if properly prepared and interviewed, Julia Sanchez and Amanda Leza could have provided additional mitigating evidence of Leza's social history.  DE 50 at 128–29.  This evidence is in the same vein as that described in Section XIV, C and D, *supra*, namely Leza's troubled upbringing, dysfunctional family, his drug addiction, and primarily the neglect and abuse Celia inflicted on the children.  *Id.*  For the reasons addressed in these prior sections, Leza's claim fails. Moreover, trial counsel clearly had a good reason for limiting Amanda's testimony: she proved to be a disastrous witness who could not follow the court's basic instructions about what Trevino supposedly told her after the crime and, in the process, provided contradictory information to the court.  18 RR 104–15.  Amanda's credibility was diminished by the time trial counsel asked her if she wanted to say anything else to the jury.  It would not have been wise for counsel to continue to question Amanda about these other matters.

Because this claim is not substantial, Leza cannot demonstrate prejudice nor can he show state habeas counsel was ineffective for failing to raise it. Thus, the claim is defaulted.

### B. Trial counsel were not ineffective for not presenting additional evidence about the drive-by shooting.

Leza claims that counsel were ineffective for failing to present witnesses— Leza's brother William and Rudy Trevino—to testify that Leza had no involvement in the drive-by shooting the State tried to address at punishment. Leza states: "Collectively, [William] Chapman would have testified that Leza did not participate in the shooting, and Trevino found Leza's presence to be so negligible he did not recall him even being in the truck." DE 50 at 130. Leza raised this claim in his initial state habeas application, 1 SHCR 77–82, and the state court's rejection is not objectively unreasonable.[29]

This claim has no merit for several reasons. First, at trial, the State attempted to show Leza was involved in a drive-by shooting that left Abel Carrasco dead. 17 RR 34–41; 18 RR 4-11. Rudy Trevino and William Chapman were apparently convicted for the offense. DE 11-2 & 11-5. But, ultimately, all the State established was that, per the testimony of Jesse Peck, Leza was in the bed of a truck that included Trevino and Chapman, and he passed a loaded gun clip to Trevino that was never used. 17 RR 36–41. The State's other witness, Albert Aguilar, testified he was in the car with

---

[29]   The state court did issue findings pertaining to this claim, but the findings erroneously addressed a separate issue. 8 SHCR 2383–84. For this reason, the CCA rejected these findings. *Ex parte Leza*, 2017 WL 117347, at *2. But this is of no moment because it is the state court's "ultimate decision" that is to be tested for unreasonableness and not every jot of its reasoning. *Neal*, 286 F.3d at 246.

Carrasco when Carrasco got shot, but he did not recognize Leza and did not see Leza shoot the gun.  18 RR 4–11.  The State then attempted to place Carrasco's mother on the stand to prove her son was murdered, but the defense contested her testimony. 18 RR 13–14.  Outside the presence of the jury, the court asked the State how her testimony was relevant.  *Id.*  The court said: "You haven't even proved a murder.  You haven't even come close to proving a murder.  Your only witness doesn't even say that this guy did anything at the time of the shooting in that car.  Your own witness says that."  18 RR 15.  When the prosecution tried to argue that Leza's role was loading the clips and handing them to the perpetrators, the court responded: "No he did not. I beg your pardon.  What the witness said is the guy shot the gun.  This guy [Leza] loaded the clip and then no other guns were fired . . . . This second witness has no idea who loaded that clip, when, or anything."  *Id.*  The State tried to argue that the jury could put the case together, but the trial court disagreed, asserted the State had not proven anything, and dismissed Carrasco's mother as a witness.  18 RR 15–18. Via stipulation, the jury was simply informed Carrasco was killed in the shooting, but Leza's involvement was not mentioned.  18 RR 18–21.

Thus, the evidence the State presented of Leza's involvement in the murder was thin.  Only one witness, Peck, placed Leza in the truck, and Peck downplayed Leza's involvement in the shooting.  Although the State tried to argue that Leza was a party to the offense, 19 RR 23–24, 27, 29, the defense argued that Leza was simply in the back of the truck and handed someone a clip after the shooting.  19 RR 19–20. Given that Leza's role in this matter was questionable at best—per the trial court the

State proved nothing— Leza was not prejudiced by counsel's decision not to present other witnesses about the offense.

Second, Trevino's and Chapman's declarations are of no help. They both claim that Leza had no involvement in the 1992 Carrasco murder at all. DE 11-2 & 11-5. But in another declaration, Chapman contradicts himself and Trevino and states: "Armando was with me the night of the shooting but he did not shoot anyone. Armando was just riding with us that night." DE 11-17 at 2. This latter statement confirms what Peck stated at trial; it simply omits the part about Leza handing a clip to Trevino. Thus, their testimony would have added nothing.

Third, per McDonald, counsel made a tactical decision not to rely on Leza's family due to their credibility issues and negative associations with Leza. It would not have aided Leza's cause to place on the stand two persons incarcerated for murder to provide redundant evidence. And as shown, Chapman's credibility is already diminished by his conflicting declarations. Had counsel placed Trevino on the stand to prove Leza had no involvement, and then Chapman testified that Leza was present but did not shoot anyone, that would have only made matters worse and ultimately diminished the defense's credibility. At the very least, Leza cannot demonstrate any prejudice or that the state court's decision is unreasonable.

## C. Trial counsel were not ineffective for not presenting additional evidence about Leza's attempted escape.

Leza claims that trial counsel were ineffective for not calling former inmate Robert Pina to counter the State's evidence that Leza tried to escape from prison during his prior incarceration. DE 50 at 131–32. Leza raised this allegation in his

application dismissed for abuse.  1 SHCR2 163–66.  Leza cannot overcome his default under *Martinez/Trevino* because the instant claim is not substantial and state habeas counsel was not ineffective for failing to raise it.

As shown in the Statement of Facts, *supra*, prior TDCJ officer Rene Avila testified that in the early morning hours of August 17, 2001, he was looking for some missing prisoners on the Connally Unit, including Leza.  He was in the back dock area looking for them, which is outside, and then he looked through some double doors and saw three individuals.  They did not have permission to be there at 1:00 a.m.  Leza was on top of a bread rack, which was leaning against the freezer, and part of Leza's body was on the freezer.  Leza was probably a couple of feet from the roof access panel.  Other officers responded and they took custody of the inmates.  Leza received a loss of recreation and commissary privileges for forty-five days as a result.  TDCJ officer Billy Carr testified that once the offenders were found and apprehended, he and another officer found three state issued cold weather coats, three extra state issued pants and shirts, and four strips of galvanized metal crafted into different forms in the crawl space between the freezer and hatch.  The roof access hatch had been slightly damaged indicating it had been jimmied.

Leza now provides a declaration from Robert Pina, who claims to be one of the other inmates placed in custody at the time.  DE 12-6.  Leza claims that, if called to testify, Pina would have stated the following.  At the time, he was a night shift cook in the kitchen.  He was talking to Leza and inmate Roy Garcia in the hallway when he noticed a latch in the door to the ceiling was undone.  Thinking they would get in

trouble, they "freaked out" and made a quick decision to try to fix it.  Leza and Garcia grabbed a bread rack to use as a ladder, and Pina climbed up to fix the latch, which Pina says in retrospect was a bad idea.  Then, an officer spotted them in the hall trying to fix the latch, asked them what they were doing, and Pina was ultimately placed in a cell awaiting a disciplinary hearing.  He states that he does not know how the clothing got on top of the freezer and that he did not put it there.  DE 12-6 at 2.

Pina then states the following: he was supposed to be in the kitchen that night, and neither he nor the others were trying to escape; he believes he was punished due to the fallout of the Texas Seven prison escape; Carr and Avila's testimony was misleading because it would not have made sense for the inmates to try to escape from that part of the prison given that it was visible from several large windows and because the kitchen is in the middle of the prison, which would have required an inmate to navigate other obstacles to escape; the door latch is nowhere near the freezer where the clothes were found; and Leza said he had been granted parole, which Leza states would have made it unlikely he would try to escape so close to release.  *Id.* at 2–3; DE 50 at 132.

Pina's declaration is problematic for several reasons.  First, Pina indicates that he and the others had permission to be where they were but got in trouble because an officer merely spotted them in the hallway trying to fix the latch.  To the contrary, both Avila and Carr testified they were looking for three *unaccounted for* inmates and that the inmates did not have permission to be where they were.  Second, Pina does not explain why they "freaked out" and felt it was their responsibility to go to such

174

trouble to fix a latch that, if Pina is to be believed, none of the three broke.  Third, Avila found Leza on top of the freezer and bread rack; he did not testify that Leza was on the ground and Pina was at the top.  The officers' testimony also does not support Pina's claim that the latch was not near the freezer.  Fourth, had Pina testified, he would have been rigorously cross-examined on the coincidence that three inmates were involved and three sets of clothing were found in the crawl space, not to mention the metal needed to pry open the latch to the roof.  Fifth, if Leza had in fact been granted parole, it indeed would not have made sense for him to try to escape. But it also would not make sense that he would jeopardize his parole by being unaccounted for at 1:00 a.m. and in a particular area without permission doing something that looked extremely suspicious.

Pina's declaration is problematic for an additional reason.  He states that he only knew Leza in passing, he did not see Leza outside of work at the kitchen and, even then, "our paths did not cross often at work," and that the night in question "was the only time I spent more than a few minutes with him."  DE 12-6 at 3.  But he then says: "Based on my contact with Leza, I would not have depended on him with anything important.  It wasn't that I thought Leza wasn't trustworthy, it was just obvious to me that he was not very smart.  He seemed to struggle for words when he talked and just wasn't very bright."  *Id.* at 3–4.  It is odd that Pina could form a concrete opinion about someone he hardly knew and one that, coincidentally, conforms to what all the other declarations above state about Leza.

The bottom line is that had counsel presented Pina as a witness, counsel would have had to persuade the jury to believe an ex-convict with a shaky story over the consistent versions from two TDCJ officers.   It is doubtful counsel would have succeeded in this endeavor.   It is also possible that the strategy could have backfired. Defense counsel elicited from Avila that Leza only received a loss of privileges for this offense, which is arguably a minor penalty for an attempted escape.   Had counsel placed Pina on the stand and the jury disbelieved him, this may have only reinforced the argument that Leza was indeed trying to escape.

At any rate, this incident is minor in comparison to Leza's criminal history and, particularly, the brutal facts of the offense.   Therefore, Leza cannot show that counsel's failure to call Pina resulted in prejudice.   Leza fails to meet the *Martinez/Trevino* exception, and the instant claim is defaulted.

## XVI.   The Trial Court's Failure to Define Sentencing Terms Does Not Amount to a Constitutional Violation (Claim 17).

Leza alleges that the Texas capital sentencing scheme—the language in the special issues—is unconstitutionally vague and fails to channel the jury's discretion because it fails to define the terms "probability," "criminal acts of violence," "continuing threat to society," and "militates."   He further argues that trial counsel were ineffective for failing to request the trial court to include specific definitions. DE 50 at 132–41.   Leza raised this claim on direct appeal and in his initial state habeas application.   *Leza v. State*, 351 S.W.3d at 362; 1 SHCR 98–99; 8 SHCR 2408– 09.   On direct appeal, the CCA held that it has previously rejected these claims and that Leza did not distinguish his case from the others.   *Leza v. State*, 351 S.W.3d at

176

362.  On habeas review, the state court issued findings rejecting this claim on the merits, but the CCA held that the allegation was procedurally barred because it was raised and rejected on direct appeal.  *Ex parte Leza*, 2017 WL 117347, at *1.  These decisions are not objectively unreasonable.[30]

Leza's claim must be denied because the Fifth Circuit has repeatedly rejected the exact same arguments.  *See Sprouse v. Stephens*, 748 F.3d 609, 622–23 (5th Cir. 2014) (denying COA on complaints about the lack of definitions of "probability," "criminal acts of violence," and "continuing threat to society" in a Texas capital sentencing jury charge); *Paredes v. Quarterman*, 574 F.3d 281, 294 (5th Cir. 2009) (holding the terms "probability," "criminal acts of violence," and "continuing threat to society" "have a plain meaning of sufficient content that the discretion left to the jury is no more than that inherent in the jury system itself"); *Leal v. Dretke*, 428 F.3d 543, 552–53 (5th Cir. 2005) (listing numerous Fifth Circuit opinions rejecting complaints about the failure of Texas courts to define the terms "probability," "criminal acts of violence," and "continuing threat to society").  This Court has held the same.  *Moore v. Quarterman*, 526 F.Supp.2d 654, 721 (W.D. Tex. 2007); *Martinez v. Dretke*, 426 F.Supp.2d 403, 530 (W.D. Tex. 2006).  The Fifth Circuit has also indicated that

---

[30]      A quirk with Leza's claim is that, on direct appeal, he challenged the terms "probability," "criminal acts of violence," and "militates" but *not* "continuing threat to society." *Leza v. State*, 351 S.W.3d at 362; *see also* Appellant's Brief at 102–08, 129–32.  On state habeas review, he challenged the terms "probability," "criminal acts of violence," and "continuing threat to society" but *not* "militates."  1 SHCR 98–99.  The direct appeal claims were adjudicated on the merits; thus, § 2254(d) applies to them.  But because the CCA determined the state habeas claim was defaulted, Leza's claim with regard to "continuing threat to society" is defaulted.  And Leza provides no argument to overcome his default as it pertains to that term.

177

the term "militates" is not unconstitutionally vague. *Robles v. Thaler*, 344 F. App'x 60, 63 (5th Cir. 2009) ("The words 'mitigates against' follow immediately after the words 'militates for.' The sentence structure suggests a clear contrast and, when read in context, the meaning of the later term is plain. Common sense suggests a meaning opposed to the words preceding the disjunctive, and the jury was not likely to be confused by its usage."). And regarding "militates," the CCA has rejected that claim many times. *Petetan v. State*, ---S.W.3d---, 2017 WL 915530, at *47 (Tex. Crim. App. 2017); *Jenkins v. State*, 493 S.W.3d 583, 615 (Tex. Crim. App. 2016); *Gardner v. State*, 306 S.W.3d 274, 302–03 (Tex. Crim. App. 2009).

Moreover, because the Supreme Court has never held that Texas's capital sentencing statute contains vague terms that require definitions, Leza's claim is barred under non-retroactivity doctrine of *Teague v. Lane*. *See Kerr v. Thaler*, 384 F. App'x 400, 404 (5th Cir. 2010).

Leza also claims that trial counsel were ineffective for failing to request definitions of these terms. DE 50 at 141. This claim is not exhausted and is procedurally defaulted because Leza never raised an IATC claim on direct appeal or habeas review regarding the failure to request definitions of these terms. Leza cannot overcome his default via the *Martinez/Trevino* exception because, as shown, this claim is not substantial. Counsel is not required to make futile motions or objections. *Koch*, 907 F.2d at 527. Thus, habeas relief must be denied.

## XVII. The Grand Jury Indictment Need Not Include the Aggravating Factors in the Texas Special Issues (Claim 18).

Leza alleges that the grand jury indictment in his case was defective because the grand jury did not consider the aggravating elements contained in the Texas special issues, namely the future dangerousness special issue.  DE 50 at 141–44.  He relies on *Apprendi v. New Jersey* and *Ring v. Arizona*[31] for the proposition that all aggravating elements, including the future dangerousness question must be pled in the indictment.  *Id.*  Leza raised this claim on direct appeal, and the CCA rejected it. *Leza v. State*, 351 S.W.3d at 354.   This decision is not objectively unreasonable.

In *Apprendi*, the Supreme Court held that "[o]ther than the fact of prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt[.]"  530 U.S. at 490.  *Ring* extended *Apprendi* to capital murder cases.  536 U.S. at 609.   In *federal* death-penalty cases, the government is required to charge by indictment all aggravating factors that it intends to prove at trial that would render a defendant death eligible.  *United States v. Robinson*, 367 F.3d 278, 288, 294 (5th Cir. 2004).   But the Fifth Amendment right to a grand jury indictment was never incorporated into the Fourteenth Amendment requirements imposed on the states. *Albright v. Oliver*, 510 U.S. 266, 272 (1994); *see also Kerr*, 384 F. App'x. at 402–03.

At any rate, Leza cannot avail himself of *Ring* and *Apprendi* because his claim is based on a fallacy—that the Texas special issues are aggravating factors that somehow increase the maximum penalty for capital murder and must therefore be

---

[31]      536 U.S. 584 (2002).

presented in the indictment.  In Texas, the aggravating factors that could render a person death-eligible are found solely in Section 19.03(a) of the Texas Penal Code, and the eligibility determination is made at the guilt phase of trial according to the elements that were alleged in the indictment.  *See Lowenfield v. Phelps*, 484 U.S. 231, 245–46 (1988) (noting that, in Texas, capital-murder aggravating factors are determined at the guilt-innocence phase of trial).   The special issues addressed at the punishment phase have nothing to do with the eligibility determination, but instead are designed to narrow the jury's discretion in making the ultimate decision whether to impose a death sentence.  *See Jurek*, 428 U.S. at 279 (reviewing and upholding the Texas death penalty statutory scheme).  As such, the special issues are not elements of the offense that must be alleged in an indictment and proven beyond a reasonable doubt and do not implicate the Supreme Court's holdings in *Ring* and *Apprendi*.

Indeed, the Fifth Circuit has consistently held that the Texas capital sentencing scheme does not violate *Ring* or *Apprendi*.  *See Granados v. Quarterman*, 455 F.3d 529, 536–37 (5th Cir. 2006); *Rowell*, 398 F.3d at 376–78.  The Fifth Circuit has also held that *Apprendi* is not implicated by Texas's special issues not being pleaded in the indictment.  *Anderson v. Quarterman*, 204 F. App'x. 402, 409 (5th Cir. 2006); *see also Bigby v. Stephens*, 595 F. App'x. 350, 354 (5th Cir. 2014) (summarily denying similar claim).   Likewise, the Supreme Court has never held that the prosecution must plead punishment-phase factors in the indictment.  *See Apprendi*, 530 U.S. at 477 n.3 (refusing to address the indictment issue because the petitioner

did not raise it); *Ring*, 536 U.S. at 597 n.4 (noting that petitioner did not allege constitutional defects in the indictment); *see also United States v. Bourgeois*, 423 F.3d 501, 507 (5th Cir. 2005) (noting that the Supreme Court has yet to hold that non-statutory aggravating factors must be charged in the indictment).

Finally, Leza fails to establish that the state court adjudication resulted in an unreasonable application of Supreme Court precedent, and because there is no such controlling precedent, the relief he seeks is barred under *Teague*.

## XVIII.  Leza's Challenge to Texas's "10-12" Rule Is Meritless (Claim 19).

Leza complains that Texas's "10-12" rule violates the Fifth, Sixth, Eighth, and Fourteenth Amendments because it is arbitrary and misleading in that it fails to inform the jury of the effect of one juror disagreeing with the others when voting on the special issues.  DE 50 at 144–45.  Leza then provides a host of reasons why he considers this rule unconstitutional.  *Id.* at 145–47.  Leza raised this claim on direct appeal, and the CCA denied it holding that it has repeatedly rejected claims that the "10-12" rule results in the arbitrary imposition of the death penalty.  *Leza v. State*, 351 S.W.3d at 361–62.  This decision is not objectively unreasonable.

The Supreme Court has rejected the theory that a trial court's failure to instruct the jury as to the consequences of deadlock gives rise to an Eighth Amendment violation.  *Jones v. United States,* 527 U.S. 373, 381 (1999).  Further, Leza's multifariouas complaints about the "10-12" rule have been rejected on numerous occasions by the Fifth Circuit.  *Davila v. Davis*, 650 F. App'x 860, 871–72 (5th Cir. 2016), *aff'd on other grounds*, 137 S. Ct. 2058 (2017); *Reed*, 739 F.3d at 779;

*Blue*, 665 F.3d at 669–70; *Druery*, 647 F.3d at 542–44; *Greer v. Thaler,* 380 F. App'x. 373, 389 (5th Cir. 2010).  And because the Supreme Court has never held that this particular rule is unconstitutional, Leza is seeking a new rule of law barred under *Teague v. Lane.  Blue*, 665 F.3d at 670.

## XIX.   Leza's Other IATC Claims Are Defaulted and Meritless (Claim 20).

Leza alleges that trial counsel were ineffective for (1) not making an opening statement at guilt-innocence; (2) not objecting to Detective McCampbell's statement about Leza's arrest; (3) not objecting to the "suggestible" out-of-court identification of Leza by the convenience store clerk; and (4) not objecting to gruesome photographs. DE 50 at 147–50.  Leza concedes that only claim 1 is exhausted because it was raised in his initial habeas application.  He argues that the default of the other three claims can be excused due to the ineffectiveness of trial and state habeas counsel.  *Id*. at 147. However, habeas relief should be denied because none of the claims are substantial, and Leza cannot meet the *Martinez/Trevino* exception.

### A.   Opening statement

Leza argues that trial counsel were ineffective for not making an opening statement because "[t]he jury did not hear any evidence as to the defense's theory of the case, if any, until closing argument.  Thus, the jury had no alternate lens in which to view the evidence it received; only the lens offered by the prosecution."  DE 50 at 148.  Here, the state court found that counsel McDonald chose not to make an opening statement because, per his hearing testimony, "he lacked witnesses and a defense." 8 SHCR 2382; *see also* 1 SHRR 193.  The state court concluded that the decision to

waive opening argument is strategic and does not amount to ineffective assistance. 8 SHCR 2382. This decision is not objectively unreasonable.

The Fifth Circuit has long held that the decision whether to present an opening statement falls squarely within "the zone of trial strategy." *Gillard v. Scroggy*, 847 F.2d 1141, 1147 (5th Cir. 1988); *Murray v. Maggio*, 736 F.2d 279, 283 (5th Cir. 1984). Because trial counsel lacked witnesses or a case to rebut that of the State, counsel could not have made a substantive opening argument. This decision should not be second-guessed.

Moreover, Leza's claim is conclusory because he does not present any facts demonstrating how he was prejudiced. For instance, he does not explain what counsel should have specifically said in an opening argument. Further, counsel did attempt to make the case in closing that Trevino, rather than Leza, was responsible for the murder. 16 RR 21–30. Nonetheless, the fact remains that Leza admitted to slitting Allen's throat, he stole her possessions, and the DNA evidence placed him in the apartment. Given these circumstances, the failure to make an opening statement could not have resulted in prejudice. *See Martinez*, 426 F. Supp. 2d at 468–69 (where petitioner has alleged no specific facts showing how his attorney's failure to make an opening statement prejudiced him and where evidence was "overwhelming," there was no "reasonable probability that, but for the failure of petitioner's trial counsel to make an opening statement ..., the outcome of the guilt-innocence phase of petitioner's trial would have been different."). At the very least, the state court's decision is not objectively unreasonable.

## B.     Detective McCampbell's statement

Leza next complains about counsel's failure to object to Detective McCampbell's statement regarding how he obtained an arrest warrant in this case. Detective McCampbell stated: "Basically, I type out my probable cause, the events of the crime, to show that Armando Leza and Dolores Trevino were responsible for the death of Caryl Allen, and then I went and had the warrants signed by a Judge and they were arrested for the offense of murder."  12 RR 105.  Leza argues this statement was prejudicial and impermissible because it indicated McCampbell could "show" Leza and Trevino were responsible for Allen's death and left the impression that a judge had already found Leza was responsible.  DE 50 at 148–49.  This claim is meritless.

Under Texas law, to establish probable cause to arrest, "the evidence must show that at that moment of the arrest the facts and circumstances within the officer's knowledge and of which he had reasonably trustworthy information *were sufficient to warrant a prudent man in believing that the arrested person had committed or was committing an offense.*"  *Parker v. State*, 206 S.W.3d 593, 596 (Tex. Crim. App. 2006) (internal quotations omitted) (emphasis added).  And "[t]he standard of probable cause must be the same as is required for a warrant of arrest." *Knox v. State*, 586 S.W.2d 504, 508 (Tex. Crim. App. 1979) (Roberts, J., concurring) (citing *Whiteley v. Warden*, 401 U.S. 560, 564 (1971)).  Counsel cannot be faulted for failing to object to a detective's statement that conforms to the actual law regarding probable cause.  Again, counsel is not required to make futile objections.

Regardless, Leza cannot demonstrate any prejudice because Leza and Trevino were in fact responsible for Allen's death, as the evidence clearly showed. Detective McCampbell's statement added nothing the jury did not hear. Because this claim is not substantial and because Leza cannot show state habeas counsel should have raised it, he cannot meet the *Martinez/Trevino* equitable exception. Thus, the claim is defaulted.

### C.   Convenience store show up

Leza complains that when the police showed up at the store where Leza and Trevino pawned Allen's possessions, they showed the clerk, Mohamad Chahrour, single photographs of Leza and Trevino. Leza argues that this "lineup" was impermissibly suggestive rather than the typical six-person photo arrays often shown to witnesses for identification purposes. DE 50 at 149–50. He further states: "Leza is Hispanic and Mohamad Chahrour is not. This increases the significant risk of misidentification as people have a more difficult time identifying people from another ethnicity." *Id.* at 150. Thus, he argues counsel should have objected to the "suggestible" out-of-court identification. *Id.*

This claim fails for two reasons. First, even assuming the single photographs were suggestive, this is irrelevant. Chahrour testified that Leza and Trevino were regular customers who came into the store *approximately three times a week for about a year.* He did not know them by name, but he immediately recognized them when they walked in. 13 RR 58–60. Under the circumstances, when the police showed him their photos, 13 RR 62–63, there was no chance for misidentification. *See United*

*States v. Burgos*, 55 F.3d 933, 942 (4th Cir. 1995) ("Here, because the witnesses knew Burgos personally, the chance of misidentification from a concededly suggestive photo display is virtually non-existent."); *see also Manson v. Brathwaite*, 432 U.S. 98, 133 n.14 (1977) ("It should be noted that this was not a case where the witness knew the person whom he saw committing a crime, or had an unusually long time to observe the criminal, so that the identification procedure was merely used to confirm the suspect's identity.") (Marshall, J., dissenting).  Thus, there was no basis for counsel to object.

Second, Charhour merely identified Leza and Trevino as the persons who pawned some items.  Leza's guilt was established by his confession, spontaneous comment to police, the DNA evidence, and stealing Allen's car and setting it on fire.  There is not a reasonable probability that Leza would not have been convicted even if counsel had objected to the photos and obtained a favorable ruling.

**D.    Graphic photos**

Leza claims that trial counsel were ineffective for failing to object to the admission of "four photographs showing the victim's bloody body at the crime scene or bloated face at the autopsy," which Leza argues were prejudicial.  DE 50 at 150.  Leza, however, cites no law for the proposition that crime scene and autopsy photos are inadmissible.  Indeed, Texas law states otherwise.  *See Ripkowski*, 61 S.W.3d at 392 ("Although appellant also claims unfair prejudice, we find that the videotape simply reflects the gruesomeness of the crime—and that is not a sufficient reason for excluding the evidence.").

Moreover, Leza argues that Juror Harris stated she did not want to see graphic photos, could be prejudiced by them, and "the photographs mentioned above no doubt were the type that Harris was speaking of." DE 50 at 150. Thus, the instant claim actually pertains to what Harris stated during voir dire and any potential bias, not the admissibility of the photos. That claim was addressed at length above and has no merit. Further, once counsel accepted Harris as a juror, counsel had no grounds to object to photos he knew Harris would see. Again, counsel is not required to make futile objections.

## XX.  Leza's Claims about the Victim Impact Testimony Are Meritless (Claim 21).

Leza claims as follows: "[T]he trial court failed to instruct the jurors that its consideration of victim impact evidence: (1) should not be considered in connection with the future dangerousness special issue; and (2) did not relieve the State of its burden to prove the 'future dangerousness issue beyond a reasonable doubt.'" He also argues that trial counsel were ineffective for failing to request the court to give these instructions and for failing to object to the victim impact evidence. DE 50 at 151. Regarding the claim of trial court error, the CCA held that the record failed to demonstrate that trial counsel requested any such instruction and that Leza failed to show he was "egregiously harmed" thereby excusing him of his burden of preserving jury charge error. *Leza v. State*, 351 S.W.3d at 361. The CCA then stated: "In any event, as the State points out, we have lately held, on more than one occasion, that a trial court does not err in failing to submit the very instructions [Leza] now contends should have been submitted on appeal. *Id.* (citing *Mays v. State*, 318 S.W.3d 368, 391

& n. 85 (Tex. Crim. App. 2010); *Saldano v. State*, 232 S.W.3d 77, 105–107 (Tex. Crim. App. 2007)).  This decision is not objectively unreasonable.

In *Payne v. Tennessee*, the Supreme Court overruled prior precedent that barred the admission of victim impact evidence.  501 U.S. 808, 827 (1991) ("[I]f the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar.").  The Court held:

> We are now of the view that a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant.  "[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family."

*Id.* at 825 (quoting *Booth v. Maryland*, 482 U.S. 496, 517 (1987) (White, J., dissenting)).  The Court further stated: "In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief."  *Id.*

In short, victim impact testimony is admissible in capital trials.  *See also United States v. Fields*, 483 F.3d 313, 340–41 (2007); *Griffith v. Quarterman*, 196 F. App'x 237, 245 (5th Cir. 2006).  Leza's claim of trial court error is that the trial court should have issued additional instructions that the victim impact evidence should not be considered regarding the future dangerousness special issue.  Leza cites no authority post-*Payne* that requires trial courts to issue such supplemental

instructions. Indeed, as shown, the CCA held that it had previously rejected this argument. Moreover, the Director has located no authority holding that additional instructions regarding victim impact testimony are necessary. Leza's argument, therefore, is barred under *Teague v. Lane*. At the very least, given the absence of precedent, the state court's decision is not contrary to clearly established federal law.

As for Leza's IATC claim, he argues that counsel were ineffective for failing to request additional instructions and for failing to object to improper testimony from Daryl Allen. Leza never raised these claims in any state habeas application. Thus, they are unexhausted, and Leza cannot meet the *Martinez/Trevino* exception to overcome his default.

Regarding the former claim, because state law did not require any further instructions, counsel had no basis on which to object. As stated, counsel is not required to make futile motions or objections.

Regarding the latter claim, as shown in the Statement of Facts, the testimony from the Allen's brother addressed her positive qualities, Allen's children, and the effect of the crime on him and his siblings. 18 RR 90–101. At the end of his testimony, Daryl did state to Leza: "That was my sister, you fool. You coward. That's what you are. You're a damn coward." 18 RR 101. Leza's counsel interjected, Daryl said "excuse me," the court said "it's all right, Mr. Allen," and the questioning ended. 18 RR 101–02. Daryl's testimony was proper under *Payne*, but his opinion or characterization about Leza arguably implicated the Eighth Amendment. *See Bosse v. Oklahoma*, 137 S. Ct. 1, 2–3 (2016) (holding *Payne* did not overrule the portion of

189

*Booth* that characterizations of the defendant and opinions of the sentence are prohibited by the Eighth Amendment). But Leza cannot show how he was harmed or prejudiced by this matter. *See Mitchell v. Esparza*, 540 U.S. 12, 16–17 (2003) (recognizing Eighth Amendment error is subject to a harmless-error analysis). Daryl's comment may have been improper, but it was brief, defense counsel cut him off, and his testimony concluded. Moreover, it pales in comparison to the evidence of Leza's future dangerousness discussed above, particularly the horrific facts of the offense. *See Payne*, 501 U.S. at 832 (noting that while jurors may have been moved by victim impact testimony, "surely this brief statement did not inflame their passions more than did the facts of the crime") (O'Connor, J., concurring). Thus, contrary to Leza's argument, DE 50 at 153, the statement did not render his trial fundamentally unfair, and Leza cannot demonstrate that he was prejudiced by counsel's failure to formally object. For these reasons, the instant claim is defaulted.

## XXI.   Leza's Claim Regarding Elected Judges Is Meritless (Claim 22).

Leza alleges that his constitutional rights were violated because his trial, sentencing, and appellate review were conducted before judges dependent on popular elections. He states: "Judges and justices who are subject to popular election cannot be impartial in any capital case within due process standards because of the threat of removal as a result of unpopular decisions in favor of a capital defendant." DE 50 at 154–55.

Leza, raised this claim on direct appeal, and the CCA held:

[Leza] directs us to nowhere in the record where any such complaints were registered in the trial court, nor have we found any. Nor does he

190

> now offer any justification for treating these arguments as immune from ordinary principles of procedural default, in contemplation of the framework for error preservation elaborated in *Marin v. State*.[32]  For this reason, we regard his arguments under this point of error as inadequately briefed and decline to reach their merits.

*Leza v. State*, 351 S.W.3d at 358 (footnote in original and footnotes omitted).  The Fifth Circuit has held that the CCA's rejection of a claim as inadequately briefed is an adequate and independent state procedural rule barring federal habeas relief. *Roberts v. Thaler*, 681 F.3d 597, 606–08 (5th Cir. 2012).  Further, Leza fails to overcome his default via the cause and prejudice standard of *Coleman* because he does not address the default in his petition. DE 50 at 154–55. This claim is, therefore, barred from federal habeas review.

At any rate, Leza's claim has no merit.  Leza does not argue actual bias on the part of the judges.  Instead, his claim is premised solely on the fact that judges are elected.  Thus, he is arguing bias must be presumed based on that factor alone.  The Fifth Circuit has recognized that the Supreme Court has found presumptive judicial bias in only three situations:

> (1) the decision maker has a direct personal, substantial, and pecuniary interest in the outcome of the case; (2) an adjudicator has been the target of personal abuse or criticism from the party before him; and (3) a judicial or quasi judicial decision maker has the dual role of investigating and adjudicating disputes and complaints.

*Buntion v. Quarterman*, 524 F.3d 664, 672 (5th Cir. 2008) (quoting *Bigby v. Dretke*, 402 F.3d 551, 559 (5th Cir. 2005) (citing Supreme Court cases)).  A judge being elected is obviously not among these situations.  Moreover, Leza does not cite any case law

---

[32]     851 S.W.2d 275 (Tex. Crim. App. 1993).

to support his argument that bias must be presumed where the judge is elected.  And because the Supreme Court has never reached that conclusion, Leza's claim is *Teague*-barred.  For these reasons, Leza's claim must be denied.

## XXII. Leza's Conflict-of-Interest Claim Is Not Cognizable on Federal Habeas Review and Meritless (Claim 23).

Leza alleges that his constitutional rights were violated by a conflict of interest occurring on state habeas review.  He argues that Jay Brandon, who previously represented him in his original habeas proceeding, left mid-stream to take a job with the Bexar County District Attorney's Office.  Brandon was replaced by Michael Gross as habeas counsel.  Nonetheless, Leza argues that during Brandon's transition, he signed and filed the original habeas application.  Because Brandon was joining the office opposing Leza, Leza claims Brandon's actions amounted to a conflict of interest. DE 50 at 155–56.  This claim is not cognizable and meritless.

Leza's claim is not cognizable for two reasons.  First, it is settled that infirmities in state habeas proceedings provide no basis for federal habeas relief. *Kinsel v. Cain*, 647 F.3d 265, 273 (5th Cir. 2011); *Trevino v. Johnson*, 168 F.3d 173, 180 (5th Cir. 1999).  Second, Leza had no constitutional right to state habeas counsel, much less conflict-free counsel.  *See Coleman*, 501 U.S. at 752; *Murray v. Giarratano*, 492 U.S. 1, 7–10 (1989); *Beazley v. Johnson*, 242 F.3d 248, 271 (5th Cir. 2001).

Moreover, Leza fails to show that state habeas counsel had a conflict of interest.  *See Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980).  Jay Brandon was appointed counsel on June 9, 2009.  DE 8-2.  In January of 2011, he informed the trial court that he would be taking a job with the district attorney's office at the end of the

month.  DE 8-5.  He also informed the court that he would be able to finish writing the writ application before then, but he requested appointment of new counsel who would continue to represent Leza in the future.  *Id*.  Leza's writ application was filed on April 26, 2011, and was signed by both Brandon and Leza's newly appointed counsel Michael Gross.  1 SHCR 126.  Gross alone signed the April 26th statement swearing that all allegations of fact in the writ were true and correct.  1 SHCR 127.

On February 27th, the Bexar County District Attorney's Office filed a motion to recuse itself from the case and appoint a district attorney pro tem.  5 SHCR 1580–83.  The motion informed the trial court that "Mr. Gross filed the application in the instant court" and that Jay Brandon had withdrawn from representation of Leza.  5 SHCR 1581.  The motion explained that recusal was not necessary, but that the district attorney believed it was appropriate.  5 SHCR 1581–82.  Michael Gross represented Leza at the state habeas hearing.  1 SHRR 2.  There is no indication that Brandon worked on drafting the application at any time after he began work at the district attorney's office or that he had any conflict while he was representing Leza.  Further, it is clear from the record that Mr. Gross represented Leza at least from the time the state habeas application was filed through its adjudication by the CCA.  Accordingly, Leza fails to show any conflict provided good cause for his failure to exhaust claims in state court.

## XXIII. Leza's Cumulative-Error Claim Is Procedurally Defaulted and Meritless (Claim 24).

In his final claim, Leza alleges that he is entitled relief based on the cumulation of all the alleged errors discussed above.  DE 50 at 156–57.  Leza raised

this claim in his state habeas application dismissed for abuse of the writ.  1 SHCR2 180–81.  Thus, it is defaulted.  And because Leza does not address the default in his petition, he fails to show cause and prejudice under *Coleman* to overcome his default.

Further, as explained in Sections III, C, 5, and XIII, C, 5, *supra*, when none of the alleged errors are of constitutional dimension, there is nothing to cumulate. Because Leza has failed to show he is entitled to relief on any claim, his claim of cumulative error necessarily fails.

## CONCLUSION

For the foregoing reasons, the Director respectfully requests that this Court deny Leza's petition for federal habeas relief, deny his requests for an evidentiary hearing, and deny a COA.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

MARK PENLEY
Deputy Attorney General for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

/s/ Erich Dryden

ERICH DRYDEN*

*Lead Counsel                    Assistant Attorney General
                                 State Bar No. 24008786

                                 P. O. Box 12548, Capitol Station
                                 Austin, Texas 78711
                                 (512) 936-1400
                                 (512) 936-1280 (Facsimile)

                                 ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF SERVICE

I do hereby certify that a copy of the above and foregoing Answer has been served electronically to Bradley Levenson, Erik Guenther, and Katherine Tanaka, counsel for Petitioner, on this the 19th day of March, 2020.

/s/ Erich Dryden

ERICH DRYDEN
Assistant Attorney General